## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| RSB SPINE, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 19-1515-RGA |
| | ) | |
| DEPUY SYNTHES SALES, INC., and | ) | **JURY TRIAL DEMANDED** |
| DEPUY SYNTHES PRODUCTS, INC. | ) | |
| | ) | |
| Defendants. | ) | |

## FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff RSB Spine, LLC ("RSB" or "Plaintiff") hereby asserts claims against DePuy Synthes Sales, Inc. and DePuy Synthes Products, Inc. ("DePuy" or "Defendants") for infringement of U.S. Patent Nos. 6,984,234 ("the '234 Patent") and 9,713,537 ("the '537 Patent") and alleges as follows:

## NATURE OF THE ACTION

1.     This is an action for patent infringement arising under the Patent Laws of the United States, 35 U.S.C. § 1 *et seq.*

## THE PARTIES

2.     RSB is a limited liability company organized and existing under the laws of Delaware with its principal place of business at 2530 Superior Avenue # 703, Cleveland, OH 44114.

3.     Upon information and belief, Defendants are corporations organized and existing under the laws of Delaware with their places of business at 325 Paramount Drive, Raynham, Massachusetts, 02767.

4.      Upon information and belief, DePuy manufactures and distributes spinal therapy products, including anterior lumbar interbody fusion (ALIF) devices.

5.      Upon information and belief, DePuy sells and offers to sell products and services throughout the United States, including in this judicial district, and introduces products and services into the stream of commerce and that incorporate infringing technology knowing that they would be sold in this judicial district and elsewhere in the United States.

## JURISDICTION AND VENUE

6.      This is an action for patent infringement arising under the Patent Laws of the United States, Title 35 of the United States Code.

7.      This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a).

8.      Venue is proper in this judicial district under 28 U.S.C. § 1400(b).

9.      DePuy is subject to this Court's general and specific personal jurisdiction because it is incorporated in Delaware and has purposely availed itself of the privileges and benefits of the laws of the State of Delaware.  Further, upon information and belief, DePuy has sufficient minimum contacts within the State of Delaware because DePuy purposefully availed itself of the privileges of conducting business in the State of Delaware, DePuy regularly conducts and solicits business within the State of Delaware, and RSB's causes of action arise directly from DePuy's business contacts and other activities in the State of Delaware.

## BACKGROUND

### RSB and Its Spinal Stabilization Devices

10.      RSB Spine, LLC, was formed in 2001 as R&B Surgical Solutions ("R&B") by John A. Redmond ("Redmond") and Robert S. Bray, Jr., M.D. ("Dr. Bray") to develop and market spinal implant concepts from Dr. Bray and other innovative spine surgeons.

2.

11.    Dr. Bray, the sole inventor on the asserted patents, is currently the Director of St. Johns Spine Institute in Santa Monica, California, was the Founding Director of The Institute for Spinal Disorders for Cedars Sinai, and founded a Multidisciplinary Outpatient Center, D.I.S.C. (Diagnostic and Interventional Spinal Care).

12.    Dr. Bray was a Major in the United States Air Force and served as the Chief of Neurosurgery at Travis Air Force Base.  Dr. Bray has been awarded eight U.S. patents for spinal implants and neurosurgical instruments, with several more applications pending, and has performed more than 7,500 spinal surgeries, including using devices covered by the asserted patents.

13.    R&B's strategy was to use the instrument line to generate revenue and build distribution while the novel implants were being developed.  In 2003, R&B sold its instrument line.  As a condition of sale, the company changed its name to RSB Spine, LLC.

14.    Proceeds of the sale provided the requisite capital to launch the company's first implant system.

15.    In August 2006, the FDA approved RSB's InterPlate™ product, as a vertebral body replacement.  The InterPlate™ product is a platform technology for performing fusion procedures in the lumbar and cervical spine.  The InterPlate™ implants, made from both titanium and polyetheretherketone (PEEK), offer surgeons a very unique and different option as compared with existing plates and interbody devices.

16.    In July 2007, the FDA reclassified interbody fusion devices and as of September 18, 2007 the InterPlate™ became the first device cleared for interbody fusion under the new guidelines.

17.     The current InterPlate™, sold for use in the cervical and lumbar spine, is made of titanium and is used in conjunction with graft material for fusion of adjacent vertebral bodies.

18.     RSB's products are exclusively distributed by Paradigm BioDevices in the United States.

19.     RSB and Paradigm BioDevices provide public notice in compliance with 35 U.S.C. § 287 that the InterPlate™ products incorporate the invention of, among others, U.S. Patent Nos. 6,984,234 and 9,713,537 (the "Asserted Patents").  The product packaging, product inserts and RSB's website identify RSB's patents, including the Asserted Patents.

**RSB Patents**

20.     The spinal column of vertebrates provides support to bear weight and protection to the delicate spinal cord and spinal nerves.  The spinal column comprises a series of vertebrae stacked on top of each other.  There are typically seven cervical (neck), twelve thoracic (chest), and five lumbar (low back) segments.  Each vertebra has a cylindrical shaped vertebral body in the anterior portion of the spine with an arch of bone to the posterior which covers the neural structures.  Between each vertebral body is an intervertebral disk, a cartilaginous cushion to help absorb impact and dampen compressive forces on the spine.  To the posterior, the laminar arch covers the neural structures of the spinal cord and nerves for protection.  At the junction of the arch and anterior vertebral body are articulations to allow movement of the spine.

21.     Various types of problems can affect the structure and function of the spinal column.  These can be based on degenerative conditions of the intervertebral disk or the articulating joints, traumatic disruption of the disk, bone or ligaments supporting the spine, tumor or infection.  In addition congenital or acquired deformities can cause abnormal angulation or slippage of the spine.  Slippage (spondylolisthesis) anterior of one vertebral body on another can

cause compression of the spinal cord or nerves.  Patients who suffer from one of more of these conditions often experience extreme and debilitating pain, and can sustain permanent neurologic damage if the conditions are not treated appropriately.

22.      One technique for treating these disorders is known as surgical arthrodesis of the spine.  This can be accomplished by removing the intervertebral disk, replacing it with bone and immobilizing the spine to allow the eventual fusion or growth of the bone across the disk space to connect the adjoining vertebral bodies together.  The stabilization of the vertebra to allow fusion is often assisted by a surgically implanted device to hold the vertebral bodies in proper alignment and allow the bone to heal, much like placing a cast on a fractured bone.  Such techniques have been effectively used to treat the above described conditions and in most cases are effective at reducing the patient's pain and preventing neurologic loss of function.  However, there are disadvantages to these stabilization devices.

23.      The invention of the Asserted Patents relate to medical stabilization devices, used to repair or alleviate these types of injuries to the spine.

24.      Dr. Bray's inventions overcame disadvantages of prior stabilization devices, systems and methods as well as the tools then available to implant them.  The disadvantages of prior art stabilization devices included the inability to properly affix the device to the spine and the inability for the device to properly bear the weight of adjacent vertebral bodies.

The '234 Patent

25.      RSB is the assignee and owner of the right title and interest in and to the `234 Patent having acquired those rights on October 10, 2005, including the right to assert all causes of action arising under the '234 Patent and the right to any remedies for infringement, including remedies for past infringements.

26.     The '234 Patent, entitled "Bone Plate Stabilization System and Method for its Use," was issued by the United States and Patent Trademark Office on January 10, 2006.  The '234 Patent issued from United States Patent Application No. 10/419,652, filed on April 21, 2003.  A copy of the '234 Patent is attached as **Exhibit A**.

27.     The inventions of the '234 Patent are generally directed to a bone plate system that is particularly useful for assisting with the surgical arthrodesis (fusion) of two bones together, and more particularly, to a bone plate that provides and controls limited movement between the bones during fusion.

28.     The '234 Patent is valid, enforceable and duly issued in full compliance with Title 35 of the United States Code.

The '537 Patent

29.     RSB is the assignee and owner of the right of title and interest in and to the '537 Patent, having acquired those rights on January 23, 2017, including the right to assert all causes of action arising under the '537 Patent and the right to any remedies for infringement, including remedies for past infringement.

30.     The '537 Patent, entitled "Bone Plate Stabilization System and Method For Its Use," was issued by the United States and Patent Trademark Office on July 25, 2017.  The '537 Patent issued on United States Patent Application No. 15/413,945, filed on January 24, 2017.  A copy of the '537 Patent is attached as **Exhibit B**.

31.     The '537 Patent is valid, enforceable, and duly issued in full compliance with Title 35 of the United States Code.

**DePuy's Knowledge of the '234 Patent**

32.     On or about May 27, 2003, the Director of Business Development for Synthes Spine, Inc. ("Synthes"), Glenn Kenney ("Kenney"), sent an e-mail to RSB seeking a meeting between RSB CEO John Redmond, Dr. Bray, the Synthes Vice President of Product Development, and members of the Synthes Cervical Group to discuss RSB's products and a potential licensing arrangement.  A copy of the May 27, 2003 e-mail is attached as **Exhibit C**.

33.     Kenney requested additional information on the RSB InterPlate and SmartPlate implants, including "sketches, testing info, technique guide, drawings, [and a] prototype."  Kenney also attached a product questionnaire for RSB to complete prior to the meeting. A copy of the product questionnaire is attached as **Exhibit D**.

34.     Kenney sent a follow-up e-mail on June 27, 2003 once again requesting the aforementioned information prior to the meeting.  He further requested that Dr. Bray perform a demonstration of the SmartPlate and InterPlate implants in Synthes' on-site cadaver lab as part of the meeting.  A copy of the June 27, 2003 e-mail is attached as **Exhibit E**.

35.     On or about July 21, 2003, RSB and Synthes signed a non-disclosure agreement. John Redmond, Dr. Bray, and Synthes employees met to discuss the SmartPlate and the InterPlate implants.  RSB provided Synthes with the requested information on the SmartPlate and InterPlate, including a completed questionnaire, and Dr. Bray performed a demonstration of the SmartPlate and InterPlate in Synthes' cadaver lab.

36.     In a follow-up e-mail dated July 22, 2003 between Redmond and Kenney, Redmond stated:

> I am going to send you a package that includes the details of the bio-mechanical testing on both the SmartPlate and the InterPlate. I am also going to send the opinion letter from our regulatory consultant on the 510k potential for the InterPlate.  ***We are checking with our attorney on what we can send you on the patent apps for both products.*** He had warned us before the meeting about some issue

7.

with attorney/client stuff, because I wanted to give you his opinion
on non-infringement of our SmartPlate. He did not want us showing
this letter to too many people.

(emphasis added.)  A copy of the July 22, 2003 e-mail is attached as **Exhibit F**.

37.      At the time of the July 22, 2003 e-mail, United States Patent Application No. 10/419,652, from which the '234 Patent issued, had already been filed.

38.      In August 2003, RSB provided Synthes with, among other things, drawings of the SmartPlate components, Sawbones models with the SmartPlate and InterPlate implanted, and prototypes of the SmartPlate and InterPlate.  Synthes later returned these materials to RSB.

39.      On or about September 2003, Kenney e-mailed RSB confirming that Synthes would destroy RSB's proprietary material per the companies' nondisclosure agreement.  Kenney noted that the nondisclosure agreement permitted a copy of RSB's written materials for Synthes' records.

40.      Synthes did not enter into a licensing agreement with RSB for either the SmartPlate or InterPlate thereafter.

41.      On information and belief, in May 2007, Synthes expressed an interest in licensing or purchasing the '234 Patent.  On information and belief, representatives from RSB and Synthes discussed the possibility of a limited license but did not enter into an agreement.

42.      On information and belief, starting in April 2007, DePuy Spine, Inc. and RSB engaged in discussions regarding RSB's InterPlate product.  Specifically, the Group Product Director for Cervical Devices for DePuy Spine, Inc., Bill McGattigan, contacted Redmond seeking sample sets of implants and instruments for the InterPlate.

43.      On information and belief, DePuy Spine, Inc. and RSB continued discussions regarding possible licensing of the InterPlate into 2008.  DePuy Spine, Inc. and RSB signed a non-disclosure agreement on or about December 12, 2008 connected to a "possible business relationship."

44.     DePuy Spine, Inc. did not enter into a licensing agreement with RSB for the InterPlate thereafter.

45.     On or about April 27, 2011, Johnson and Johnson acquired Synthes Spine, Inc. in a merger agreement, integrating Synthes Spine, Inc. with former DePuy Spine, Inc. to form DePuy Synthes, Inc.

**The Accused Products**

46.     DePuy's Zero-P VA Spacer is illustrated below.

   

47.     The Zero-P VA Spacer is a stand-alone implant for use in cervical interbody fusion, combining the functionality of a cervical interbody spacer and benefits of an anterior cervical plate.  Purported benefits of the Zero-P VA Spacer include a zero-profile midline, two variable angle screws, and contra-lateral added to the interbody plate to prevent over insertion to the posterior direction during initial insertion and during final tightening.

48.     DePuy's Zero-P Spacer is illustrated below.

   

49.     The Zero-P Spacer is a stand-alone anterior cervical body fusion device designed

to combine the functionality and benefits of a cervical interbody spacer and an anterior cervical plate.  Unlike traditional anterior plating systems, the Zero-P Spacer does not extend beyond the confines of the intervertebral disc space.  The Zero-P Spacer includes four rigid locking screws for fixation into adjacent vertebral bodies.

50.     DePuy's Zero-P Natural Plate is illustrated below.



51.     The Zero-P Natural Plate is designed for use with an allograft spacer that offers structural support and fusion potential.  The Zero-P Natural Plate is assembled outside of the operating field, allowing for simultaneous insertion into the disc space during anterior cervical discectomy fusion (ACDF) procedures.  The Zero-P Natural Plate is anchored by four locking screws, which form a rigid bone wedge for stability.

52.     DePuy's Synfix-LR System is illustrated below.



53.     The Synfix-LR System includes a standalone ALIF device that incorporates the benefits of an anterior plate and a radiolucent interbody spacer.  The design creates a zero-profile construct and includes four locking screws that provide anterior fixation and stability.

54.     DePuy's Synfix Evolution System is illustrated below.



55.     The Synfix Evolution System is designed for standalone ALIF surgery.  The design includes a PEEK spacer, a titanium zero-profile plate, and a quartet of divergent locking screws.

56.     The Zero-P VA Spacer is herein referred to as the "Accused Zero-P VA Product". The Zero-P VA Spacer, Zero-P Spacer, Zero-P Natural Plate, Synfix-LR System, and Synfix Evolution System are herein referred to as the "Accused Products".

### COUNT I – INFRINGEMENT OF U.S. PATENT 6,984,234

57.     RSB realleges and incorporates by reference the allegations set forth in the foregoing paragraphs 1 through 56 of the First Amended Complaint as though fully set forth herein.

58.     Upon information and belief, DePuy has infringed and continues to infringe directly and indirectly, literally and under the doctrine of equivalents, at least claims 1, 22, 35, and 40 of the '234 Patent by making, using, selling, and/or offering for sale the Accused Zero-P VA Product.

59.     Claim 1 of the '234 Patent claims a novel method for joining first and second bones with the following limitations:

> inserting between the side surfaces of the bones a base plate having a first end nearer the first bone and a second end nearer the second bone, wherein the base plate has a first screw hole extending through the first end and a second screw hole extending through the second end;
>
> introducing a first bone screw through the first screw hole and into the first bone, wherein the first bone screw is introduced at an angle relative to the top surface of the bone ranging from about 20° to about 60°,
>
> introducing a second bone screw through the second screw hole and into the second bone, wherein the second bone screw is introduced

at an angle relative to the top surface of the bone ranging from about 20° to about 70°, and

covering at least a part of the first bone screw and at least a part of the second bone screw to prevent the first and second bone screws from backing out of the first and second bones, respectively.

60.     The use of the Accused Zero-P VA Product meets each of the above limitations. *See, e.g.,* **Exhibit G**.

61.     The Accused Zero-P VA Product is used to join adjacent bones having top surfaces and side surfaces generally facing each other.

62.     The Accused Zero-P VA Product includes a base plate that is inserted between the side surfaces of the adjacent bones.  The base plate has a first end nearer the first bone and a second end nearer the second bone.  The base plate has a first screw hole extending through the first end and a second screw hole extending through the second end.

63.     To secure the Accused Zero-P VA Product, a first bone screw is inserted through the first screw hole and into the first bone and a second bone screw is inserted through the second screw hole and into the second bone, at an angle relative to the top surface of the bone between 20 and 60 degrees and between 20 and 70 degrees, respectively.

64.     Part of the first bone screw and part of the second bone screw are covered to prevent the bone screws from backing out of the bones.

65.     Claim 22 of the '234 Patent claims a novel bone stabilization plate system with the following limitations:

a base plate having bottom surface and first and second ends, the first end comprising a first bone screw region having a first bone screw hole extending therethrough at an angle relative to the bottom surface of the base plate ranging from about 20° to about 60°, and the second end comprising a second bone screw region having a second bone screw hole extending therethrough at an angle relative

to the bottom surface of the base plate ranging from about 20° to about 70°;

a first bone screw capable of securing the base plate to a first bone by insertion through the first bone screw hole;

a second bone screw capable of securing the base plate to a second bone by insertion through the second bone screw hole; and

a bone screw retaining means for securely covering at least a part of the first and second bone screws to prevent the bone screws from backing out from the first and second bones.

66.     The Accused Zero-P VA Product contains each of the above limitations.  *See, e.g.,* **Exhibit G**.

67.     The Accused Zero-P VA Product includes a base plate having first and second ends and respective bone screw regions including bone screw holes extending therethrough.  A first bone screw hole extends at an angle of 20 to 60 degrees relative to the bottom surface of the base plate and a second bone screw hole extends at an angle from 20 to 70 degrees relative to the bottom surface of the base plate.

68.     The Accused Zero-P VA Product includes first and second bone screws capable of securing the base plate to the first and second bones, respectively.

69.     The Accused Zero-P VA Product includes bone screw retaining means for securely covering at least part of the first and second bone screws to prevent the bone screws from backing out of the first and second bones.

70.     Claim 35 of the '234 Patent claims a novel bone stabilization plate system with the following limitations:

a base plate for retaining bone graft material between first and second longitudinally-aligned, adjacent bone bodies and for permitting force transmission between the first and second bone bodies through the bone graft material,

the base plate being sized to have an inter-fit between the first and second adjacent bone bodies and adjacent to lateral extents of the bone graft material such that the first and second bone bodies engage the bone graft material, and

at least first and second bone screws for extending into the first and second bone bodies, respectively, to retain the base plate between the first and second bone bodies,

the base plate having means for interacting with the first and second bone screws, the means for interacting including means for permitting movement of at least one of the first and second bone bodies relative to the base plate.

71.     The Accused Zero-P VA Product contains each of the above limitations.  *See, e.g.,* **Exhibit G**.

72.     The Accused Zero-P VA Product includes a base plate for retaining bone graft material between first and second longitudinally-aligned, adjacent bone bodies and for permitting force transmission between the first and second bone bodies through the bone graft material.

73.     The base plate is sized to have an inter-fit between the first and second adjacent bone bodies and adjacent to lateral extents of the bone graft material such that the first and second bone bodies engage the bone graft material.

74.     The Accused Zero-P VA Product has first and second bone screws for extending into the first and second bone bodies.

75.     The base plate has a means for permitting movement of at least one of the first and second bone bodies relative to the base plate.

76.     Claim 40 of the '234 Patent claims a novel bone stabilization plate system with the following limitations:

[A] U-shaped base plate for positioning onto bone graft material placed at a location between first and second longitudinally aligned, adjacent bone bodies and for retaining the bone graft material at the location between the first and second bone bodies,

14.

the base plate being sized to have an inter-fit between the first and second adjacent bone bodies and adjacent to lateral extents of the bone graft material,

wherein each of the bone bodies has an outwardly-facing surface and each of the bone bodies has a side surface facing toward the side surface of the other bone body,

the base plate having a first end portion adjacent to the first bone body, the first end portion having an outwardly-facing surface for location at a position recessed relative to the outwardly-facing surface of the first bone body, the first end portion having a first screw hole that opens toward the side surface of the first bone body,

the base plate having a second end portion that has a second screw hole that opens toward the second bone body, and at least first and second bone screws for extending through the first and second holes into the first and second bone bodies, respectively, each at an angle that is non-orthogonal to the longitudinal alignment of the first and second bone bodies.

77.     The Accused Zero-P VA Product contains each of the above limitations.  *See, e.g.,* **Exhibit G**.

78.     The Accused Zero-P VA Product has a U-shaped base plate for positioning bone graft material between first and second longitudinally-aligned, adjacent bone bodies and for retaining the bone graft material at the location between the first and second bone bodies.

79.     The base plate is sized to have an inter-fit between the first and second adjacent bone bodies and adjacent to lateral extents of the bone graft material.

80.     The base plate has a first end portion adjacent to the first bone body, the first end portion having an outwardly-facing surface for location at a position recessed relative to the outwardly-facing surface of the first bone body. The first portion has a first screw hole that opens toward the side surface of the first bone body.

81.     The base plate also has a second end portion that has a second screw hole that opens toward the second bone body.

82.     The Accused Zero-P VA Product further has two bone screws that extend through the first and second bone screw holes into the first and second bone bodies, respectively, each at an angle that is non-orthogonal to the longitudinal alignment of the first and second bone bodies.

83.     Upon information and belief, DePuy markets and sells the Accused Zero-P VA Product in the United States to its partners, clients, customers, and end users who use the Accused Zero-P VA Product across the country and in this District.

84.     Upon information and belief, since at least July 22, 2003, DePuy has induced and continues to induce others to infringe at least one claim of the '234 Patent under 35 U.S.C. § 271(b) by, among other things, actively aiding and abetting others to infringe with specific intent or willful blindness, such others including, but not limited to, DePuy's partners, clients, customers, and end users, whose use of the Accused Zero-P VA Product constitutes direct infringement of at least one claim of the '234 Patent.

85.     In particular, DePuy's actions that aid and abet others such as its partners, clients, customers and end users to infringe include advertising and distributing the Accused Zero-P VA Product and providing instruction materials, training, and services regarding the Accused Zero-P VA Product.

86.     Upon information and belief, DePuy is liable for contributory infringement of the '234 Patent under 35 U.S.C. § 271(c) for offering to sell and selling in the United States Accused Zero-P VA Product to be especially made or adapted for use to infringe the '234 Patent. The Accused Zero-P VA Product is a material component for use in practicing the '234 Patent, is

specifically made, and is not a staple article of commerce suitable for substantial non-infringing use.

87.     As a consequence of each of DePuy's direct and indirect infringements, both literal and under the doctrine of equivalents, of the '234 Patent, RSB has been, and continues to be, damaged in an amount not yet determined and is entitled to recover damages pursuant to 35 U.S.C. § 284.

88.     Upon information and belief, DePuy's infringement of the '234 Patent will continue in the future, and RSB will continue to suffer damages, as a consequence, unless DePuy's infringing acts are enjoined by this Court.

89.     Upon information and belief, DePuy's infringement of the '234 Patent has been, and continues to be, willful. Since at least July 22, 2003, DePuy knew of the '234 Patent and knew it was infringing the '234 Patent.

## COUNT II – INFRINGEMENT OF U.S. PATENT 9,713,537

90.     RSB realleges and incorporates by reference the allegations set forth in the foregoing paragraphs 1 through 89 of the First Amended Complaint as though fully set forth herein.

91.     Upon information and belief, DePuy has infringed and continues to infringe directly and indirectly, literally and under the doctrine of equivalents, at least claims 1, 15, and 21 of the '537 Patent by making, using, selling, and/or offering for sale the Accused Products.

92.     Claim 1 of the '537 Patent claims a novel bone stabilization system with the following limitations:

> a base plate having a top surface, first and second ends, a bottom surface, and a plurality of bone screw holes, wherein the base plate is configured to fit primarily between anterior portions of adjacent vertebral bones' lip osteophytes to bear weight to hold the vertebral bones while sharing weight with bone graft material for fusion; and

a plurality of bone screws configured to fit in the plurality of bone screw holes, respectively;

wherein the vertebral bones have top surfaces and have side surfaces generally facing each other;

wherein a first of the bone screw holes, being configured to receive a first of the bone screws, extends at least partially from the top surface of the base plate and opens at least partially toward the side surface of a first of the vertebral bones;

wherein a second of the bone screw holes, being configured to receive a second of the bone screws, extends at least partially from the top surface of the base plate and opens at least partially toward the lip osteophyte of a second of the vertebral bones; and

wherein each and every one of the plurality of bone screw holes is configured to receive one of the bone screws angled relative to the base plate and oriented generally in an anterior-posterior direction through at least partially the top surface of the base plate.

93.     The Accused Products contain each of the above limitations. *See, e.g.,* **Exhibit H**.

94.     The Accused Products are each bone stabilization systems with base plates having a top surface, a bottom surface, and more than one bone screw hole.

95.     The Accused Products further include base plates configured to fit primarily between anterior portions of adjacent vertebral bones' lip osteophytes to bear weight to hold the vertebral bones while sharing weight with bone graft material for fusion.

96.     The Accused Products have multiple bone screws configured to fit in multiple bone screw holes.  The vertebral bones have top surfaces and have side surfaces generally facing each other.

97.     The Accused Products have a first of the bone screw holes, configured to receive a first of the bone screws that extends at least partially from the top surface of a base plate and opens at least partially toward the side surface of a first of the vertebral bones.

18.

98.     The Accused Products also have a second of the bone screw holes, configured to receive a second of the bone screws that extends at least partially from the top surface of a base plate and opens at least partially toward the lip osteophyte of a second of the vertebral bones.

99.     The Accused Products have bone screw holes configured to receive one of the bone screws angled relative to a base plate and oriented generally in an anterior-posterior direction through at least partially the top surface of the base plate.

100.    Claim 15 of the '537 Patent claims a novel bone stabilization plate system with the following limitations:

> a base plate having a plurality of bone screw holes, a top surface, a generally flat bottom surface and first and second ends for retaining bone graft material between adjacent vertebral bone bodies having top surfaces and having side surfaces generally facing each other,
>
> wherein the base plate is configured to fit primarily between anterior portions of the bone bodies' lip osteophytes, without covering significant portions of the top surfaces of the bone bodies, to primarily bear weight, and to permit force transmission between the bone bodies through the bone graft material while holding the bone bodies for fusion; and
>
> a plurality of bone screws configured for insertion through the plurality of corresponding bone screw holes to anchor primarily into the lip osteophytes, with each of the bone screws being configured to extend from at least partially the top surface of the base plate to at least partially the side surface of one of the bone bodies, such that the base plate is secured.

101.    The Accused Products contain each of the above limitations.  *See, e.g.,* **Exhibit H**.

102.    The Accused Products include a base plate having a plurality of bone screw holes and retain bone graft material between adjacent vertebral bone bodies.  The base plate fits between anterior portions of the bone bodies' lip osteophytes without covering significant portions of the top surfaces of the bone bodies.

103.    The base plate bears weight and permits force transmission between the bone bodies through the bone graft material while holding the bone bodies for fusion.

104.    The Accused Products include a plurality of bone screws configured for insertion through the plurality of corresponding bone screw holes to anchor primarily into the lip osteophytes, with each of the bone screws being configured to extend from at least partially the top surface of the base plate to at least partially the side surface of one of the bone bodies, such that the base plate is secured.

105.    Claim 21 of the '537 Patent claims a novel bone stabilization plate system for anchoring between side surfaces of first and second adjacent vertebral bones with the following limitations:

> a base plate having a top surface, a first end nearer the first bone comprising a first bone screw hole extending at least partially therethrough and a first bone engaging region fully extending uninterrupted between lateral extents of the first end, a second end nearer the second bone comprising a second bone screw hole extending at least partially therethrough, and a bottom surface, and configured to fit primarily between an anterior portion of the first bone's lip osteophyte and an anterior portion of the second bone's lip osteophyte while bearing weight to hold the bones for fusion; and
>
> a first bone screw configured to secure the base plate to the first bone by insertion through the first bone screw hole and to extend from at least partially the top surface of the base plate to at least partially the side surface of the first bone, and a second bone screw configured to secure the base plate to the second bone by insertion through the second bone screw hole and to extend from at least partially the top surface of the base plate to at least partially the side surface of the second bone.

106.    The Accused Products contain each of the above limitations. *See, e.g.,* **Exhibit H**.

107.    The Accused Products anchor between side surfaces of a first and second adjacent vertebral bone.

108.    The Accused Products are designed to include a base plate having a top surface, a first end nearer to the first bone with a first bone screw hole extending at least partially therethrough and a first bone engaging region fully extending uninterrupted between lateral extents of the first end and, a second end nearer the second bone with a second bone screw hole extending at least partially therethrough, and a bottom surface.

109.    The base plate of the Accused Products is also configured to fit primarily between an anterior portion of a first bone's lip osteophyte and an anterior portion of a second bone's lip osteophyte while bearing weight to hold bones for fusion.

110.    The first bone screw is configured to secure the base plate to the first bone by insertion through the first bone screw hole and to extend from the top surface of the base plate to the side surface of the first bone.

111.    The second bone screw is configured to secure the base plate to the second bone by insertion through the second bone screw hole and to extend from the top surface of the base plate to the side surface of the second bone.

112.    Upon information and belief, DePuy markets and sells the Accused Products in the United States to its partners, clients, customers, and end users who use the Accused Products across the country and in this District.

113.    Upon information and belief, since at least the date of the filing of the original Complaint, DePuy has induced and continues to induce others to infringe at least one claim of the '537 Patent under 35 U.S.C. § 271(b) by, among other things, actively aiding and abetting others to infringe with specific intent or willful blindness, such others including, but not limited to, DePuy's partners, clients, customers, and end users, whose use of the Accused Products constitute direct infringement of at least one claim of the '537 Patent.

114.    In particular, DePuy's actions that aid and abet others such as its partners, clients, customers and end users to infringe include advertising and distributing the Accused Products and providing instruction materials, training, and services regarding the Accused Products.

115.    Upon information and belief, DePuy is liable for contributory infringement of the '537 Patent under 35 U.S.C. § 271(c) by offering to sell and selling in the United States the Accused Products to be especially made or adapted for use to infringe the '537 Patent.  The Accused Products are a material component for use in practicing the '537 Patent, are specifically made, and are not a staple article of commerce suitable for substantial non-infringing use.

116.    As a consequence of each of DePuy's direct and indirect infringements, both literal and under the doctrine of equivalents, of the '537 Patent, RSB has been, and continues to be, damaged in an amount not yet determined and is entitled to recover damages pursuant to 35 U.S.C. § 284.

117.    Upon information and belief, DePuy's infringement of the '537 Patent will continue in the future, and RSB will continue to suffer damages, as a consequence, unless DePuy's infringing acts are enjoined by this Court.

118.    Upon information and belief, DePuy's infringement of the '537 Patent has been, and continues to be, willful. Since at least the date of the filing of the original Complaint, DePuy knew of the '537 Patent and knew it was infringing the '537 Patent.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, RSB demands a trial by jury on all triable issues.

**PRAYER FOR RELIEF**

WHEREFORE, if RSB is unsuccessful securing a reasonable royalty prior to service of this First Amended Complaint, RSB demands judgment for itself and against DePuy as follows:

A.      An adjudication that DePuy has infringed the Asserted Patents;

B.      A permanent injunction against DePuy, its officers, agents, servants, employees, attorneys, parent and subsidiary corporations, assigns and successors in interest, and those persons in active concert or participation with them, enjoining them from continued acts of infringement of the Asserted Patents;

C.      An award of damages to be paid by DePuy adequate to compensate RSB for DePuy's past infringement of the Asserted Patents, and any continuing or future infringement of the Asserted Patents through the date such judgment is entered, including pre-judgment and post-judgment interest, costs, expenses and an accounting of all infringing acts including, but not limited to, those acts presented at trial as well as those acts not presented at trial;

D.      An adjudication that DePuy's infringement has been willful and an award of treble damages;

E.      A declaration that this case is exceptional under 35 U.S.C. § 285, and an award of RSB's reasonable attorneys' fees; and

F.      An award to RSB of such further relief at law or in equity as the Court deems just and proper.

October 1, 2019

/s/ *John C. Phillips, Jr.*

_____

John C. Phillips, Jr. (#110)

OF COUNSEL:

David A. Bilson (#4986)
PHILLIPS, GOLDMAN, MCLAUGHLIN
& HALL, P.A.

Erik B. Milch
Dustin M. Knight
COOLEY LLP
11951 Freedom Drive
One Freedom Square
Reston, VA  20190-5656
(703) 456-8000

1200 North Broom Street
Wilmington, DE 19806
(302) 655-4200
jcp@pgmhlaw.com
dab@pgmhlaw.com

Frank V. Pietrantonio
Rose S. Whelan
Stephen Crenshaw
COOLEY LLP
1299 Pennsylvania Avenue NW, Suite 700
Washington, DC  20004
(202) 842-7800

*Attorneys for Plaintiff*

Joseph M. Drayton
COOLEY LLP
55 Hudson Yards
New York, NY 10001
(212) 479-6000