# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

RSB SPINE, LLC,

          Plaintiff,

    v.

DEPUY SYNTHES SALES, INC., and
DEPUY SYNTHES PRODUCTS, INC.,

        Defendants.

**REDACTED - PUBLIC VERSION**

Civil Action No. 19-1515-RGA

Judge Richard G. Andrews

## DEFENDANTS' OPENING MEMORANDUM IN SUPPORT OF THEIR MOTION TO EXCLUDE CERTAIN OPINIONS AND TESTIMONY OF DOUGLAS KIDDER

*Of Counsel:*

Calvin P. Griffith
Patrick J. Norton
Kenneth S. Luchesi
T. Kaitlin Crowder
**JONES DAY**
North Point
901 Lakeside Avenue
Cleveland, OH  44114-1190
(216) 586-3939

Dated: June 23, 2022

ASHBY & GEDDES
John G. Day (#2403)
Andrew C. Mayo (#5207)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE  19899
(302) 654-1888
jday@ashbygeddes.com
amayo@asbygeddes.com

*Attorneys for Defendants*

## TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ........................................................................................................... 1

II.  BACKGROUND ............................................................................................................ 1

    A.   The Asserted Patents ........................................................................................... 1

    B.   DePuy's Accused Products And Patents ............................................................. 2

    C.   RSB's Litigation And Settlement Agreements ................................................... 2

    D.   Kidder's Reports ................................................................................................. 4

III. LEGAL STANDARD ..................................................................................................... 4

IV.  ARGUMENT ................................................................................................................. 5

    A.   Kidder Failed To Apportion His Reasonable Royalty To The Value Of
        The Patented Features .......................................................................................... 5

        1.   Kidder Did Not Value The Patented Features Relative To The
            Unpatented Features In The Accused Products ........................................ 6

        2.   Kidder Cannot Rely On The Settlement Agreements To Apportion ......... 8

            a.   Kidder Failed To Consider Differences In The Relative
                Value Of The Patented Features As To The Licensed
                Products And The Accused Products ............................................. 9

            b.   The Settlement Agreements Confer Patent Rights Which
                DePuy Would Not Obtain In The Hypothetical Negotiation ....... 10

    B.   Kidder's Failure To Address The "Negotiation" Part Of The Hypothetical
        Negotiation Is Unreliable And Cannot Assist The Jury ...................................... 12

V.   CONCLUSION ............................................................................................................. 14

# TABLE OF AUTHORITIES

Page

CASES

*Aqua Shield v. Inter Pool Cover Team*,
774 F.3d 766 (Fed. Cir. 2014).................................................................................12

*Asetek Danmark A/S v. CMI USA Inc.*,
852 F.3d 1352 (Fed. Cir. 2017).................................................................................12

*Biedermann Techs. GmbH & Co. KG v. K2M, Inc.*,
No. 2:18cv585, 2021 WL 6034269 (E.D. VA. Dec. 10, 2021) .................................10

*Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*,
C.A. No. 15-152-RGA, 2018 WL 4691047 (D. Del. Sept. 28, 2018) .................................6, 10

*Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*,
C.A. No. 15-152-RGA, 2018 WL 5729732 (D. Del. Nov. 2, 2018).................................10

*Calhoun v. Yamaha Motor Corp., U.S.A.*,
350 F.3d 316 (3d Cir. 2003).................................................................................5

*Commonwealth Sci. & Indus. Research Organisation v. Cisco Sys.*,
809 F.3d 1295 (Fed. Cir. 2015).................................................................................9

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993).................................................................................4, 5

*Ericsson, Inc. v. D-Link Sys., Inc.*,
773 F.3d 1201 (Fed. Cir. 2014).................................................................................5

*Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp.*,
LLC, 879 F.3d 1332 (Fed. Cir. 2018) .................................................................................6, 7, 8

*Finjan, Inc. v. Blue Coat Sys., Inc.*,
879 F.3d 1299 (Fed. Cir. 2018).................................................................................5

*Garretson v. Clark*,
111 U.S. 120 (1884).................................................................................5

*Gen. Elec. Co. v. Joiner*,
    522 U.S. 136 (1997) .................................................................................................5, 12, 14

*In re Koninklijke Philips Patent Litig.*,
    No. 18-cv-01885-HSG, 2020 WL 7398647 (N.D. Cal. Apr. 13, 2020) ............................13, 14

*LaserDynamics, Inc. v. Quanta Comput. Inc*,
    694 F.3d 51 (Fed. Cir. 2012).....................................................................................5, 8, 12

*MiiCs & Partners, Inc. v. Funai Elec. Co.*,
    C.A. No. 14-804-RGA, 2017 WL 6268072 (D. Del. Dec. 7, 2017) ...........................................8

*MLC Intellectual Prop., LLC v. Micron Tech., Inc.*,
    10 F.4th 1358 (Fed. Cir. 2021) ......................................................................................5, 6, 10

*Mondis Tech. Ltd. v. LG Elecs., In*c.,
    407 F. Supp. 3d 482 (D.N.J. Sept. 24, 2019) ......................................................................9, 11

*Sprint Commc'ns Co. LP v. Charter Commc'ns, Inc.*,
    C.A. No. 17-1734-RGA, 2021 WL 982732 (D. Del. Mar. 16, 2021)....................................8, 9

*TC Tech. LLC v. Sprint Corp.*,
    C.A. No. 16-153-RGA, 2019 WL 2515779 (D. Del. June 18, 2019) .......................................13

*Trell v. Marlee Elecs. Corp.*,
    912 F.2d 1443 (Fed. Cir. 1990).............................................................................................10

*Wi-LAN Inc. v. LG Elecs., Inc.*,
    No. 18-cv-01577-H-BGS, 2019 WL 5681622 (S.D. Cal. Nov. 1, 2019) ...............................13

*Wordtech Sys., Inc. v. Integrated Networks Sols, Inc.*,
    609 F.3d 1308 (Fed. Cir. 2010)................................................................................................9

## OTHER AUTHORITIES

Fed. R. Evid. 702 ..............................................................................................................4, 5

**Table of Abbreviations**

| Term | Abbreviation |
|---|---|
| RSB Spine, LLC | RSB or Plaintiff |
| DePuy Synthes Sales, Inc. and DePuy Synthes Products, Inc., | DePuy or Defendants |
| U.S. Patent No. 6,984,234 | the '234 patent |
| U.S. Patent No. 9,713,537 | the '537 patent |
| U.S. Patent No. 6,234,034 | the '034 patent |
| The '234 and '537 patents | the Asserted Patents |
| March 21, 2022 Opening Expert Report of Douglas Kidder | Opening Report |
| May 9, 2022 Reply Expert Report of Douglas Kidder | Reply Report |
| April 18, 2022 Rebuttal Report of Kevin McElroy | McElroy Report |
| Defendants' Zero-P, Zero-P VA, Synfix LR and Synfix Evolution products | DePuy's Accused Products |
| May 25, 2022 deposition transcript of Douglas Kidder | Kidder Tr. |

**Table of Exhibits**

| Exhibit No. | Description |
|---|---|
| Ex. A | March 21, 2022 Opening Expert Report of Douglas Kidder, without attachments ("Opening Report") |
| Ex. B | May 9, 2022 Reply Expert Report of Douglas Kidder, without attachments ("Reply Report") |
| Ex. C | April 18, 2022 Rebuttal Report of Kevin McElroy, without attachments ("McElroy Report") |
| Ex. D | May 25, 2022 deposition transcript of Douglas Kidder (excerpts) ("Kidder Tr.") |
| Ex. E | |
| Ex. F | |
| Ex. G | |
| Ex. H | |

## I.    INTRODUCTION

In determining a reasonable royalty for patent infringement, the royalty must be apportioned. Any award must be based on the incremental value added by the patented invention. RSB's damages expert, Douglas Kidder ("Kidder"), makes no attempt to apportion the value the Asserted Patents allegedly provided against the value *DePuy* provided to the Accused Products. Instead, Kidder depends on never-paid "headline rates" from Settlement Agreements between RSB and third parties. But these rates do not apportion for differences in value contributed by *DePuy* to its products, nor do they apportion those rates to only the Asserted Patents. Kidder's opinions are unreliable.

Further, Kidder's hypothetical negotiation "analysis" starts and ends with RSB's opening demand. The hypothetical negotiation framework contemplates a ***negotiation***, not a demand by the licensor that is passively accepted by the licensee. Kidder's conclusion that DePuy would simply acquiesce to RSB's "ask" is an unreliable misapplication of the hypothetical negotiation framework and should be excluded.[1]

## II.    BACKGROUND

### A.    The Asserted Patents

RSB has accused DePuy of infringing its '234 and '537 patents. The '234 patent is the grandparent application to which the '537 patent claims priority. There are five other patents in this same patent family, but none are asserted against DePuy. The Asserted Patents are generally directed to a stand-alone, interbody device that is placed between two bones (such as two vertebrae) to facilitate fusion.

---

[1] The parties met and conferred concerning DePuy's grounds for the exclusion of Kidder's opinions and testimony on June 21, 2022, but no agreement was reached.

**B.      DePuy's Accused Products And Patents**

RSB has accused one product of infringing the '234 patent, and five products of infringing the '537 patent. D.I. 10. DePuy's Accused Products are all anterior stand-alone interbody devices. Ex. C,[2] ¶¶38-42. Some are designed to be used in the lumbar (or lower) spine, while others are designed for use in the cervical (or neck) region of the spine. *Id.* These products are part of a larger portfolio of products offered by DePuy that can be used to accomplish fusion, including "traditional" anterior plates. *Id.*, ¶151.

Synfix-LR (a lumbar device) was first sold in the United States in 2006, but was launched internationally in 2004. *Id.*, ¶73. The Zero-P family of products are essentially an adaptation of the Synfix-LR for use in the cervical spine. DePuy began selling the first of the Zero-P devices in the United States in 2008. *Id.*, ¶39. The technology embodied in Synfix-LR was invented and developed in large part by Dr. Christopher Cain. *Id.*, ¶73. Dr. Cain is the named inventor on at least 13 patents that pertain to technology embodied in the Accused Products (*id*), and DePuy pays royalties to him and other surgeons for their technical contributions (*id.*, ¶113, Fig. 11). DePuy has at least six additional patents that pertain to technology embodied in the Accused Products. *Id.*, ¶¶73, 105, Fig. 10. Some of DePuy's patents pertain to unique features of the Accused Products, including patents on features found patentable over the Asserted Patents. For example, while the '234 (but not the '537) patent requires the use of a screw back-out prevention mechanism (many forms of which were well-known), DePuy invented and patented a unique screw back-out mechanism that is a feature of the Zero-P VA product (U.S. Patent No. 9,192,419). *Id.*, ¶38.

**C.      RSB's Litigation And Settlement Agreements**

RSB was formed in 2001 by Mr. John Redmond and Dr. Robert Bray to sell spinal implants

---

[2] Exhibits referenced herein are attached to the Declaration of T. Kaitlin Crowder, filed concurrently herewith.

designed by Dr. Bray.  D.I. 10, ¶10.  RSB had planned to build up its spinal implant business to sell to a larger medical device company.  Ex. C, ¶21.  While RSB does sell products that embody the Asserted Patents (D.I. 10, ¶19), despite years of trying, it was unable to obtain significant sales and has been unable to sell the business.  Ex. C, ¶¶73, 146, 149.

Now, RSB has turned its focus to the courtroom.  RSB has filed patent infringement lawsuits against six different companies (RTI Surgical,[3] Life Spine, Medacta USA, Precision Spine, Xtant, and, DePuy)[4] and has accused a seventh company (█████ of infringing its patents. Ex. A, ¶95.  RSB has entered into ████████████████████████████████████ ████████████████████████[5]  All of the Settlement Agreements confer ███████████ ██████████████████████████████ *Id.*, ¶¶74, 82, 87.  ████████████████████ ████████████████████████████  ████████████████ which differs from what is claimed in the '234 and '537 patents.  Ex. C, ¶135.  Each of the Settlement Agreements identifies a "headline" royalty rate, and then provides each licensee with a "discounted" rate, purportedly applied against some portion of past and projected sales for some period of time, which varies by licensee and product.  *Id.,* ¶48.  Relevant terms of each of these Settlement Agreements are summarized below:

---

[3] C.A. No. 18-1975-RGA.  This case was voluntarily dismissed, but no information concerning the reason for that dismissal has been provided.

[4] C.A. No. 18-1972-RGA (Life Spine); C.A. No. 18-1973-RGA (Medacta USA); C.A. No. 18-1974-RGA (Precision Spine); C.A. No. 18-1976-RGA (Xtant).

[5] The ███████████████████ was executed after Kidder served his reports.



Ex. E, §3.1; Ex. F, §3.1; Ex. G, §3.1; Ex. H, §3.1.  Kidder had no understanding as to what considerations caused the variability in applicable terms for the purported royalty bases.  Neither DePuy nor Kidder was provided the underlying sales information, and, as such, neither has any way to assess whether the lump sums paid accurately reflect even the supposed "discounted" royalty rates.  Ex. D, 50:13-53:2; 57:11-19; 73:1-17; 74:1-75:14.

### D.    Kidder's Reports

Kidder opines that an appropriate reasonable royalty rate in this case would be 6%.  To reach his conclusion, Kidder started with a ▇▇▇ "headline rate" identified in the Settlement Agreements (Ex. A, ¶¶72-99), rejected DePuy's negotiated royalty obligations on the accused products as an indicator of DePuy's willingness to pay (*id.*, ¶¶100-126), summarily mentioned the *Georgia-Pacific* factors, and concluded that DePuy would have agreed to 6% (*id.*, ¶¶127-178).  In other words, Kidder ▇▇▇▇▇▇▇▇▇▇▇▇ royalty based on the rate that RSB has asked for but no party has ever paid.

## III.    LEGAL STANDARD

In *Daubert v. Merrell Dow Pharms., Inc.*, the Supreme Court explained that Federal Rule of Evidence 702 creates "a gatekeeping role for the [trial] judge" in order to "ensur[e] that an

expert's testimony both rests on a reliable foundation and is relevant to the task at hand." 509 U.S. 579, 597 (1993). Rule 702 allows an expert to give opinion testimony only if: (1) the opinion is based on sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the witness has reliably applied the principles and methods to the facts of the case. In applying this test, courts consider whether the expert's methodology is reliable and whether the testimony is relevant, *i.e.*, whether it will assist the factfinder to understand the evidence or determine a fact in issue. *Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316, 321 (3d Cir. 2003). An expert's testimony is unreliable and should be excluded where evidence is "connected to existing data only by the *ipse dixit* of the expert" and the court concludes that "there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

## IV.     ARGUMENT

### A.     Kidder Failed To Apportion His Reasonable Royalty To The Value Of The Patented Features

An essential requirement for an expert's damages analysis is that the "ultimate reasonable royalty award must be based on the incremental value that the patented invention adds to the end product." *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1309 (Fed. Cir. 2018) (quoting *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014)). A patentee "must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented features and the unpatented features, and such evidence must be reliable and tangible, and not conjectural or speculative." *LaserDynamics, Inc. v. Quanta Comput. Inc*, 694 F.3d 51, 67 (Fed. Cir. 2012) (quoting *Garretson v. Clark*, 111 U.S. 120, 121 (1884)); *see also MLC Intellectual Prop., LLC v. Micron Tech., Inc*., 10 F.4th 1358, 1373 (Fed. Cir. 2021). "The Federal Circuit has repeatedly emphasized the importance of apportionment as part of a

district court's gatekeeping function." *Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*, C.A. No. 15-152-RGA, 2018 WL 4691047, at *8 (D. Del. Sept. 28, 2018).

Despite this well-established body of law, Kidder admitted that he did not even ***consider*** the value of the patented features as against the unpatented features of the Accused Products. Ex. D, 89:13-90:1. Instead, Kidder blindly applied an artificial rate to DePuy's products without knowing (1) what the licensed products in the Settlement Agreements were, much less the contributions by each licensee to their respective products (*e.g.*, Ex. D, 75:20-76:7; 134:20-135:19; 137:12-22), (2) what products were accounted for in the purported royalty base or how sales projections were determined (*e.g.*, *id.*, 50:13-51:13; 73:1-10; 80:23-81:19), and (3) what considerations led to the royalty terms, which vary across agreements and products (*e.g.*, *id.*, 72:5-73:18).

The Settlement Agreements do not apportion for the two Asserted Patents—either against DePuy's contributions to its products, or against the other patents not asserted against DePuy but included in the Settlement Agreements. Kidder was therefore required to conduct an apportionment analysis. His failure to do so renders his opinions unreliable and warrants exclusion. *See Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp.*, LLC, 879 F.3d 1332, 1349-50 (Fed. Cir. 2018); *MLC Intellectual Prop.*, 10 F.4th at 1374.

### 1. Kidder Did Not Value The Patented Features Relative To The Unpatented Features In The Accused Products

Kidder made no effort to consider the features of the accused products and apportion value between what RSB's alleged invention contributed, and what DePuy contributed. In *Georgia-Pacific* Factor 13, Kidder admits that "[a] ***substantial portion*** of the realizable profit should be credited to factors other than the patented technology." Ex. A, ¶166 (emphasis added); *see also* Ex. D, 130:6-10. He recognizes that each company would incur R&D investments and costs

associated with getting FDA approval, as well as other sales and marketing-related costs (Ex. A, ¶166), but summarily concludes that "[t]he resulting royalties negotiated by the licensees reflect this balance." *Id.*, ¶167.

Kidder's Factor 13 "analysis" made no attempt to determine what *DePuy's* investments were, and to what extent those investments contributed value beyond the allegedly patented features. Kidder does not identify a single non-patented element or significant feature added by DePuy, much less evaluate what "substantial portion" of that profit should have been credited to DePuy's contributions (such as Dr. Cain's contributions or the unique screw back-out mechanism in the Zero-P VA). In fact, Kidder did not consider **any** features of the Accused Products:

> Q: Are the features that are available in competitors' products not relevant to your analysis of the value of the features in the accused products?

> A: So your underlying assumption there is that I've done an analysis of the value of the features of the accused products, and I don't - ***I haven't done such an analysis***.

Ex. D, 89:19-90:1 (emphasis added).

Kidder also did not attempt to account for the value attributable to contributions made by Dr. Cain:

> Q: [D]o you know how much of the value of the accused products is attributable to Dr. Cain's patents?

> A: No, other than DePuy Synthes agreed to pay ▮ percent to Dr. Cain for some period of time.

*Id.*, 129:6-10.

It is not enough for an expert to say they did an analysis; they must actually do the work. Kidder's supposed Factor 13 analysis is precisely the type of analysis the Federal Circuit found "troublesome" and rejected in *Exmark*, 879 F.3d at 1350. Like Kidder, Exmark's expert acknowledged other elements that contributed value, but "failed to conduct any analysis indicating the degree to which these considerations impact the market value or profitability" of the accused

product.  *Id.*  This Court has likewise barred this type of "troublesome" analysis.  For example, in *MiiCs & Partners, Inc. v. Funai Elec. Co.*, the Court excluded the patentee's expert because, like Kidder, the expert's Factor 13 analysis "lack[ed] any meaningful analysis or attempt to quantify the portion of realizable profit that should be attributed to the patented feature."  C.A. No. 14-804-RGA, 2017 WL 6268072, at *3 (D. Del. Dec. 7, 2017).  MiiCs' expert noted contributions from "brand and trademarks, marketing, facilities, an assembled and trained workforce, vendor relations and contracts, and customer relations and contracts," but "fail[ed] to give any 'reliable and tangible' evidence" that apportioned those contributions.  *Id.*  The Court excluded MiiCs' expert's opinion as unreliable then; the Court should exclude Kidder's opinion as unreliable now.

## 2.    Kidder Cannot Rely On The Settlement Agreements To Apportion

Remarkably, Kidder found that not a single *Georgia-Pacific* factor puts either upward or downward pressure on his starting point.  Kidder relies wholesale on the unpaid rates in the Settlement Agreements to meet the apportionment requirement.  However, in order to rely on any purported "built-in" apportionment in the Settlement Agreements, Kidder needed to evaluate those agreements in context, and tie the rates within those agreements to the economic value of the patented inventions to DePuy's Accused Products.  Kidder failed to do so.

To begin, "this Court has observed that 'Federal Circuit precedent is hostile toward using litigation settlement agreements in proving a reasonable royalty, except in limited circumstances.'" *Sprint Commc'ns Co. LP v. Charter Commc'ns, Inc.*, C.A. No. 17-1734-RGA, 2021 WL 982732, at *10 (D. Del. Mar. 16, 2021) (citations omitted).  "[L]icense fees negotiated in the face of a threat of high litigation costs may be strongly influenced by a desire to avoid full litigation." *LaserDynamics*, 694 F.3d at 77 (citation omitted).  Indeed, the lump-sum amounts paid in the Settlement Agreements are (arguably) more indicative of a desire to avoid the cost of litigation than any actual value of the Asserted Patents.  Settlement agreements have "minimal probative

value" because they are "not comparable to a negotiation between two willing parties," and that "minimal probative value is 'even less, where, as here, the settlement agreements occurred years after the hypothetical negotiation.'" *Sprint Commc'ns*, 2021 WL 982732, at *10 (citation omitted). The hypothetical negotiation between DePuy and RSB for the '234 patent is in 2012—████ prior to the execution of the ████ Settlement Agreement.[6]

Although negotiated-for rates in a comparable license may sufficiently apportion the value of a patent under certain circumstances, *see Commonwealth Sci. & Indus. Research Organisation v. Cisco Sys.*, 809 F.3d 1295, 1303 (Fed. Cir. 2015) ("CSIRO"), this is so only where such license accounts for the value of the asserted patent and no more, *see Mondis Tech. Ltd. v. LG Elecs., Inc.*, 407 F. Supp. 3d 482, 491-92 (D.N.J. Sept. 24, 2019).  Here, Kidder's reliance is even more dubious because he does not rely on the rates actually paid.  Instead, he relies on "headline" rates that were not paid, cost the licensees nothing, and seem solely intended to justify an artificially high rate in still-pending litigations.

### a. Kidder Failed To Consider Differences In The Relative Value Of The Patented Features As To The Licensed Products And The Accused Products

Any alleged apportionment in the Settlement Agreements could—at most—account only for the value added by the patented technology to the products of each *licensee*—not the value added to *DePuy's* Accused Products.  As such, Kidder was required to conduct a *separate* apportionment analysis to determine the relative value contributed by *DePuy* compared to the relative value contributed by the other licensees.  He did not do so.

Kidder did not know what the other licensees' products were, or whether there were any

---

[6] Kidder's attempt to draw a distinction between the ████ agreement and the other agreements because no lawsuit was filed against ████ (Ex. B, ¶¶38-39) fails.  *See Wordtech Sys., Inc. v. Integrated Networks Sols, Inc.*, 609 F.3d 1308, 1320-21 (Fed. Cir. 2010) (finding that licenses signed "after initiating *or threatening* litigation" could skew the results) (emphasis added).

differences between those products and DePuy's Accused Products.  While he "would assume they are similar to [DePuy's] accused products," he would also be "surprised" if there were not differences.  Ex. D, 75:20-76:7; 134:20-135:19.  Regardless, he made no attempt to analyze, or even identify, what DePuy and each licensee contributed to their respective products.  *Id.*, 131:11-132:21; 134:20-135:19.  Without any understanding of the relative value of the patented technology in the licensed products, Kidder cannot reliably conclude that the rates in the Settlement Agreements were comparably apportioned.  *See MLC Intellectual Prop.*, 10 F.4th at 1375; *see also Trell v. Marlee Elecs. Corp.*, 912 F.2d 1443, 1447 (Fed. Cir. 1990); *Biedermann Techs. GmbH & Co. KG v. K2M, Inc.*, No. 2:18cv585, 2021 WL 6034269, at *19 (E.D. VA. Dec. 10, 2021).

This Court has previously excluded an expert's opinion where, as here, the expert "relied on the benchmark licenses as having built in apportionment, without conducting a separate apportionment analysis."  *Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*, C.A. No. 15-152-RGA, 2018 WL 5729732, at *2 (D. Del. Nov. 2, 2018).  "[T]he fact that the parties to each agreement incorporated the concept of apportionment into their reasonable royalties does not itself show that the same royalty rates apply here."  *Bio-Rad Labs.*, 2018 WL 4691047 at n.3.  Likewise, Kidder has not shown, or made any attempt to show, that the Settlement Agreements comparably apportion the contribution of the patented technology.  His opinion is unreliable, and should be excluded.

> **b.    *The Settlement Agreements Confer Patent Rights Which DePuy Would Not Obtain In The Hypothetical Negotiation***

Kidder also fails to apportion the rates identified in the Settlement Agreements to only the two Asserted Patents.  Kidder admits that a license to a portfolio of patents is worth more than one to individual patents within that portfolio.  Ex. A, ¶94.  All of the Settlement Agreements include

████████████, and the ███████████████████████ ████ ████

████ They do not reflect "the value of the asserted patent[s] 'and no more.'" *Mondis Tech.*, 407 F. Supp. 3d at 491 (quoting *CSIRO*, 809 F.3d at 1303).

Based on an "understanding" from RSB's counsel that ████████████████ ██████████████████████████ however, Kidder affords no material value to ████████. Ex. A, ¶95. Kidder has no actual knowledge about this agreement. Ex. D, 64:18-65:6; 66:12-67:9; 70:8-71:14. But ███████ negotiated for rights to ███████████, demonstrating that at least ████ believed it had value.

Kidder's purported justifications for assigning no value to the other additional patents lack merit. First, Kidder observes that RSB stopped paying maintenance fees on some (but not all) of the additional patents, allowing them to lapse. Ex. A, ¶96. But Kidder did not ask RSB why it allowed these patents to lapse or make any effort to assess RSB's valuation of them at the time of the hypothetical negotiation. Ex. D, 94:18-97:6. Kidder's "reasoning" also ignores the value that RSB's licensees (or DePuy) would ascribe to the other patents.

Second, Kidder incorrectly states that only the '234 and '537 patents have been asserted (and thus had value). Ex. A, at ¶96. But RSB asserted the '034 patent against multiple parties, which (using Kidder's logic) demonstrates that it had significant value.[7] Kidder ignores that RSB filed one of the additional patent applications after commencing litigation, indicating (again using Kidder's logic) that RSB saw value in it.[8] And, again, Kidder ignores the value attributed to these other patents by the licensee.

Third, Kidder claims that ███████████████████████████ ████████████ *Id.* But Kidder (1) has never seen the sales data that allegedly forms

---

[7] *See* C.A. No. 18-1975, D.I. 1 (RTI Surgical); C.A. No. 18-1972, D.I. 1 (Life Spine).

[8] U.S. Patent No. 11,026,802 patent, filed August 11, 2020.

the royalty bases for each agreement, (2) does not know the manner in which sales projections were determined, and (3) does not know which products are included within those bases. Ex. D, *e.g.*, 50:13-51:13; 73:1-10; 80:23-81:19. In short, Kidder has no information about the negotiation of these agreements.

Kidder has no principled basis for concluding that the patents licensed to others—but not to DePuy—have no value. "[T]there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co.*, 522 U.S. at 146. While it may be true that not all patents are of equal value, Kidder's conclusion that *all* of the value is concentrated in the Asserted Patents, and none is found in the other patents, is pure *ipse dixit*.

### B.    Kidder's Failure To Address The "Negotiation" Part Of The Hypothetical Negotiation Is Unreliable And Cannot Assist The Jury

Kidder purports to opine as to a reasonable royalty resulting from a hypothetical ***negotiation***, but his analysis starts—and ends—with RSB's opening negotiating ***demand***. Kidder's conclusions are both unreliable and unhelpful to the jury.

The hypothetical negotiation assumes an arm's length negotiation between a willing licensor and a willing licensee. *LaserDynamics*, 694 F.3d at 77. As such, "the ultimate royalty determination must reflect the two-sided nature of the posited negotiation." *Aqua Shield v. Inter Pool Cover Team*, 774 F.3d 766, 771 (Fed. Cir. 2014); *see also Asetek Danmark A/S v. CMI USA Inc.*, 852 F.3d 1352, 1363 (Fed. Cir. 2017). Although infringement and validity are presumed, the hypothetical negotiation does not contemplate a hold-up by the patentee in which the patentee gets exactly what it asks for, and the licensee simply agrees to that demand.

Kidder opines: "In the hypothetical negotiations, RSB Spine would have ***asked for and received*** a ▇ running royalty." Ex. A, ¶¶174, 175 (emphasis added). The sole basis for Kidder's opinion is a conversation he had with John Redmond, RSB's CEO. A ▇ rate does not reflect

what RSB would have been *willing to accept*; it reflects only where RSB would have *started* its negotiation:



Ex. D, 139:17-140:12.

Kidder has "improperly assumed a one-sided negotiation where [RSB] dictates the terms of the hypothetical agreement based on its [patents] and [DePuy] passively accepts them." *In re Koninklijke Philips Patent Litig.*, No. 18-cv-01885-HSG, 2020 WL 7398647, at *9 (N.D. Cal. Apr. 13, 2020) (expert "erred by taking [the patentee's] advertised rates as both the starting and the ending points of a hypothetical negotiation"). This renders his opinion unreliable. *See, e.g.*, *TC Tech. LLC v. Sprint Corp.*, C.A. No. 16-153-RGA, 2019 WL 2515779, at *8-9 (D. Del. June 18, 2019) (excluding testimony where expert did not explain how an "the opening offer in a negotiation," are a "reliable measure of a rate *resulting* from the hypothetical negotiation."); *Wi-LAN Inc. v. LG Elecs., Inc.*, No. 18-cv-01577-H-BGS, 2019 WL 5681622, at *7 (S.D. Cal. Nov. 1, 2019).

Kidder made no effort to tie the 6% rate to the economic value of the invention with respect to DePuy's products, nor did he explain why 6% would be consistent with DePuy's willingness to pay. "Instead, [Kidder] assumed—without evidence—that [RSB] would dictate the terms…, that [DePuy] would acquiesce to those terms without modification, and that the rates made sense in the

context of the value of the infringing feature.  These assumptions are unsubstantiated and therefore not reliable."  *Koninklijke Philips Patent Litig.*, 2020 WL 7398647, at \*10.  "[T]here is simply too great an analytical gap between the data and the opinion proffered," and Kidder's opinion should be excluded.  *Gen. Elec. Co.*, 522 U.S. at 146.

## V.    CONCLUSION

For the foregoing reasons, DePuy respectfully requests that the Court exclude Kidder's unreliable opinion.

                                                    ASHBY & GEDDES

*Of Counsel:*                                       */s/ John G. Day*

Calvin P. Griffith                                  John G. Day (#2403)
Patrick J. Norton                                   Andrew C. Mayo (#5207)
Kenneth S. Luchesi                                  500 Delaware Avenue, 8th Floor
T. Kaitlin Crowder                                  P.O. Box 1150
**JONES DAY**                                       Wilmington, DE  19899
North Point                                         (302) 654-1888
901 Lakeside Avenue                                 jday@ashbygeddes.com
Cleveland, OH  44114-1190                           amayo@ashbygeddes.com
(216) 586-3939

                                                    *Attorneys for Defendants*
Dated: June 23, 2022

## <u>WORD COUNT CERTIFICATION OF COMPLIANCE</u>

The undersigned hereby certifies that the foregoing brief contains 3,984 words (exclusive of the cover page, tables of contents, authorities, abbreviations, and exhibits, and signature block) in Times New Roman 12-point font, counted using Microsoft Word's word count feature.


/s/ *John G. Day*
_____
John G. Day