# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

**RSB SPINE, LLC,**

      **Plaintiff,**

      **v.**

**DEPUY SYNTHES SALES, INC., and DEPUY SYNTHES PRODUCTS, INC.,**

      **Defendants.**

**REDACTED PUBLIC VERSION**

**Civil Action No. 19-1515-RGA**

Judge Richard G. Andrews

## DECLARATION OF T. KAITLIN CROWDER IN SUPPORT OF DEPUY'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTIONS FOR SUMMARY JUDGMENT OF NO INTERFERENCE, PARTIAL SUMMARY JUDGEMENT OF INFRINGEMENT, AND TO EXCLUDE EXPERT OPINIONS

I, T. Kaitlin Crowder, hereby declare as follows:

1.     I am an attorney at the law firm of Jones Day in Cleveland, Ohio.  I am admitted to practice in the State of Ohio.  I submit this declaration based on personal knowledge and following a reasonable investigation.  If called upon as a witness, I could and would competently testify to the truth of each statement herein.

2.     I submit this declaration in support of DePuy's Memorandum in Opposition to Plaintiff's Motions for Summary Judgment of No Interference, Partial Summary Judgment of Infringement, and to Exclude Expert Opinions;

3.     The document attached as Exhibit 1 is a true and correct copy of the Declaration of Beat Lechmann, with accompanying Exhibits A-D.

4.     The document attached as Exhibit 2 is a true and correct copy of excerpts from the First Expert Report of Boyle C. Cheng, Ph.D on Invalidity of U.S. Patent Nos. 6,984,234 and 9,713,537, dated March 21, 2022.

5.     The document attached as Exhibit 3 is a true and correct copy of excerpts from the Second Expert Report of Boyle C. Cheng, Ph.D on Non-Infringement of U.S. Patent Nos. 6,984,234 and 9,713,537, dated April 17, 2022.

6.     The document attached as Exhibit 4 is a true and correct copy of excerpts from the Third Expert Report of Boyle C. Cheng, Ph.D. on Invalidity of U.S. Patent Nos. 6,984,234 and 9,713,537, dated May 9, 2022.

7.     The document attached as Exhibit 5 is a true and correct copy of excerpts from the deposition transcript of Troy D. Drewry, taken on June 8, 2022.

8.     The document attached as Exhibit 6 is a true and correct copy of excerpts from the Expert Report of Troy D. Drewry In Response to Dr. Cheng's Report on Invalidity of U.S. Patent Nos. 6,984,234 and 9,713,537, dated April 18, 2022.

9.     The document attached as Exhibit 7 is a true and correct copy of excerpts from the deposition transcript of Boyle C. Cheng, taken on May 20-21, 2022.

10.    The document attached as Exhibit 8 is a true and correct copy of excerpts from the deposition transcript of Robert S. Bray, Jr. MD., taken February 11, 2022.

11.    The document attached as Exhibit 9 is a true and correct copy of the May 26, 2017 Election and Amendment "A" from the prosecution history of U.S. Patent No. 9,713,537.

12.    The document attached as Exhibit 10 is a true and correct copy of the September 9, 2020 Office Action, from the prosecution history of U.S. Patent No. 11,026,802.

13.    The document attached as Exhibit 11 is a true and correct copy of the Summary of November 20, 2020 Applicant-Initiated Interview Summary from the prosecution history of U.S. Patent No. 11,026,802.

14.    The document attached as Exhibit 12 is a true and correct copy of the March 9, 2021 Amendment/Response to Office Action from the prosecution history of U.S. Patent No. 11,026,802.

15.    The document attached as Exhibit 13 is a true and correct copy of the Aug. 18, 2005 Amendment B and accompanying Remarks/Argument in response to Office action of May 24, 2005 from the prosecution history of U.S. Patent No. 6,984,234.

16.    The document attached as Exhibit 14 is a true and correct copy of excerpts from the Opening Expert Report of Dr. Richard A. Hynes on Infringement of U.S. Patent Nos. 6,984,234 and 9,713,537, dated March 21, 2022.

17.    The document attached as Exhibit 15 is a true and correct copy of excerpts from the deposition transcript of Dr. Richard A. Hynes, taken May 24, 2022.  The transcript is incorrectly designated as the transcript of "Robert S. Hynes, Jr."

18.    The document attached as Exhibit 16 is a true and correct copy of excerpts from the deposition transcript of Dr. Christopher M.J. Cain, with Exhibit 114, taken February 11, 2022.


I declare under penalty of perjury that the foregoing is true and correct.


Executed on July 21, 2022.             */s/ T. Kaitlin Crowder*

                                                   T. Kaitlin Crowder

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 21st day of July, 2022, the attached **DECLARATION OF T. KAITLIN CROWDER IN SUPPORT OF DEPUY'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTIONS FOR SUMMARY JUDGMENT OF NO INTERFERENCE, PARTIAL SUMMARY JUDGEMENT OF INFRINGEMENT, AND TO EXCLUDE EXPERT OPINIONS** was served upon the below-named counsel of record at the address and in the manner indicated:

John C. Phillips, Jr., Esquire                     <u>VIA ELECTRONIC MAIL</u>
PHILLIPS, GOLDMAN, MCLAUGHLIN & HALL, P.A.
1200 North Broom Street
Wilmington, DE  19806

Erik B. Milch, Esquire                             <u>VIA ELECTRONIC MAIL</u>
COOLEY LLP
11951 Freedom Drive
One Freedom Square
Reston, VA  20190-5656

Frank V. Pietrantonio, Esquire                     <u>VIA ELECTRONIC MAIL</u>
COOLEY LLP
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC  20004

Joseph M. Drayton, Esquire                         <u>VIA ELECTRONIC MAIL</u>
COOLEY LLP
55 Hudson Yards
New York, NY  10001

Rose S. Whelan, Esquire                            <u>VIA ELECTRONIC MAIL</u>
COOLEY LLP
1299 Pennsylvania Avenue NW, Suite 700
Washington, DC  20004

Reuben Chen, Esquire                               <u>VIA ELECTRONIC MAIL</u>
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304-1130

                                                   */s/ John G. Day*
                                                   John G. Day

# EXHIBIT 1

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| RSB SPINE, LLC, | |
| Plaintiff, | |
| v. | Civil Action No. 19-1515-RGA |
| DEPUY SYNTHES SALES, INC. and DEPUY SYNTHES PRODUCTS, INC., | Judge Richard G. Andrews |
| Defendants. | |

## DECLARATION OF BEAT LECHMANN

I, Beat Lechmann, hereby declare as follows:

1.      I reside in Grenchen, Switzerland. I obtained my Bachelor's Degree,
University Applied Science, Micro Mechanics Division from NTB Interstaatliche Hochschule
fur Technik Buchs SG in 1987. I am currently the Director R&D Innovation, Trauma at
DePuy Synthes ("DePuy"). I have been employed by DePuy and at Synthes Spine
("Synthes") before it became part of DePuy, and before that, at Mathys Medical Ltd.
("Mathys"), since 1998. From 1998 to 2000 I was the Head of Spine Development and from
2000 to 2004 I was the Manager of Spine Development. During that time I led the team that
designed and developed a number of spinal implants, including SynFix-LR.

2.      In 1999, Dr. Christopher Cain, a spine surgeon, approached Mathys with an
idea for a novel spinal implant. Shortly afterwards, I met with Dr. Cain concerning his idea.
Following our meeting, Dr. Cain agreed to work with Mathys to develop the product and I
was assigned to lead the development team. I worked closely with Dr. Cain on all aspects of
the design of the product, which we called "Alif-Fix" internally. The device was eventually
commercialized as SynFix-LR. In addition to Dr. Cain, I worked with Dr. Claude Mathieu
and Dominique Burkhard on the design of SynFix-LR. Though each contributed to the
device's development, I was the engineer ultimately responsible for the SynFix-LR design. I

have personal knowledge of the SynFix-LR design, and the decisions and processes that led to the design of the accused SynFix-LR devices.

3.      During the development of SynFix-LR, I submitted design parameters to Dominique Burkhard, a third-party contractor to Mathys, who among other things, was responsible for generating technical drawings of the device. Mr. Burkhard took my input and returned to the team CAD drawings of the device at various stages of development. I received and reviewed those drawings.

4.      For example, Mr. Burkhard created technical drawings in December 2002, a true and accurate copy of which I have attached as Exhibit A hereto. I directed Mr. Burkhard to create the drawings in Exhibit A and personally reviewed them on or around December 2002. Exhibit A shows drawings that describe the SynFix-LR device as it existed in December 2002. They depict the device from several perspectives, three of which I include below, for illustration:







Schnitt D-D

*See* Exhibit A.

5.     I am a co-inventor of U.S. Patent No. 7,846,207, which I will refer to as the "207 patent" and which is attached as Exhibit B. The other inventors of the 207 patent are Drs. Cain and Mathieu and Mr. Burkhard. Together we formed the principal design team for SynFix-LR. I understand the application that led to the 207 patent was a continuation of a previous patent application that was filed in Switzerland on February 6, 2003 and designated PCT/CH03/0089, and which is attached as Exhibit C. I will refer to this application as the "PCT application." I am a named inventor on the PCT application and personally worked with the patent attorneys who filed the PCT and U.S. applications to convey the design of our invention, which was the design of SynFix-LR as it existed at the time.

6.     I provided the patent attorneys technical drawings of SynFix-LR, as it existed near the time of filing the PCT application, and personally explained to the patent attorneys the design and functionality of the device. The drawings I provided to the patent attorneys were extracted from the CAD drawings provided by Mr. Burkard, such as those in Exhibit A reproduced above. The description of the invention I provided to the patent attorneys was the design of SynFix-LR, as it then existed. I reviewed both the PCT application and the U.S. application leading to the 207 patent. The preferred embodiment depicted in the 207 patent, including in its Figures, describes and accurately depicts the SynFix-LR design as it existed in April 2003, when the PCT application was filed. This is partially illustrated by comparing the SynFix-LR technical drawings from December 2002 with the patent Figures:

- 4 -





| SynFix-LR (December 2002); Ex. A (Cross-section D-D). | 207 patent, Figure 4. |
|---|---|



7.      After the PCT application was filed, in consultation with the design team, I decided that the securing plate of the SynFix-LR device (illustrated in Figures 3 and 7 of the 207 patent as element 18) was not necessary.  SynFix-LR utilized bone screws with threaded heads that mated with threads in the interior of the boreholes, and the team determined that this connection was sufficient to prevent screw backout, which rendered the use of a securing plate unnecessary.  Accordingly, we removed the securing plate from the design of SynFix-LR.

8.      In all other respects, the SynFix-LR design as commercialized matches the preferred embodiment described and illustrated in the 207 patent.  This includes the geometrical relationship between the front plate, bone screws and three-dimensional body.  This is reflected in the SynFix Systems Technique Guide, which describes the SynFix-LR commercial embodiments, a true and accurate copy of which is attached as Exhibit D.  The Technique guide illustrates that the design (and geometry) of the commercialized SynFix-LR devices match that disclosed and shown in the preferred embodiment depicted and illustrated in the 207 patent, except that the commercialized SynFix-LR devices lack the securing plate shown in the 207 patent.  This is illustrated in the device depictions at page 3:

| SynFix-LR (Technique Guide), Ex. D at 3. | 207 patent, Figure 3. |



| SynFix-LR (Technique Guide), Ex. D at 3. | 207 patent, Figure 4. |



9.      In my work I have spent countless hours evaluating and analyzing the SynFix-LR device, including samples of the commercialized SynFix-LR products. I have handled the devices, tested them, discussed their technical aspects with colleagues, including Dr. Cain, and observed the implantation of the devices during surgery. I have personal knowledge of the commercialized SynFix-LR devices, their functionality and design, including the geometry of the plate, cage and screws.

10.    The commercialized SynFix-LR devices, except for the use of a securing plate, are substantially identical to the preferred embodiment of the 207 patent. In short, minus the securing plate, the preferred embodiment of the 207 patent is SynFix-LR.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on July 20, 2022.

Beat Lechmann

- 8 -

# EXHIBIT A



Schnitt E-E

Schnitt C-C

Schnitt D-D

| | Stueck | | Gegenstand | Pos. | Werkstoff | Dimension | | Lieferant |
|---|---|---|---|---|---|---|---|---|
| Gezeichnet 05.12.02 Burkard | | | Aenderungen | | | Format A3 | Ersetzt durch | |
| Geprueft | | | | | | | Ersatz fuer | |
| | | | ALIF-FIX Var. 3a Syncage 13,5 Schraube Ø 4mm | | | Massstab 2:1 | | |
| | | | Mathys Medical, Bettlach | | | | AF 000-00 | |

HIGHLY CONFIDENTIAL - ATTORNEYS ' EYES ONLY - PROSECUTION BAR

DEPRSB_00222850

# EXHIBIT B

US007846207B2

(12) **United States Patent**
Lechmann et al.

(10) **Patent No.:** **US 7,846,207 B2**
(45) **Date of Patent:** **Dec. 7, 2010**

(54) **INTERVERTEBRAL IMPLANT**

(75) Inventors: **Beat Lechmann**, Bettlach (CH);
**Dominique Burkard**, Gretzenbach
(CH); **Chris M. J. Cain**, Norwood (AU);
**Claude Mathieu**, Zurich (CH)

(73) Assignee: **Synthes USA, LLC**, West Chester, PA
(US)

( * ) Notice: Subject to any disclaimer, the term of this
patent is extended or adjusted under 35
U.S.C. 154(b) by 1412 days.

(21) Appl. No.: **11/199,599**

(22) Filed: **Aug. 8, 2005**

(65) **Prior Publication Data**
US 2006/0085071 A1    Apr. 20, 2006

**Related U.S. Application Data**

(63) Continuation of application No. PCT/CH03/00089,
filed on Feb. 6, 2003.

(51) **Int. Cl.**
*A61F 2/44*          (2006.01)

(52) **U.S. Cl.** ................................. **623/17.11**; 623/17.16

(58) **Field of Classification Search** ................... 606/63,
606/291, 90, 293;  623/17.11, 17.15, 17.16
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

2,621,145 A    12/1952   Sano

(Continued)

FOREIGN PATENT DOCUMENTS

CA          2317791  A1    8/1999

DE          30 42 003  A1    7/1982
DE          39 33 459  A1    4/1991

(Continued)

OTHER PUBLICATIONS

Office Notice of Reason of Rejection issued by the Japanese Patent
Office.

*Primary Examiner*—Todd E Manahan
*Assistant Examiner*—Lynnsy Schneider
(74) *Attorney, Agent, or Firm*—Stroock & Stroock & Lavan
LLP

(57) **ABSTRACT**

An intervertebral implant having a three-dimensional body
(**10**) and a securing plate (**1**). The three-dimensional body
(**10**) includes an upper side (**1**) and an underside (**2**) which are
suitable for abutting the end plates of two adjacent vertebral
bodies, a left side surface (**3**) and a right side surface (**4**), a
front surface (**5**) and a rear surface (**6**), a horizontal middle
plane (**7**) between the upper side (**1**) and the underside (**2**), and
a vertical middle plane (**12**) extending from the front surface
(**5**) to the rear surface (**6**). The three-dimensional body further
includes a plurality of boreholes (**9**a) passing through the
body (**10**), which are suitable for accommodating longitudi-
nal fixation elements (**20**). The intervertebral implant also
includes a front plate (**8**) displaceably disposed as an insert
with the front side (**5**) of the three-dimensional body, the front
plate (**8**) having a plurality of boreholes (**9**) in which the
longitudinal fixation elements (**20**) can be anchored, and
whose openings overlap with the openings of the boreholes of
the three-dimensional body (**10**). A securing plate can be
fastened essentially parallel to the front plate (**8**) at the three-
dimensional body (**10**) in such a manner that the boreholes of
the front plate (**9**) are covered at least partly by the securing
plate (**18**). By virtue of the configuration of the intervertebral
implant, a rigid, firm connection between the intervertebral
implant and the longitudinal fixation elements used to fasten
it, is possible.

**43 Claims, 6 Drawing Sheets**



**US 7,846,207 B2**

Page 2

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,135,506 A | 1/1979 | Ulrich |
| 4,501,269 A | 2/1985 | Bagby |
| 4,512,038 A | 4/1985 | Alexander et al. |
| 4,627,853 A | 12/1986 | Campbell et al. |
| 4,678,470 A | 7/1987 | Nashef et al. |
| 4,717,115 A | 1/1988 | Schmitz |
| 4,858,603 A | 8/1989 | Clemow et al. |
| 4,904,261 A | 2/1990 | Dove et al. |
| 4,936,851 A | 6/1990 | Fox et al. |
| 4,950,296 A | 8/1990 | McIntyre |
| 4,961,740 A | 10/1990 | Ray et al. |
| 4,978,350 A * | 12/1990 | Wagenknecht ............... 606/312 |
| 4,994,084 A | 2/1991 | Brennan |
| 5,026,373 A | 6/1991 | Ray et al. |
| 5,053,049 A | 10/1991 | Campbell |
| 5,062,850 A | 11/1991 | MacMillan et al. |
| 5,084,051 A | 1/1992 | Törmälä et al. |
| 5,112,354 A | 5/1992 | Sires |
| 5,192,327 A | 3/1993 | Brantigan |
| 5,211,664 A | 5/1993 | Tepic et al. |
| 5,281,226 A | 1/1994 | Davydov et al. |
| 5,284,655 A | 2/1994 | Bogdansky et al. |
| 5,298,254 A | 3/1994 | Prewett et al. |
| 5,314,476 A | 5/1994 | Prewett et al. |
| 5,348,788 A | 9/1994 | White |
| 5,405,391 A | 4/1995 | Hednerson et al. |
| 5,423,817 A | 6/1995 | Lin |
| 5,439,684 A | 8/1995 | Prewett et al. |
| 5,458,638 A | 10/1995 | Kuslich et al. |
| 5,489,308 A | 2/1996 | Kuslich et al. |
| 5,507,818 A | 4/1996 | McLaughlin |
| 5,514,180 A | 5/1996 | Heggeness et al. |
| 5,522,899 A | 6/1996 | Michelson |
| 5,534,030 A | 7/1996 | Navarro et al. |
| 5,549,679 A | 8/1996 | Kuslich |
| 5,554,191 A | 9/1996 | Lahille et al. |
| 5,556,430 A | 9/1996 | Gendler |
| 5,569,308 A | 10/1996 | Sottosanti |
| 5,571,190 A | 11/1996 | Ulrich et al. |
| 5,571,192 A | 11/1996 | Schönhöffer |
| 5,607,474 A | 3/1997 | Athanasiou et al. |
| 5,609,635 A | 3/1997 | Michelson |
| 5,609,636 A | 3/1997 | Kohrs et al. |
| 5,609,637 A | 3/1997 | Biedermann et al. |
| 5,676,699 A | 10/1997 | Gogolewski et al. |
| 5,683,394 A | 11/1997 | Rinner |
| 5,683,463 A | 11/1997 | Godefroy et al. |
| 5,702,449 A | 12/1997 | McKay |
| 5,702,451 A | 12/1997 | Biedermann et al. |
| 5,702,453 A | 12/1997 | Rabbe et al. |
| 5,702,455 A | 12/1997 | Saggar |
| 5,728,159 A | 3/1998 | Stroever et al. |
| 5,735,905 A | 4/1998 | Parr |
| 5,766,253 A | 6/1998 | Brosnahan, III |
| 5,776,194 A | 7/1998 | Mikol et al. |
| 5,776,197 A | 7/1998 | Rabbe et al. |
| 5,776,198 A | 7/1998 | Rabbe et al. |
| 5,776,199 A | 7/1998 | Michelson |
| 5,782,915 A | 7/1998 | Stone |
| 5,785,710 A | 7/1998 | Michelson |
| 5,800,433 A | 9/1998 | Benzel et al. ................. 606/61 |
| 5,865,849 A | 2/1999 | Stone |
| 5,876,452 A | 3/1999 | Athanasiou et al. |
| 5,885,299 A | 3/1999 | Winslow et al. |
| 5,888,222 A | 3/1999 | Coates et al. |
| 5,888,223 A | 3/1999 | Bray, Jr. ...................... 623/17 |
| 5,888,224 A | 3/1999 | Beckers et al. |
| 5,888,227 A | 3/1999 | Cottle |
| 5,895,426 A | 4/1999 | Scarborough et al. |
| 5,899,939 A | 5/1999 | Boyce et al. |
| 5,902,338 A | 5/1999 | Stone |

| | | | |
|---|---|---|---|
| 5,904,719 A | 5/1999 | Errico et al. |
| 5,910,315 A | 6/1999 | Stevenson et al. |
| 5,922,027 A | 7/1999 | Stone |
| 5,944,755 A | 8/1999 | Stone |
| 5,968,098 A | 10/1999 | Winslow |
| 5,972,368 A | 10/1999 | McKay |
| 5,976,187 A | 11/1999 | Richelsoph |
| 5,980,522 A | 11/1999 | Koros et al. |
| 5,981,828 A | 11/1999 | Nelson et al. |
| 5,984,967 A | 11/1999 | Zdeblick et al. |
| 5,989,289 A | 11/1999 | Coates et al. |
| 6,013,853 A | 1/2000 | Athanasiou et al. |
| 6,025,538 A | 2/2000 | Yaccarino, III |
| 6,033,405 A | 3/2000 | Winslow et al. |
| 6,033,438 A | 3/2000 | Bianchi et al. |
| 6,039,762 A | 3/2000 | McKay |
| 6,045,579 A | 4/2000 | Hochshuler et al. |
| 6,045,580 A | 4/2000 | Scarborough et al. |
| 6,080,158 A | 6/2000 | Lin |
| 6,080,193 A | 6/2000 | Hochshuler et al. |
| 6,090,998 A | 7/2000 | Grooms et al. |
| 6,096,081 A | 8/2000 | Grivas et al. |
| 6,110,482 A | 8/2000 | Khouri et al. |
| 6,123,731 A | 9/2000 | Boyce et al. |
| 6,129,763 A | 10/2000 | Chauvin et al. |
| 6,143,030 A | 11/2000 | Schroder |
| 6,143,033 A | 11/2000 | Paul et al. |
| 6,156,070 A | 12/2000 | Incavo et al. |
| 6,193,756 B1 | 2/2001 | Studer et al. |
| 6,200,347 B1 | 3/2001 | Anderson et al. |
| 6,206,922 B1 | 3/2001 | Zdeblick et al. |
| 6,231,610 B1 | 5/2001 | Geisler |
| 6,235,059 B1 | 5/2001 | Benezech et al. |
| 6,241,769 B1 | 6/2001 | Nicholson et al. |
| 6,245,108 B1 | 6/2001 | Biscup |
| 6,258,125 B1 | 7/2001 | Paul et al. |
| 6,261,586 B1 | 7/2001 | McKay |
| 6,264,695 B1 | 7/2001 | Stoy |
| 6,270,528 B1 | 8/2001 | McKay |
| 6,322,562 B1 * | 11/2001 | Wolter ......................... 606/62 |
| 6,342,074 B1 | 1/2002 | Simpson |
| 6,364,880 B1 | 4/2002 | Michelson |
| 6,423,063 B1 | 7/2002 | Bonutti |
| 6,432,106 B1 | 8/2002 | Fraser |
| 6,458,158 B1 | 10/2002 | Anderson et al. |
| 6,468,311 B2 | 10/2002 | Boyd et al. |
| 6,569,201 B2 | 5/2003 | Moumene et al. |
| 6,638,310 B2 | 10/2003 | Lin et al. |
| 6,645,212 B2 * | 11/2003 | Goldhahn et al. ........... 606/291 |
| 6,761,739 B2 | 7/2004 | Shepard |
| 6,884,242 B2 * | 4/2005 | LeHuec et al. ............. 606/86 B |
| 6,972,019 B2 * | 12/2005 | Michelson ............. 606/86 A |
| 6,984,234 B2 | 1/2006 | Bray ........................ 606/69 |
| 7,112,222 B2 | 9/2006 | Fraser et al. |
| 7,172,627 B2 * | 2/2007 | Fiere et al. ............... 623/17.11 |
| 7,232,464 B2 | 6/2007 | Mathieu et al. ........... 623/17.11 |
| 2001/0001129 A1 | 5/2001 | McKay et al. |
| 2001/0005796 A1 | 6/2001 | Zdeblick et al. |
| 2001/0010021 A1 | 7/2001 | Boyd et al. |
| 2001/0016777 A1 | 8/2001 | Biscup |
| 2001/0031254 A1 | 10/2001 | Bianchi et al. |
| 2001/0039456 A1 | 11/2001 | Boyer, II et al. |
| 2001/0041941 A1 | 11/2001 | Boyer, II et al. |
| 2002/0010511 A1 | 1/2002 | Michelson |
| 2002/0022843 A1 | 2/2002 | Michelson .................. 606/70 |
| 2002/0029084 A1 | 3/2002 | Paul et al. |
| 2002/0082597 A1 | 6/2002 | Fraser |
| 2002/0082603 A1 * | 6/2002 | Dixon et al. ................ 606/69 |
| 2002/0091447 A1 | 7/2002 | Shimp et al. |
| 2002/0099376 A1 | 7/2002 | Michelson .................. 606/61 |
| 2002/0106393 A1 | 8/2002 | Bianchi et al. |
| 2002/0111680 A1 | 8/2002 | Michelson |
| 2002/0147450 A1 | 10/2002 | LeHuec et al. ............. 606/61 |

**US 7,846,207 B2**

Page 3

| | | | | | |
|---|---|---|---|---|---|
| 2002/0169508 A1 | 11/2002 | Songer et al. ............ 623/17.11 | WO | WO 96/39988 | 12/1996 |
| 2002/0193880 A1* | 12/2002 | Fraser ...................... 623/17.11 | WO | WO 97/20526 | 6/1997 |
| 2003/0078668 A1* | 4/2003 | Michelson ............... 623/17.16 | WO | WO 97/25941 | 7/1997 |
| 2003/0125739 A1 | 7/2003 | Bagga et al. | WO | WO 97/25945 | 7/1997 |
| 2004/0210314 A1 | 10/2004 | Michelson | WO | WO 97/39693 | 10/1997 |
| 2005/0033433 A1 | 2/2005 | Michelson | WO | WO 98/17209 | 4/1998 |
| 2007/0219635 A1 | 9/2007 | Mathieu et al. .......... 623/17.16 | WO | WO 98/55052 | 12/1998 |
| | | | WO | WO 98/56319 | 12/1998 |
| | FOREIGN PATENT DOCUMENTS | | WO | WO 98/56433 | 12/1998 |
| | | | WO | WO 99/29271 | 6/1999 |
| DE | 42 42 889 A1 | 6/1994 | WO | WO 99/32055 | 7/1999 |
| DE | 44 09 392 A1 | 9/1995 | WO | WO 99/38461 | 8/1999 |
| DE | 195 04 867 C1 | 2/1996 | WO | WO 99/38463 | 8/1999 |
| DE | 299 13 200 U1 | 9/1999 | WO | WO 99/56675 | 11/1999 |
| EP | 0505634 A1 | 9/1992 | WO | WO 99/63914 | 12/1999 |
| EP | 0517030 A2 | 12/1992 | WO | WO 00/07527 | 2/2000 |
| EP | 0577178 A1 | 1/1994 | WO | WO 00/07528 | 2/2000 |
| EP | 0639351 A2 | 2/1995 | WO | WO 00/30568 | 6/2000 |
| EP | 0505634 B1 | 8/1997 | WO | WO 00/40177 | 7/2000 |
| EP | 0966930 | 12/1999 | WO | WO 00/41654 | 7/2000 |
| EP | 0968692 A1 | 1/2000 | WO | WO 00/59412 | 10/2000 |
| EP | 0906065 B1 | 1/2004 | WO | WO 00/66044 A1 | 11/2000 |
| FR | 2 697 996 | 5/1994 | WO | WO 00/66045 A1 | 11/2000 |
| FR | 2 700 947 | 8/1994 | WO | WO 00/74607 A1 | 12/2000 |
| FR | 2 753 368 | 3/1998 | WO | WO 01/08611 | 2/2001 |
| GB | 2 148 122 A | 5/1985 | WO | WO 01/56497 A2 | 8/2001 |
| SU | 1465040 A1 | 3/1989 | WO | WO 01/93742 A2 | 12/2001 |
| WO | WO 88/03417 | 5/1988 | WO | WO 01/95837 A1 | 12/2001 |
| WO | WO 88/10100 | 12/1988 | | | |
| WO | WO 92/01428 | 2/1992 | * cited by examiner | | |
| WO | WO 95/21053 | 8/1995 | | | |



Fig. 1



**Fig. 2**



**Fig. 3**



**Fig. 4**



Fig. 5

Fig. 6



**Fig. 7**

US 7,846,207 B2

1

# INTERVERTEBRAL IMPLANT

## CROSS REFERENCE TO RELATED APPLICATION

This application is a continuation of International Patent Application No. PCT/CH2003/000089, filed Feb. 6, 2003, the entire contents of which is expressly incorporated herein by reference.

## TECHNICAL FIELD

The present invention relates generally to intervertebral implants.

## BACKGROUND OF THE INVENTION

GB-A-2 207 607 discloses an intervertebral implant, which has a horseshoe-shaped configuration with a plurality of cylindrical holes. The holes are smooth on the inside and only have a stop for the heads of the bone screws, which are to be introduced therein. A disadvantage of this arrangement is that the fastening screws, introduced therein, can be anchored only with their shaft in the bone. This does not result in a rigid connection with the horseshoe-shaped intervertebral implant. When the anchoring of the screw shaft in the bone is weakened, the intervertebral implant becomes movable with respect to the screw and the bone screws tend to migrate, endangering the blood vessels. Moreover, the loosening of the intervertebral implant can lead to a pseudoarthrosis.

U.S. Patent Publication US-A 2000/0010511 (Michelson) discloses an intervertebral implant, which, at its front surface, has two boreholes with an internal thread, into which bone screws with a threaded head can be introduced. A disadvantage of this implant is that the bone screws can become loose and are not secured against being screwed out or falling out. A further disadvantage is that the bone screws are fastened completely to the implant body itself and that therefore the latter experiences a relatively large stress.

Screws which emerge at the anterior or anterolateral edge of the vertebral body because of loosening run the risk of injuring main vessels such as the aorta and Vena cava, as well as supply vessels such as lumbar arteries and veins. Injury to these main vessels may result in internal bleeding possibly causing death within a very short time. Loosening of screws is more likely when they are not mounted angularly firmly.

## SUMMARY OF THE INVENTION

The present invention is to provide a remedy for the above-discussed disadvantages. The present invention is directed to an intervertebral implant which can enter into a permanent, rigid connection with bone fixation means, so that, even if the bone structure is weakened, there is no loosening between the intervertebral implant and the bone fixation means. Moreover, over a separately constructed front plate, there is tension chording for the bone fixation elements, so that the implant body experiences less stress, that is, superimposed tensions. Moreover, a securing plate enables all bone fixation elements to be secured simultaneously.

The present invention accomplishes the objective set out above with an intervertebral implant, comprising a three-dimensional body having an upper side and an under side which are suitable for abutting the end plates of two adjacent vertebral bodies. The three-dimensional body further includes a left side surface and a right side surface, a front surface and a rear surface, a horizontal middle plane between

2

the upper side and the under side, and a vertical middle plane extending from the front surface to the rear surface. The three-dimensional body further comprising a plurality of boreholes, having openings at least at or near the front surface, passing there through and being suitable for accommodating longitudinal fixation elements. The intervertebral implant further including a front plate displaceably disposed as an insert with the front side of the three-dimensional body, where the front plate includes a plurality of boreholes having openings and in which the longitudinal fixation elements can be anchored, and whose openings overlap with the openings of the boreholes of the three-dimensional body. The intervertebral implant has a securing plate fastened substantially parallel to the front plate in such a manner that the boreholes of the front plate are covered at least partly by the securing plate. An advantage achieved by the present invention, arises essentially from the solid connection between the intervertebral implant and the longitudinal fixation elements, used to fasten it.

Compared to the two-part implants of the state of the art, for which a front plate is implanted in a separate step, the present invention has the advantage that the implantation of the intervertebral implant may be carried out in one step and, with that, can be carried out more easily and more quickly. A further advantage is that the intervertebral implant is fixed as frontally as possible at the body of the vertebra. That is, at a place where good bone material usually is present. The result is an anterior movement limitation without a greater risk to the surrounding structures. The load is still absorbed under compression by the intervertebral implant and not by the front plate or the fixation screws (longitudinal fixation elements).

A method for implanting an intervertebral implant of the present invention between two adjacent vertebral bodies includes introducing the intervertebral implant, having a three-dimensional body, a front plate, and one or more boreholes, between two adjacent vertebral bodies, attaching longitudinal fixation elements with heads through the boreholes into the vertebral bodies, and attaching a securing plate by means of a fastening agent over the heads of the longitudinal fixation elements to the front plate, such that the heads of the longitudinal fixation elements are captured between the front plate and the securing plate wherein the longitudinal fixation elements are secured against being shifted relative to the intervertebral implant.

Other objectives and advantages in addition to those discussed above will become apparent to those skilled in the art during the course of the description of a preferred embodiment of the invention which follows. In the description, reference is made to accompanying drawings, which form a part thereof, and which illustrate an example of the invention. Such example, however, is not exhaustive of the various embodiments of the invention, and therefore, reference is made to the claims that follow the description for determining the scope of the invention.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 shows an exploded drawing of the intervertebral implant,

FIG. 2 shows a longitudinal fixation element in the form of a screw,

FIG. 3 shows an elevation of the intervertebral implant of FIG. 1,

FIG. 4 shows a side view of the intervertebral implant of FIG. 1,

US 7,846,207 B2

3

4

FIG. **5** shows a three-dimensional detailed representation of the body of the intervertebral implant, which shows the connecting elements to the front plate of FIG. **6**,

FIG. **6** shows a three-dimensional detailed representation of the front plate of the intervertebral implant and the connecting elements to the body of FIG. **5** and

FIG. **7** shows a completely installed intervertebral implant with front plate and securing plate.

## DESCRIPTION OF THE PREFERRED EMBODIMENTS

The intervertebral implant, shown in FIG. **1**-**7**, includes a three-dimensional body **10** in the form of a cage with an upper side **1** and an underside **2**, which are suitable for abutting the end plates of two adjacent vertebral bodies, a left side surface **3** and a right side surface **4**, a front surface **5** and a back surface **6**, a horizontal middle plane **7** located between the upper side **1** and the underside **2**, a vertical middle plane **12** extending from the front surface **5** to the rear surface **6** and four boreholes **9**a, which pass through the body **10** and are suitable for accommodating longitudinal fixation elements **20**. The body **10** may be constructed as a hollow body, the mantle surfaces of which are provided with perforations **19**. The upper side **1** and/or under side **2** of the intervertebral implant may preferably be convex in shape, not planar. A convex shape to the upper side **1** and the underside **2** allows for an improved fit with the end plates of the adjacent vertebral bodies by the intervertebral implant. Further, the side surfaces **1**-**6** of the intervertebral implant may be essentially convex, as well.

As shown in FIG. **7**, the upper side **1** and the underside **2** of the three-dimensional body **10** are provided with structuring in the form of teeth **30**.

At the front surface of the three-dimensional body **10**, a front plate **8** may be mounted, which is disposed perpendicular to the horizontal central plane of the intervertebral implant and through which four boreholes **9** pass and in which the longitudinal fixation elements **20** can be anchored. The front plate **8**, as shown in FIGS. **5** and **6**, is constructed as an insert for the three-dimensional body **10**. The three-dimensional body **10** has a semicircular groove **27** extending parallel to the vertical middle plane **12** at the transitions of the left side surface **3** and the right side surface **4** (FIG. **5**) to the front surface **5**. Correspondingly, the front plate **8** has right and left (FIG. **6**) similarly extending and similarly dimensioned, semicircular rail **28**. As a result, the front plate can be pushed and positioned easily with its two lateral rails **28** into the corresponding grooves **27** of the body **10** during the production of the intervertebral implant.

In one embodiment, at least one of the boreholes **9** in the front plate is constructed so that a longitudinal fixation element **20**, accommodated therein, can be connected rigidly with the front plate. A rigid connection may be accomplished, for example, owing to the fact that at least one of the boreholes **9** of the front plate **8** has an internal thread. A corresponding longitudinal fixation element **20**, bone screw, with a threaded end can then be screwed together rigidly with the implant. In an alternative embodiment, the four boreholes **9** in the front plate may have an internal thread **11**, so that longitudinal fixation elements **20** can be connected rigidly with the front plate **8**.

As discussed, the front plate **8** may be disposed, preferably vertically to the horizontal central plane, so that it can be displaced vertically with respect to the three-dimensional body **10**. By these means, "stress shielding" (protection and neutralization of mechanical stresses) is attained, which permits the end plates to be adapted to the intervertebral implant during the healing process.

The intervertebral implant may have a securing plate **18**, which can be fastened by means of a screw connection parallel to the front plate **8** at the front plate **8** in such a manner that the boreholes **9** of the front plate **8** are partly covered by the securing plate **18**. The securing plate **18** may have a central borehole **17** provided, preferably, with an internal thread. Corresponding thereto, the front plate **8** has a central borehole **15** for accommodating fastening means **16**. Preferably, the central borehole **15** has an internal thread **14** for accommodating a fastening means **16** in the form of a screw. The securing plate **18** may also be fastened by a bayonet catch or a click catch. By fastening the securing plate **18** to the front plate **8**, the heads **21** of the longitudinal fixation elements **20** (discussed later) are contacted by the securing plate **18**, so that they are secured against being ejected or screwed out.

Preferably, the boreholes **9**a of the three-dimensional body **10** do not pass either through the left side surface **3** or the right side surface **4** or completely through the front surface **5**. The front surface **5**, preferably, is also not crossed by the boreholes **9**a. Further, the horizontal middle plane **7** is not pierced by the boreholes **9**a. Only the axes **24** of the longitudinal fixation elements **20**, introduced therein, intersect the horizontal middle plane **7** of the body **10**. As seen from the front surface **5**, the boreholes of the three-dimensional body **10** and the front plate diverge. The axes **24** of the boreholes of the three-dimensional plate **10** and the front plate **8** enclose an angle β ranging from 20° to 60°, specifically from 36° to 48°, and more preferably an angle β of 42° with the horizontal middle plane **7** (FIG. **4**) and an angle α ranging from 10° to 45°, specifically from 27° to 33°, and more preferably an angle α of 30° with the vertical middle plane **12** (FIG. **3**). Thus, better access for introducing the screws is achieved.

In one embodiment, at least one of the boreholes **9** of the front plate **8** may taper conically towards the underside **2**, so that a bone screw, with a corresponding conical head, can be anchored rigidly therein. The conical borehole preferably has a conical angle, which is smaller than the resulting frictional angle. Advisably, the conicity of the conical borehole is 1:3.75 to 1:20.00 and preferably 1:5 to 1:15.

In another configuration, at least two of the boreholes **9** of the front plate **8** extend parallel to each other. This makes insertion of the intervertebral implant easier. In another embodiment, at least two of the boreholes **9** of the front plate **8** diverge when viewed from the front side. By these means, a region of the vertebral body, which has a better bone quality than does the center of the vertebral body, is reached by the bone screws.

To improve the anchoring of the bone screw in a plastic body of the intervertebral implant (discussed later), a metal sleeve with an internal thread (not shown) may be inserted in the boreholes of the front plate and three-dimensional body. The intervertebral implant may also consist only partially of an x-ray transparent plastic and, in the region of the boreholes consist of a metal, such as titanium or a titanium alloy. Improved guidance and anchoring of the bone screws in the intervertebral implant may be achieved. Further, the boreholes **9** may have a smooth internal wall, into which the threaded head of a metallic, longitudinal fixation element may cut or be molded.

Depending on circumstances, two, three, four or more longitudinal fixation elements may be connected rigidly with the intervertebral implant. Preferably, at least one fixation element should pierce the upper side and at least one fixation element the underside of the intervertebral implant. The lon-

US 7,846,207 B2

5

gitudinal fixation elements **20** may have either a smooth head, so that there will not be a rigid connection with the plate or a threaded, conical or expendable end, so that there will be a rigid connection with the implant. In both cases, however, the longitudinal fixation elements **20** are secured by the securing plate against rotating out, being ejected out or falling out at a later time.

The longitudinal fixation elements **20** are preferably constructed as bone screws. As shown in FIG. **2**, the longitudinal fixation elements **20**, introduced into the boreholes **9**, have a head **21**, a tip **22**, a shaft **23** and an axis **24**. The head **21** may preferably be provided with an external thread **25**, which corresponds to the internal thread **11** of the borehole **9**, so that the heads **21** can be anchored in the boreholes **9** in a rigid manner. The shaft **23** may be provided with a thread **26**, which is self-drilling and self-cutting. The load thread angle of the thread **26** has a range of between 11° to 14°, preferably between 12° and 13°, and more preferably a load thread angle of 12.5°. The pitch angle of the thread may have a range of between 6° and 10°, preferably between 7° and 9°, and more preferably have a pitch angle of 8°. The special pitch angle produces a self-retardation in the thread, thus ensuring that the bone screw will not automatically become loose.

In the case of a second, possibly rigid type of connection, a longitudinal fixation element **20**, bone screw, may preferably be used, the head of which tapers conically towards the shaft, the conicity of the head corresponding to the conicity of the borehole of the intervertebral implant. The longitudinal fixation elements may also be constructed as threadless cylindrical pins, which are provided with a drilling tip, preferably in the form of a trocar. A further variation consist therein that the longitudinal fixation elements are constructed as spiral springs. Finally, the longitudinal fixation elements may also be constructed as single-vaned or multi-vaned spiral blades.

As shown in FIG. **7**, two longitudinal fixation elements **20** pierce the upper side **1** and two longitudinal fixation elements **20** pierce the underside **2** of the body **10**, thereby anchoring the intervertebral implant to the adjacent vertebral bodies.

The intervertebral implant may be produced from any material which is compatible with the body. Preferably, the three-dimensional body **10** may consist of a body-compatible plastic which has not been reinforced and which may be transparent to x-rays. The advantage over fiber-reinforced plastics, which are already known in implant technology, is that no reinforcing fibers are exposed. Such exposure may be disadvantageous clinically. In such a three-dimensional body **10** constructed of a plastic that has not been reinforced, the use bone screws may be preferable. As discussed previously, the external thread of the bone screw(s) may have a load thread angle range of 11° to 14°, and preferably between 12° to 13°. A comparatively slight inclination of the load flank brings about a high clamping force. As a result, radial expansion and the danger of forming cracks in the plastic are reduced. Furthermore, the external thread of the bone screw(s) may preferably have a pitch angle between 6° and 10° and preferably between 7° and 9'.

The front plate **8** may be made from materials different than the three-dimensional body **10**. The front plate **8** is preferably made from a metallic material. Titanium or titanium alloys are particularly suitable as metallic materials. The complete tension chord arrangement (front plate and screws) may also be made from implant steel or highly alloyed metallic materials, such as CoCrMo or CoCrMoC. The advantage of titanium lies in that there is good tissue compatibility and the good ingrowing behavior of bones. The advantage of highly alloyed metallic materials lies in their high-strength values, which permit filigree constructions.

6

A brief description of a surgical procedure follows in order to explain the invention further.

The intervertebral implant, in the form of a three-dimensional body **10**, is introduced between two adjacent vertebral bodies by means of a suitable instrument. Longitudinal fixation elements **20**, in the form of bone screws, securing the three-dimensional body **10** are screwed/inserted by means of a suitable aiming device through the boreholes **9** of the front plate **8** into the vertebral bodies. The front plate **8** may be displaced vertically with respect to the three-dimensional body **10**, such that the openings of the boreholes **9a** of the three-dimensional plate **10** and the boreholes **9** of the front plate **8** overlap, to obtain stress shielding. The securing plate **18** is fastened by means of the fastening agent **16** in the form of a screw over the heads **21** of the longitudinal fixation elements **20** at the front plate **8**, so that the heads **21** of the longitudinal fixation elements **20** and, with that, the screws themselves, are captured between the front plate **8** and the securing plate **18** and secured against being shifted relative to the three-dimensional body **10** (for example, by falling out or by turning out). The fastening agent **16**, in the form of a screw, preferably is provided with a thread, which is distinguished by a large self-retardation.

The invention claimed is:

**1**. An intervertebral implant for insertion into an intervertebral disc space between endplates of adjacent vertebral bodies, the implant comprising:

  a three-dimensional body having an upper side and an underside provided with teeth, the upper side and underside suitable for abutting the end plates of the adjacent vertebral bodies, the upper side defining an upper plane and the underside defining an underside plane, a left side surface and a right side surface, a front surface including first and second partial boreholes, a rear surface, a horizontal middle plane between the upper side and the underside, and a vertical middle plane extending from the front surface to the rear surface;

  a front plate mounted to the front surface of the three-dimensional body, the front plate including a first borehole and a second borehole having openings, the first borehole and the second borehole each being aligned with a respective first and second partial borehole;

  first and second fixation elements being anchorable within the first and second boreholes and the first and second partial boreholes, respectively, the first and second fixation elements having first and second heads and first and second shafts, respectively, the first and second heads and the first and second boreholes and partial boreholes positioned substantially between the upper and underside planes in an assembled configuration, the first and second shafts being positioned substantially on an opposite side of the upper and underside planes, respectively, in the assembled configuration; and

  a securing plate fastened substantially parallel to the front plate in such a manner that the first and second boreholes of the front plate and the first and second heads are covered at least partly by the securing plate.

  **2**. The intervertebral implant according to claim **1**, wherein the securing plate is fastened parallel to the front plate, by at least one of a screw connection, a bayonet catch or a click catch.

  **3**. The intervertebral implant according to claim **1**, wherein the securing plate has a central borehole.

  **4**. The intervertebral implant according to claim **3**, wherein the front plate has a central borehole for accommodating a fastening agent.

**7**

**5**. The intervertebral implant according to claim **1**, wherein at least one of the first and second boreholes includes internal threads.

**6**. The intervertebral implant according to claim **5**, wherein the first and second boreholes are tapered conically in the direction of the underside of the three-dimensional body.

**7**. The intervertebral implant according to claim **6**, wherein the first and second boreholes have a conical angle, which is smaller than a resulting angle of friction.

**8**. The intervertebral implant according to claim **7**, wherein a conicity of the first and second boreholes range from 1:3.75 to 1:20.00.

**9**. The intervertebral implant according to claim **7**, wherein a conicity of the first and second boreholes range from 1:5 to 1:15.

**10**. The intervertebral implant according to claim **1**, wherein the front plate is preferably disposed vertically relative to the horizontal middle plane.

**11**. The intervertebral implant according to claim **10**, wherein the front plate is disposed in the three-dimensional body, such that it can be shifted vertically relative to the middle plane.

**12**. The intervertebral implant according to claim **1**, wherein the front plate is constructed of a material, which is different from that of the three-dimensional body and is metallic.

**13**. The intervertebral implant according to claim **1**, wherein the side surfaces are constructed convexly.

**14**. The intervertebral implant according to claim **1**, wherein at least one of the upper side and underside are not planar and are constructed convexly.

**15**. The intervertebral implant according to claim **1**, wherein the partial boreholes of the three-dimensional body do not pass completely through the front surface.

**16**. The intervertebral implant according to claim **1**, wherein the first and second boreholes of the front plate diverge when viewed from the front surface.

**17**. The intervertebral implant according to claim **1**, wherein axes of the first and second boreholes define an angle β, ranging from 20° to 60° with the horizontal middle plane.

**18**. The intervertebral plant according to claim **1**, wherein axes of the first and second boreholes enclose an angle α ranging from 10° to 45° with the vertical middle plane.

**19**. The intervertebral implant according to claim **1**, wherein the three-dimensional body consists of a reinforced plastic.

**20**. The intervertebral implant according to claim **1**, wherein the three-dimensional body consists partly of a material which is transparent to x-rays.

**21**. The intervertebral implant according to claim **1**, wherein the first and second boreholes of the front plate have a smooth inner wall, and the first and second heads of the first and second fixation elements include external threads for embedding in the smooth inner walls of the first and second boreholes.

**22**. The intervertebral implant according to claim **1**, wherein the three-dimensional body is constructed as a hollow body and includes casing surfaces which are provided with perforations.

**23**. The intervertebral implant according to claim **1**, wherein the first and second heads are in contact with the securing plate in the assembled configuration.

**24**. The intervertebral implant according to claim **23**, wherein each of the first and second fixation elements include an axis, the axes of the first and second fixation elements intersect the horizontal middle plane of the three-dimensional body.

**8**

**25**. The intervertebral implant according to claim **1**, wherein the first fixation element pierces the upper side and the second fixation element pierces the underside.

**26**. The intervertebral implant according to claim **1**, wherein the first and second boreholes include internal threads and the first and second heads of the first and second fixation elements are provided with an external thread, which is threadably matable with the internal threads of the first and second boreholes.

**27**. The intervertebral implant according to claim **1**, wherein the first and second heads taper conically toward the first and second shafts, respectively.

**28**. The intervertebral implant according to claim **1**, wherein the first fixation element passes through the upper side and the second fixation element passes through the underside.

**29**. The intervertebral implant according to claim **1**, wherein the first and second fixation elements are constructed as bone screws, the first and second shafts including a thread capable of self-drilling and self-cutting.

**30**. The intervertebral implant according to claim **1**, wherein the first and second fixation elements are constructed as a threadless cylindrical pins with a drill tip.

**31**. The intervertebral implant according to claim **1**, wherein the first and second fixation elements are constructed as spiral springs.

**32**. The intervertebral implant according to claim **1**, wherein the first and second fixation elements are constructed as single-vaned or multi-vaned spiral blades.

**33**. The intervertebral implant according to claim **1**, wherein the first and second shafts of the first and second fixation elements include a plurality of threads having a load thread angle of 11° to 14°.

**34**. The intervertebral implant according to claim **1**, wherein the first and second shafts of the first and second fixation elements include a plurality of threads having a pitch angle ranging from 6° to 10°.

**35**. The intervertebral implant according to claim **1**, wherein axes of the first and second boreholes define an angle β, ranging from 36° to 48, with the horizontal middle plane.

**36**. The intervertebral plant according to claim **1**, wherein axes of the first and second boreholes enclose an angle α ranging from 27° to 33° with the vertical middle plane.

**37**. The intervertebral implant according to claim **1**, wherein the front surface of the three-dimensional body includes a recess for receiving the front plate.

**38**. A method for implanting an intervertebral implant between first and second adjacent vertebral bodies, said method comprising the steps of:

(a) introducing the intervertebral implant between the first and second adjacent vertebral bodies, the implant comprising:

a three-dimensional body having first and second partial boreholes extending through a front surface, an upper side and an underside including teeth, the upper side defining an upper plane and the underside defining an underside plane, and

a front plate having first and second boreholes which are aligned with the first and second partial boreholes, respectively, the first and second boreholes and first and second partial boreholes being positioned substantially between the upper and underside planes;

(b) attaching a first fixation element having a first head portion and a first shaft portion through the first borehole of the front plate, through the first partial borehole of the three-dimensional body, and into the first vertebral body;

US 7,846,207 B2

9

10

(c) attaching a second fixation element having a second head portion and a second shaft portion through the second borehole of the front plate, through the second partial borehole of the three-dimensional body, and into the second vertebral body; and

(d) attaching a securing plate with a fastening agent over the first and second head portions of the first and second fixation elements to the front plate, such that the first and second head portions of the first and second fixation elements are captured between the front plate and the securing plate wherein the first and second fixation elements are secured against being shifted relative to the intervertebral implant.

**39**. The method according to claim **38**, wherein the front surface of the three-dimensional body includes a recess for receiving the front plate.

**40**. An intervertebral implant for mounting between adjacent vertebral bodies including a first vertebral body and a second vertebral body, the intervertebral implant comprising:

a body defining a horizontal middle plane, the body having an upper side including teeth for abutting the first vertebral body and an underside having teeth for abutting the second vertebral body, the upper side defining an upper plane and the underside defining an underside plane, the body further including a front surface having first and second partial boreholes;

a front plate mounted to the front surface of the body, the front plate including a first borehole and a second borehole, the first and second boreholes aligning with the first and second partial boreholes, respectively, and extending through the front plate at an angle ranging from about twenty degrees (20°) to about sixty degrees (60°) relative to the horizontal middle plane;

a first fixation element having a first head portion and a first shaft portion, the first head portion positioned in the first borehole and the first partial borehole and positioned between the upper and underside planes in an assembled configuration, the first shaft portion sized and configured to engage the first vertebral body;

a second fixation element having a second head portion and a second shaft portion, the second head portion positioned in the second borehole and the second partial borehole and positioned between the upper and under-

side planes in the assembled configuration, the second shaft portion sized and configured to engage the second vertebral body; and

a securing plate fastened to the front plate to at least partly cover the first and second head portions and prevent the first and second fixation elements from moving out of the first and second boreholes, respectively.

**41**. The intervertebral implant according to claim **40**, wherein the front surface of the body includes a recess for receiving the front plate.

**42**. An intervertebral implant for insertion into an intervertebral disc space between endplates of first and second vertebral bodies, the implant comprising:

a body portion including a left side surface, a right side surface, a front surface having first and second partial boreholes, a rear surface, an upper side having teeth suitable for abutting the end plate of the first vertebral body, the upper side defining an upper plane, an underside having teeth suitable for abutting the end plate of the second adjacent vertebral body, the underside defining an underside plane;

a front plate operatively coupled to the front surface of the body, the front plate including a first borehole and a second borehole having respective openings, the first and second boreholes being aligned with the first and second partial boreholes, respectively;

first and second fixation elements being anchorable within the first and second boreholes and partial boreholes, respectively, the first and second fixation elements having first and second heads and first and second shafts, respectively, the first and second heads and the first and second boreholes and partial boreholes positioned substantially between the upper and underside planes in an assembled configuration, the first and second shafts being positioned substantially on an opposite side of the upper and underside planes, respectively, in the assembled configuration; the implant further comprising a securing plate operatively connectable to the front plate in such a manner that the first and second boreholes of the front plate and the first and second heads are covered at least partly by the securing plate.

**43**. The intervertebral implant according to claim **42**, wherein the front plate is received within a recess formed in the body portion.

*   *   *   *   *

# EXHIBIT C



March 15, 2022

**Certification**

**Welocalize Translations**

**TRANSLATOR'S DECLARATION:**

I, Sam Larson, hereby declare:

That I possess advanced knowledge of the German and English languages. The attached German into English translation has been translated by me and to the best of my knowledge and belief, it is a true and accurate translation of: PCT/CH2003/000089.

Sam Larson

Sam Larson

Project Number: JODAY_2203_P0005

**(12) INTERNATIONAL APPLICATION PUBLISHED UNDER THE PATENT COOPERATION TREATY (PCT)**

**(19) World Intellectual Property Organization**
International Bureau

(43) International publication date
19. August 2004 (19.08.2004)



PCT



**(10) International publication number**

**WO 2004/069106 A1**

**(51) International patent classification** [7]: A61F 2/44

**(21) Internationals application number:**
PCT/CH2003/000089

**(22) Internationals filing date:**
6. Februar 2003 (06.02.2003)

**(25) Filing language:** German

**(26) Publication language:** German

**(71) Applicant** (for all designated states with the exception of CA, US): *SYNTHES AG CHUR [CH/CH]; Grabenstrasse 15, CH-7002 Chur (CH).*

**(71) Applicant** (only for CA): **SYNTHES (U.S.A.)** [US/US]; 1690 Russell Road, P.O. Box 1766, Paoli, PA 19301-1222 (US).

**(72) Inventor; and**

**(75) Inventor/applicant** (only for US): **LECHMANN, Beat** [CH/CH]; Grenchenstrasse 29 A, CH-2544 Bettlach (CH). **BURKARD, Dominique** [CH/CH]; Hasengasse 6, CH-5014 Gretzenbach (CH). **CAIN, Chris, M., J.** [AU/AU]; 104 George Street, Norwood, S.A. 5067 (AU). **MATHIEU, Claude** [LU/CH]; Aristonstrasse 3, CH-2544 Bettlach (CH).

**(74) Agent: LUSUARDI, Werther;** Dr. Lusuardi AG, Kreuzbühlstrasse 8, CH-8008 Zürich (CH).

**(81) Designated states** (national): AE, AG, AL, AM, AT, AU, AZ, BA, BB, BG, BR, BY, BZ, CA, CH, CN, CO, CR, CU, CZ, DE, DK, DM, DZ, EC, EE, ES, FT, GB, GD, GE, GH, GM, HR, HU, ID, IL, IN, IS, JP, KE, KG, KP, KR,

[continued on next page]

**(54) Title:** INTERVERTEBRAL IMPLANT

**(54) Bezeichnung:** ZWISCHENWIRBELIMPLANTAT



**(57) Abstract:** The intervertebral implant comprises a three-dimensional body (10) having an upper side (1) and a lower side (2), which are suitable for contact on the end plates of two adjacent vertebral bodies; a left lateral face (3) and a right lateral face (4); a front face (5) and a rear face (6); a

WO 2004/069106 A1

horizontal center plane (7) located between the upper side (1) and lower side (2); a vertical center plane (12) extending from the front face (5) to the rear face (6); and a plurality of bores (9) penetrating the body (10), which are suitable for accommodating longitudinal fixation elements (20); wherein the three-dimensional body (10) has a front plate (8) on its front face (5), through which the bores (9) pass and in which the longitudinal fixation elements (20) can be anchored. The intervertebral implant furthermore has a securing plate (18), which is fastenable essentially in parallel to the front plate (8) on the body (10) or the front plate (8) in such a way that the bores (9) can be at least partially covered by the securing plate (18). A permanently rigid, i.e., fixed connection is thus possible between the intervertebral implant and the longitudinal fixation elements used for its fastening.

WO 2004/069106 A1

# WO 2004/069106  A1

KZ, LC, LK, LR, LS, LT, LU, LV, MA, MD, MG, MK, MN, MW, MX, MZ, NO, NZ, OM, PH, PL, PT, RO, RU, SC, SD, SE, SG, SK, SL, TJ, TM, TN, TR, TT, TZ, UA, UG, US, UZ, VC, VN, YU, ZA, ZM, ZW.

**(84) Designated states** *(regional)*-. ARIPO Patent (GH, GM, KE, LS, MW, MZ, SD, SL, SZ, TZ, UG, ZM, ZW), Eurasian Patent (AM, AZ, BY, KG, KZ, MD, RU, TJ, TM), European Patent (AT, BE, BG, CH, CY, CZ, DE, DK, EE, ES, FT, FR, GB, GR, HU, IE, IT, LU, MC, NL,

PT, SE, SI, SK, TR), OAPI Patent (BF, BJ, CF, CG, CI, CM, GA, GN, GQ, GW, ML, MR, NE, SN, TD, TG).

Published:
- with international search report

Reference is made to the explanations ("Guidance Notes on Codes and Abbreviations") at the beginning of each regular issue of the PCT Gazette for explanation of the two-letter codes and the other abbreviations. .

**Intervertebral implant**

The invention relates to an intervertebral implant according to the preamble of claim 1.

An intervertebral implant is known from GB-A-2 207 607, which has a horseshoe-shaped design having a plurality of cylindrical holes. The holes are formed smooth on the inside and only

5    have a stop for the heads of the bone screws to be inserted therein. The disadvantages of this arrangement are that the fastening screws inserted therein can only be anchored with their shaft in the bone, without a rigid connection resulting with the horseshoe-shaped intervertebral implant. As soon weakening of the anchoring of the screw shaft in the bone occurs, the intervertebral implant becomes movable in relation to the screw and there is the tendency toward migration of the bone

10   screws with endangerment of the blood vessels. The loosening of the intervertebral implant can moreover result in pseudo-arthrosis.

An intervertebral implant is known from US-A 2000/0010511 MICHELSON, which has on its front face two bores having an inner thread, into which bone screws are insertable with a threaded head. This implant has the disadvantage, on the one hand, of the circumstance that the bone screws

15   can loosen again and are not secured against unscrewing or falling out. On the other hand, there is the further disadvantage that the bone screws are fastened completely on the implant body itself and the latter therefore experiences a relatively high stress.

Screws which exit at the anterior or anterior lateral edge of the vertebral body run the risk of injuring main vessels such as the aorta, the vena cava, and supply vessels such as lumbar arteries

20   and veins. The injuring of the main vessels results in internal bleeding within a very short time. It is rather possible for screws to loosen if they are not attached in an angularly stable manner.

The invention wishes to provide a remedy here. The invention is based on the problem of creating an intervertebral implant which can form a permanently rigid connection with bone fixation means, so that no loosening occurs between intervertebral implant and bone fixation means

25   even in the event of weakening of the bone structure. Moreover, tension belting for the bone fixation elements is to be produced via a separately formed front plate, so that the implant body experiences less stress, i.e., overlaid tensions. Moreover, a securing plate enables the simultaneous

4

securing of all bone fixation elements.

The invention achieves the stated object with an intervertebral implant which has the features of claim 1.

The advantages achieved by the invention essentially result due to the permanently rigid, i.e., fixed connection between the intervertebral implant and the longitudinal fixation elements used for its fastening.

A front plate arranged vertically in relation to the horizontal center plane of the intervertebral implant is attached to the front face of the three-dimensional body, through which the bores extend and in which the longitudinal fixation elements can be anchored. This has the advantage over two-part implants according to the prior art, in which a front plate is implanted in a separate operation step, that the implantation of the intervertebral implant can be carried out in one step and thus in an easier and faster manner. A further advantage is that the fixation of the intervertebral implant thus takes place as frontally as possible on the vertebral body, i.e., where in general good bone material is present. The result is an anterior movement restriction, without a greater risk for the surrounding structures thus arising than is the case with an intervertebral implant according to the prior art. The load is still absorbed by the intervertebral implant under compression and not by the front plate or the fixation screws.

A securing plate is fastenable in parallel to the front plate, preferably by means of a screw connection, a bayonet fitting, or a click fastener. The securing plate expediently has a central bore which is preferably provided with an internal thread. The front plate expediently has a central bore for accommodating a fastening means.

In one particular embodiment, at least one of the bores in the front plate is designed in such a way that a longitudinal fixation element accommodated therein is connectable in a rigid manner to the front plate.

Rigid connections can be achieved, for example, in that at least one of the bores has an internal thread. A corresponding bone screw having a threaded head can then be screwed together in a rigid manner with an implant.

An alternative thereto is that at least one of the bores tapers conically toward the lower side, so that a bone screw having corresponding cone head can be rigidly anchored therein. The conical bore preferably has a cone angle which is less than the resulting friction angle. The conicity of the conical bore is expediently 1:3.75 to 1:20.00, preferably 1:5 to 1:15.

5      The bone fixation elements can either have a smooth head, so that a rigid connection is not formed with the implant, or a threaded head, cone head, or expanding head, so that a rigid connection is formed with the implant. In both cases, however, the bone fixation elements are secured by the securing plate against later unscrewing, injection, or falling out.

In one particular embodiment, the front plate in the three-dimensional body is designed as an insert and is preferably arranged displaceably vertically in relation to the horizontal center plane, so that it can be displaced vertically in relation to the three-dimensional body. "Stress shielding" (protection or neutralization of mechanical stresses) is thus achieved, which permits a gradual adaptation of the end plates to the intervertebral implant during the healing process.

In a further embodiment, the front plate is manufactured from a different material than the three-dimensional body, preferably from a metallic material. In particular titanium or titanium alloys are suitable as metallic materials. The complete tension belting arrangement (front plate and screw) can also be manufactured from implant steel or highly-alloyed metallic materials such as CoCrMo or CoCrMoC. The advantage of titanium is the tissue compatibility and the good bone ingrowth behavior. The advantage of highly-alloyed metallic materials is their high strength values, which permit filigree structures.

The upper side and/or the lower side of the intervertebral implant are expediently not formed planar, but rather preferably convex. Better adaptation to the end plates of the adjacent vertebral bodies can thus be achieved. In a further embodiment, the lateral faces of the intervertebral implant are essentially all formed convex.

The bores expediently do not drill through the left and the right lateral face of the intervertebral implant. The front face is advantageously also not traversed by the bores.

In a further preferred embodiment, at least two of the bores extend in parallel. The insertability

6

of the intervertebral implant during the implantation is thus facilitated.

In another preferred embodiment, at least two of the bores extend divergently viewed from the front side. The bone screws thus reach a region of the vertebral body which has a better bone quality in comparison to its center.

5    In one particular embodiment, the axes of the bores enclose an angle beta in the range of 20° to 60°, preferably 36° to 48°, in relation to the horizontal center plane. The axes of the bores expediently enclose an angle alpha in the range of 10° to 45°, preferably 27° to 33°, in relation to the vertical center plane. A better access is thus achieved during the introduction of the screws.

In a further embodiment, the horizontal center plane is not penetrated by the bores.

10   In one particular embodiment, the upper side and lower side of the body are provided with a structuring, preferably in the form of teeth.

The intervertebral implant can be formed as a hollow body, the lateral surfaces of which are preferably provided with perforations.

Depending on the circumstances, two, three, four, or even more longitudinal fixation elements

15   can be connected in a rigid manner to the intervertebral implant, expediently at least one fixation element is to penetrate the upper side and at least one fixation element is to penetrate the lower side of the intervertebral implant.

Preferably, longitudinal fixation elements in the form of bone screws having a head and a shaft are used, wherein the head is preferably provided with an external thread, which corresponds to

20   the internal thread of the bore of the intervertebral implant. In a second possible rigid type of connection, a bone screw can preferably be used, in which the head tapers conically toward the shaft, wherein the conicity of the head corresponds to the conicity of the bore of the intervertebral implant.

In a further embodiment, at least two longitudinal fixation elements penetrate the upper side

25   and at least two longitudinal fixation elements penetrate the lower side. The intervertebral implant thus receives optimum anchoring in the adjacent vertebral bodies.

The longitudinal fixation elements formed as bone screws preferably have a self-drilling and

7

self-tapping external thread. The longitudinal fixation elements can also be formed as threadless cylinder pins, which are provided with a drill tip, preferably in the form of a trocar.

A further variant is that the longitudinal fixation elements are formed as spiral springs and finally the longitudinal fixation elements can also be formed as single-wing or multi-wing spiral

5    blades.

The intervertebral implant can be manufactured from any biocompatible material, however, the body expediently consists of a biocompatible plastic, preferably a non-reinforced plastic. The advantage over the fiber-reinforced plastics already known in implantology is that reinforcing fibers are not exposed, which is clinically disadvantageous. In such a body consisting of

10   nonreinforced plastic, bone screws can expediently be used, the external thread of which has a load flank angle in the range of 11° to 14°, preferably 12° to 13°. The comparatively minor inclination of the load flank causes a high clamping force, due to which the radial expansion and the risk of cracking in the plastic are reduced. The external thread of the bone screws expediently has a pitch angle in the range of 6° to 10°, preferably 7° to 9°. This special pitch angle generates self-locking

15   in the thread and thus secures the bone screw against loosening independently.

To improve the anchoring of the bone screw in the plastic body, the bore can be a metal sleeve having internal thread. The intervertebral implant can also only partially consist of an x-ray-transmissive plastic and – in the region of the bores – of metal, for example, of titanium or titanium alloy. Better guiding and anchoring of the bone screws in the intervertebral implant is thus achieved

20   overall.

In a further preferred embodiment, the bores can have a smooth inner wall, into which the threaded head of a metallic, longitudinal fixation element can be cut or formed.

The invention and refinements of the invention are explained in more detail hereinafter on the basis of the partially schematic illustration of an exemplary embodiment.

25   In the figures:

Figure 1 shows an exploded drawing of an intervertebral implant;

Figure 2 shows a longitudinal bone fixation means in the form of a screw;

8

Figure 3 shows a front view of the intervertebral implant according to Figure 1;

Figure 4 shows a side view of the intervertebral implant according to Figure 1;

Figure 5 shows a three-dimensional detail view of the body of the intervertebral implant, which shows the connecting elements to the front plate according to Figure 6;

5      Figure 6 shows a three-dimensional detail view of the front plate of the intervertebral implant, which shows the connecting elements to the body according to Figure 5;

Figure 7 shows a completely assembled intervertebral implant having front plate and securing plate.

The intervertebral implant shown in Figures 1-7 comprises a three-dimensional body 10 in the

10    form of a cage having an upper side 1 and a lower side 2, which are suitable for contact on the end plates of two adjacent vertebral bodies, a left lateral surface 3 and a right lateral surface 4, a front face 5 and a rear face 6, a horizontal center plane 7 located between the upper side 1 and lower side 2, a vertical center plane 10 extending from the front face 5 to the rear face 6, four bores 9 penetrating the body 10, which are suitable for accommodating longitudinal fixation elements 20.

15    The body 10 is formed as a hollow body, the lateral surfaces of which are provided with perforations 19.

The three-dimensional body 10 has a front plate 8 on its front face 5, through which the bores 9 pass and in which the longitudinal fixation elements 20 can be anchored.

The intervertebral implant furthermore has a securing plate 18, which is fastenable on the front

20    plate 8 by means of a screw connection in parallel to the front plate 8 in such a way that the bores 9 can be partially covered by the securing plate 18. The securing plate 18 has a central bore 17 for this purpose. Corresponding thereto, the front plate 8 has a central bore 15 having internal thread 14 for accommodating a fastening means 16 in the form of a screw.

The four bores 9 in the front plate 8 have an internal thread 11, so that the longitudinal fixation

25    elements 20 accommodated therein in the form of screws are connectable in a rigid manner to the front plate 8.

The front plate 8 consists of titanium and the three-dimensional body 10 consists of an x-ray-

9

transmissive, nonreinforced plastic. The front plate 8 is designed, as shown in Figures 5/6, as an insert for the body 10 and is arranged displaceably vertically in relation to the horizontal center plane 7. The body 10 has for this purpose, at the transitions of the left lateral face 3 and the right lateral face 4 (Figure 5) to the front face 5, a semi-cylindrical groove 27 extending in parallel to

5   the vertical center plane 12. Correspondingly, the front plate 8 has an identically extending and identically dimensioned, semicylindrical rail 28 on the right and left (Figure 6). The front plate – during the production of the intervertebral implant – may thus be inserted easily with its two lateral rails 28 into the corresponding grooves 27 of the body 10 and positioned.

The lateral faces 1, 2, 3, 4, 5, and 6 of the body 10 are all formed convex.

10   The bores 9 do not drill through the left lateral face 3 or the right lateral face 4; the front face 5 is also not completely drilled through by the bores 9.

The four bores 9 all extend divergently viewed from the front face 5 (Figure 7).

The axes 24 of the bores 9 enclose an angle beta of 42° in relation to the horizontal center plane 7 and an angle alpha of 30° in relation to the vertical center plane 12.

15   The bores 9 do not penetrate the horizontal center plane 7, only the axes 24 of the longitudinal fixation elements 20 inserted therein intersect the horizontal center plane 7 of the body 10.

As shown in Figure 7, the upper side 1 and lower side 2 of the body 10 are provided with a structuring in the form of teeth 30.

The longitudinal fixation elements 20 are designed as bone screws. As shown in Figure 2, the

20   longitudinal fixation elements 20 inserted into the bores 9 have a head 21, a tip 22, a shaft 23, and an axis 24. The head 21 is provided with an external thread 25, which corresponds to the internal thread 11 of the bore 9, so that the heads 21 can be anchored in a rigid manner in the bores 9. The shaft 23 is provided with a thread 26, which is self-drilling and self-tapping. The load flank angle of the thread 26 is 12.5° and the pitch angle is 8°.

25   Due to the fastening of the securing plate 18 on the front plate 8, the heads 21 of the longitudinal fixation elements 20 are contacted by the securing plate 18, so that they are secured against ejection or unscrewing.

10

As shown in Figure 7, two longitudinal fixation elements 20 penetrate the upper side 1 and two longitudinal fixation elements 20 penetrate the lower side 2 of the body 10.

A brief operational description follows for further explanation of the invention:

a) The intervertebral implant in the form of a three-dimensional body (10) is introduced by means of a suitable instrument between two adjacent vertebral bodies;

b) four longitudinal fixation elements 20 in the form of bone screws are screwed by means of a suitable targeting device through the bores 9 of the front plate 8 into the vertebral body;

c) the securing plate 18 is fastened by means of the fastening means 16 in the form of a screw via the heads 21 of the longitudinal fixation elements 20 on the front plate, so that the heads 21 of the longitudinal fixation elements 20 – and thus the screws themselves – are trapped between the front plate 8 and the securing plate 18 and secured against a relative displacement in relation to the body 10 (for example due to falling out or unscrewing). The fastening means 16 in the form of a screw is preferably provided with a thread which is distinguished by significant self-locking.

11

Claims

1. An intervertebral implant, which comprises a three-dimensional body (10) having

A) an upper side (1) and a lower side (2), which are suitable for contact on the end plates of two adjacent vertebral bodies;

5      B) a left lateral face (3) and a right lateral face (4);

C) a front face (5) and a rear face (6);

D) a horizontal center plane (7) located between the upper side (1) and lower side (2);

E) a vertical center plane (12) extending from the front face (5) to the rear face (6);

F) a plurality of bores (9) penetrating the body (10), which are suitable for accommodating

10      longitudinal fixation elements (20); wherein

G) the three-dimensional body (10) has a front plate (8) on its front face (5), through which the bores (9) pass and in which the longitudinal fixation elements (20) can be anchored;

**characterized in that**

H) the intervertebral implant has a securing plate (18), which is fastenable essentially in parallel

15      to the front plate (8) on the body (10) or the front plate (8) in such a way that the bores (9) can be at least partially covered by the securing plate (18).

2. The intervertebral implant as claimed in claim 1, characterized in that the securing plate (18) is fastenable in parallel to the front plate (8), preferably by means of a screw connection, a bayonet fitting, or a click fastener.

20      3. The intervertebral implant as claimed in claim 1 or 2, characterized in that the securing plate (18) has a central bore (17).

4. The intervertebral implant as claimed in claim 3, characterized in that the front plate (8) has a central bore (15) for accommodating the fastening means (16), which is preferably provided with an internal thread (14).

25      5. The intervertebral implant as claimed in any one of claims 1 to 4, characterized in that at least one of the bores (9) is formed in the front plate (8) in such a way that a longitudinal fixation element (20) accommodated therein is connectable in a rigid manner to the front plate (8).

12

6. The intervertebral implant as claimed in claim 5, characterized in that at least one of the bores (9) has an internal thread (11).

7. The intervertebral implant as claimed in claim 5 or 6, characterized in that at least one bore (9) tapers conically toward the lower side (2).

8. The intervertebral implant as claimed in claim 7, characterized in that the conical bore (9) has a cone angle, which is less than the resulting friction angle.

9. The intervertebral implant as claimed in claim 8, characterized in that the conicity of the conical bore (9) is in the range of 1:3.75 to 1:20.00, preferably in the range of 1:5 to 1:15.

10. The intervertebral implant as claimed in any one of claims 1 to 9, characterized in that the front plate (8) is designed as an insert and is preferably arranged vertically in relation to the horizontal center plane (7).

11. The intervertebral implant as claimed in claim 10, characterized in that the front plate (8) is arranged displaceably in the three-dimensional body (10) vertically in relation to the center plane (7).

12. The intervertebral implant as claimed in any one of claims 1 to 11, characterized in that the front plate (8) is manufactured from a different material than the three-dimensional body (10) and is preferably metallic.

13. The intervertebral implant as claimed in any one of claims 1 to 12, characterized in that its lateral faces (1, 2, 3, 4, 5, 6) are essentially all formed convex.

14. The intervertebral implant as claimed in any one of claims 1 to 13, characterized in that the upper side (1) and/or the lower side (2) is formed non-planar and preferably convex.

15. The intervertebral implant as claimed in any one of claims 1 to 14, characterized in that the bores (9) do not drill through the left lateral face (3) and the right lateral face (4).

16. The intervertebral implant as claimed in any one of claims 1 to 15, characterized in that the bores (9) do not completely drill through the front face (5).

17. The intervertebral implant as claimed in any one of claims 1 to 16, characterized in that at least two of the bores (9) extend in parallel.

13

18. The intervertebral implant as claimed in any one of claims 1 to 17, characterized in that at least two of the bores (9) extend divergently viewed from the front side (1).

19. The intervertebral implant as claimed in any one of claims 1 to 18, characterized in that the axes (24) of the bores (9) enclose an angle beta in the range of 20° to 60°, preferably 36° to 48°, in relation to the horizontal center plane (7).

20. The intervertebral implant as claimed in any one of claims 1 to 19, characterized in that the axes (24) of the bores (9) enclose an angle alpha in the range of 10° to 45°, preferably 27° to 33°, in relation to the vertical center plane (12).

21. The intervertebral implant as claimed in any one of claims 1 to 20, characterized in that the bores (9) do not penetrate the horizontal center plane (7).

22. The intervertebral implant as claimed in any one of claims 1 to 21, characterized in that the body (10) consists of plastic, preferably a nonreinforced plastic.

23. The intervertebral implant as claimed in any one of claims 1 to 22, characterized in that the bore (9) has a metal sleeve having internal thread (11).

24. The intervertebral implant as claimed in any one of claims 1 to 23, characterized in that it partially consists of an x-ray-transmissive material, preferably a plastic, and consists of a metal, preferably based on titanium, in the region of the bores (9).

25. The intervertebral implant as claimed in any one of claims 1 to 24, characterized in that the bores (9) have a smooth inner wall, into which the threaded head of a metallic, longitudinal fixation element (20) can be cut or formed.

26. The intervertebral implant as claimed in any one of claims 1 to 25, characterized in that its upper side (1) and lower side (2) are provided with a structuring, preferably in the form of teeth (30).

27. The intervertebral implant as claimed in any one of claims 1 to 26, characterized in that it is formed as a hollow body, the lateral surfaces of which are preferably provided with perforations (19).

28. The intervertebral implant as claimed in any one of claims 1 to 27, having at least two

14

longitudinal fixation elements (20) insertable into the bores (9),

**characterized in that**

the longitudinal fixation elements (20) inserted into the bores (9) have a head (21), a tip (22), a shaft (23), and an axis (24), and in that the heads (21) can be anchored in the bores (9).

5     29. The intervertebral implant as claimed in claim 28, characterized in that the heads (21) can be contacted by the securing plate (18) fastened on the body (10) or on the front plate (8).

30. The intervertebral implant as claimed in claim 28 or 29, characterized in that the axes (24) of the longitudinal fixation elements (20) intersect the horizontal center plane (7) of the body (10).

31. The intervertebral implant as claimed in any one of claims 28 to 30, characterized in that at

10    least one longitudinal fixation element (20) penetrates the upper side (1) and at least one longitudinal fixation element (20) penetrates the lower side (2).

32. The intervertebral implant as claimed in any one of claims 28 to 31, characterized in that the head (21) is provided with an external thread (25), which corresponds to the internal thread (11) of the bore (9).

15    33. The intervertebral implant as claimed in any one of claims 28 to 32, characterized in that the head (21) tapers conically toward the shaft (23), wherein preferably the conicity of the shaft (21) corresponds to the conicity of the bore (9).

34. The intervertebral implant as claimed in any one of claims 28 to 33, characterized in that at least two longitudinal fixation elements (20) penetrate the upper side (1) and at least two

20    longitudinal fixation elements (20) penetrate the lower side (2).

35. The intervertebral implant as claimed in any one of claims 28 to 34, characterized in that the longitudinal fixation elements (20) are formed as bone screws, the shaft (23) of which is provided with a thread (26), which is preferably self-drilling and self-tapping.

36. The intervertebral implant as claimed in any one of claims 28 to 35, characterized in that

25    the longitudinal fixation elements (20) are formed as threadless cylinder pins having a drill tip, preferably in the form of a trocar.

37. The intervertebral implant as claimed in any one of claims 28 to 36, characterized in that

the longitudinal fixation elements (20) are formed as spiral springs.

38. The intervertebral implant as claimed in any one of claims 28 to 37, characterized in that the longitudinal fixation elements (20) are formed as single-wing or multi-wing spiral blades.

39. The intervertebral implant as claimed in any one of claims 28 to 38, characterized in that the thread (26) of the shaft (23) of the longitudinal fixation elements (20) has a load flank angle in the range of 11° to 14°, preferably 12° to 13°.

40. The intervertebral implant as claimed in any one of claims 28 to 39, characterized in that the thread (26) of the shaft (23) of the longitudinal fixation elements (20) has a pitch angle in the range of 6° to 10°, preferably 7° to 9°.

41. A method for implanting an intervertebral implant between two adjacent vertebral bodies, characterized by the following operation steps:

a) an intervertebral implant having a front plate (8) having multiple bores (9) is introduced between two adjacent vertebral bodies;

b) at least two longitudinal fixation elements (20) having heads (21) are screwed through the bores (9) of the front plate (8) into the vertebral body;

c) a securing plate (18) is fastened by means of a fastening means (16) over the heads (21) of the longitudinal fixation elements (20) on the front plate (8), so that the heads (21) of the longitudinal fixation elements (20) are trapped between the front plate (8) and the securing plate (18) and secured against a relative displacement to the intervertebral implant.

42. The method as claimed in claim 41, characterized in that a tension belting for the bone fixation elements takes place between operation steps b) and c).

16



Fig. 1



24
21
25
26
25
23
22

Fig. 2



Fig. 3



Fig. 4



Fig. 5          Fig. 6



Fig. 7

# INTERNATIONAL SEARCH REPORT

| International Application No |
|---|
| PCT/CH 03/00089 |

**A. CLASSIFICATION OF SUBJECT MATTER**
IPC 7    A61F2/44

According to International Patent Classification (IPC) or to both national classification and IPC

**B. FIELDS SEARCHED**

Minimum documentation searched  (classification system followed by classification symbols)
IPC 7    A61F

Documentation searched other than minimum documentation to the extent that such documents are included  in the fields searched

Electronic data base consulted during the international search (name of data base and, where practical, search terms used)

EPO-Internal

**C. DOCUMENTS CONSIDERED TO BE RELEVANT**

| Category * | Citation of document, with indication, where appropriate, of the relevant passages | Relevant to claim No. |
|---|---|---|
| X | US 5 888 223 A (BRAY JR ROBERT S)<br>30 March 1999 (1999-03-30)<br><br>figures 2,3,14<br>column 6, line 28 – line 63 | 1-4,<br>13-15,<br>18,<br>27-29,35 |
| Y<br>Y | | 10,11<br>28,32,33 |
| | --- | |
| Y | US 6 235 059 B1 (ALBY ALBERT  ET AL)<br>22 May 2001 (2001-05-22)<br>figure 2<br>column 3, line 6 – line 13 | 10,11 |
| | --- | |
| Y | US 2002/022843 A1 (MICHELSON GARY K)<br>21 February 2002 (2002-02-21)<br>figures 6,7A,7B,17 | 28,32,33 |
| | --- | |
| | -/-- | |

| X | Further documents are listed in the  continuation of box C. | X | Patent family members are listed in annex. |
|---|---|---|---|

*  Special categories of cited documents :

"A"  document defining the general state of the  art which is not
      considered to be of particular relevance

"E"  earlier document but published on or after the  international
      filing date

"L"  document which may throw doubts on priority  claim(s) or
      which is cited to establish the publication date of another
      citation or other special reason (as  specified)

"O"  document referring to an oral disclosure, use,  exhibition or
      other means

"P"  document published prior to the international  filing date but
      later than the priority date claimed

"T"  later document published after the  international filing date
      or priority date and not in conflict with the  application but
      cited to understand the principle or theory  underlying the
      invention

"X"  document of particular relevance; the claimed  invention
      cannot be considered novel or cannot be considered to
      involve an inventive step when the document  is taken alone

"Y"  document of particular relevance; the claimed  invention
      cannot be considered to involve an inventive  step when the
      document is combined with one or more other  such docu-
      ments, such combination being obvious to a  person skilled
      in the art.

"&"  document member of the same patent family

| Date of the actual completion of the international search | Date of mailing of the international search report |
|---|---|
| 4 November 2003 | 03/12/2003 |

| Name and mailing address of the ISA | Authorized officer |
|---|---|
| European Patent Office, P.B. 5818 Patentlaan 2<br>NL – 2280 HV Rijswijk<br>Tel. (+31–70) 340–2040, Tx. 31 651 epo nl,<br>Fax: (+31–70) 340–3016 | Josten, S |

Form PCT/ISA/210 (second sheet) (July 1992)

1

**INTERNATIONAL SEARCH REPORT**

International Application No

PCT/CH 03/00089

**C.(Continuation) DOCUMENTS CONSIDERED TO BE RELEVANT**

| Category * | Citation of document, with indication, where appropriate, of the relevant passages | Relevant to claim No. |
|---|---|---|
| A | US 2002/099376 A1 (MICHELSON GARY K) 25 July 2002 (2002-07-25) figures 1,11 ---- | 1-40 |
| A | US 2002/169508 A1 (KILPELA THOMAS S   ET AL) 14 November 2002 (2002-11-14) figure 7 ------ | 37 |

Form PCT/ISA/210 (continuation of second sheet) (July 1992)

2

## INTERNATIONAL SEARCH REPORT

Information on patent family members

International Application No

PCT/CH 03/00089

| Patent document cited in search report | | Publication date | Patent family member(s) | | Publication date |
|---|---|---|---|---|---|
| US 5888223 | A | 30-03-1999 | AU | 705598 B2 | 27-05-1999 |
| | | | AU | 1330197 A | 27-06-1997 |
| | | | CA | 2242645 A1 | 12-06-1997 |
| | | | EP | 0915687 A1 | 19-05-1999 |
| | | | WO | 9720526 A1 | 12-06-1997 |
| US 6235059 | B1 | 22-05-2001 | FR | 2747034 A1 | 10-10-1997 |
| | | | BR | 9710703 A | 17-08-1999 |
| | | | CA | 2250804 A1 | 16-10-1997 |
| | | | EP | 0891169 A1 | 20-01-1999 |
| | | | WO | 9737620 A1 | 16-10-1997 |
| | | | JP | 2000508187 T | 04-07-2000 |
| | | | KR | 2000005136 A | 25-01-2000 |
| US 2002022843 | A1 | 21-02-2002 | US | 2002016595 A1 | 07-02-2002 |
| | | | AU | 4824300 A | 17-11-2000 |
| | | | WO | 0066011 A1 | 09-11-2000 |
| US 2002099376 | A1 | 25-07-2002 | CA | 2431218 A1 | 01-08-2002 |
| | | | EP | 1353607 A2 | 22-10-2003 |
| | | | WO | 02058593 A2 | 01-08-2002 |
| US 2002169508 | A1 | 14-11-2002 | US | 6395030 B1 | 28-05-2002 |
| | | | WO | 9965412 A1 | 23-12-1999 |

Form PCT/ISA/210 (patent family annex) (July 1992)

3

## INTERNATIONALER RECHERCHENBERICHT

Internationales Aktenzeichen
PCT/CH 03/00089

### A. KLASSIFIZIERUNG DES ANMELDUNGSGEGENSTANDES
IPK 7    A61F2/44

Nach der internationalen Patentklassifikation (IPK) oder nach der nationalen Klassifikation und der IPK

### B. RECHERCHIERTE GEBIETE

Recherchierter Mindestprüfstoff  (Klassifikationssystem und Klassifikationssymbole )
IPK 7    A61F

Recherchierte aber nicht zum Mindestprüfstoff gehörende Veröffentlichungen, soweit diese unter die recherchierten Gebiete fallen

Während der internationalen Recherche konsultierte elektronische Datenbank (Name der Datenbank  und evtl. verwendete Suchbegriffe)

EPO-Internal

### C. ALS WESENTLICH ANGESEHENE UNTERLAGEN

| Kategorie° | Bezeichnung der Veröffentlichung, soweit erforderlich unter Angabe der in Betracht kommenden Teile | Betr. Anspruch Nr. |
|---|---|---|
| X | US 5 888 223 A (BRAY JR ROBERT S) 30. März 1999 (1999-03-30) | 1-4, 13-15, 18, 27-29,35 |
|   | Abbildungen 2,3,14 Spalte 6, Zeile 28 – Zeile 63 | |
| Y | --- | 10,11 |
| Y | | 28,32,33 |
| Y | US 6 235 059 B1 (ALBY ALBERT  ET AL) 22. Mai 2001 (2001-05-22) Abbildung 2 Spalte 3, Zeile 6 – Zeile 13 | 10,11 |
| Y | --- US 2002/022843 A1 (MICHELSON GARY K) 21. Februar 2002 (2002-02-21) Abbildungen 6,7A,7B,17 | 28,32,33 |
|   | --- -/-- | |

[X] Weitere Veröffentlichungen sind der Fortsetzung von Feld C zu entnehmen

[X] Siehe Anhang Patentfamilie

° Besonders Kategorien von angegebenen Veröffentlichungen    :
"A" Veröffentlichung, die den allgemeinen Stand  der Technik definiert, aber nicht als besonders bedeutsam anzusehen ist
"E" älteres Dokument, das jedoch erst am oder  nach dem internationalen Anmeldedatum veröffentlicht worden ist
"L" Veröffentlichung, die geeignet ist, einen  Prioritätsanspruch zweifelhaft er-scheinen zu lassen, oder durch die das Veröffentlichungsdatum einer anderen im Recherchenbericht genannten Veröffentlichung belegt werden soll oder die aus einem anderen besonderen Grund angegeben ist (wie ausgeführt)
"O" Veröffentlichung, die sich auf eine mündliche  Offenbarung, eine Benutzung, eine Ausstellung oder andere Maßnahmen bezieht
"P" Veröffentlichung, die vor dem internationalen  Anmeldedatum, aber nach dem beanspruchten Prioritätsdatum veröffentlicht worden ist

"T" Spätere Veröffentlichung, die nach dem internationalen Anmeldedatum oder dem Prioritätsdatum veröffentlicht worden  ist und mit der Anmeldung nicht kollidiert, sondern nur  zum  Verständnis des der Erfindung zugrundeliegenden Prinzips oder der Ihr zugrundeliegenden Theorie angegeben ist
"X" Veröffentlichung von besonderer Bedeutung; die beanspruchte Erfindung kann allein aufgrund dieser Veröffentlichung; nicht als neu oder auf erfinderischer Tätigkeit beruhend betrachtet werden
"Y" Veröffentlichung von besonderer Bedeutung; die beanspruchte Erfindung kann nicht als auf erfinderischer Tätigkeit beruhend betrachtet werden, wenn die Veröffentlichung mit einer oder mehreren anderen Veröffentlichungen dieser Kategorie in Verbindung gebracht wird und diese Verbindung für einen Fachmann naheliegend ist
"&" Veröffentlichung, die Mitglied derselben Patentfamilie ist

| Datum des Abschlusses der internationalen Recherche | Absendedatum des internationalen Recherchenberichts |
|---|---|
| 4. November 2003 | 03/12/2003 |

| Name und Postanschrift der internationalen Recherchenbehörde | Bevollmächtigter Bediensteter |
|---|---|
| Europäisches Patentamt, P.B. 5818 Patentlaan 2 NL – 2280 HV Rijswijk Tel. (+31–70) 340–2040, Tx. 31 651 epo nl, Fax: (+31–70) 340–3016 | Josten, S |

Formblatt PCT/ISA/210 (Blatt 2) (Juli 1992)

4

## INTERNATIONALER RECHERCHENBERICHT

Internationa___ Aktenzeichen
PCT/CH 03/00089

**C.(Fortsetzung)  ALS WESENTLICH ANGESEHENE UNTERLAGEN**

| Kategorie* | Bezeichnung der Veröffentlichung, soweit erforderlich unter Angabe der in Betracht kommenden Teile | Betr. Anspruch Nr. |
|---|---|---|
| A | US 2002/099376 A1 (MICHELSON GARY K)<br>25. Juli 2002 (2002-07-25)<br> Abbildungen 1,11<br>       --- | 1-40 |
| A | US 2002/169508 A1 (KILPELA THOMAS S  ET<br>AL) 14. November 2002 (2002-11-14)<br> Abbildung 7<br>              ----- | 37 |

Formblatt PCT/ISA/210 (Fortsetzung von Blatt 2) (Juli 1992)

5

## INTERNATIONALER RECHERCHENBERICHT

Angaben zu Veröffentlichungen, die zur selben Patentfamilie gehören

Internationales Aktenzeichen

PCT/CH 03/00089

| Im Recherchenbericht angeführtes Patentdokument | | Datum der Veröffentlichung | Mitglied(er) der Patentfamilie | | Datum der Veröffentlichung |
|---|---|---|---|---|---|
| US 5888223 | A | 30-03-1999 | AU | 705598 B2 | 27-05-1999 |
| | | | AU | 1330197 A | 27-06-1997 |
| | | | CA | 2242645 A1 | 12-06-1997 |
| | | | EP | 0915687 A1 | 19-05-1999 |
| | | | WO | 9720526 A1 | 12-06-1997 |
| US 6235059 | B1 | 22-05-2001 | FR | 2747034 A1 | 10-10-1997 |
| | | | BR | 9710703 A | 17-08-1999 |
| | | | CA | 2250804 A1 | 16-10-1997 |
| | | | EP | 0891169 A1 | 20-01-1999 |
| | | | WO | 9737620 A1 | 16-10-1997 |
| | | | JP | 2000508187 T | 04-07-2000 |
| | | | KR | 2000005136 A | 25-01-2000 |
| US 2002022843 | A1 | 21-02-2002 | US | 2002016595 A1 | 07-02-2002 |
| | | | AU | 4824300 A | 17-11-2000 |
| | | | WO | 0066011 A1 | 09-11-2000 |
| US 2002099376 | A1 | 25-07-2002 | CA | 2431218 A1 | 01-08-2002 |
| | | | EP | 1353607 A2 | 22-10-2003 |
| | | | WO | 02058593 A2 | 01-08-2002 |
| US 2002169508 | A1 | 14-11-2002 | US | 6395030 B1 | 28-05-2002 |
| | | | WO | 9965412 A1 | 23-12-1999 |

Formblatt PCT/ISA/210 (Anhang Patentfamilie)(Juli 1992)

# EXHIBIT D

# SynFix-LR System. Instruments and implants for stand-alone anterior lumbar interbody fusion (ALIF).

Technique Guide



SYNTHES®  Instruments and implants
approved by the AO Foundation

 Image intensifier control

**Warning**
This description alone does not provide sufficient background for direct use of the instrument set. Instruction by a surgeon experienced in handling these instruments is highly recommended.

**Reprocessing, Care and Maintenance of Synthes Instruments**
For general guidelines, function control and dismantling of multi-part instruments, please refer to: www.synthes.com/reprocessing

# Table of Contents

**Introduction**

| SynFix-LR System | 2 |
| AO Principles | 6 |
| Indications and Contraindications | 7 |

**Surgical Technique**

| Preoperative Planning | 8 |
| Access and Exposure | 9 |
| Preparation and Trial Implantation | 11 |
| Selection and Packing of Implant | 15 |

Implant Insertion
| Option A: SQUID | 17 |
| Option B: Implant Holder | 20 |

Screw Insertion
| Option A: Standard Instruments | 22 |
| Option B: Mini-Open Instruments | 30 |

**Product Information**

| Implant Removal | 37 |
| SynFix-LR Implants | 39 |
| SynFix-LR Screws | 40 |
| SynFix-LR Trial Implants | 41 |
| SynFix-LR Instruments | 42 |
| SynFix-LR Aiming Devices | 45 |
| Filling Material | 47 |
| Additional Recommended Sets | 48 |

**Bibliography**

**SynFix-LR System.** Instruments and implants for stand-alone anterior lumbar interbody fusion (ALIF).

## SynFix-LR Implants

The SynFix-LR implant is a stand-alone ALIF device that incorporates the benefits of an anterior fixation plate and a radiolucent interbody spacer. The design creates a zero profile construct and includes four locking screws that provide anterior fixation and stability.

**Stand-alone ALIF**
– Biomechanically equivalent to a spacer with pedicle screws.[1]
– PEEK spacer provides modulus of elasticity similar to cortical bone.
– Titanium plate with locking screws provides stable fixation.

**Zero-profile construct**
– Spacer and fixation plate fit completely within the disc space.





[1] See Cain et al. 2005

## Anatomic shape
– The SynFix-LR is convex to match the anatomy of the disc space.
– Two footprints and two angles are offered to accommodate individual patient anatomy.

## Screw and plate fixation
– One-step conical locking mechanism ensures screws securely lock to plate and eliminates the need for a blocking plate.
– Locking screws provide stability and load transfer near the cortex of the vertebral body.
– Four locking screws diverge to form a fixed-angle construct that creates a wedge of bone (highlighted in yellow) for fixation.
– Self-tapping cortical threads allow largest possible core diameter for maximum fixation.



**Titanium plate material:**
Titanium alloy (TiAl6Nb7)







**PEEK spacer material:**
PEEK (polyetheretherketone)



Double-lead locking threads mate with threaded portion of plate



**Titanium screw material:**
Titanium alloy (TiAl6Nb7)

**SynFix-LR System.** Instruments and implants for stand-alone anterior lumbar interbody fusion (ALIF).

## Instruments for insertion of the implant

**Option A:**

**Quick inserter (SQUID)**
The SynFix SQUID inserts in one simple step, without impaction.

**Option B:**

**Implant holder and distractor**
For the insertion of the implant while distraction is maintained.



# Instruments for insertion of the screws

**Standard instruments option A:**

**Mini-open instruments option B:**

**Awl with cardan joint**
Penetrates the cortical rim for subsequent screw insertion.

**Aiming device mini-open with fixed handle**
For precise positioning of the locking screws.

**Tweezers**
For guiding awl and screwdriver into the aiming device.

**Awl for SynFix-LR mini-open**
Penetrates the cortical rim for subsequent screw insertion.

**Aiming device holder with implant coupling**
For insertion of the aiming device. Easily removable to facilitate access for screw insertion.

**Aiming device**
For precise positioning of the locking head screws.

**Screwdriver with cardan joint**

**Screwdriver for SynFix-LR  mini-open with cardan joint**



Opening of the cortical bone for screw insertion

Opening of the cortical bone for screw insertion

In 1958, the AO formulated four basic principles, which have become the guidelines for internal fixation.[1]
They are:
– Anatomical reduction
– Stable fixation
– Preservation of blood supply
– Early, active mobilization

The fundamental aims of fracture treatment in the limbs and fusion of the spine are the same. A specific goal in the spine is returning as much function as possible to the injured neural elements.[2]

**AO Principles as applied to the spine[3]**

**Anatomical reduction**
In the spine, this means reestablishing and maintaining the natural curvature and the protective function of the spine. By regaining this natural anatomy, the biomechanics of the spine can be improved, and a reduction of pain can be experienced.

**Stable fixation**
Stabilization of the spinal segment to promote bony fusion. The integrated anterior fixation plate with locking head screws provides an anterior "tension band" and additional stability that allows its use as a stand-alone implant.

**Preservation of blood supply**
Creation of an optimal environment for fusion.

**Early, active mobilization**
Minimized damage to the spinal vasculature, dura, and neural elements, which may contribute to pain reduction and improved function for the patient.

[1] See Müller et al. 1995
[2] Ibid.
[3] See Aebi et al. 2007

**Indications and Contraindications**

**Indications**

Lumbar and lumbosacral pathologies which may require anterior segmental arthrodesis, including:
– Localised symptomatic degenerative disc disease
– Revision surgery for failed decompression syndrome
– Pseudoarthrosis

**Contraindications**
– Spinal fractures
– Spinal tumor
– Osteoporosis
– Infection

**Contraindications for stand-alone application**
– Spondylolisthesis
– Severe segmental instability

Case 1:19-cv-01515-RGA    Document 195    Filed 07/28/22    Page 71 of 286 PageID #: 27535

# 1
## Preoperative planning

### Instruments

| | |
|---|---|
| X000045 | X-ray Template for SynFix-LR, 26 × 32 mm, 8° |
| X000046 | X-ray Template for SynFix-LR, 26 × 32 mm, 12° |
| X000047 | X-ray Template for SynFix-LR, 30 × 38 mm, 8° |
| X000048 | X-ray Template for SynFix-LR, 30 × 38 mm, 12° |

Determine the approximate implant size by comparing the SynFix-LR X-ray template with a lateral radiograph of the patient's adjacent intervertebral discs.

### Notes
– The height indicated on the template is approximately 1 mm lower than that of the actual spacer to account for penetration of the teeth into the vertebral endplate.
– It is recommended to select the maximum implant size, to optimize the stability of the segment through tension in the longitudinal ligaments.



# 1
**Patient positioning**

For an anterior approach to the lower lumbar levels, position the patient in a slight Trendelenburg position.

# 2
**Anterior access and approach**

**Recommended set**

| 01.609.102 | Set SynFrame RL, lumbar |
| --- | --- |
| 187.310 | SynFrame Basic System in Vario Case |



The surgical approach depends on the level to be treated.

Locate the correct operative disc level and incision location by taking a lateral flouroscopic view while holding a straight metal instrument at the side of the patient. This ensures that the incision and exposure will allow direct visualization into the disc space.

Expose the operative disc level through a standard retroperitoneal approach. A mini-open retroperitoneal approach can be used if SynFix mini-open instruments will be used (see page 45).

**Note:** If a retraction system such as the SynFrame is used, pay attention to the positioning of soft tissue or Hohmann retractors as they may interfere with the screw insertion.

## 3

**Exposure**

The locking head screws of the SynFix-LR must be inserted
from a direct anterior approach. Expose the intervertebral
disc such that there is sufficient space on either side of the
vertebral midline, equal to half the width of the SynFix-LR.
This enables the insertion of the implant without interference
from adjacent soft tissue structures (major vessels, peri-
toneum etc.).

Once the spacer has been inserted, visualization of the entire
anterior fixation plate is necessary for insertion of the locking
head screws.

**Preparation and Trial Implantation**

# 1

## Cut anterior window

Cut a rectangular window the width of the SynFix-LR into the anterior longitudinal ligament and annulus fibrosus.

A trial implant (see page 40) may be used as a template to indicate the width of the window.

Retain as much of the antero-lateral, lateral and posterior annulus as possible in order to provide the necessary stability of the instrumented segment.



## 2
**Prepare disc space**

**Recommended set**

| 01.600.100 | Proprep Set |

Excise the disc material and remove the cartilaginous end-plates to expose the underlying bony vertebral endplates.

Adequate clearance of the endplates is important to enable the provision of a vascular supply to the bone graft. Excessive clearance or use of a rasp may, however, weaken the endplate and result in subsidence of the spacer.

Once the endplates have been prepared, complete eventual additional surgical procedures (i.e. removal of a disc fragment from the spinal canal).

**Note:** It is essential that the nucleus and the inner annulus are removed to prevent displacement of disc material into the spinal canal during spacer insertion and interference with bone in-growth.



## 3
**Distract segment**

| Instrument | |
|---|---|
| SFW650R | Prodisc-L Spreader Forceps, curved |

**Optional instrument**

| | |
|---|---|
| SFW550R | Prodisc-L Spreader Forceps, straight |

For a safe placement, verify spreader position with the help of an intraoperative lateral X-ray.

Distraction of the segment is essential for restoration of disc height, opening of the neural foramina and initial stability of the SynFix-LR.



## 4
**Trial for implant size**

| Instruments | |
|---|---|
| 03.802.000 – 03.802.019 | SynFix-LR Trial Implants |
| 397.034 | Handle for SynCage Trial Implants, straight |

**Optional instrument**

| | |
|---|---|
| 397.113 | Distractor, anterior, for SynCage-LR |

Select the trial implant that corresponds with the SynFix-LR size determined during the preoperative planning. Attach it to the handle for trial implants. The handle must be tightened firmly to prevent loosening of the trial implant.



Controlled and light hammering on the handle for trial implants may be required to advance the trial implant into the disc space. If a tight fit is not achieved, repeat the process using larger trial implants. If the trial implant cannot be inserted, repeat using smaller trial implants.

Alternatively, a distractor may be used to assist with guiding the trial implant into the disc space. To ensure that the implant is inserted symmetrically into the disc space, the central line on the distractor blades should be aligned with the anterior midline of the vertebral bodies. Slide the trial implant between the distractor blades into the disc space.

With the segment fully distracted, the trial implant (and final implant) must fit firmly with a tight press-fit between the endplates so that the disc height is not lost once the distractor is removed.

 The image intensifier may be used to check the position of the trial implant, restoration of disc and foraminal height and overall alignment before selecting the final SynFix-LR implant size.



**Notes**
– Markings on the trial implant indicate the entry points of the locking screws in the anterior aspect of the adjacent vertebrae.
– The distractor must be firmly held in place to prevent its ejection from the disc space and possible injury to adjacent structures.



Markings indicate the entry points of the locking screws

Selection and Packing of Implant

## 1
### Select implant size

**Instrument**

| | |
|---|---|
| 03.802.039 | Implant Holder for SynFix-LR |

Select the final SynFix-LR implant corresponding to the trial implant size and attach it to the implant holder.

**Caution:** Make sure that implant holder and implant are perfectly aligned to each other and that no cross threading occurs.

To facilitate selection of the final implant, trial implants are laser etched with the nominal height, lordotic angle and footprint of the implant. Trial implants, aiming guides and fixation plates are color-coded (see page 38).

**Note:** Make sure all components at the tip of the implant holder are firmly tightened according to the reprocessing, care & maintenance instructions.






## 2

### Pack implant with bone graft or bone substitution

**Instruments**

| | |
|---|---|
| 03.802.041 | Packing Block for SynFix-LR, 26 × 32 mm |
| 03.802.042 | Packing Block for SynFix-LR, 30 × 38 mm |
| 389.288 | Cancellous Bone Impactor, 8 × 2.5 mm |
| 394.585 | Cancellous Bone Impactor, 5.5 × 8.5 mm |

After attaching the SynFix-LR to the implant holder, insert it into the appropriate packing block.

It is important to fill the spacer until the filling material protrudes from its perforations in order to ensure optimal contact with the vertebral endplates.

Use a cancellous bone impactor to firmly pack the filling material into the implant cavities.

**Notes**
– The implant holder must be firmly attached to the fixation plate in order to avoid damage to either the implant holder or the plate.
– For more information about the filling material chronOS see page 46.



**Implant Insertion**
**Option A: SQUID**

---

**Instrument**

---

03.802.121          SQUID for SynFix-LR

---

# 1
**Load the implant**

Detach the implant from the implant holder.

Release the main thread of the SQUID by pushing the release button on the grip and slide the pusher fully back.

Place the instrument flat on the table to load the implant.



Place the implant onto the bottom spring ramp. Holding both sides of the implant, engage the grooves with the spring ramp guides and gently slide the implant forward until the implant is held without sliding back.

Slide the pusher up to the implant and engage the main thread by pressing the "engage" button.

The implant is now held securely in place and is ready for insertion.

---

**Note:** The tips of the inserter will be inserted into the disc space up to the depth stops on the spring ramps; to allow full insertion, the tips must not be spread apart.

---



Implant Insertion
Option A: SQUID

## 2
### Insert the implant

Place the tips of the instrument into the disc space so that the depth stops on the spring ramps touch the anterior rim of the vertebral body. The tips of the instrument are 26 mm deep and 30 mm wide. To ensure that the implant is inserted symmetrically into the disc space, the central line between the SQUID blades should be aligned with the anterior midline of the vertebral bodies.

With the main thread engaged, turn the T-handle on the SQUID to advance the implant down the spring ramps and into the disc space. The force required to turn the T-handle will increase as the implant advances down the spring ramps and the instrument elevates the disc space.



Continue turning the T-handle until the implant is fully ejected and released from the SQUID. An audible click, as the spring ramps spring back, confirms that the implant is seated and the instrument is fully ejected and released.

**Note:** The pusher will be moving toward the vertebral body. Be aware of soft tissue and blood vessels that may be in the path of the pusher and ejector as they move toward and push against the vertebral bodies.



## 3
### Remove instruments

When the implant is correctly positioned carefully remove the SQUID to avoid possible injury to adjacent structures.

Depending on the size of the vertebrae, the anterior edge of the implant will usually be 1 mm–3 mm recessed relative to the anterior aspect of the adjacent vertebrae.



## 4
### Verify final implant position

Verify final implant position with the help of an intraoperative lateral X-ray.

The titanium fixation plate and single posterior X-ray marker incorporated into the implant allow accurate intraoperative radiographic assessment of the position of the implant. The posterior X-ray marker is located approximately 3 mm from the posterior wall of the spacer.



**Implant Insertion**

## Option B: Implant Holder

| Instrument | |
|---|---|
| 03.802.039 | Implant Holder for SynFix-LR |

| Optional instrument | |
|---|---|
| 397.113 | Distractor, anterior, for SynCage-LR |

## 1

**Insert the implant**

Insert the implant into the disc space.

Controlled and light hammering on the implant holder may be required to advance the implant into the disc space. The implant must fit firmly with a tight press-fit between the endplates.

Alternatively, a distractor can be used to assist with guiding the implant into the disc space. To ensure that the implant is inserted symmetrically into the disc space, the central line on the distractor blades should be aligned with the anterior midline of the vertebral bodies.

Slide the implant between the distractor blades and into the disc space.

The image intensifier may be used to check the implant position, restoration of disc and foraminal height, and overall alignment.

**Note:** The distractor must be firmly held in place to prevent its ejection from the disc space and possible injury to adjacent structures.





## 2
### Remove instruments

When the implant is correctly positioned, if the optional distractor was used, loosen the locking nut on the distractor handle and release the distraction.

Gently remove the distractor while the implant holder hold the implant in position.

After the distractor is removed, ensure a secure fit by lightly hammering on the implant holder.

Remove the implant holder by rotating the handle counter-clockwise. The implant should now be in its optimal position.

Depending on the size of the vertebrae, the anterior edge of the implant will usually be 1 mm – 3 mm recessed relative to the anterior aspect of the adjacent vertebrae.



## 3
### Verify final implant position

Verify final implant position with the help of an intraoperative lateral X-ray.

The titanium fixation plate and single posterior X-ray marker incorporated into the implant allow accurate intraoperative radiographic assessment of the position of the implant. The posterior X-ray marker is located approximately 3 mm from the posterior wall of the spacer.



# Screw Insertion
## Option A: Standard Instruments

**Important:** All standard instruments have brown, phenolic handles.

## 1
### Mount aiming device

**Instrument**

| | |
|---|---|
| 03.802.031 | Holder for Aiming Device for SynFix-LR |

The aiming devices are color-coded to correspond with the implant height and color.

The aiming device ensures appropriate alignment, fit and engagement of the locking screws into the fixation plate and the vertebrae.



| Aiming device | Corresponding implant size | Color code |
|---|---|---|
| 03.802.020 | 12 mm | light blue |
| 03.802.032 | 13.5 mm | gold |
| 03.802.036 | 15 mm | blue |
| 03.802.033 | 17 mm | purple |
| 03.802.034 | 19 mm | green |

**Optional:** The modified aiming device for SynFix-LR allows working through a smaller incision compared to the aiming device mentioned above (see also page 44).

| Modified aiming device | Corresponding implant size | Color code |
|---|---|---|
| 03.802.242 | 12 mm | light blue |
| 03.802.243 | 13.5 mm | gold |
| 03.802.245 | 15 mm | blue |
| 03.802.247 | 17 mm | purple |
| 03.802.249 | 19 mm | green |



Choose the corresponding aiming device and attach the aiming device holder.

Insert the aiming device.

Position the aiming device so that the threaded pin (a) fits into the central hole of the fixation plate and the lateral positioning pin (b) aligns with one of the the plate holes for the fixation screw.

When the aiming device has been positioned, secure it by tightening the nut (c) on top of the aiming device holder.

**Notes**
– The aiming device should fit snugly against the plate. Do not overtighten.
– As the guiding distance of the modified aiming device is shorter than the guiding distance of the standard aiming device, take care to maintain alignment of the awl and screwdriver (see page 44).

Screw insertion
Option A: Standard Instruments

## 2
**Create pilot hole**

**Instruments**

| | |
|---|---|
| 03.802.035 | Awl ⌀ 3.2 mm for SynFix-LR |
| 03.802.038 | Tweezers for SynFix-LR |

**Optional instrument**

| | |
|---|---|
| 03.802.400 | Soft Tissue Retractor, curved, for SynFix-LR |



For better visualization of the operative site, the holder for aiming device can be removed, leaving only the aiming device attached to the fixation plate.

Insert the awl into the aiming device. Prepare the vertebral body for screw insertion by applying pressure on the handle of the awl with rotational motions. Tweezers should be used to ensure directional control of the awl tip and to avoid injury to the surrounding soft tissues or vessels.

Insert the first screw before preparing any other holes.

**Notes**
– The tweezers can also be used to remove the awl in order to avoid damaging adjacent structures.
– Using the soft tissue retractor with the aiming device helps to protect soft tissue.
– It is not necessary to completely rotate the awl to break the cortex, clockwise and counterclockwise rotational motions are sufficient.
– Awl depth is approximately 15 mm, equivalent to the purchase length of a 20 mm screw (see page 39).

## 3
### Insert and tighten first screw

**Instruments**

| | |
|---|---|
| 03.802.037 | Screwdriver for SynFix-LR |
| 03.802.038 | Tweezers for SynFix-LR |

Select the appropriate screw length (20 mm screws are recommended for use in most cases). Screw length should be selected to penetrate completely through the cortical bone. For a two-level procedure, proper consideration should be given to the screw length on the common vertebral body to prevent screw interference. The tweezers allow control of the screw during insertion to avoid damage to the surrounding soft tissue or vessels.



Insert the self-tapping screw through the aiming device and into the pilot hole created by the awl. As soon as the ring marked on the screwdriver meets the entry point of the aiming device, the locking position of the screw within the fixation plate has been approximately reached.

Tighten the screw firmly.



**Notes**
– It is important that the four locking screws be inserted sequentially, and that awl and screw insertion be done through a SynFix-LR aiming device to ensure the proper locking of the screw to the plate.
– The tweezers can also be used for removal of the screwdriver to avoid damaging adjacent structures.
– Using the soft tissue retractor with the aiming device helps to protect soft tissue.



Ring marked on screwdriver

## 4
**Insert second screw**

**Instruments**

| | |
|---|---|
| 03.802.035 | Awl ⌀ 3.2 mm for SynFix-LR |
| 03.802.037 | Screwdriver for SynFix-LR |
| 03.802.038 | Tweezers for SynFix-LR |

Following steps 2 through 3, use the awl with the second opening in the aiming device in order to insert the second screw. Insert the second screw with the screwdriver. Use the tweezers, to ensure directional control.



## 5
### Rotate aiming device

**Instrument**

| | |
|---|---|
| 03.802.031 | Holder for Aiming Device for SynFix-LR |



If the holder for the aiming device has been removed, reattach it to the aiming device before rotation.

Loosen the aiming device by turning the nut (1) counterclockwise four to five times. The aiming device can be rotated 180°, without disengaging it completely from the fixation plate (2).

Relock the aiming device by turning the nut (1) clockwise.

**Notes**
– If the aiming device is difficult to rotate, verify that the screws are advanced far enough and are not blocking the aiming device during rotation.
– Rotating the aiming device clockwise will ensure that the aiming device handle does not loosen unintentionally.
– The aiming device should fit snugly against the plate. Do not overtighten.

Screw Insertion
Option A: Standard Instruments

## 6
### Insert third and fourth screws

For insertion of the third and fourth screws, repeat steps 2 through 4.

---

**Notes**
– Four (4) screws should always be used for every SynFix-LR construct.
– If less than 4 screws are inserted, a supplemental fixation is mandatory.



## 7
### Remove instruments

When the implant is secured, remove the aiming device by turning the nut on top of the aiming device holder.

---

**Note:** If the aiming device is difficult to remove, verify that the screws are advanced far enough and are not blocking the aiming device during removal.



## 8
### Verify placement

The SynFix-LR implant is positioned optimally when the implant is completely within the confines of the vertebral bodies.

Depending on the size of the vertebrae, the anterior edge of the SynFix-LR will usually be 1 mm – 3 mm behind the anterior edge of the adjacent vertebrae.

The location of the implant relative to the vertebral bodies in the AP and lateral directions can be verified using an image intensifier.

The titanium fixation plate and single posterior X-ray marker incorporated into the implant design allow accurate intra-operative radiographic assessment of the implant's position.





# Screw Insertion
## Option B: Mini-Open Instruments

**Important:** All mini-open instruments have green, silicone handles.



Implant coupling           Fixed-handle aiming device

## 1
**Mount aiming device**

| Instrument | |
|---|---|
| 03.802.200 | Coupling for Mini-Open Aiming Device, with fixed handle, for SynFix-LR |

The aiming devices are color-coded to correspond with the implant height and the plate color.

| Fixed handle aiming device | Corresponding implant size | Color code |
|---|---|---|
| 03.802.202 | 12 mm | light blue |
| 03.802.203 | 13.5 mm | gold |
| 03.802.205 | 15 mm | blue |
| 03.802.207 | 17 mm | purple |
| 03.802.209 | 19 mm | green |

The aiming device ensures appropriate alignment, fit and engagement of the locking screws into the fixation plate and the vertebrae.

Choose the corresponding aiming device and attach the implant coupling.

Insert the aiming device.



Position the aiming device so the threaded pin (a) fits into the central hole of the fixation plate and the lateral positioning pin (b) aligns with one of the plate holes for the fixation screw.

Arrows located just below the handle indicate caudal and cranial orientation of the aiming device. When the aiming device has been positioned, secure it by tightening the implant coupling top of the fixed handle aiming device.

**Note:** The aiming device should fit snugly against the plate. Do not overtighten.



## 2
### Create pilot hole

**Instrument**

| | |
|---|---|
| 03.802.230 | Awl Ø 3.2 mm for SynFix-LR Mini-Open |

**Optional instruments**

| | |
|---|---|
| 03.802.038 | Tweezers for SynFix-LR |
| 03.802.400 | Soft Tissue Retractor, curved, for SynFix-LR |

Insert the awl into the aiming device. Prepare the vertebral body for screw insertion by applying pressure on the handle of the awl with rotational motions.

Insert the first screw before preparing any other holes.



**Notes**
– It is not necessary to completely rotate the awl to break the cortex, rotational motions clockwise and counterclockwise are sufficient.
– The awl for SynFix-LR mini-open features a tip with positional memory. There is no need to use tweezers to control the tip while inserting into the aiming device; however, the tweezers can be used as an option.
– Awl depth is approximately 10 mm, equivalent to the purchase length of a 15 mm screw.
– Using the soft tissue retractor with the aiming device helps to protect soft tissue.

## 3
**Insert and tighten first screw**

**Instruments**

| | |
|---|---|
| 03.802.431/.331 | Screwdriver Shaft for SynFix-LR Mini-Open |
| 388.396 | Handle with Quick Coupling, small |

**Optional instruments**

| | |
|---|---|
| 03.802.038 | Tweezers for SynFix-LR |
| 03.802.400 | Soft Tissue Retractor, curved, for Synfix-LR |



To insert the self tapping screw through the aiming device and into the pilot hole created by the awl, only use the screwdriver shaft for SynFix-LR mini-open (03.802.431/.331) with the small handle (388.396). Screw length should be selected to penetrate completely through the cortical bone. For a two-level procedure, proper consideration should be given to the screw length on the common vertebral body to prevent screw interference.

Insert the self-tapping screw through the aiming device and into the pilot hole created by the awl. As soon as the ring marked on the screwdriver passes the entry point of the aiming device, the locking position of the screw within the fixation plate is approximately reached.

Tighten the screw firmly.

**Notes**
– It is important that the four locking screws be inserted sequentially, and that awl and screw insertion be done through a SynFix-LR aiming device to ensure proper locking of the screw to the plate.
– The screwdriver shaft for SynFix-LR mini-open (03.802.431/.331) must only be used with the small silicon handle (388.396) mentioned above.
– The screwdriver for SynFix-LR mini-open features a tip with positional memory. There is no need to use tweezers to control the tip while inserting or removing the driver from the aiming device; however, the tweezers can be used as an option.
– Using the soft tissue retractor with the aiming device helps to protect soft tissue.



Ring marked on screwdriver

## 4
### Insert second screw

**Instruments**

| | |
|---|---|
| 03.802.230 | Awl ⌀ 3.2 mm for SynFix-LR Mini-Open |
| 03.802.431/.331 | Screwdriver Shaft for SynFix-LR Mini-Open |
| 388.396 | Handle with Quick Coupling, small |

Following steps 2 through 3, use the awl with the second opening in the aiming device in order to insert the second screw. Insert the second screw with the screwdriver.



## 5
### Rotate aiming device

Loosen the aiming device by turning the nut (1) counterclockwise four to five turns. The aiming device can be rotated 180° without disengaging completely from the fixation plate (2).

Arrows located just below the handle indicate caudal and cranial orientation of the aiming device.

Relock the aiming device by turning the nut (1) clockwise.

**Notes**
– If the aiming device is difficult to rotate, verify that the screws are advanced far enough and are not blocking the aiming device during rotation.
– The fixed-handle aiming device can be rotated in either direction.
– The aiming device should fit snugly against the plate. Do not overtighten.



## 6

### Insert third and fourth screws

For insertion of the third and fourth screws, repeat steps 2 through 4.

### Notes
– Four (4) screws should always be used for every SynFix-LR construct.
– If less than 4 screws are inserted, a supplemental fixation is mandatory.



## 7

### Remove instruments

When the implant is secured, remove the aiming device by turning the nut on top of the fixed handle aiming device.

**Note:** If the aiming device is difficult to remove, verify that the screws are advanced far enough and are not blocking the aiming device during removal.



Screw insertion
Option B: Mini-Open Instruments

## 8
**Verify placement**

The SynFix-LR implant is positioned optimally when the implant is completely within the confines of the vertebral bodies.

Depending on the size of the vertebrae, the anterior edge of the SynFix-LR will usually be 1 mm–3 mm behind the anterior edge of the adjacent vertebrae.

The location of the implant relative to the vertebral bodies in the AP and lateral directions can be verified using an image intensifier.

The titanium fixation plate and single posterior X-ray marker incorporated into the implant design allow accurate intra-operative radiographic assessment of the implant's position.





**Implant Removal**

## 1

**Approach the Implant**

---

**Instrument**

| | |
|---|---|
| 388.407 | Holding Forceps for Rods $\varnothing$ 3.5 mm, length 181 mm |

---

Make sure to remove all screws prior to usage of holding forceps.
In case the implant needs to be removed out of the intervertebral disc space the holding forceps 388.407 can be used alternatively to the implant holder 03.802.039.
Check all four available bridges of the SynFix-LR implant prior removal. Choose a bridge that is easy to access.
Approach the implant with the holding forceps in opened condition.

---

**Note:** In case the accessibility of the bridge is limited due to bony structures remove them with appropriate instrumentation.



## 2

**Connect Forceps to Implant**

Grab the bridge with the holding forceps and lock it by scrunching the levers of the forceps.



## 3

**Remove Implant**

Apply a gentle extraction force to the holding forceps to remove the implant. Ensure after removal of the implant that all components were removed out of the intervertebral disc space.

---

**Note:** Reuse of implant is not recommended due to possible damage to the conical thread of the plate after extraction.



**Postoperative management**

Patients can usually be mobilized once they regain muscular control of their trunk on the same day or one day after surgery. As no supplementary posterior fixation is required, surgical morbidity and post-operative discomfort are likely to be reduced. Patients may be inclined to increase activities quite rapidly. However, patients should be cautioned against activities that place unreasonable stress on the lower back until solid bony union has been achieved.

Excessive physical activity and trauma may result in failure, with subsidence of the implant and/or the development of a non-union. Loss of fixation may also occur if excessive activity and motion is attempted prior to restoration of good lumbar trunk and abdominal muscle control and function.

**Synfix-LR Implants**

Supplied sterile and preassembled (spacer with anterior fixation plate).

Plate components and trial components are color coded.

Spacer component: PEEK (polyetheretherketone)
Plate component: Titanium alloy (TiAl6Nb7)

\* Posterior height is measured from the top of the most posterior teeth. Introduction height is approximately 1.8 mm less than the posterior height.



### 26 mm depth × 32 mm width

| Implant | Lordotic angle | Height | Posterior height* | Color code |
|---|---|---|---|---|
| 08.802.016S | 8° | 12 mm | 9 mm | light blue |
| 08.802.000S | | 13.5 mm | 10.5 mm | gold |
| 08.802.001S | | 15 mm | 12 mm | blue |
| 08.802.002S | | 17 mm | 14 mm | purple |
| 08.802.003S | | 19 mm | 16 mm | green |
| 08.802.017S | 12° | 12 mm | 8 mm | light blue |
| 08.802.004S | | 13.5 mm | 9 mm | gold |
| 08.802.005S | | 15 mm | 11 mm | blue |
| 08.802.006S | | 17 mm | 12.5 mm | purple |
| 08.802.007S | | 19 mm | 14.5 mm | green |

### 30 mm depth × 38 mm width

| Implant | Lordotic angle | Height | Posterior height* | Color code |
|---|---|---|---|---|
| 08.802.018S | 8° | 12 mm | 9 mm | light blue |
| 08.802.008S | | 13.5 mm | 10 mm | gold |
| 08.802.009S | | 15 mm | 11.5 mm | blue |
| 08.802.010S | | 17 mm | 13.5 mm | purple |
| 08.802.011S | | 19 mm | 15.5 mm | green |
| 08.802.019S | 12° | 12 mm | 7 mm | light blue |
| 08.802.012S | | 13.5 mm | 8.5 mm | gold |
| 08.802.013S | | 15 mm | 10 mm | blue |
| 08.802.014S | | 17 mm | 12 mm | purple |
| 08.802.015S | | 19 mm | 14 mm | green |



**SynFix-LR Screws**

---

**4.0 mm locking implant screws**
Self-tapping
Titanium Alloy (TiAl6Nb7)

| Screw | Length | Bone purchase* |
|---|---|---|
| 04.802.200 | 15 mm | 10 mm |
| 04.802.201 | 20 mm | 15 mm |
| 04.802.202 | 25 mm | 20 mm |
| 04.802.203 | 30 mm | 25 mm |


*Bone purchase

Length

**4.0 mm locking implant screws fine tip**
Self-tapping
Titanium Alloy (TiAl6Nb7)

| Screw fine tip | Length | Bone purchase* |
|---|---|---|
| 04.802.210 | 15 mm | 10 mm |
| 04.802.211 | 20 mm | 15 mm |
| 04.802.212 | 25 mm | 20 mm |
| 04.802.213 | 30 mm | 25 mm |


*Bone purchase

Length

Fine tip screws are more pointed and therefore easier to use
in dense sclerotic bone.

**Trial implants**

Color coded by size (same color as the SynFix-LR implant plate component).

**26 mm depth × 32 mm width**

| Implant | Lordotic angle | Height | Color code |
|---|---|---|---|
| 03.802.016 | 8° | 12 mm | light blue |
| 03.802.000 | | 13.5 mm | gold |
| 03.802.001 | | 15 mm | blue |
| 03.802.002 | | 17 mm | purple |
| 03.802.003 | | 19 mm | green |
| 03.802.017 | 12° | 12 mm | light blue |
| 03.802.004 | | 13.5 mm | gold |
| 03.802.005 | | 15 mm | blue |
| 03.802.006 | | 17 mm | purple |
| 03.802.007 | | 19 mm | green |



**30 mm depth × 38 mm width**

| Implant | Lordotic angle | Height | Color code |
|---|---|---|---|
| 03.802.018 | 8° | 12 mm | light blue |
| 03.802.008 | | 13.5 mm | gold |
| 03.802.009 | | 15 mm | blue |
| 03.802.010 | | 17 mm | purple |
| 03.802.011 | | 19 mm | green |
| 03.802.019 | 12° | 12 mm | light blue |
| 03.802.012 | | 13.5 mm | gold |
| 03.802.013 | | 15 mm | blue |
| 03.802.014 | | 17 mm | purple |
| 03.802.015 | | 19 mm | green |



| 397.034 | Handle for SynCage Trial Implants, straight |
| 397.113 | Distractor, anterior, for SynCage-LR |
| 389.288 | Cancellous Bone Impactor for Travios and Plivios, 8 × 2.5 mm |
| 394.585 | Cancellous Bone Impactor, 5.5 × 8.5 mm |
| 03.802.041 | Packing Block for SynFix-LR, 26 × 32 mm |
| 03.802.042 | Packing Block for SynFix-LR, 30 × 38 mm |
| 03.802.031 | Holder for Aiming Device for SynFix-LR |
| 03.802.035 | Awl ⌀ 3.2 mm for SynFix-LR |

| | | |
|---|---|---|
| 03.802.037 | Screwdriver for SynFix-LR | |
| 03.802.038 | Tweezers for SynFix-LR | |
| 03.802.039 | Implant Holder for SynFix-LR | |
| 388.311 | Screwdriver T15, length 300 mm | |
| 388.407 | Holding Forceps for Rods ⌀ 3.5 mm, length 181 mm | |
| SFW650R | Prodisc-L Spreader Forceps, curved | |

| 03.802.121 | SQUID for SynFix-LR | |
| 03.802.200 | Coupling for Mini-Open Aiming Device, with fixed handle, for SynFix-LR | |
| 03.802.400 | Soft Tissue Retractor, curved, for SynFix-LR | |
| 03.802.230 | Awl Ø 3.2 mm for SynFix-LR Mini-Open | |
| 03.802.431 | Screwdriver Shaft for SynFix-LR Mini-Open, with tapered Tip | |
| 388.396 | Handle with Quick Coupling, small | |



**SynFix-LR Aiming Devices**

**Standard aiming device (required exposure 8–10 cm)**

| | |
|---|---|
| 03.802.020 | Aiming Device for SynFix-LR, 12 mm, light blue |
| 03.802.032 | Aiming Device for SynFix-LR, 13.5 mm, gold |
| 03.802.036 | Aiming Device for SynFix-LR, 15 mm, blue |
| 03.802.033 | Aiming Device for SynFix-LR, 17 mm, purple |
| 03.802.034 | Aiming Device for SynFix-LR, 19 mm, green |

If a standard aiming device is used, a radius of ~4.3 cm is required. It enables a good guidance of the awl and the screwdriver while ensuring a secure insertion of all screws.





**Modified aiming device (required exposure 7–9 cm)**

**Optional:**

| | |
|---|---|
| 03.802.242 | Aiming Device, modified, for SynFix-LR, 12 mm, light blue |
| 03.802.243 | Aiming Device, modified, for SynFix-LR, 13.5 mm, gold |
| 03.802.245 | Aiming Device, modified, for SynFix-LR, 15 mm, blue |
| 03.802.247 | Aiming Device, modified, for SynFix-LR, 17 mm, purple |
| 03.802.249 | Aiming Device, modified, for SynFix-LR, 19 mm, green |

The modified aiming device has a relief that allows the awl to be inserted more toward the center, similar to the mini-open instruments. The red shaded area indicates the change made to the standard aiming device.



Guidance is established just before the awl penetrates the cortex.



**Aiming device mini-open with fixed handle (required exposure 5–7 cm)**

| | |
|---|---|
| 03.802.202 | Aiming Device Mini-Open, with fixed handle, for SynFix-LR, 12 mm |
| 03.802.203 | Aiming Device Mini-Open, with fixed handle, for SynFix-LR, 13.5 mm |
| 03.802.205 | Aiming Device Mini-Open, with fixed handle, for SynFix-LR, 15 mm |
| 03.802.207 | Aiming Device Mini-Open, with fixed handle, for SynFix-LR, 17 mm |
| 03.802.209 | Aiming Device Mini-Open, with fixed handle, for SynFix-LR, 19 mm |

If an aiming device mini-open with fixed handle is used, a radius of ~ 2.7 cm is required. It enables a good guidance of the awl and the screwdriver while ensuring a secure insertion of all screws.



**Trade-off between guidance and exposure**
There is a trade-off between guidance and exposure. The standard aiming device offers the best guidance but also requires a larger exposure. The aiming device mini-open requires a smaller exposure, but the guidance is decreased.

Compared to the standard aiming device, the modified aiming device allows less angulation when inserting the awl or the screwdriver. During the insertion of the instrument, less space is needed.



Standard aiming device      Modified aiming device      Aiming device mini-open

**Filling Material**

**Synthetic cancellous bone graft substitute: chronOS**
chronOS is a fully synthetic and resorbable bone graft substitute consisting of pure β tricalcium phosphate. Its compressive strength is similar to that of cancellous bone. Based on literature, the use of β tricalcium phosphate in the spinal column is a valuable alternative to allografts and autografts, even when larger amounts are required.[1]

**Resorbable**
It is remodeled to vital bone within 6 – 18 months

**Osteoconductive**
Interconnecting macropores of defined size (100 – 500 μm) facilitate bone ingrowth. Interconnected micropores (10 – 40 μm) allow an optimal supply of nutrients. The patient's blood, blood platelet concentrate or bone marrow aspirate enhances the properties of chronOS required for fusion.[2]



**Safe**
100% synthetic – no risk of cross infection

**chronOS granules**

| | |
|---|---|
| 710.000S | ⌀ 0.5 – 0.7 mm, 0.5 cc |
| 710.001S | ⌀ 0.7 – 1.4 mm, 0.5 cc |
| 710.002S | ⌀ 0.7 – 1.4 mm, 1 cc |
| 710.003S | ⌀ 0.7 – 1.4 mm, 2.5 cc |
| 710.011S | ⌀ 1.4 – 2.8 mm, 2.5 cc |
| 710.014S | ⌀ 1.4 – 2.8 mm, 5 cc |
| 710.019S | ⌀ 1.4 – 2.8 mm, 10 cc |
| 710.021S | ⌀ 1.4 – 2.8 mm, 20 cc |
| 710.024S | ⌀ 2.8 – 5.6 mm, 2.5 cc |
| 710.025S | ⌀ 2.8 – 5.6 mm, 5 cc |
| 710.026S | ⌀ 2.8 – 5.6 mm, 10 cc |
| 710.027S | ⌀ 2.8 – 5.6 mm, 20 cc |

[1] Muschik et al. 2001; Knop et al. 2006; Arlet et al. 2006
[2] Allman et al. 2002; Stoll et al. 2004; Becker et al. 2006

Case 1:19-cv-01515-RGA   Document 195   Filed 07/28/22   Page 111 of 286 PageID #: 27575

| Set | |
| --- | --- |
| 01.609.102 | SynFrame RL, lumbar |
| 187.310 | SynFrame Basic System in Vario Case |

SynFrame Basic System is a surgical approach and retraction system. It consists of a basic system (basic construction) and modules that are specially designed for the respective requirements and needs of various indications and/or approach techniques. The SynFrame basic system is always constructed in the same sequence following the same principles. The SynFrame RL Lumbar is a supplementary module for the access and retraction system SynFrame. It contains radiolucent soft tissue and muscle retractors and semi transparent bone levers for minimally invasive surgery.



| Set | |
| --- | --- |
| 01.600.100 | Proprep Set |

A clearly arranged set for intervertebral disc preparation and vertebral body resection for lumbar surgery with an anterior approach.
– Compact but comprehensive: contains all instruments required for intervertebral disc preparation and vertebral body resection.
– Simplifies the entire anterior discectomy and corpectomy thanks to angled instruments with which even the posterolateral regions of the intervertebral discs can be reached.
– Ideal for use in extensively collapsed segments as the instruments have a low profile.
– The instrument length is specially designed for anterior surgery and for patients with a high BMI.
– Maximum instrument control thanks to silicone handles that can be gripped with two hands.







# Bibliography

Aebi M, Arlet V, Webb JK (2007) AOSPINE Manual (2 vols), Stuttgart, New York: Thieme

Allmann M, Florias E, Stoll T, Hoerger F, Bart F (2002): Haematological evaluation of blood samples after vacuum like impregnation of a Beta-TCP ceramic bone substitute before implantation (internal communication)

Arlet V, Jiang L, Steffen T, Ouellet, J, Reindl R, Max Aebi (2006): Harvesting local cylinder autograft from adjacent vertebral body for anterior lumbar interbody fusion: surgical technique, operative feasibility and preliminary clinical results. Eur Spine J. 15: 1352-9

Baumgart FW, Cordey J, Morikawa K, Perren SM, Rahn BA, Schavan R, Snyder S (1993) AO/ASIF self-tapping screws (STS). Injury 24(1):1-17

Becker et al. (2006) Osteopromotion by a β-TCP/Bone Marrow Hybrid Implant for Use in Spine Surgery. Spine, Volume 31(1): 11–17

Cain MJ, Schleicher P, Gerlach R, Pflugmacher R, Scholz M, Kandziora F (2005) A new stand alone ALIF device: Biomechanical comparison with established fixation methods. Spine 30(23):2631-6

Frigg R, Appenzeller A, Christensen R, Frenk A, Gilbert S, Schavan R. (2001) The development of the distal femur Less Invasive Stabilization System (LISS). Injury 32(3):SC24-31

Knop C, Sitte I, Canto F, Reinhold M, Blauth M (2006): Successful posterior interlaminar fusion at the thoracic spine by sole use of β-tricalcium phosphate. Arch Orthop Trauma Surg, 126: 204-210

Müller ME, Allgöwer M, Schneider R, Willenegger H (1995) Manual of Internal Fixation. 3rd, exp. a. completely rev. ed. 1991. Corr. 3rd printing. Berlin, Heidelberg, New York: Springer

Muschik M, Ludwig R, Halbhubner S, Bursche K, Stoll T (2001) Beta-tricalcium phosphate as a bone substitute for dorsal spinal fusion in adolescent idiopathic scoliosis: preliminary results of a prospective clinical study. Eur Spine J. 10 Suppl 2:178-84

Pavlov PW, Meijers H, van Limbeek J, Jacobs WC, Lemmens JA, Obradov-Rajic M, de Kleuver M (2004) Good outcome and restoration of lordosis after anterior lumbar interbody fusion and additional posterior fixation. Spine 29(17): 1893-9

Rüedi TP, Murphy WM (2000) AO Principles of Fracture Management. Stuttgart, New York: Thieme

Steffen T, Tsantrizos A, Aebi M (2000) Effect of implant design and endplate preparation on the compressive strength of interbody fusion constructs. Spine 25(9): 1077-84

Stoll et al. (2004) New Aspects in Osteoinduction. Mat.-wiss. u. Werkstofftech, 35 (4): 198–202

Watkins RG. Anterior Lumbar Interbody Fusion: Surgical Technique in Lumbar Interbody Fusion, eds. P.M. Lin, K. Gill. Rockville: Aspen Publishers, Inc.

Synthes and SynFix-LR are trademarks of Synthes, Inc. or its affiliates

All rights reserved

© 08/2010 Synthes, Inc. or its affiliates

036.000.915 AG   50147249

**⊕ SYNTHES®**

Synthes GmbH
Eimattstrasse 3
CH-4436 Oberdorf
www.synthes.com

All technique guides are available as PDF files at
www.synthes.com/lit

CE
0123

# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| RSB SPINE, LLC,                            ) | |
| )   | |
| Plaintiff,            ) | |
| )   | Civil Action No. 19-1515-RGA |
| v.                     ) | |
| )   | |
| DEPUY SYNTHES SALES, INC., and DEPUY   ) | |
| SYNTHES PRODUCTS, INC.,                   ) | |
| )   | **CONFIDENTIAL** |
| Defendants.            ) | |
| )   | |
| )   | |
| )   | |
| )   | |

**FIRST EXPERT REPORT OF BOYLE C. CHENG, PhD PURSUANT TO**
**RULE 26, FEDERAL RULES OF CIVIL PROCEDURE**

**INVALIDITY REPORT ON U.S. PATENT NOS. 6,984,234 AND 9,713,537**

the '537 patent.  I will collectively refer to claims 9 and 12 of the '234 patent and claims 10, 12, 14, 24, 26, and 30 of the '537 patent as the "Asserted Claims."

5.      I have been asked to provide my opinions as to whether the Asserted Claims of the Asserted Patents are valid in view of certain prior art references, and opinions on certain indefiniteness and interference issues.

6.      In preparing this report, I have reviewed the materials and information listed in Exhibit A of this report or otherwise cited in this report.

7.      I expect to provide testimony at trial regarding the opinions resulting from my analysis of the Asserted Patents and the materials as described in my report.  I may also use demonstrative exhibits in connection with my testimony.

8.      This report provides my opinions to date regarding issues of validity with respect to the Asserted Patents.  I reserve the right to supplement or amend this report to address any issues raised by RSB or its experts, or resulting from further rulings of the Court or from further discovery.

II.     **Professional Qualifications, Background and Experience**

9.      I received a Bachelor of Science degree in Mechanical Engineering in 1991, and received a Master of Science degree in Mechanical Engineering in 1993, both from Colorado State University.  In 1999, I earned a Ph.D degree in Mechanical Engineering from the University of Wisconsin.  I have more than 20 years' experience in developing, commercializing and evaluating spinal technologies.

10.     In 2005, I joined the University of Pittsburgh as the Co-Director of the Welch Neurosurgical Research Laboratory.  In 2009, I joined the Allegheny Health Network,

Neuroscience Institute, where I have served as Director of the Neurosurgery Spine and

Biomechanics Research Laboratory, Director of Research in the Department of Neurosurgery,

and Director of Research for the Neuroscience Institute.  I have recently also been appointed as

the Director of Research for the Orthopedic Institute.

11.     Between 2005 and 2022 I also held a number of academic appointments at

several well-respected academic institutions, including the University of Pittsburgh, in both the

Department of Neurological Surgery and the Department of Biomedical Engineering, and

Carnegie Mellon University, in the Department of Bioengineering.

12.     Since 2012, I have been a professor at Drexel University School of Medicine,

Allegheny Campus, in the Department of Neurosurgery.  I have taught numerous courses,

focusing largely on spine biomechanics, motion preservation technologies, spinal implants, and

spinal surgery for engineers.  I currently hold the rank of Full Professor in the Department of

Neurosurgery at Drexel University-Allegheny General Hospital Campus (AGH) and have an

adjunct faculty appointment in the Department of Bioengineering at Carnegie Mellon

University.

13.     In addition to my academic career, I have also been involved in the industrial

aspects of commercializing spinal implants, serving as a Global Product Manager at Stryker

Spine, Program Manager at Stryker Howmedica Osteonics, Director of Biologics and Motion

Preservation Technologies at Blackstone Medical, and *locum* Vice President at Altiva.  I have

been a consultant to Alphatec Spine, Medtronic, and Globus, all of which are companies

providing spine technology to physicians and their patients.

3

14.     Additionally, I serve on the editorial board of The Spine Journal and SpineLine, a trade publication.  I am also a section editor for the Spine Arthroplasty Society Journal (now known as the IJSS Journal) and the Journal of Biomechanical Engineering.

15.     Furthermore, I participated in the commercialization of spinal implant devices including the Stryker Spine Reflex® Anterior Cervical Plate, the Stryker Spine Oasys® Posterior Cervical System, and the Stryker Howmedica Osteonics Allocraft® C, PLIF and TLIF systems.  I have also participated in the launch of Blackstone Medical's Construx® Vertebral Body Replacement System and development of Blackstone Medical's Advent® Cervical Total Disc Replacement and biologics program.  Currently, I am the principal investigator on a biomechanical study researching the properties of sacral iliac joint fixation, and a filled PEEK composite material as a part of a validation and characterization study for submission to the FDA as a new spinal implant material for interbody devices.

16.      A copy of my current resume / CV, which includes a list of my publications and a list of other cases in which I have testified as an expert, is attached as Exhibit B.

**III.    Prior Testimony**

17.     I have not testified as an expert at trial or by deposition in the last four years.

**IV.    The Level Of Ordinary Skill In The Art**

18.     I understand that the Asserted Patents should be evaluated from the perspective of a person of ordinary skill in the art ("POSA") at the time the patent application was filed.

19.     Further, I understand that the hypothetical POSA is presumed to possess the normal skills and technical knowledge of an individual focused on the particular problem that the claimed invention addresses.  I further understand that the POSA is presumed to have

4

kerrosen punch rongeur, the vertebral bodies would be prepared in such a way to allow the

best fit for an interbody device to be sandwiched tightly against the vertebral bodies to

promote osseous fusion as described by Lauryssen.

### 4.   Claim 14

227.   Dependent claim 14 of the '537 patent claims as follows:

> 14. The system as set forth in claim 1, wherein each of the plurality of bone
> screw holes extends at least partially through the first or second end, the
> first end comprising a first bone engaging region fully extending
> uninterrupted between lateral extents of the first end, and the second end
> comprising a second bone engaging region fully extending uninterrupted
> between lateral extents of the second end.

228.   Michelson 376 discloses this limitation.  For example, as seen in figure 8 of

Michelson 376, the bone screws extend at least partially through the first and second ends, and

each end includes an uninterrupted bone engaging region:



229.   To the extent that RSB contends that this claim is not obvious in view of

Michelson 376 alone, this claim is obvious over Michelson 376 in view of at least Fraser 106,

which discloses uninterrupted bone engaging regions, as shown in Figures 2 and 3 of Fraser 106

below:



Uninterrupted bone engaging regions

FIG. 2          FIG. 3

230.    To the extent RSB contends that Michelson 376 does not include uninterrupted

bone engaging regions, it would have been obvious to incorporate such regions, as shown in

Fraser 106, to provide additional surface area for engaging the vertebral bodies.  Such a

modification would have been simple and obvious, and would include simply closing off a

portion of openings 130 in the Michelson 376 device.  A POSA could have made such a

modification without otherwise altering the functionality of the Michelson 376 device, and with

a reasonable expectation of success.

     **5.**    **Claim 21**

231.    Independent claim 21 of the '537 patent claims as follows:

> 21. A bone stabilization plate system for anchoring between side surfaces
> of first and second adjacent vertebral bones, comprising:
>
> [a] a base plate having a top surface, a first end nearer the first bone
> comprising a first bone screw hole extending at least partially
> therethrough and a first bone engaging region fully extending
> uninterrupted between lateral extents of the first end, a second end
> nearer the second bone comprising a second bone screw hole extending
> at least partially therethrough, and a bottom surface, and configured to fit
> primarily between an anterior portion of the first bone's lip osteophyte
> and an anterior portion of the second bone's lip osteophyte while bearing
> weight to hold the bones for fusion; and

a reduced neck diameter to permit movement of the bone screws so as to allow the angle

between the implant and the bone screw to be variable."  Michelson 376 at [0044].

### 8. Claim 30

238.   Dependent claim 30 of the '537 patent claims as follows:

30. The system as set forth in claim 21, wherein the system further
comprises a screw retainer configured to prevent at least one of the first
and second bone screws from backing out.

239.   Michelson 376 discloses this limitation.  For example, Michelson 376 explains

that "trailing end 104 can further include at least one locking mechanism 144 for locking the

bone screws to implant 100."  Michelson 376 at [0046].  Michelson 376 further explains that

"Locking mechanism 144 can be in the form of a screw or a rivet having a head for contacting

and securing the bone screws to implant 100. Locking mechanism 144 may be capable of

rotational movement relative to trailing end 104. Locking mechanism 144 includes a tool-

engaging portion 146 for moving locking mechanism 144 from an unlocked to a locked

position."  Michelson 376 at [0048].

240.   As depicted in Figure 11, the locking mechanism 144 described in Michelson 376

covers at least a part of the first and second bone screws, and is configured to prevent them

from backing out of the base plate:

plate portion and the bone graft material will "bear weight," as that phrase is used in the Asserted Patents.

448.   Claim 10 next recites (by way of dependency from claim 1): "a plurality of bone screws configured to fit in the plurality of bone screw holes, respectively; wherein the vertebral bones have top surfaces and have side surfaces generally facing each other."  RSB's alternative of Count 1 discloses the use of bone screws and a plurality of bone screw holes; both were well-known in the art.  It also was known that vertebral bones have top surfaces and have side surfaces generally facing each other, which is a matter of anatomy.  Thus, a POSA would have understood this limitation to be obvious over the RSB alternative to Count 1.

449.   Claim 10 next recites (by way of dependency from claim 1):

> wherein a first of the bone screw holes, being configured to receive a first of the bone screws, extends at least partially from the top surface of the base plate and opens at least partially toward the side surface of a first of the vertebral bones;

> wherein a second of the bone screw holes, being configured to receive a second of the bone screws, extends at least partially from the top surface of the base plate and opens at least partially toward the lip osteophyte of a second of the vertebral bones; and

> wherein each and every one of the plurality of bone screw holes is configured to receive one of the bone screws angled relative to the base plate and oriented generally in an anterior-posterior direction through at least partially the top surface of the base plate.

450.   These limitations describe basic geometry of the device claimed in the RSB alternative in Count 1, which recites "first and second screw holes" that extend through the first and second ends of the base plate and receive "bone screws" angled relative to the base plate at recited angle ranges.  A POSA would have understood the RSB alternative to Count 1 to disclose bone screw holes to extend at least partially toward the side surface and/or "lip

1. A bone stabilization plate system comprising:

[a] a base plate having a top surface, first and second ends, a bottom surface, and a plurality of bone screw holes, wherein the base plate is configured to fit primarily between anterior portions of adjacent vertebral bones' lip osteophytes to bear weight to hold the vertebral bones while sharing weight with bone graft material for fusion; and

[b] a plurality of bone screws configured to fit in the plurality of bone screw holes, respectively;

[c] wherein the vertebral bones have top surfaces and have side surfaces generally facing each other;

[d] wherein a first of the bone screw holes, being configured to receive a first of the bone screws, extends at least partially from the top surface of the base plate and opens at least partially toward the side surface of a first of the vertebral bones;

[e] wherein a second of the bone screw holes, being configured to receive a second of the bone screws, extends at least partially from the top surface of the base plate and opens at least partially toward the lip osteophyte of a second of the vertebral bones; and

[f] wherein each and every one of the plurality of bone screw holes is configured to receive one of the bone screws angled relative to the base plate and oriented generally in an anterior-posterior direction through at least partially the top surface of the base plate.

10. The system as set forth in claim 1, [g] wherein the base plate includes two lateral tabs configured to fit between the lip osteophytes of the vertebral bones and extending from opposite ends of the bottom surface of the base plate in a direction generally transverse to the vertebral bones.

513.    A POSA would have understood limitation [a] of claim 10 to be obvious in view of

limitation claim 17, which recites an "intervertebral implant for insertion into an intervertebral

disc space between endplates of adjacent vertebral bodies" including a "front plate mounted to

the front surface of the three-dimensional body, the front plate including a first borehole and a

second borehole having openings, the first borehole and the second borehole each being

aligned with a respective first and second partial borehole."  A POSA would have understood

that the front plate of claim 17 is a base plate as construed by the Court, which necessarily has top and bottom surfaces and first and second ends.  Claim 17 recites that the front plate has a plurality of boreholes, which a POSA would have understood to be bone screw holes.  A POSA would have understood that the intervertebral device insertion described in of the claim 17, between endplates of adjacent vertebral bodies renders obvious the claim 10 [a] limitation " wherein the base plate is configured to fit primarily between anterior portions of adjacent vertebral bones' lip osteophytes," as that limitation is applied by RSB in its infringement contentions.

514.   As discussed above, RSB contends, based upon the testimony of Dr. Drewry during the claim construction phase, that a "lip osteophyte" is:

> "'more of a region'" and a 'three-dimensional structure' that, while varying based on patient anatomy, is nevertheless the strongest part of the bone and may be located within an anterior portion of the cortical rim. . . . In other words, bony outgrowth occurs in a three dimensional region of the vertebrae and is not simply a bony protuberance.  The side profile of Syn-Fix LR above depicts how the accused device is inserted between the anterior portions of these lip osteophytes, within the intervertebral disc space.
>
> RSB Supplemental Infringement Contentions A-2 at 12, 43; see also RSB Supplemental Infringement Contentions B-2 at 12, 47; C-2 at 11, 39; D-2 at 8; E-2 at 11.

515.   A POSA would have understood from claim 17 in view of the descriptions in the '207 patent, that it was obvious to insert the claimed base plate to fit "primarily between anterior portions of adjacent vertebral bones' lip osteophytes" as interpreted by RSB.  That the plate would fit between adjacent vertebrae is explicitly referenced in claim 17 "an intervertebral implant for insertion into an intervertebral disc space between endplates of adjacent vertebral bodies" and by the '207 patent specification: "the intervertebral implant . . .

*FIG. 1*



563.    A POSA would have been motivated to combine the base plate of claim 1 of

the '234 patent with Fraser 222 to implement a two-piece plate plus spacer design.  A POSA

would have known that the use of polymers in the design of interbody cages had become

commonplace. Specifically, PEEK cages either as a monolithic implant, or in combination with a

base plate made of titanium, would have been an obvious combination to a POSA with a

reasonable probability of success. The radiolucent nature of PEEK cages helps the surgeon

assess the progress of the fusion. In contrast, the stiffness of a metal such as titanium, provides

a method of securely capturing the bone screw and providing a secondary mechanism to

prevent back out. Both bone screws and anti-back out mechanisms benefit from metal fastener

technology, e.g., threaded screw holes. Threads and through holes in metal have higher

strength and are not prone to fatigue issues like polymer plates. In combination, the two

material choices provide advantages that would otherwise be a compromise with a design

incorporating only one material.

564.    A POSA also would have been motivated to use a spacer containing teeth on its

underside.  A POSA would have understood that stabilizing the implant prior to bone healing

212

would require supplemental fixation would have been necessary. Teeth on the underside surface like bone screws help secure the device in the interbody space. Teeth contribute to the immediate stabilization by increasing the resistance of the interbody device and thus, reduces the likelihood of device back out.

565.   That the spacer could, optionally, have partial boreholes would have been equally obvious to a POSA.  Such a design would have been a matter of geometry.  A POSA would have understood that the partial borehole for the screws would be designed to prevent back out of the screw by partially engaging the implant and partially engaging the vertebrae. A screw trajectory that would capture the top, back and side surface of the implants while capturing the centrum, preferably along the anterior surface of apophyseal ring or cortical rim for optimal purchase of the bone anchor would be ideal and obvious. The interference of the screw between implant and vertebrae due to the partial borehole would be obvious to a POSA.   A POSA would have been motivated to provide such partial boreholes in the spacer (three-dimensional body) to accommodate the preferred angle of such bone screws.  Indeed, for designs with bone screw angles, measured from the top plane of the device, within the ranges recited in '234 patent claims 1 and 9, a POSA would have been motivated to include partial boreholes in the spacer (three-dimensional body) to accommodate such angles while maintaining a spacer with appropriate thickness to engage the cortical rim or apophyseal ring of the second vertebral body].

566.   Indeed, RSB itself co-marketed a separate spacer to be used with its InterPlate device, which is depicted in Figure 1 of the '234 patent. As shown below, the spacer has teeth on the upper side surface and underside surface.  While the RSB co-marketed spacer does not

213

contain partial boreholes, such a design choice would have been obvious to a POSA.  Though

later in time, the InterPlate is an example of how a POSA would have known to incorporate a

separate three-dimensional body with the baseplate of the '234 and '537 patents.



InterPlate C-PS

### (2)   Limitation [a] in view of '537 patent claims 10, 12, 14, 24, 26 and 30

567.   Claims 10 and 12 of the '537 patent incorporate the limitations of claim 1 of

the '234 patent.  A POSA would have understood that limitation [a] is obvious in view of claim 1

of the '234 patent, and therefore necessarily obvious in view of each of claims 10 and 12.

Claims 24, 26 and 30 of the '537 patent incorporate the limitations of claim 21 of the '537

patent.  A POSA would have understood that limitation [a] is obvious in view of claim 21 of

the '537 patent, and therefore necessarily obvious in view of each of claims 24, 26 and 30.

568.   In my opinion, a POSA would have understood claim 17, limitation [a] to be

obvious in view of either claim 1 or 21 of the '537 patent in combination with Fraser 222 for the

reasons discussed above with respect to claim 1 of the '234 patent.  While the '537 patent

claims do not reference specific angles for the bone screws, a POSA would have understood

that, in the context of the '537 patent claims, the bone screws would have been angled

appropriately to engage both the plate, spacer and vertebrae.

584.   A POSA would have understood claim 17 limitation [d] to be obvious over '234 claim 1, which expressly recites covering at least a part of the first and second bone screws to prevent back out:

> covering at least a part of the first bone screw and at least a part of the second bone screw to prevent the first and second bone screws from backing out of the first and second bones, respectively.

'234 patent claim 1.

585.   A POSA would have understood the "covering" recited in claim 1 to be performed by the retaining plate described in the '234 patent, which is illustrated below, and comprises a securing plate fastened substantially parallel to the front plate to cover the first and second boreholes and heads, at least partially.



*FIG.6*

*FIG.7*

'234 patent Figs. 6 and 7; 537 patent Figs. 6 and 7.



FIG.4

'234 patent Fig. 4; see additional disclosure below.

586. Thus, A POSA would have understood that claim 1 of the '234 patent expressly discloses the securing plate limitation [d] of '234 patent claim 17. Accordingly, a POSA would have understood claim 17 to be obvious in view of claim 1 of the '234 patent.

> **(2)   Limitation [d] in view of '537 patent claims 10, 12, 14, 24, 26 and 30.**

587. Claims 10, 12 and 14 of the '537 patent incorporate the limitations of claim 1 of the '537 patent. A POSA would have understood that limitation [d] is obvious in view of claim 1 of the '537 patent, and therefore necessarily obvious in view of each of claims 10 and 12. Claims 24, 26 and 30 of the '537 patent incorporate the limitations of claim 21 of the '537 patent. A POSA would have understood that limitation [d] is obvious in view of claim 21 of the '537 patent, and therefore necessarily obvious in view of each of claims 24, 26 and 30.

588.     In my opinion, a POSA would have understood claim 17, limitation [d] to be

obvious in view of either claim 1 or 21 of the '537 patent.  A POSA would have understood that

securing  or covering plates were well known in the art to aid in the prevention of bone screw

back out.  The specification of the '537 and '234 patents make this clear by expressly disclosing

the use of a bone screw retaining plate (i.e., a securing plate), to prevent the bone screws, once

inserted, from backing out of the vertebrae:

> The bone stabilization plate system includes a bone screw retaining means, which is any means for securely covering at least a part of each of the bone screws 24 and 25 so that the bone screws cannot back out from the bone once screwed in through the base plate 20. In the depicted embodiment, the bone screw retaining means comprises a retaining plate 50 and a retaining plate fixing means.

> As best shown in FIGS. 6 and 7, the retaining plate 50 is a generally flat plate having a first end 51, a second end 52, a top surface 53 and a bottom surface 54 that is shaped to sit against the top surface 28 of the base plate 20. In the depicted embodiment, the retaining plate 50 sits in a recessed region of the base plate 20, as best shown in FIG. 3. The use of a recessed region permits the user to more easily properly place the retaining plate on the base plate. The thickness of the retaining plate 50 is not critical, but can be ranges from about 0.5 mm to about 2 mm, more specifically from about 1 mm to about 1.5 mm.

> The retaining plate 50 includes at its first end 51 two generally-rounded notches 55 on the sides of its bottom surface 54. When the retaining plate 50 is fixed in place over the base plate 20, the two generally-rounded notches 55 each cover a portion of a corresponding one of the first bone screws 24. The generally-rounded nature of the notches 55 permits the first bone screws 24 to toggle within the first bone screw holes 42.

> The retaining plate includes at its second end 52 a U-shaped notch 56, which, in the depicted embodiment, is centered at the edge of the second end. The U-shaped notch 56 includes a generally U-shaped sidewall between the top and bottom surfaces of the retaining plate that is curved outwardly from the top surface 53 to the bottom surface 54 so that the opening formed by the notch is larger at the bottom surface of the retaining plate and smaller at the top surface of the retaining plate. When the retaining plate 50 is fixed in place over the base plate 20, the top of

the second bone screw 25 sits within the U-shaped notch 56 with the top of the second bone screw covered by the top surface 53 of the retaining plate. With this design, the second bone screw 25 is permitted to slide and toggle within the bone screw slot 48 even when the retaining plate 50 is fixed over the second bone screw.

The retaining plate 50 also includes a set screw aperture 57 between its first and second ends. The set screw aperture 57 in the retaining plate 50 is aligned with a set screw aperture (not shown) in the base plate 20, both of which can receive a set screw (not shown) for fixing the retaining plate in place over the base plate. The set screw can be made of any suitable material well known in the art, and can be titanium or a titanium alloy. In one embodiment, the set screw is a hexagonal set screw that can be turned with a hexagonal driver. Other types of set screws can also be used, as well as any other suitable mechanism for fixing the retaining plate to the base plate. The precise mechanism by which the retaining plate is fixed to the base plate is not critical to the invention.

Any other suitable bone screw retaining means can be used in connection with the invention. For example, the bone screw retaining means can comprise multiple retaining plates that cover different bone screws. Alternatively, the bone screw retaining means can comprise one or more screws with heads that overlap at least a portion of one or more bone screws to thereby prevent the bone screws from backing out. The precise mechanism by which the bone screws are covered is not critical to the invention.

'234 patent 5:35-6:23; '537 patent 9:64-10:53.

222



*FIG.6*

*FIG.7*

'234 patent Figs. 6 and 7; '537 patent Figs. 6 and 7.

589.    Figure 4 shows the retaining plate 50 installed substantially parallel to the front

plate and partially covering the first and second boreholes and heads:

591.    Numerous other references disclose the use of a securing plate to prevent bone screw back out.  See, e.g., Michelson 045, Michelson 376.  Additionally, in his deposition (see pages 122-123 (objection omitted)), Dr. Bray confirmed that securing plates to prevent screw back out were well known in the art before 2003:

> Q.  But having a cover plate or a securing plate to prevent screw backout, that concept wasn't new in 2003, was it?
>
> A.  I had already used a plate cover in the Blackstone plate, and it was already – I had already used a plate cover in the SmartPlate that went to NuVasive.  So it wasn't unique to this thing, no.
>
> Q.  And it wasn't new in 2003 is the question.
>
> A.  A plate cover was not new; that is correct. . . .

592.    Accordingly, a POSA would have understood claims 10, 12, 14, 24 and 26 of the '537 patent to render obvious limitation [d].  Additionally, Claim 30 of the '537 patent expressly discloses "a screw retainer configured to prevent at least one of the first and second bone screws from backing out," which a POSA would have understood to disclose  the securing plate limitation [d] of claim 17 and therefore render it obvious.

### e.    Claim 17 limitation [e]

593.   Limitation [e] of claim 17 recites:

> wherein axes of the first and second boreholes define an angle β, ranging from 20° to 60° with the horizontal middle plane

### (1)    Limitation [e] in view of '234 patent claims 9 and 12

594.    Claims 9 and 12 of the '234 patent incorporate the limitations of claim 1 of the '234 patent.  A POSA would have understood that limitation [e] is obvious in view of claim 1 of the '234 patent, and therefore necessarily obvious in view of each of claims 9 and 12.

595.   Claim 1 of the '234 patent recites:

introducing a first bone screw through the first screw hole and into the first bone, wherein the first bone screw is introduced at an angle relative to the top surface of the bone ranging from about 20° to about 60°,

introducing a second bone screw through the second screw hole and into the second bone, wherein the second bone screw is introduced at an angle relative to the top surface of the bone ranging from about 20° to about 70°

The '234 patent further discloses potential angle ranges

The system 10 is designed so that the bone screws 24 and 25 are introduced into the vertebral bodies 14 and 15 at an angle other than 90° relative to the bone surface. Preferably the first bone screws 24 are introduced into the first vertebral body 14 so that the axis of each bone screw is at an angle relative to the bone surface ranging from about 20° to about 60°, more preferably from about 40° to about 50°. The second bone screw 25 is preferably introduced into the second vertebral body 16 so that the axis of the bone screw is at an angle relative to the bone surface ranging from about 20° to about 70°, more preferably from about 45° to about 65°.

'234 patent 5:23-34; see identical disclosure in '537 patent 9:53-63.

596.   A POSA would have understood that the angles at which the bone screws are positioned are substantially defined by the angles of the boreholes through which the bone screws are inserted.

597.   Claim 17, limitation [e] recites an angle β defined by the axes of the first and second boreholes with the horizontal middle plane.  Claim 1 of the '234 patent recites angle ranges of  about 20° to about 60° and about 20° to about 70° for a bone screws introduced at an angle relative to the top surface of the bone.  Because the top surface of the bone is approximately 90° from the horizontal middle plane, of the claim 17 device, these angle ranges relative to the horizontal middle plane would be expressed as about 30° to about 70° to and about 20° to about 70°.  A POSA would have understood that these claim 1 angle ranges render obvious the claim 17 angle range of 20° to 60°.

226

598.   The '234 patent explains that the angles of the bone screws are important to define the angle at which the bone screws enter the side faces of the vertebrae (which RSB incorrectly calls the lip osteophytes), to better anchor the device and reduce sheer forces on the screws during settling.

> The angles of the bone screws 24 and 25 relative to the bone surfaces of the vertebral bodies 14 and 16 are particularly important. As note[d] above, the lip osteophite is the strongest part of the bone, and thus angling the bone screws through the lip osteophite increases the ability of the base plate 20 to stay anchored to the vertebral bodies. Moreover, by being angled, each bone screw 24 or 25 is positioned along the angle of rotation of the corresponding vertebral body as well as the angle of settling of the vertebral body. This places each screw in a protected position against motion of the spinal column. As a result, significant sheer forces are not exerted on the screws as the vertebral bodies rotate and settle.

'234 patent 7:13-25.

599.   While a POSA would have understood the claim 17 range to fall within the claim 1 ranges, even small differences in angles would not render the claim non-obvious.  Small differences in angles do not dramatically alter the compressive forces nor the stability of the construct. The supplemental fixation relies mostly on the engagement of the bone anchoring and the engagement with the interbody implant. The migration is not affected by small changes as well. The important consideration is the bone implant interface for both the interbody component as well as the bone screw engagement into the vertebrae.

600.   For the reasons described above, a POSA would have understood claim 17 limitation [e] to have been obvious over claim 1 of the '234 patent.

(2)  Limitation [e] in view of '537 patent claims 10, 12, 14, 24, 26 and 30.

601.  Claims 10, 12 and 14 of the '537 patent incorporate the limitations of claim 1 of the '537 patent.  A POSA would have understood that limitation [d] is obvious in view of claim 1 of the '537 patent, and therefore necessarily obvious in view of each of claims 10 and 12. Claims 24, 26 and 30 of the '537 patent incorporate the limitations of claim 21 of the '537 patent.  A POSA would have understood that limitation [d] is obvious in view of claim 21 of the '537 patent, and therefore necessarily obvious in view of each of claims 24, 26 and 30.

602.  The '537 patent discloses the identical angle ranges and rationale for those ranges as does the '234 patent.  See, e.g., '537 patent 9:53-63, 11:41-53.

603.  In view of this disclosure, a POSA would have understood claim 17, limitation [e] to be obvious in view of either claim 1 or 21 of the '537 patent in combination with the disclosure of the '537 patent, as described above, for the reasons described above.

F.  **Priority of RSB Asserted Claims to the Count**

1.  **Priority of the '207 Patent**

604.  It is my understanding that, on its face, the '207 patent claims priority to PCT Application No. PCT/CH2003/000089 (the "PCT application"), dated February 6 2003.  I understand that, in an interference, a prior application, such as the PCT application, may entitle a subsequent patent, such as the '207 patent, to the priority date of the earlier application if certain conditions are met.  I understand this is known as entitlement to the "benefit" of the earlier filing date.

605.  It is my understanding that to qualify for benefit of an earlier filing date, the earlier application must provide a proper constructive reduction to practice of the count.  I

228

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 21, 2022

DR. BOYLE C. CHENG

# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| RSB SPINE, LLC,                              ) | |
| )                                            | |
| Plaintiff,                 ) | |
| )                                            | Civil Action No. 19-1515-RGA |
| v.                    ) | |
| )                                            | |
| DEPUY SYNTHES SALES, INC., and DEPUY        ) | |
| SYNTHES PRODUCTS, INC.,                      ) | |
| )                                            | **CONFIDENTIAL** |
| Defendants.                 ) | |
| )                                            | |
| )                                            | |
| )                                            | |
| )                                            | |

**SECOND EXPERT REPORT OF BOYLE C. CHENG, PhD PURSUANT TO
RULE 26, FEDERAL RULES OF CIVIL PROCEDURE**

**NON-INFRINGEMENT REPORT ON U.S. PATENT NOS. 6,984,234 AND 9,713,537**

XII.   **Opinions Regarding Non-Infringement of the '234 Patent**

A.   **Zero-P VA**

237.   I understand that RSB is currently asserting that Defendants' Zero-P VA product infringes claims 9 and 12 of the '234 patent.  (See Hynes Report at pp. 57-79.)  For the reasons explained below, it is my opinion that the accused Zero-P VA products do not infringe either of claims 9 or 12 of the '234 patent.

1.   **The Zero-P VA Product Does Not Include A Base Plate That Has A First Screw Hole Extending Through The First End or a Second Screw Hole Extending Through The Second End (All Asserted Claims of the '234 Patent)**

238.   Independent claim 1 of the '234 patent requires "a base plate having a first end nearer the first bone and a second end nearer the second bone, wherein the base plate has a first screw hole extending through the first end and a second screw hole extending through the second end."  Because asserted claims 9 and 12 of the '234 patent depend from claim 1, these claims include the same requirement.  Zero-P VA does not meet this limitation, and therefore does not infringe claim 9 or 12 of the '234 patent, for the reasons explained below.

239.   Each of the asserted claims of the '234 patent requires a "first end nearer the first bone" and "a second end nearer the second bone."  These claimed "ends" are regions of the claimed baseplate, one nearer the upper bone and one nearer the lower bone in an upright spine.  Dr. Hynes states that the first end and second end are "opposing portions" of the plate, and are "generally orthogonal to (but not mutually exclusive of) its top and bottom surfaces."  Hynes Report at ¶ 115.  I agree that the "first end" and "second end" are "opposing portions," in that they do not overlap.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

240.    The claim further requires a "first bone screw hole extending through the first end" and a "second bole screw hole extending through the second end."  Thus, the claims require that the first bone screw hole be located in the first end, and the second bone screw hole be located in the second end.  This is consistent with the only embodiment described and depicted in the '234 patent:



241.    Zero-P VA does not infringe the asserted claims of the '234 patent because it does not meet these limitations.  To the contrary, what Dr. Hynes identifies as the "first bone screw hole" is located in the second end, and what Dr. Hynes identifies as the "second bone screw hole" is located in the first end.  This can be seen in the images reproduced in ¶¶ 118-119 of the Hynes Report (my annotations are added in blue):

CONFIDENTIAL – ATTORNEYS' EYES ONLY





242.    While some portion of the first bone screw hole is located in the "first end," the hole begins in the "second end," and transverses both ends, running from one side of the device to the other.  The same is true for the second bone screw hole.  This crisscross pattern of bone screws is not what was depicted or described in the '234 patent, and is not what was claimed.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

product's effectiveness or desirability.  This is the case for anterior cervical plating systems, as well as stand-alone interbody devices.

248.    There are, and have been, numerous anterior cervical plate options on the market, and (for the major companies) they are all similar.  Absent unique pathology, they are all fairly effective.

249.    For example, the Skyline system is an anterior cervical plate system that has been available for years and is sound from a design perspective.  Skyline provides for graft visualization, adapts to the anatomy of the patient, and employs a clinically proven screw backout mechanism.[10]  I understand that the Skyline product is offered with both variable angle and fixed angle screws, and that it is promoted as being able to create fixed, semi-constrained, and hybrid constructs.  That Skyline permits a semi-constrained construct is consistent with my understanding of this and similar products (such as Codman ACP).  Because Skyline is an anterior cervical plate that can be used with an interbody spacer (for example, allograft or PEEK cages), and because it is in the DePuy Synthes product line and provided by DePuy Synthes sales representatives, it has been an alternative to the Zero-P products.  DePuy Synthes' Vectra family of products is another example of an alternative to the Zero-P products.[11]

250.    With respect to the Zero-P VA product, it is my opinion that the Zero-P and Zero-P Natural products—which are also standalone interbody devices—have been sound, acceptable alternatives to Zero-P VA, even though they are considered to be rigid constructs.

---

[10] See, e.g., https://www.depuysynthes.com/hcp/spine/products/qs/SKYLINE-Anterior-Cervical-Plate-System.

[11] https://www.jnjmedtech.com/en-US/product/vectratm-cervical-plating-system .

CONFIDENTIAL – ATTORNEYS' EYES ONLY

This is consistent with the fact that the Zero-P and Zero-P Natural products continue to be sold. Additionally, for all the same reasons noted above, it is my opinion that, if Zero-P VA were no longer offered, many surgeons would simply use Zero-P instead, rather than turn to a competitor's product.

251.    There are also numerous anterior lumbar plate options that have been on the market, and again (for the major companies) they are all similar, and absent unique pathology, they are all fairly effective.

252.    For example, products like the AEGIS system provided for a low-profile plate for anterior stabilization that could be used together with structural allograft or an interbody fusion device.[12]  I understand that the AEGIS plate allowed for variable angle screw placement and had a clinically proven screw locking mechanism.  Because AEGIS was an anterior lumbar plate for use with an interbody spacer (for example, allograft or PEEK cages), and because it, along with other similar products on the market today, has been in the DePuy Synthes product line and provided by DePuy Synthes sales representatives, it has been an alternative to the SynFix products.  DePuy Synthes' ATB Anterior Tension Band Plate,[13] which I understand became obsolete in 2019, also would have been an alternative to the SynFix products during part of the applicable time frame.

---

[12]
http://synthes.vo.llnwd.net/o16/LLNWMB8/INT%20Mobile/Synthes%20International/Product%20Support%20Material/legacy_Synthes_PDF/095798.pdf

[13]
http://synthes.vo.llnwd.net/o16/LLNWMB8/INT%20Mobile/Synthes%20International/Product%20Support%20Material/legacy_Synthes_PDF/107091.pdf

113

**B.**   **Alleged Technical Benefits of the Asserted Patents**

253.   I have reviewed the Hynes Report at ¶¶ 368–605, where Dr. Hynes purports to enumerate the alleged technical benefits of the '234 and '537 patents.  However, none of the "technical benefits" to which he refers are attributable to anything allegedly inventive in the Asserted Patents.

254.   The first technical benefit Dr. Hynes claims is attributable to the Asserted Patents is the "low profile" of the claimed device.  Hynes Report at ¶600.  However, as I have shown extensively in my invalidity report ("First Report"), a "low profile" is something disclosed throughout the prior art, including, for example, Michelson 376, Michelson 045, Fraser 106, Fraser 222, Lauryssen, Dove, and Lechmann 207.  Dr. Hynes cites the Asserted Patents' disclosure of trimming some portion of bone from the vertebral body to "provide[] a substantially flat surface for anchoring the second bone screw," but trimming away a portion of bone was a well-known technique for ensuring the correct and efficacious placement of the anterior plate described by, for example, Lauryssen (First Report, ¶47).  *See also* First Report at ¶¶ 225.

255.   The second technical benefit Dr. Hynes claims is attributable to the Asserted Patents is "bone purchase" and "graft retention."  Hynes Report at ¶ 601.  There is nothing novel about "bone purchase," whatever Dr. Hynes means by that.  As Dr. Hynes observes, it is important to have "adequate bone purchase" so screws do not tear out of the bone, and there is nothing novel about placing screws in a manner that achieves "bone purchase," preferably along the anterior surface of the apophyseal ring or cortical rim.   Nor was "graft retention" anything novel.  Interbody cages were known and widely used to contain graft many years

CONFIDENTIAL – ATTORNEYS' EYES ONLY

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 17, 2022

BOYLE C. CHENG

# EXHIBIT 4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| RSB SPINE, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 19-1515-RGA |
| v. | ) | |
| | ) | |
| DEPUY SYNTHES SALES, INC., and DEPUY | ) | |
| SYNTHES PRODUCTS, INC., | ) | |
| | ) | **CONFIDENTIAL** |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) | |

**THIRD EXPERT REPORT OF BOYLE C. CHENG, PhD PURSUANT TO**
**RULE 26, FEDERAL RULES OF CIVIL PROCEDURE**

**REPLY INVALIDITY REPORT ON U.S. PATENT NOS. 6,984,234 AND 9,713,537**

that Mr. Drewry contends that "non-stress shielding" is encompassed in the '537 patent claim limitations, the need to prevent stress shielding was known, and solved, long before the filing date of the Asserted Patents.

## XIV. OPINIONS REGARDING INTERFERENCE COUNTERCLAIM

### A. The two-way test analysis uses the plain and ordinary meanings of the Lechmann '207 claim terms

135.    Mr. Drewry asserts that I have failed to consider claim constructions for claim 17 of the Lechmann '207 patent.    Drewry Reb. Report at ¶ 432.  This is not correct.  Each claim term in claim 17 had a plain and ordinary meaning to a POSA and I applied the claim 17 limitations in accordance with those plain and ordinary meanings.  I understand that where claim terms have plain and ordinary meanings and the claim uses the terms in accordance with such, no further clam construction is necessary or appropriate.  In the case of claim 17, each term would have had a plain and ordinary meaning to a POSA.

136.    Mr. Drewry was able to, and did, apply the plain and ordinary meaning to the claim 17 terms with the exception of "fixation elements," for which he crafted his own construction[1].  I disagree with Mr. Drewry's construction of "fixation elements" as discussed below.

---

[1] Mr. Drewry opined that the term "three-dimensional body" did not have a plain and ordinary meaning (Drewry Reb. Report at ¶ 437), but did not apply any construction distinct from what a POSA would understand the plain and ordinary meaning of three-dimensional body to be.  In my opinion, a three-dimensional body would include a fusion cage, as Mr. Drewry opines.  *Id.*

**B.** **Mr. Drewry's Opinion That The Two-Way Test Is Not Satisfied For The Claims Of The '234 Patent Is Incorrect.**

**1.** **Claims 9 and 12 of the '234 patent each renders obvious Claim 17 of _Lechmann '207_, alone or in view of _Michelson 376_ and/or _Fraser 222_**

137.     Mr. Drewry argues that I have not shown that claims 9 or 12 of the '234 patent anticipates or renders obvious Lechmann '207 claim 17 alone or in combination with the cited references.  I disagree.

**a.** **Claims 9 and 12 of the '234 patent renders obvious a "three-dimensional body having an upper side and an underside provided with teeth.**

138.     Mr. Drewry opines that neither claims 9 nor 12, alone or in combination with Fraser 222, renders obvious a "three dimensional body having an upper side and an underside provided with teeth."  Drewry Reb. Report at ¶¶ 435-445.  In doing so, Mr. Drewry does not dispute that Fraser 222 discloses a three-dimensional body in the form of an intervertebral cage.  A POSA would have understood that an intervertebral  cage was a type of spacer that could be packed with bone graft to stabilize adjacent vertebrae and promote fusion.  As Mr. Drewry acknowledges, the '234 patent contemplates the use of the claim 9 and 12 base plate with a spacer packed with bone graft, such as an intervertebral cage.  Drewry Reb. Report at ¶ 448 ("The specification supports that the claimed base plate is designed for use with bone graft **12**, which a POSITA would have understood as including bone graft material and **_spacers packed with bone graft material_**.")(emphasis mine)).  Agreeing that claimed base plate was designed to be used with a spacer, such as a cage, Mr. Drewry takes exception only with the narrow proposition that a POSA would have combined the claimed base plate with the spacer disclosed in Fraser 222.  Drewry Reb. Report at ¶ 435.  I disagree with Mr. Drewry.

54

### 2. The asserted claims of the '537 patent each renders obvious "fixation elements" recited in Claim 17 of *Lechmann '207*

173.     In response to my first report, Mr. Drewry incorporates his analysis from Section XII.B.2.  Mr. Drewry's analysis is incorrect for the reasons I discuss in Section XIV.B.2 above, which I incorporate here.

### 3. The asserted claims of the '537 patent each renders obvious a "securing plate" as recited in Claim 17 of Lechmann '207

174.     Mr. Drewry focuses only upon whether each claim expressly discloses a securing plate.  Drewry Reb. Report at ¶ 478.  As I explain in my First Report at ¶¶ 587-592, the use of a securing plate was well known to a POSA.  This is evidenced in the specification and claim disclosure I discuss therein.  To be clear, even without reference to the '234 or '537 specification, a POSA would have understood the use of a securing plate to be obvious in view of each of the asserted '537 claims.  Mr. Drewry does not dispute that securing plates were well known in this art, which is consistent with the patent disclosures.  Tellingly, Dr. Bray himself considered the use of a securing plate with vertebral fusion devices to be well-known in the art.  Dr. Bray himself had made use of securing plates in the prior art, in conjunction with at least two other devices.  Bray Deposition Transcript at pp. 122-123.  The '234 and '537 patents disclose how such securing plates would be incorporated with the devices claimed in the '537 patent.  See also the discussion of the use of securing plate in the prior art in Michelson 376 (see, e.g. First Report at ¶ 239), Michelson 045 (*id.* at 279), which I incorporate herein by reference.  While such a combination is not necessary, in my view, to show that each of the '537 patent asserted claims renders obvious Lechmann '207 claim 17, in the alternative, a POSA would understand that each of the asserted '537 claims, in view of either Michelson 376 or 045

would have constituted a combination of the elements of the asserted claims (e.g., the claimed

base plate) with the known prior art elements (the Michelson securing plates) to yield

predictable results (the prevention of bone screw back out).  Accordingly, a POSA would have

been motivated to make such combinations and would understand that they would have

rendered obvious Lechmann '207 claim 17.

### 4. The asserted claims of the '537 patent each renders obvious "wherein axes of the first and second boreholes define an angle, ranging from 20° to 60° with the horizontal middle plane" as recited in Claim 17 of *Lechmann '207*

175.    I disagree with Mr. Drewry's opinion that the asserted '537 claims do not render

obvious the claim 17 angle limitation.  Drewry Report at ¶ 479.  Mr. Drewry takes exception to

my reference to the '537 specification, which discloses what a POSA would have known, that

for the claimed device to stabilize adjacent vertebrae, the boreholes must be angled within an

acceptable range.  That range is explained in the '537 patent, but would have been equally

obvious to a POSA without the specification disclosure.  To be clear, A POSA reading each of the

asserted claims independently of the patent specification would find that each renders obvious

claim 17 of the Lechmann '207 patent.  Each of the asserted '537 claims depend from either

claim 1 or claim 21 of the '537 patent.  A POSA would have understood, from those claims

alone, that it was obvious that the claimed boreholes must be angled within the range recited

in Lechmann '207 claim 17 to affix the claimed base plate "to fit primarily between anterior

portions of adjacent vertebral bones' lip osteophytes" ('537 patent claim 1) and "to fit primarily

between an anterior portion of the first bone's lip osteophyte and an anterior portion of the

second bone's lip osteophyte" ('537 patent claim 21) as Dr. Hynes defines "lip osteophyte" in

his infringement analysis.  In disclosing express angle ranges, the '537 patent explains what a

POSA would already understand from the claims as they are being asserted.  The patent's specification illustrates this but is not required to render obvious claim 17 of the Lechmann patent.

176.     That a POSA would understand the claimed angle range to be obvious is confirmed by Michelson 376, which I address in my First Report at paragraphs 108-109, which I incorporate herein by reference.  Thus, A POSA would understand the Lechmann '207 claim 17 angle range limitation to be obvious over each of the asserted '537 claims alone, or over each of the asserted '537 claims in view of a POSA's knowledge of the art, or, over each of the '537 asserted claims in view of Michelson '376.  A POSA would have been motivated to combine each of the '537 asserted claims with Michelson 376 because such a combination would have been merely combining prior art elements (the claimed baseplate placement between lip osteophytes as Dr. Hynes interprets lip osteophytes) according to known methods (angling the boreholes to accommodate bone screws to engage the adjacent vertebrae, as Dr. Hynes opines), to yield predictable results (the promotion of vertebrae fusion).  A POSA would also understand the claimed angle range to be obvious from each asserted '537 claim in view of Fraser 222, which discloses a borehole angle $\alpha$ of between 15° and 60° from the middle plane of the device.  Fraser 222 at 3:61-62.  A POSA would have been motivated to combine Fraser 222 with the '537 claims for the same reason he or she would have been motivated to combine the claims with Michelson.

surface as I explain in my First Report at ¶ 226, which I incorporate herein by reference. For example, Lauryssen explains that "After the pilot holes are prepared, all anterior anomalies, i.e., osteophytes, that can impede bone plate 110, 210, 310 placement are removed. Using an osteophyte remover instrument, the endplate and anterior column of the vertebral body is prepared to allow the underside of the plate 110, 210, 310 to be sandwiched tightly against the vertebral bodies to promote osseous fusion. The osteophyte remover instrument is used to create a smooth flat surface to fit the plate 110, 210, 310 precisely and match the plate's width. By shaving the vertebral bodies in this manner, the bone plate 110, 210, 310 is able to be inserted flush against the bony surface and produce a low profile which reduces the amount of damage to surrounding soft tissue." Lauryssen at ¶ [0049]. A POSA would have known that by using an osteophyte remover instrument, e.g., a kerrosen punch rongeur, the vertebral bodies would be prepared in such a way to allow the best fit for an interbody device to be sandwiched tightly against the vertebral bodies to promote osseous fusion as described by Lauryssen.

186.   A POSA would understand that trimming osteophytes as disclosed in Lauryssen was a known technique that could be used to improve the claimed Lechmann device, which, like Lauryssen, is a spinal stabilization device that anchors to vertebrae. A POSA would understand that trimming osteophytes to provide a substantially flat surface for enhanced anchoring would yield predictable results—i.e., a better intervertebral fit for improved efficacy.

187.   Dependent claim 14 of the '537 patent claims as follows:

14. The system as set forth in claim 1, wherein each of the plurality of bone screw holes extends at least partially through the first or second end, the first end comprising a first bone engaging region fully extending uninterrupted between lateral extents of the first end, and the second end comprising a second bone engaging region fully extending uninterrupted between lateral extents of the second end.

188.    Accepting RSB's infringement contention that the plates in the accused products contact the vertebrae (which they do not), Lechmann '207 claim 17, alone or in view of Michelson 376 or Fraser 106 discloses the limitations of claim 14 for the same reasons stated in my First Report at ¶ 228-230, which I incorporate herein by reference.

189.    Under Mr. Drewry's infringement theory, Lechmann '207 claim 17 discloses this limitation for the same reasons Michelson 376 does, as shown below in Figure 3 of Lechmann '207, showing that the bone screws extend at least partially through the first and second ends, and each end includes an uninterrupted bone engaging region:



Fig. 3

### 4.    Claim 17 of *Lechmann '207* renders obvious the "first bone engaging region extending uninterrupted between lateral extents of the first end" as recited in Claim 21 of the '537 patent

190.    Mr. Drewry's only substantive comment regarding claim 21 is that I do not address the limitation "bone engaging region fully extending uninterrupted between lateral extents." This limitation is recited in claim 14 of the '537 patent, addressed above and I incorporate my analysis of claim 14 and my analysis of the claim limitations found in the asserted claims preceding claim 24, here.[5]

### E.    The one-way correspondence test is met for Claims 12 of the '234 patent and claim 10 of the '537 patent

191.    Mr. Drewry opines that claim 12 of the '234 patent and claim 10 of the '537 patent do not correspond to the proposed Count and that the proposed Count is not proper as a result. I disagree with his analysis and conclusions.

192.    I note that Mr. Drewry states no disagreement with the proposed Count other than with respect to the toggling limitation ('537 claim 12 in his report at ¶¶ 496-506) here and the lateral tabs limitation ('537 claim 10 in his report at ¶¶ 507-517). He also states no opinion as to whether claim 10 of the '537 patent is rendered obvious by the DePuy alternative to proposed Count 1 (i.e., Lechmann '207 claim 17). Mr. Drewry states no opinion on whether the proposed Count properly captures the remaining interfering subject matter.

---

[5] My First Report a ¶ 544 states that the limitations are in material part contained in "claim 10 above," which should read "the preceding claims above."

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 9, 2022

BOYLE C. CHENG

# EXHIBIT 5

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - x
RSB SPINE, LLC,                     :
                                    :
            Plaintiff,      :
                                    :
        vs.                : C.A. No. 19-1515-RGA
                                    :
DEPUY SYNTHES SALES, INC.,    :
and DEPUY SYNTHES PRODUCTS,    :
INC.,                               :
            Defendants.   :
- - - - - - - - - - - - - - - -x

                        Reston, Virginia

                        Wednesday, June 8, 2022

        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
              PURSUANT TO PROTECTIVE ORDER

            Videotaped Deposition of TROY DEAN DREWRY,

a witness herein, called for examination by counsel

for the DePuy Defendants in the above-entitled

matter, pursuant to notice, the witness being duly

sworn by KAREN YOUNG, a Notary Public in and for the

Commonwealth of Virginia, taken at the offices of

Cooley, LLP, 11951 Freedom Drive, 14th Floor, Reston,

Virginia, at 9:08 a.m. on Wednesday, June 8, 2022,

and the proceedings being taken down by stenotype and

transcribed by KAREN YOUNG.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Drewry, Troy Dean                                    June 8, 2022

2

1    APPEARANCES:

2        On Behalf of RSB Spine, LLC and the Witness:

3            JENNIFER VOLK-FORTIER, ESQ.

4            ERIK MILCH, ESQ

5            Cooley LLP

6            One Freedom Square

7            11951 Freedom Drive

8            Reston, Virginia 20190

9            emilch@cooley.com

10           (703) 456-8000

11

12

13

14

15

16

17

18

19

20

21

22

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Drewry, Troy Dean                                    June 8, 2022

3

```
 1      On Behalf of the DePuy Defendants:

 2              CALVIN P. GRIFFITH, ESQ.

 3              PATRICK NORTON, ESQ. (remote)

 4              JONES DAY

 5              North Point

 6              901 Lakeside Avenue

 7              Cleveland, Ohio 44114-1190

 8              CPGRIFFITH@JONESDAY.COM

 9              (216) 586-3939

10

11              TIMOTHY J. HEVERIN, ESQ.

12              JONES DAY

13              110 North Wacker Drive, Suite 4800

14              Chicago, Illinois 60606

15              (312) 269-4087

16

17      ALSO PRESENT:

18              Rachel Preston, Cooley LLP

19              Deshawn White, Videographer

20

21

22
```

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Drewry, Troy Dean                                    June 8, 2022

120

1      Q.    And that's what's identified as the

2   trailing end 104.

3            MR. MILCH:  Object to form.

4            BY MR. GRIFFITH:

5      Q.    Correct?

6      **A.    Yes, correct.**

7      Q.    Okay.  So in the embodiment of figure 1,

8   the trailing end has screw holes for bone screws to

9   go through, correct?

10     **A.    Yes, that's correct.**

11     Q.    And the bone screws are fixation elements,

12  correct?

13           MR. MILCH:  Objection, form.

14     **A.    I mean, I think they could be a type of**

15  **element.**

16     Q.    They're for fixation, correct?

17     **A.    Yeah, but I mean, I think fixation elements**

18  **could mean multiple -- multiple things.**

19     Q.    Understood.  So -- but bone screws are a

20  kind of fixation element, not the only kind of

21  fixation element.  Is that fair?

22           MR. MILCH:  Objection, form.

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Drewry, Troy Dean                                          June 8, 2022

143

1      Q.    Does the lip -- can the lip be -- strike

2  that.  Can a portion of the lip be part of both the

3  side surface and the top surface?

4      **A.    Yes, sir, it can.**

5      Q.    That's what I meant by overlap.  So there

6  can be a portion of the lip that is top surface but

7  is also part of the side surface.

8            MR. MILCH:  Object to form.

9      **A.    Again, now I understand what you're talking**

10  **about, overlap.  I don't think the portion of a lip**

11  **itself would be an overlap.  I think the lip is the**

12  **actual intersection of that top surface and that side**

13  **surface.**

14      Q.    And -- and the lip is neither side surface

15  nor top surface?

16            MR. MILCH:  Objection, form, scope.

17            BY MR. GRIFFITH:

18      Q.    It's between the two?

19      **A.    No, I think it -- it's the intersection of**

20  **two lines, so it's where the side surface ends and**

21  **where the top surface ends, at that intersection.**

22      Q.    And so that's what I'm getting at.  The lip

Henderson Legal Services, Inc.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Drewry, Troy Dean                                    June 8, 2022

144

1    can be part of both the top surface and the side

2    surface.

3              MR. MILCH:  Objection to form.

4              BY MR. GRIFFITH:

5        Q.    Is that right?

6        A.    Again, I think it's a -- a unique rim

7    around the circumference of the vertebral body where

8    the side surface and the top surface intersect.

9        Q.    And is that lip -- do you regard that lip

10   as part of the side surface, or having some side

11   surface?

12             MR. MILCH:  Objection, form, scope.

13       A.    Again, I think the lip itself is that --

14   that line intersection of the two.

15       Q.    The lip is the -- the intersection between

16   the top surface and the side surface?

17             MR. MILCH:  Object to the form, scope.

18             BY MR. GRIFFITH:

19       Q.    I'm just trying to clarify.  You said "the

20   two" in your answer.  Is the lip the intersection

21   between the top surface and the side surface?

22       A.    Yes, with -- again, with, you know, the --

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Drewry, Troy Dean                                      June 8, 2022

179

1    skill in the art, and I'm going by what the inventors

2    say in their specification, so I'm assuming there's

3    some design feature or they figured something out

4    where that's how this implant performs.

5        Q.    Is it possible that the inventors were

6    referring to direct weight-bearing as you've defined

7    it as opposed to indirect weight-bearing?

8        A.    The way I read it, they say no load, so

9    whether it's direct or indirect, the way a POSITA,

10   which I am, would refer to this is that, again, the

11   intervertebral implant and not -- that the load is

12   absorbed under compression by the intervertebral

13   implant and not by the front plate or the fixation

14   screws.

15       Q.    What if anything would a POSITA understand

16   the design feature in Lechmann '207 that would cause

17   no load to be transferred indirectly to the plate

18   from the screw?

19           MR. MILCH:  Objection, form.

20       A.    Again, I didn't do that analysis.  I

21   haven't looked at it that closely.  I went based on

22   what the inventors documented in their specification.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Drewry, Troy Dean                                      June 8, 2022

252

1    UNITED STATES OF AMERICA  )

2                                ss:

3    COMMONWEALTH OF VIRGINIA  )

4         I, KAREN C. YOUNG, a Notary Public within

5    and for the Commonwealth of Virginia, do hereby

6    certify that the witness whose deposition is

7    hereinbefore set forth was duly sworn and that the

8    within transcript is a true record of the testimony

9    given by such witness.

10        I further certify that I am not related to

11   any of the parties to this action by blood or

12   marriage and that I am in no way interested in the

13   outcome of this matter.

14        IN WITNESS WHEREOF, I have hereunto set my

15   hand this 14th day of June, 2022.

16

17

18   _____

19

20   My commission expires:

21   June 30, 2026

22   Registration No. 7046852

# EXHIBIT 6

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| RSB SPINE, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 19-1515-RGA |
| | ) | |
| DEPUY SYNTHES SALES, INC., and | ) | |
| DEPUY SYNTHES PRODUCTS, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**EXPERT REPORT OF TROY D. DREWRY IN RESPONSE TO DR. CHENG'S
REPORT ON INVALIDITY OF U.S. PATENT NOS. 6,984,234 AND 9,713,537**

Dated:  April 18, 2022

Respectfully submitted,

*Troy D. Drewry*

Troy D. Drewry



448.   Left without *Fraser '222*, Dr. Cheng defaults to the same hindsight-driven "common sense" obviousness analysis that pervades other analyses in his report.  He leads his analysis with a baseless contention that a "partial borehole for the screws would be designed to prevent back out of the screw by partially engaging the implant and partially engaging the vertebrae."  However, a spacer does not and would not facilitate screw anti-backout in the '234 base plate.  Claim 1 does not limit the base plate's use to a mated spacer; no spacer is claimed.   The specification supports that **the claimed base plate** is designed for use with bone graft **12**, which a POSITA would have understood as including bone graft material and spacers packed with bone graft material.   It is silent on the **bone graft 12 being designed** to accommodate screw angulation within the bone stabilization plate system.[535]   Screw anti-backout is achieved through, *e.g.*, various bone screw retaining means, and

---

[535] *See* '234, 4:16-19 ("FIGs. 1 and 3 show the base plate **20** mounted to first and second adjacent vertebral bones **14** and **16** with a bone graft **12** between the vertebral bodies.").

specifically claimed in "covering at least a part of the first bone screw and at least a part of the second bone screw ***to prevent*** the first and second bone screws ***from backing out*** of the first and second bones, respectively."[536]

449.   His conclusion on a POSITA's motivations to modify a hypothetical spacer to include partial boreholes is further premised on accommodating the angular ranges in Claim 1 "while maintaining a spacer with appropriate thickness to engage the cortical rim or apophyseal ring of the second vertebral body] [*sic*]."[537] But Dr. Cheng does not explain why a POSITA would specifically design partial boreholes in a mated spacer, as opposed to manipulating other dimensions, geometries, and/or form factors in the hypothetical spacer.   Accommodation of varying screw angulations, while maintaining a certain spacer profile, can be accomplished in many ways that do not require partial screw boreholes, and Dr. Cheng points to no teaching, suggestion, or motivation (other than, presumably, the *Lechmann '207* claim language) that would have prompted a POSITA to design a hypothetical spacer for use with the claimed base plate that includes partial

---

[536] *See* '234, cl. 1; *see also id*., cl. 13 (reciting a "single retaining plate" to cover the screws), cl. 22 ("bone screw retaining means" to "prevent the bone screws from backing out from the first and second bones").

[537] Cheng Op. Rep., ¶ 565. Dr. Cheng's discussion of the spacer's position as "engag[ing] the cortical rim or apophyseal ring" appears to rely on a faulty assumption that the Court's claim construction opinion precludes "lip osteophyte" from extending into the disc space, necessitating that a base plate be positioned between bony projections anterior to the cortical rim.   While I disagree with Dr. Cheng's overnarrow interpretation, I find its application to be unmerited with respect to Claim 1, which does not recite the "lip osteophyte" or where within the disc space to position the claimed "base plate."

# EXHIBIT 7

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

- - -

RSB SPINE, LLC,                )

        Plaintiff,        )

  vs.                          )   CASE NO.

DePUY SYNTHES SALES,           )   1:19-cv-1515-RGA

INC., and DePUY                )

SYNTHES PRODUCTS,              )

INC.,                          )

        Defendants.       )

                     - - -

      Videotaped deposition of BOYLE C.

CHENG, Ph.D, an expert witness herein, called by

the Plaintiff for Examination pursuant to the

Federal Rules of Civil Procedure, taken before

me, the undersigned, Binnie Purser, a Registered

Diplomate Reporter, Certified Realtime Reporter

and Notary Public in and for the State of Ohio,

pursuant to Notice and agreement of counsel at

the law offices of Jones Day, North Point, 901

Lakeside Avenue, Cleveland, Ohio, on Friday, the

20th day of May, 2022, commencing at 8:07

o'clock a.m.

                     - - -



Page 2

```
 1   APPEARANCES:

 2

 3       On Behalf of the Plaintiff:

 4           COOLEY LLP

 5   BY:     Joseph M. Drayton, Attorney at Law

 6           55 Hudson Yards

 7           New York, New York 10001-2157

 8           212/479-6539

 9           jdrayton@cooley.com

10           AND

11           COOLEY LLP

12   BY:     David N. Murdter, Attorney at Law

13           3175 Hanover Street

14           Palo Alto, California 94304-1130

15           650/843-5881

16           dmurdter@cooley.com

17           AND VIA VIDEOCONFERENCE:

18           COOLEY LLP

19   BY:     Erik Milch, Attorney at Law

20           Reston Tower Center

21           11951 Freedom Drive, 14th Floor

22           Reston, Virginia 20190-5640

23           703/456-8000

24           emilch@cooley.com

25
```



```
                                                           Page 3
 1   Appearances (Continued):

 2

 3        On Behalf of the Defendants:

 4             JONES DAY

 5     BY:     Timothy J. Heverin, Attorney at Law

 6             110 N. Wacker Drive

 7             Suite 4800

 8             Chicago, Illinois 60601-1692

 9             312/782-3939

10             tjheverin@jonesday.com

11             AND VIA VIDEOCONFERENCE:

12             JONES DAY

13     BY:     Calvin P. Griffith, Attorney at Law

14             Kenneth S. Luchesi, Attorney at Law

15             North Point

16             901 Lakeside Avenue

17             Cleveland, Ohio 44114-1190

18             216/586-3939

19             cpgriffith@jonesday.com

20             ksluchesi@jonesday.com

21

22   ALSO PRESENT:

23             Remington Cooper, Videographer

24

25                        - - -
```



Page 116

1    surface, depending on where you are, has a

2    specific thickness.

3        Q.   And then as a result, the edge that we

4    have been discussing that forms the lip, under

5    your definition that you have used in this case,

6    that lip would also be three dimensional and

7    have thickness under those assumptions, correct?

8        A.   Correct.

9        Q.   Thank you.  We have got to change the

10   disk.  Take a little break to change the disk.

11            THE VIDEOGRAPHER: We are going off

12   the record.  The time is now 11:34.

13            (Thereupon, a recess was taken.)

14            THE VIDEOGRAPHER: We are now back on

15   the record on disk 2, the time is now 11:50.

16   BY MR. DRAYTON:

17       Q.   Dr. Cheng, you have in front of you

18   your rebuttal report in this case; is that

19   correct?

20       A.   That's correct, I have my rebuttal

21   report in front of me.

22       Q.   In that report, you opine that a lip

23   osteophyte is an abnormal bony formation

24   protruding outward, generally in the anterior

25   direction from the cortical rim.  This is on



1    that correct?

2         A.    They have to protrude outward.

3         Q.    Thank you.  Thank you.  You are making

4    it difficult.  You are wasting minutes of time;

5    just say yes.

6               Do the lip osteophytes have to protrude

7    in an anterior direction only?

8         A.    Again, in the context outward, the

9    anterior is the bone spurs that we are most

10   concerned about.

11        Q.    I asked you under your definition of

12   lip osteophytes, do they have to protrude in an

13   anterior direction only?

14        A.    Again, three dimensionality to it,

15   that, if you are asking specific, is that one

16   direction, there is only one direction?

17              It is growth.  And growth is in the

18   outward direction.

19        Q.    Is that a yes?

20        A.    A bone spur grows out, in the outward

21   direction.

22        Q.    Would lip osteophytes by definition,

23   your definition, only protrude in an anterior

24   direction?

25        A.    Not -- they don't protrude in only an



Page 125

1    anterior direction.

2        Q.    What other directions can they

3    protrude?

4        A.    The outward direction, outward is not

5    always anterior.

6        Q.    What other -- if it is not anterior,

7    what other directions can it be?

8        A.    If I could just use an example, and I

9    will try to answer your question.  If we go back

10   to the vertebral cortical surface, I think we

11   all agreed on what that was, right?

12           The vertebral cortical surface -- and

13   if we could represent it as a cylinder, the

14   outward direction would be out, a vector normal

15   outward from that surface.

16           That surface in some instances, the

17   ones that we are aware of, has an orientation,

18   an anatomical direction of anterior.

19           But because it is a curvilinear

20   surface, you might imagine that on the side,

21   outward now is not anatomically anterior.

22           So I am trying to answer your question,

23   and you are saying anterior, and I am saying

24   that from the cortical surface of the vertebrae,

25   it grows outward from the cortical surface,



Page 163

```
 1                MR. HEVERIN:      Objection to form.

 2                THE WITNESS:      I can only say it

 3       so many ways.

 4                Just as we stated, the cortical shell

 5       makes up one portion.  The edge makes up a

 6       portion, the edge is defined the intersection

 7       between those two surfaces.

 8                That intersection is a part of both

 9       the cortical shell and the endplate.  You need

10       the two to define the edge.

11       BY MR. DRAYTON:

12          Q.   Right.  My question is very simple.  Is

13       it an accurate statement to say that the edge

14       that you just described is part of the endplate

15       of a vertebral body?

16                MR. HEVERIN:      Objection to form.

17                THE WITNESS:      I would say the

18       cortical rim, the endplate is internal, where

19       you asked about the endplate.  The endplate is

20       internal to that edge.

21       BY MR. DRAYTON:

22          Q.   I asked was the statement accurate?

23       Can you read back my question, ma'am?  I am

24       sorry.

25                (Thereupon, the Reporter read the
```



Page  223

```
 1
 2              C  E  R  T  I  F  I  C  A  T  E
 3
    STATE OF OHIO,    )
 4                    )  SS:
    SUMMIT COUNTY,    )
 5
              I, Binnie Denise Purser, a Registered
 6  Diplomate Reporter, Certified Realtime Reporter
    and Notary Public within and for the State of
 7  Ohio, duly commissioned and qualified, do hereby
    certify that the within-named witness, BOYLE C.
 8  CHENG, Ph.D, was by me first duly sworn to
    testify the truth, the whole truth and nothing
 9  but the truth in the cause aforesaid; that the
    testimony then given by him was by me reduced to
10  Stenotype in the presence of said witness,
    afterwards prepared and produced by means of
11  Computer-Aided Transcription and that the
    foregoing is a true and correct transcript of
12  the testimony so given by him as aforesaid.
              I do further certify that this
13  deposition was taken at the time and place in
    the foregoing caption specified, and was
14  adjourned.
              I do further certify that I am not a
15  relative, employee of or attorney for any party
    or counsel, or otherwise financially interested
16  in this action.
              I do further certify that the witness
17  did not waive signature.
              I do further certify that I am not, nor
18  is the court reporting firm with which I am
    affiliated, under a contract as defined in Civil
19  Rule 28(D).
              IN WITNESS WHEREOF, I have hereunto set
20  my hand and affixed my seal of office at Akron,
    Ohio on this 26th day of May, 2022.
21
22
23
             _____
24              Binnie Denise Purser, RDR, CRR
25        My commission expires June 27, 2024.
```



Page 224

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

- - -

RSB SPINE, LLC,                )

      Plaintiff,        )

  vs.                          )   CASE NO.

DePUY SYNTHES SALES,           )   1:19-cv-1515-RGA

INC., and DePUY                )

SYNTHES PRODUCTS,              )

INC.,                          )

      Defendants.        )

- - -

     Continued videotaped deposition of

BOYLE C. CHENG, Ph.D, an expert witness herein,

called by the Plaintiff for Examination pursuant

to the Federal Rules of Civil Procedure, taken

before me, the undersigned, Binnie Purser, a

Registered Diplomate Reporter, Certified

Realtime Reporter and Notary Public in and for

the State of Ohio, pursuant to Notice and

agreement of counsel at the law offices of Jones

Day, North Point, 901 Lakeside Avenue,

Cleveland, Ohio, on Saturday, the 21st day of

May, 2022, commencing at 9:10 o'clock a.m.

- - -



Page 225

1    APPEARANCES:

2

3        On Behalf of the Plaintiff:

4            COOLEY LLP

5    BY:    Joseph M. Drayton, Attorney at Law

6            55 Hudson Yards

7            New York, New York 10001-2157

8            212/479-6539

9            jdrayton@cooley.com

10           AND

11           COOLEY LLP

12   BY:    David N. Murdter, Attorney at Law

13           3175 Hanover Street

14           Palo Alto, California 94304-1130

15           650/843-5881

16           dmurdter@cooley.com

17           AND VIA VIDEOCONFERENCE:

18           COOLEY LLP

19   BY:    Erik Milch, Attorney at Law

20           Reston Tower Center

21           11951 Freedom Drive, 14th Floor

22           Reston, Virginia 20190-5640

23           703/456-8000

24           emilch@cooley.com

25



```
 1    APPEARANCES (Continued):

 2

 3        On Behalf of the Defendants:

 4            JONES DAY

 5    BY:     Timothy J. Heverin, Attorney at Law

 6            110 N. Wacker Drive

 7            Suite 4800

 8            Chicago, Illinois 60601-1692

 9            312/782-3939

10            tjheverin@jonesday.com

11            AND VIA VIDEOCONFERENCE:

12            JONES DAY

13    BY:     Calvin P. Griffith, Attorney at Law

14            Kenneth S. Luchesi, Attorney at Law

15            North Point

16            901 Lakeside Avenue

17            Cleveland, Ohio 44114-1190

18            216/586-3939

19            cpgriffith@jonesday.com

20            ksluchesi@jonesday.com

21

22    ALSO PRESENT:

23            Remington Cooper, Videographer

24

25                         -  -  -
```



Page 262

1   affixed to load-bearing bone, correct?

2          MR. HEVERIN:     Objection, form,

3   foundation.

4          THE WITNESS:     I am just trying to

5   think through your question.  As you just said,

6   talking about load-bearing plates, but it is --

7   they are anchored to the side surfaces.  I don't

8   remember a specific claim about load-bearing

9   bone, is that what you used in the question, you

10  said load-bearing bone.  It said specifically to

11  be anchored into the side surfaces within those

12  patents.

13          I don't recall seeing something about

14  load-bearing bone.

15  BY MR. DRAYTON:

16     Q.   Is the side surface a bone?

17     A.   Yes; yes, the side surface of the bone.

18     Q.   And when a person has implants, does

19  the side surface bear weight?

20          MR. HEVERIN:     Objection, form.

21          THE WITNESS:     I haven't analyzed

22  that specific.

23  BY MR. DRAYTON:

24     Q.   You don't know one way or another?

25          MR. HEVERIN:     Objection to the



Page 308

1    three-dimensional body of the Lechmann '207

2    patent is a fusion cage, right?

3           (Pause in proceedings from 13:51:16

4            to 13:53:12.)

5    A.    So in just reading this, I can think of

6    cases where structural allograft, bone graft can

7    be a fusion cage.  That could be a possibility.

8    Q.    Are there bone grafts that are not

9    covered by the term "three-dimensional body" as

10   used in the '207 Lechmann patent?

11   A.    I don't see a material described in the

12   '207 patent, based on bone grafts, structural

13   allograft.

14   Q.    I want to take a step back.  Are you a

15   professor as well as a doctor?

16           THE REPORTER:    I am sorry?

17   BY MR. DRAYTON:

18   Q.    I was asking, was he a professor as

19   well as a doctor?

20   A.    I am.

21   Q.    I just want to clarify something, in

22   the '234 patent, there are no figures in that

23   patent that could be interpreted to be

24   three-dimensional bodies as that term is used in

25   the '207 Lechmann patent, correct?  You can take


MAGNA
LEGAL SERVICES

1    "The longitudinal fixation elements may also be

2    constructed as thread less cylindrical pins,

3    which are provided with a drilling tip,

4    preferably in the form of a trocar."

5         Did I get that right?

6    A.   Yes, that is correct.

7    Q.   So the question is, in analyzing the

8    fixation element claim of the Lechmann '207

9    patent, what did you understand fixation

10   elements to mean?

11        MR. MURDTER:     Objection, leading.

12        THE WITNESS:     I understood the

13   fixation elements to be the longitudinal

14   fixation elements are preferably constructed as

15   bone screws.  The longitudinal fixation elements

16   may also be constructed as threadless

17   cylindrical pins which are provided with a

18   drilling tip, preferably in the form of a

19   trocar.

20   BY MR. HEVERIN:

21   Q.   Would a person of ordinary skill in the

22   art have an understanding of what fixation

23   elements meant in view of the specification of

24   the '207 patent?

25   A.   Yes.  A POSA would understand, as I do,



Page 396

1    that the longitudinal fixation elements are

2    preferably constructed as bone screws and the

3    longitudinal fixation elements may also be

4    constructed as threadless cylindrical pins,

5    which are provided with a drilling tip

6    preferably in the form of a trocar.

7              MR. MURDTER:     I didn't get a

8    chance to impose my objection.  But same

9    objection.

10             THE REPORTER:     Wait, wait.

11             MR. HEVERIN:     Let's maybe slow

12   down.  I will try to slow down when I am

13   reading.  We will all try to slow down a little

14   bit to give our court reporter a better shot

15   mere.

16   BY MR. HEVERIN:

17        Q.   My apologies, I talk fast.  Column 4 of

18   the '207 patent, the last line, I am going to

19   read it, tell me if I get it right, please.  It

20   continues on the next page.  "The longitudinal

21   fixation elements 20 may have either a smooth

22   head, so that there will not be a rigid

23   connection with the implant, or a threaded

24   conical or expendable end, so that there will be

25   a rigid connection with the implant.  In both



Page 433

1              C  E  R  T  I  F  I  C  A  T  E

2
   STATE OF OHIO,    )
3                    )  SS:
   SUMMIT COUNTY,    )

4
          I, Binnie Denise Purser, a Registered
5   Diplomate Reporter, Certified Realtime Reporter
   and Notary Public within and for the State of
6   Ohio, duly commissioned and qualified, do hereby
   certify that the within-named witness, BOYLE C.
7   CHENG, Ph.D, was by me first duly sworn to
   testify the truth, the whole truth and nothing
8   but the truth in the cause aforesaid; that the
   testimony then given by him was by me reduced to
9   Stenotype in the presence of said witness,
   afterwards prepared and produced by means of
10  Computer-Aided Transcription and that the
   foregoing is a true and correct transcript of
11  the testimony so given by him as aforesaid.
          I do further certify that this
12  deposition was taken at the time and place in
   the foregoing caption specified, and was
13  completed without adjournment.
          I do further certify that I am not a
14  relative, employee of or attorney for any party
   or counsel, or otherwise financially interested
15  in this action.
          I do further certify that the witness
16  did not waive signature.
          I do further certify that I am not, nor
17  is the court reporting firm with which I am
   affiliated, under a contract as defined in Civil
18  Rule 28(D).
          IN WITNESS WHEREOF, I have hereunto set
19  my hand and affixed my seal of office at Akron,
   Ohio on this 26th day of May, 2022.
20
21
22
23  _____
   Binnie Denise Purser, RDR, CRR
24
       My commission expires June 27, 2024.
25                  - - -



# EXHIBIT 8

Case 1:19-cv-01515-RGA   Document 195   Filed 07/28/22   Page 189 of 286 PageID #: 27653

1

```
            IN THE UNITED STATES DISTRICT COURT

               FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - -x

  RSB SPINE, LLC,                    :

              Plaintiff,        :  C.A. No. 18-1972-RGA

      v.                             :

  LIFE SPINE, INC.,                  :

              Defendant.             :

- - - - - - - - - - - - - - -x

  RSB SPINE, LLC,                    :

              Plaintiff,        :  C.A. No. 18-1973-RGA

      v.                             :

  MEDACTA USA, INC.,                 :

              Defendant.             :

- - - - - - - - - - - - - - -x

  RSB SPINE, LLC,                    :

              Plaintiff,        :  C.A. No. 18-1974-RGA

      v.                             :

  PRECISION SPINE, INC.,             :

              Defendant.             :

- - - - - - - - - - - - - - -x

    **HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**


         VIDEO-RECORDED DEPOSITION OF

             ROBERT S. BRAY, JR., MD
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Bray, Jr., Robert S.                        February 11, 2022

2

```
 1    - - - - - - - - - - - - - - x
 2    RSB SPINE, LLC,                    :
 3              Plaintiff,       : C.A. No. 18-1976-RGA
 4         v.                            :
 5    XTANT MEDICAL HOLDINGS, INC.,:
 6              Defendant.         :
 7    - - - - - - - - - - - - - - x
 8    RSB SPINE, LLC,                    :
 9              Plaintiff,       : C.A. No. 19-1515-RGA
10         v.                            :
11    DEPUY SYNTHES SALES, INC.,   :
12    and DEPUY SYNTHES PRODUCTS,  :
13    INC.,                              :
14              Defendants.       :
15    - - - - - - - - - - - - - - x
16
17              Friday, February 11, 2022
18                  7:32 a.m. PST
19
20         Video-recorded deposition of
21    ROBERT S. BRAY, JR., MD, held via Zoom
22    videoconference, before Deanna J. Dean, a
23    Registered Diplomate Reporter, Certified
24    Realtime Reporter, and licensed court reporter
25    of the state of New Hampshire.
```

Henderson Legal Services, Inc.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Bray, Jr., Robert S.                                February 11, 2022

3

```
1               A P P E A R A N C E S

2

3    Representing the Plaintiff RSB Spine LLC:

4        COOLEY LLP

5            Reston Town Center

6            11951 Freedom Drive, 14th Floor

7            Reston, VA 20190-5640

8            (703) 456-8573

9        BY:  ERIK MILCH, ESQ.

10           emilch@cooley.com

11

12       COOLEY LLP

13           3175 Hanover Street

14           Palo Alto, CA 94304-1130

15           (650) 843-5095

16       BY:  JUAN PABLO GONZÁLEZ, ESQ.

17           jgonzalez@cooley.com

18

19   Representing the Defendant Medacta USA Inc.:

20       MORGAN, LEWIS & BOCKIUS LLP

21           110 North Wacker Drive

22           Chicago, IL 60606-1511

23           (312) 324-1109

24       BY:  JAMES J. KRITSAS, ESQ.

25           james.kritsas@morganlewis.com
```

4

```
 1              A P P E A R A N C E S (cont'd.)

 2

 3    Representing the Defendant Precision Spine Inc.:

 4         DEVLIN LAW FIRM LLC

 5         1526 Gilpin Avenue

 6         Wilmington, DE 19806

 7         (302) 449-9010

 8         BY:  STEPHANIE BERGER, ESQ.

 9              sberger@devlinlawfirm.com

10

11    Representing the Defendants DePuy Synthes Sales

12    Inc. and DePuy Synthes Products Inc.:

13         JONES DAY

14              77 West Wacker Drive, Suite 3500

15              Chicago, IL 60601-1692

16              (312) 269-4087

17         BY:  TIMOTHY J. HEVERIN, ESQ.

18              tjheverin@jonesday.com

19

20

21

22

23

24

25
```

5

```
 1            A P P E A R A N C E S (cont'd.)

 2

 3   Representing Defendants DePuy Synthes Sales Inc.

 4   and DePuy Synthes Products Inc.:

 5        JONES DAY

 6             901 Lakeside Avenue East

 7             Cleveland, OH 44114-1190

 8             (216) 586-7142

 9        BY:  MAEVE P. DINEEN, ESQ.

10             mdineen@jonesday.com

11

12   ALSO PRESENT:

13

14        PATRICK RUFFNER, legal video specialist

15

16

17

18

19

20

21

22

23

24

25
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Bray, Jr., Robert S.                          February 11, 2022

122

1    have to do with the function of how the piece

2    actually bears weight between the vertebral bodies

3    or the position.  It's just a method of keeping the

4    screw from backing out.  This was one envisionment.

5        Q.   Is it fair to say that screw backout was a

6    known problem with several known solutions in 2003?

7        A.   That is a fair statement, yes.

8        Q.   I take it there's nothing inventive about

9    the individual cover assembly piece that's used in

10   InterPlate?

11       A.   No.  That -- that particular method was

12   unique to my design from -- taken from an iteration

13   of the prior Blackstone plate and the prior

14   gradient plate.  It was an iteration of one plate

15   that engaged all three screws with one piece.  But

16   it was unique in its design.  It's an integral of

17   the function of the plate.  The plate doesn't

18   function any differently whether the screws are

19   backed with one mechanism or another.  So that is

20   just not claimed as an integral structural part of

21   the way it functions.  It has to be there.

22       Q.   But having a cover plate or a securing

23   plate to prevent screw backout, that concept wasn't

24   new in 2003, was it?

25       A.   I had already used a plate cover in the

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Bray, Jr., Robert S.                                    February 11, 2022

123

1    Blackstone plate, and it was already -- I had

2    already used a plate cover in the SmartPlate that

3    went to NuVasive.  So it wasn't unique to this

4    thing, no.

5        Q.   And it wasn't new in 2003 is the question.

6             ATTORNEY MILCH:  Objection.  Form.

7        A.   A plate cover was not new; that is

8    correct.  This design for the three screws and this

9    application is new.

10       Q.   And how far back before 2003 do you think

11   the idea of using a plate cover to prevent backout

12   went?

13            ATTORNEY MILCH:  Objection.  Form.  Scope.

14       A.   As far as I'm aware, a cover was described

15   in my patent in 1998 that went to Blackstone,

16   anterior stabilization device.  I don't -- I'm not

17   familiar with every single device on the market,

18   that somebody else might have used a similar type

19   of structure to prevent backout.

20       Q.   And those of skill in this particular

21   field would have known that you could use a plate

22   to prevent screw backout.  Right?

23            ATTORNEY MILCH:  Objection.  Form.  Scope.

24   Legal conclusion.

25       A.   Yeah, I can't really assume what everybody

263

```
1                 C E R T I F I C A T E

2

3          I, Deanna J. Dean, a licensed court

4     reporter, Registered Diplomate Reporter, and

5     Certified Realtime Reporter, do hereby certify:

6             That ROBERT S. BRAY, JR., MD, in the

7     foregoing deposition named, was present and by me

8     sworn as a witness in the matter of RSB Spine, LLC,

9     et al. v. Life Spine, Inc., et al., at the time and

10    place therein specified;

11            That said deposition was taken before me

12    at said time and place, and was taken down in

13    shorthand by me, and was thereafter transcribed

14    into typewriting, and that the foregoing transcript

15    constitutes a full, true and correct report of said

16    deposition and of the proceedings that took place;

17            That before completion of the proceedings,

18    review of the transcript was requested.

19

20            IN WITNESS WHEREOF, I have hereunder

21            subscribed my hand this 18th day of

22            February, 2022.

23

24    _____

25            Deanna J. Dean, LCR, RDR, CRR
```

# EXHIBIT 9

Appl. No.: 15/413,945
Amendment dated: May 26, 2017
Reply to Office action dated: March 10, 2017

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | |
|---|---|---|
| Applicant | : | Robert S. Bray JR, et al. |
| Appl. No. | : | 15/413,945 |
| Filed | : | January 24, 2017 |
| Title | : | BONE PLATE STABILIZATION SYSTEM AND METHOD FOR ITS USE |

| | | |
|---|---|---|
| Conf. No. | : | 9592 |
| TC/A.U. | : | 3733 |
| Examiner | : | Stuart Samuel Bray |

| | | |
|---|---|---|
| Customer No. : | | 108676 |
| Docket No. | : | R&B-40284US3 |

Mail Stop Amendment
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

## ELECTION and AMENDMENT "A"

Sir:

This Election and Amendment is filed in response to the Office action dated March 10, 2017, Paper No./Mail Date 20170301. The three month period for responding to the Office action expires on June 10, 2017.

Applicant hereby Elects Species A, Figures 1-7 and 30-31.

Please amend the above-identified application in the following manner.

**Amendments to the Claims** begin on page 2 of this paper.

**Remarks** begin on page 9 of this paper.

Appl. No.: 15/413,945
Amendment dated: May 26, 2017
Reply to Office action dated: March 10, 2017

## AMENDMENTS TO THE CLAIMS

This listing of claims will replace all prior versions, and listings, of claims in the application:

## Listing of Claims

1. (Currently amended)     A bone stabilization plate system comprising:

a base plate having a top surface, first and second ends, a bottom surface, and a plurality of bone screw holes, wherein the base plate is ~~sized~~ configured to fit primarily between anterior portions of adjacent vertebral bones' lip osteophytes ~~and is configured~~ to bear weight to hold the vertebral bones while sharing weight with bone graft material for fusion; and

a plurality of bone screws configured to fit in the plurality of bone screw holes, respectively;

wherein the vertebral bones have top surfaces and have side surfaces generally facing each other;

wherein ~~one~~ a first of the bone screw holes, being ~~is~~ configured to receive ~~one~~ a first of the bone screws, extends at least partially from the top surface of the base plate and opens at least partially toward the side surface of a first of the vertebral bones ~~to secure the base plate to one of the vertebral bones~~;

wherein ~~another~~ a second of the bone screw holes, being ~~is~~ configured to receive ~~one~~ a second of the bone screws, extends at least partially from the top surface of the base plate and opens at least partially toward ~~to secure the base plate to~~ the lip osteophyte of ~~another~~ a second of the vertebral bones; and

wherein each and every one of the plurality of bone screw holes is configured to receive one of the bone screws angled relative to the base plate and oriented generally in an anterior-posterior direction through at least partially the top surface of the base plate.

Appl. No.: 15/413,945
Amendment dated: May 26, 2017
Reply to Office action dated: March 10, 2017

2. (Currently amended)      The system as set forth in claim 1, wherein at least one of the plurality of bone screw holes is configured to permit a range of bone screw angles in anchoring the base plate.

3. (Original)   The system as set forth in claim 1, wherein the bottom surface of the base plate is generally flat.

4. (Original)   The system as set forth in claim 1, wherein the system further comprises a screw retainer configured to prevent at least one of the plurality of bone screws from backing out.

5. (Original)   The system as set forth in claim 4, wherein the screw retainer is a plate or a screw.

6. (Currently amended)      The system as set forth in claim 4, wherein the top surface of the base plate is configured to have a recessed region and the screw retainer is configured to sit in the recessed region of the base plate.

7. (Original)   The system as set forth in claim 1, wherein at least one of the plurality of bone screws is configured to permit toggling relative to the base plate.

8. (Currently amended)      The system as set forth in claim 1, wherein the base plate includes a primary member and a secondary member angled relative to the primary member, wherein the secondary member does not cover a significant portion of [[a]] the top surface of any of the adjacent vertebral bones.

9. (Currently amended)      The system as set forth in claim 8, wherein the secondary member has a first of the plurality of bone screw holes therethrough the first of the bone screw holes extends through the primary member and the second of the bone screw holes extends through the secondary member.

Appl. No.: 15/413,945
Amendment dated: May 26, 2017
Reply to Office action dated: March 10, 2017


10. (Currently amended)    The system as set forth in claim 1, wherein the base plate includes two lateral tabs ~~sized~~ configured to fit between the lip osteophytes of the ~~adjacent~~ vertebral bones and extending from opposite ends of the bottom surface of the base plate in a direction generally transverse to the ~~adjacent~~ vertebral bones.

11. (Original) The system as set forth in claim 10, wherein the lateral tabs have at least one of protrusions and pointed nubs.

12. (Withdrawn)     The system as set forth in claim 1, wherein the base plate is configured to fit primarily between the lip osteophytes of the bones, at least one of which is trimmed to provide a substantially flat surface for enhanced anchoring.

13. (Currently amended)    The system as set forth in claim 1, wherein the top surface of the base plate coincides with or generally matches an outer diameter of the anterior cortex of the ~~adjacent~~ vertebral bones.

14. (Currently amended)    The system as set forth in claim 1, wherein each of the plurality of bone screw holes extends ~~primarily~~ at least partially through the first or second end, the first end comprising a first bone engaging region fully extending uninterrupted between lateral extents of the first end, and the second end comprising a second bone engaging region fully extending uninterrupted between lateral extents of the second end.

15. (Currently amended)    A bone stabilization plate system comprising:
        a base plate having a plurality of bone screw holes, a top surface, a generally flat bottom surface and first and second ends for retaining bone graft material between adjacent vertebral bone bodies having top surfaces and having side surfaces generally facing each other, wherein ~~and for permitting force transmission between the bone bodies through the bone graft material, configured to primarily bear weight while holding~~

Appl. No.: 15/413,945
Amendment dated: May 26, 2017
Reply to Office action dated: March 10, 2017

~~the bone bodies for fusion, and sized~~ <u>the base plate is configured</u> to fit primarily
between anterior portions of the bone bodies' lip osteophytes<u>, without covering
significant portions of the top surfaces of the bone bodies, to primarily bear weight, and
to permit force transmission between the bone bodies through the bone graft material
while holding the bone bodies for fusion</u> ~~such that the bone bodies engage the bone
graft material~~; and

      a plurality of bone screws configured for insertion through <u>the plurality of</u>
corresponding bone screw holes to anchor primarily into the lip osteophytes<u>, with each
of the bone screws being configured to extend from at least partially the top surface of
the base plate to at least partially the side surface of one of the bone bodies,</u> such that
the base plate is secured.

16. (Currently amended)   The system as set forth in claim 15, <u>further</u> ~~wherein the base
plate is~~ configured to enable at least one of the bone screws to anchor into one of the
vertebral bone bodies at ~~any angle within a range of allowable angles~~ <u>a variable angle</u>
relative to the bottom surface of the base plate.

17. (Original) The system as set forth in claim 15, wherein at least one of the bone
screws is configured to permit toggling relative to the base plate.

18. (Currently amended)   The system as set forth in claim 15, wherein <u>the top surface
of the base plate is configured to have a recessed region, and</u> the system further
comprises a screw retainer <u>in said recessed region</u> configured to prevent one or more of
the bone screws from backing out.

19. (Original) The system as set forth in claim 15, wherein each and every one of the
plurality of bone screw holes is configured to receive a bone screw angled relative to the
base plate and oriented generally in an anterior-posterior direction.

Appl. No.: 15/413,945
Amendment dated: May 26, 2017
Reply to Office action dated: March 10, 2017

20. (Currently amended)    The system as set forth in claim 15, wherein the base plate
includes a primary member and a secondary member angled relative to the primary
member, the top surface of the base plate comprises a top surface of the primary
member and a front surface of the secondary member, wherein the secondary member
is at the second end of the base plate, ~~does not cover a significant surface of the bone
bodies~~ and has at least one of the plurality of bone screw holes therethrough.

21. (Currently amended)    A bone stabilization plate system for anchoring between side
surfaces of first and second adjacent vertebral bones, comprising:

a base plate having a top surface, a first end nearer the first bone comprising ~~a
first bone screw region having~~ a first bone screw hole ~~whose center extends~~ extending
at least partially therethrough and a first bone engaging region fully extending
uninterrupted between lateral extents of the first end, a second end nearer the second
bone comprising ~~a second bone screw region having~~ a second bone screw hole
extending at least partially therethrough, and a bottom surface, and configured to fit
primarily between an anterior portion of the first bone's lip osteophyte and an anterior
portion of the second bone's lip osteophyte while bearing weight to hold the bones for
fusion; and

a first bone screw ~~capable of securing~~ configured to secure the base plate to the
first bone by insertion through the first bone screw hole and to extend from at least
partially the top surface of the base plate to at least partially the side surface of the first
bone, and a second bone screw ~~capable of securing~~ configured to secure the base
plate to the second bone by insertion through the second bone screw hole and to
extend from at least partially the top surface of the base plate to at least partially the
side surface of the second bone.

22. (Original) The system as set forth in claim 21, wherein the entire top surface of the
base plate is configured to be an anterior boundary of a bone graft site.

Appl. No.: 15/413,945
Amendment dated: May 26, 2017
Reply to Office action dated: March 10, 2017

23. (Currently amended)    The system as set forth in claim 21, wherein the base plate comprises a primary member and a secondary member angled relative to the primary member, and does not cover without covering a significant portion of a the top surface of the first or the second bone, the top surface of the base plate comprises a top surface of the primary member and a front surface of the secondary member, and the secondary member is at the second end of the base plate and has the second bone screw hole therethrough.

24. (Currently amended)    The system as set forth in claim 21, wherein the base plate has more than two bone screw holes, and at least a first one of the bone screw holes extends partially through both the bottom surface and the first end, and a second one of the bone screw holes extends partially through both the bottom surface and the second end.

25. (Currently amended)    The system as set forth in claim 21, wherein the base plate has more than two bone screw holes, and each at least one of the bone screw holes extends not through any portion of the bottom surface but entirely through the first or second end.

26. (Original) The system as set forth in claim 21, wherein the first and second bone screws are configured to be anchored at variable angles.

27. (Currently amended)    The system as set forth in claim 21, wherein the base plate further includes two lateral tabs sized configured to fit between the lip osteophytes of the bones and extending from opposite ends of the bottom surface of the base plate in a direction generally transverse to the first and second bones.

28. (Original) The system as set forth in claim 21, wherein at least one of the first and second bone screws is permitted to toggle relative to the base plate.

Appl. No.: 15/413,945
Amendment dated: May 26, 2017
Reply to Office action dated: March 10, 2017

29. (Original) The system as set forth in claim 21, wherein the base plate has more than two bone screw holes, and each and every one of the bone screw holes is configured to receive a bone screw angled relative to the base plate and oriented generally in an anterior-posterior direction through the top surface of the base plate.

30. (Original) The system as set forth in claim 21, wherein the system further comprises a screw retainer configured to prevent at least one of the first and second bone screws from backing out.

# EXHIBIT 10

| *Office Action Summary* | Application No.<br>16/990,863 | Applicant(s)<br>BRAY, Robert S. | |
|---|---|---|---|
| | Examiner<br>JAN CHRISTOPHER L MERENE | Art Unit<br>3773 | AIA (FITF) Status<br>No |

| -- The MAILING DATE of this communication appears on the cover sheet with the correspondence address -- |
|---|

**Period for Reply**

   A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTHS FROM THE MAILING
DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) months from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
  Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1)☐ Responsive to communication(s) filed on _____.
   ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.
2a)☐ This action is **FINAL.**          2b) ☑ This action is non-final.
3)☐ An election was made by the applicant in response to a restriction requirement set forth during the interview
   on _____; the restriction requirement and election have been incorporated into this action.
4)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is
   closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims***

5) ☑ Claim(s) <u>1-29</u> is/are pending in the application.
   5a) Of the above claim(s) _____ is/are withdrawn from consideration.
6) ☐ Claim(s) _____ is/are allowed.
7) ☑ Claim(s) <u>1-29</u> is/are rejected.
8) ☐ Claim(s) _____ is/are objected to.
9) ☐ Claim(s) _____ are subject to restriction and/or election requirement
* If any claims have been determined <u>allowable</u>, you may be eligible to benefit from the **Patent Prosecution Highway** program at a
participating intellectual property office for the corresponding application. For more information, please see
http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to **PPHfeedback@uspto.gov.**

**Application Papers**

10)☐ The specification is objected to by the Examiner.
11)☐ The drawing(s) filed on _____ is/are:  a)☐ accepted or  b)☐ objected to by the Examiner.
      Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).
      Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

**Priority under 35 U.S.C. § 119**

12)☐ Acknowledgement is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
   **Certified copies:**
      a)☐ All   b)☐ Some**   c)☐ None of the:
      1.☐ Certified copies of the priority documents have been received.
      2.☐ Certified copies of the priority documents have been received in Application No. _____.
      3.☐ Copies of the certified copies of the priority documents have been received in this National Stage
         application from the International Bureau (PCT Rule 17.2(a)).
** See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1) ☑ Notice of References Cited (PTO-892)                    3) ☐ Interview Summary (PTO-413)
                                                                      Paper No(s)/Mail Date _____.
2) ☑ Information Disclosure Statement(s) (PTO/SB/08a and/or PTO/SB/08b)    4) ☐ Other: _____.
   Paper No(s)/Mail Date _____.

## DETAILED ACTION

### *Notice of Pre-AIA or AIA Status*

The present application is being examined under the pre-AIA first to invent

provisions. The claims are supported by provisional application 60/745,294 filed on April

21, 2006 and as such these claims have that effective filing date.

### *Information Disclosure Statement*

Applicant should note that the large number of references in the attached IDS

have been considered by the examiner in the same manner as other documents in

Office search files are considered by the examiner while conducting a search of the

prior art in a proper field of search. See MPEP 609.05(b). Applicant is requested to point

out any particular references in the IDS which they believe may be of particular

relevance to the instant claimed invention in response to this office action.

### *Claim Interpretation*

The following is a quotation of 35 U.S.C. 112(f):

(f) Element in Claim for a Combination. – An element in a claim for a combination may be
expressed as a means or step for performing a specified function without the recital of
structure, material, or acts in support thereof, and such claim shall be construed to cover the
corresponding structure, material, or acts described in the specification and equivalents
thereof.

The following is a quotation of pre-AIA 35 U.S.C. 112, sixth paragraph:

An element in a claim for a combination may be expressed as a means or step for performing
a specified function without the recital of structure, material, or acts in support thereof, and
such claim shall be construed to cover the corresponding structure, material, or acts
described in the specification and equivalents thereof.

The claims in this application are given their broadest reasonable interpretation using the plain meaning of the claim language in light of the specification as it would be understood by one of ordinary skill in the art.  The broadest reasonable interpretation of a claim element (also commonly referred to as a claim limitation) is limited by the description in the specification when 35 U.S.C. 112(f) or pre-AIA 35 U.S.C. 112, sixth paragraph, is invoked.

As explained in MPEP § 2181, subsection I, claim limitations that meet the following three-prong test will be interpreted under 35 U.S.C. 112(f) or pre-AIA 35 U.S.C. 112, sixth paragraph:

(A)      the claim limitation uses the term "means" or "step" or a term used as a substitute for "means" that is a generic placeholder (also called a nonce term or a non-structural term having no specific structural meaning) for performing the claimed function;

(B)      the term "means" or "step" or the generic placeholder is modified by functional language, typically, but not always linked by the transition word "for" (e.g., "means for") or another linking word or phrase, such as "configured to" or "so that"; and

(C)      the term "means" or "step" or the generic placeholder is not modified by sufficient structure, material, or acts for performing the claimed function.

Use of the word "means" (or "step") in a claim with functional language creates a rebuttable presumption that the claim limitation is to be treated in accordance with 35 U.S.C. 112(f) or pre-AIA 35 U.S.C. 112, sixth paragraph. The presumption that the claim limitation is interpreted under 35 U.S.C. 112(f) or pre-AIA 35 U.S.C. 112, sixth

paragraph, is rebutted when the claim limitation recites sufficient structure, material, or acts to entirely perform the recited function.

Absence of the word "means" (or "step") in a claim creates a rebuttable presumption that the claim limitation is not to be treated in accordance with 35 U.S.C. 112(f) or pre-AIA 35 U.S.C. 112, sixth paragraph. The presumption that the claim limitation is not interpreted under 35 U.S.C. 112(f) or pre-AIA 35 U.S.C. 112, sixth paragraph, is rebutted when the claim limitation recites function without reciting sufficient structure, material or acts to entirely perform the recited function.

Claim limitations in this application that use the word "means" (or "step") are being interpreted under 35 U.S.C. 112(f) or pre-AIA 35 U.S.C. 112, sixth paragraph, except as otherwise indicated in an Office action. Conversely, claim limitations in this application that do not use the word "means" (or "step") are not being interpreted under 35 U.S.C. 112(f) or pre-AIA 35 U.S.C. 112, sixth paragraph, except as otherwise indicated in an Office action.

This application includes one or more claim limitations that do not use the word "means," but are nonetheless being interpreted under 35 U.S.C. 112(f) or pre-AIA 35 U.S.C. 112, sixth paragraph, because the claim limitation(s) uses a generic placeholder that is coupled with functional language without reciting sufficient structure to perform the recited function and the generic placeholder is not preceded by a structural modifier. Such claim limitation(s) is/are: "retainer" in claim 30.

Because this/these claim limitation(s) is/are being interpreted under 35 U.S.C. 112(f) or pre-AIA 35 U.S.C. 112, sixth paragraph, it/they is/are being interpreted to

cover the corresponding structure described in the specification as performing the

claimed function, and equivalents thereof.

If applicant does not intend to have this/these limitation(s) interpreted under 35

U.S.C. 112(f) or pre-AIA 35 U.S.C. 112, sixth paragraph, applicant may:  (1) amend the

claim limitation(s) to avoid it/them being interpreted under 35 U.S.C. 112(f) or pre-AIA

35 U.S.C. 112, sixth paragraph (e.g., by reciting sufficient structure to perform the

claimed function); or (2) present a sufficient showing that the claim limitation(s) recite(s)

sufficient structure to perform the claimed function so as to avoid it/them being

interpreted under 35 U.S.C. 112(f) or pre-AIA 35 U.S.C. 112, sixth paragraph.


### *Claim Rejections - 35 USC § 101*

35 U.S.C. 101 reads as follows:

Whoever invents or discovers any new and useful process, machine, manufacture, or
composition of matter, or any new and useful improvement thereof, may obtain a patent
therefor, subject to the conditions and requirements of this title.


Section 33(a) of the America Invents Act reads as follows:

Notwithstanding any other provision of law, no patent may issue on a claim directed
to or encompassing a human organism.


Claims 25 and its dependent claims are rejected under 35 U.S.C. 101 and

section 33(a) of the America Invents Act as being directed to or encompassing a human

organism.  See also *Animals - Patentability*, 1077 *Off. Gaz. Pat. Office* 24 (April 21,

1987) (indicating that human organisms are excluded from the scope of patentable

subject matter under 35 U.S.C. 101).  The end of claim 25 recites "first and second ends

of the base plate *that are fitted between anterior portions of the adjacent vertebral*

bones" which positively recites the vertebral bones as part of the claimed invention. It is

suggested to recite "that is able to be fitted" or similar language.


### *Claim Rejections - 35 USC § 112*

The following is a quotation of 35 U.S.C. 112(b):
(b) CONCLUSION.—The specification shall conclude with one or more claims particularly
pointing out and distinctly claiming the subject matter which the inventor or a joint inventor
regards as the invention.


The following is a quotation of 35 U.S.C. 112 (pre-AIA), second paragraph:
The specification shall conclude with one or more claims particularly pointing out and distinctly
claiming the subject matter which the applicant regards as his invention.


Claim 29 is rejected under 35 U.S.C. 112(b) or 35 U.S.C. 112 (pre-AIA), second

paragraph, as being indefinite for failing to particularly point out and distinctly claim the

subject matter which the inventor or a joint inventor (or for applications subject to pre-

AIA 35 U.S.C. 112, the applicant), regards as the invention. The claim recites that the

bone anchor can be implanted at "any angle within a predefined range" which is

contradictory as a range of angles already precludes "any angle." Further clarification is

requested. The examiner will treat this limitation as the bone anchor can be implanted

within a range of angles.


The following is a quotation of 35 U.S.C. 112(d):

(d) REFERENCE IN DEPENDENT FORMS.—Subject to subsection (e), a claim in dependent
form shall contain a reference to a claim previously set forth and then specify a further
limitation of the subject matter claimed. A claim in dependent form shall be construed to
incorporate by reference all the limitations of the claim to which it refers.

The following is a quotation of pre-AIA 35 U.S.C. 112, fourth paragraph:

Subject to the following paragraph [i.e., the fifth paragraph of pre-AIA 35 U.S.C. 112], a claim
in dependent form shall contain a reference to a claim previously set forth and then specify a
further limitation of the subject matter claimed. A claim in dependent form shall be construed
to incorporate by reference all the limitations of the claim to which it refers.

Application/Control Number: 16/990,863                                      Page 7
Art Unit: 3773

Claim 26 is rejected under 35 U.S.C. 112(d) or pre-AIA 35 U.S.C. 112, 4th

paragraph, as being of improper dependent form for failing to further limit the subject

matter of the claim upon which it depends, or for failing to include all the limitations of

the claim upon which it depends.  The last paragraph of Claim 25 already encompasses

the limitation of Claim 26. As such, claim 26 does not further limit parent claim 25.

Applicant may cancel the claim(s), amend the claim(s) to place the claim(s) in proper

dependent form, rewrite the claim(s) in independent form, or present a sufficient

showing that the dependent claim(s) complies with the statutory requirements.

### *Claim Rejections - 35 USC § 102*

The following is a quotation of the appropriate paragraphs of pre-AIA 35 U.S.C.

102 that form the basis for the rejections under this section made in this Office action:

A person shall be entitled to a patent unless –

(e) the invention was described in (1) an application for patent, published under section
122(b), by another filed in the United States before the invention by the applicant for patent or
(2) a patent granted on an application for patent by another filed in the United States before
the invention by the applicant for patent, except that an international application filed under
the treaty defined in section 351(a) shall have the effects for purposes of this subsection of an
application filed in the United States only if the international application designated the United
States and was published under Article 21(2) of such treaty in the English language.

**Claims 1-11** are rejected under pre-AIA 35 U.S.C. 102(e) as being anticipated by

Lechmannn US 20060085071.

Regarding **Claim 1,** Lechmann discloses an apparatus (Fig 1), comprising:

a base plate (#8) having a top surface (see Fig below), a bottom surface

(opposite the top surface, surface that faces chamber structure #10), and first and

second ends (see Fig below), the base plate defining a plurality of bone anchor holes

(holes for anchors #20) that each extend from the top surface toward at least one of the

first and second ends (Fig 1); and

a chamber structure (#10) configured to be coupled to the base plate (Fig 7), the

chamber structure configured to maintain disc space across a bone graft site between

adjacent vertebral bones (Fig 1, 7, paragraph 9, 32),

the base plate and the chamber structure configured to be implanted between

the adjacent vertebral bones with (1) the base plate fitting primarily between anterior

portions of the adjacent vertebral bones (Fig 1, 7, paragraph 9, 32 the plate is able to be

implanted such that it is located between anterior and posterior portions of vertebral

bones) and (2) the chamber structure extending posteriorly from the base plate (Fig 1,

7, the apparatus is able to be implanted such that the chamber structure #10 extends

posteriorly from the base plate), the base plate, when implanted, configured to bear

weight along portions of the first and second ends of the base plate fitted between the

anterior portions of the adjacent vertebral bones, while sharing weight with bone graft

material placed between the adjacent vertebral bones and in a space (see Fig below) at

least partially defined by the chamber structure (Fig 1, 7, paragraph 9, 32, where the

space is able to house graft material and when implanted the base plate bears weight

with the graft material).



Regarding **Claim 2,** Lechmann discloses the base plate, when implanted, does

not contact an anterior surface of at least one of the adjacent vertebral bones (Fig 1, 7,

see Fig below, which shows a general image of vertebral anatomy, where when

implanted in the disc space, the base plate is able to not directly contact anterior

surfaces of the vertebra).



Regarding **Claim 3,** Lechmann discloses the base plate, when implanted, fits

primarily between anterior portions of lip osteophytes of the adjacent vertebral bones

(Fig 1, 7 where the base plate is able to be implanted in an anterior portion of the disc

space such that it is able to fit/placed between anterior portions of lip osteophytes of the

adjacent vertebral bones).


Regarding **Claim 4,** Lechmann discloses all weight-bearing portions of the first

and second ends of the base plate are shaped to fit between the anterior portions of the

adjacent vertebral bones (Fig 1, 7 where the plate is able to be placed in the anterior

portion of the disc space such that the first and second ends, that bear weight, fits

between anterior portions of adjacent vertebral bones).

Regarding **Claim 5,** Lechmann discloses the base plate has a maximum anterior-to-posterior dimension that is less than a maximum anterior-to-posterior dimension of the chamber structure (as seen in Figs 1-7, where the base plate is relatively thin as compared to the larger chamber structure that is larger in the anterior-posterior dimension).

Regarding **Claim 6,** Lechmann discloses the base plate has a maximum-anterior to posterior dimension that is less than a lateral dimension of the top surface of the base plate (see Fig 1, 7 see Fig below, where the plate is generally rectangular, where thickness or anterior posterior dimension of the plate is less than the lateral width of the top surface ).



Regarding **Claim 7-8,** Lechmann discloses the base plate and the chamber structure are formed of different materials (paragraph 32-33), wherein the base plate is formed of a metal or metal alloy (paragraph 33).

Regarding **Claim 9,** Lechmann discloses the chamber structure is detachable from the base plate (Fig 1, paragraph 20).

Regarding **Claim 10,** Lechmann discloses the base plate and the chamber structure collectively surround the space for receiving the bone graft material (see Fig above in claim 1).

Regarding **Claim 11,** Lechmann discloses each bone anchor hole from the plurality of bone anchor holes extends from a portion of the top surface of the bone plate that is disposed between the adjacent vertebral bones when the base plate is implanted between the adjacent vertebral bones (Fig 1, 7, Fig above in claim 1 where when implanted the holes is able to be disposed between adjacent vertebral bones).

**Claims 13-18** are rejected under pre-AIA 35 U.S.C. 102(e) as being anticipated by Lechmannn US 20060085071.

Regarding **Claim 13,** Lechmann discloses an apparatus (Fig 1), comprising:

a base plate (#8) having a top surface (see Fig below), a bottom surface

(opposite the top surface, surface that faces chamber structure #10), and first and

second ends (see Fig below), the base plate defining a plurality of bone anchor holes

(holes for anchors #20) that each extend from the top surface toward at least one of the

first and second ends (Fig 1),

the base plate configured to be implanted primarily between anterior portions of

adjacent vertebral bones with weight-bearing portions of the first and second ends of

the base plate fitting between and engaging side surfaces (surfaces of adjacent

vertebra that help make up the disc space)of the adjacent vertebral bones (Fig 1, 7, the

plate is able to be placed within the anterior portion of the disc space such that the

weight bearing portions of the first and second ends engage with side surfaces of

adjacent vertebra);

and a chamber structure (#10) configured to be coupled to the base plate (Fig 1,

7), the chamber structure configured to be implanted between the adjacent vertebral

bones to maintain disc space across a bone graft site between the adjacent vertebral

bones (Fig 1, 7, paragraph 9, 32),

the base plate and the chamber structure, when implanted, configured to share

weight with the bone graft material placed between the adjacent vertebral bones and in

a space (see Fig below) at least partially defined by the chamber structure (Fig 1, 7, see

Fig below, paragraph 9, 32, where the space is able to house graft material and when

implanted the base plate and chamber shares weight with the graft material).

Application/Control Number: 16/990,863                                    Page 14
Art Unit: 3773



Regarding **Claim 14,** Lechmann discloses the base plate, when implanted, does

not contact an anterior surface of at least one of the adjacent vertebral bones (Fig 1, 7,

see Fig below, which shows a general image of vertebral anatomy, where when

implanted in the disc space, the base plate is able to not directly contact anterior

surfaces of the vertebra).



Regarding **Claim 15,** Lechmann discloses the base plate has a maximum anterior-to-posterior dimension that is less than a maximum anterior-to-posterior dimension of the chamber structure (as seen in Figs 1-7, where the base plate is relatively thin as compared to the larger chamber structure that is larger in the anterior-posterior dimension).

Regarding **Claim 16,** Lechmann discloses the base plate has a maximum-anterior to posterior dimension that is less than a lateral dimension of the top surface of the base plate (see Fig 1, 7 see Fig below, where the plate is generally rectangular, where thickness or anterior posterior dimension of the plate is less than the lateral width of the top surface ).



Regarding **Claim 17,** Lechmann discloses the base plate and the chamber structure are formed of different materials (paragraph 32-33).

Regarding **Claim 18,** Lechmann discloses each bone anchor hole from the plurality of bone anchor holes extends from a portion of the top surface of the bone plate that is disposed between the adjacent vertebral bones when the base plate is implanted between the adjacent vertebral bones (Fig 1, 7, Fig above in claim 1 where when implanted the holes is able to be disposed between adjacent vertebral bones).

**Claims 25-28, 30** are rejected under pre-AIA 35 U.S.C. 102(e) as being anticipated by Lechmann US 20060085071.

Regarding **Claim 25,** Lechmann discloses an apparatus (Fig 1), comprising:

a base plate (#8) having a top surface (see Fig below), a bottom surface (opposite the top surface, surface that faces chamber structure #10), and first and second ends (see Fig below), the base plate defining a plurality of bone anchor holes (holes for anchor #20) each configured to receive a bone anchor; and

a chamber structure (#10) configured to be coupled to the base plate (Fig 1, 7), the chamber structure configured to maintain disc space across a bone graft site between adjacent vertebral bones (Fig 1, 7, paragraph 9, 32), the base plate and the chamber structure configured

(1) to be implanted between the adjacent vertebral bones with the base plate fitted primarily between anterior portions of the adjacent vertebral bones (Fig 1, 7, the plate able to be implanted within anterior portions of the disc space) and

(2) to share weight with bone graft material placed between the adjacent vertebral bones and in a space (see Fig below) at least partially defined by the chamber structure (see Fig 1, 7, se Fig below),

each bone anchor hole from the plurality of bone anchor holes extending from the top surface to different portions of the first or second ends of the base plate that are fitted between the anterior portions of the adjacent vertebral bones (Fig 1, 7 where the holes extend from the top surface and angled towards the first and second ends, where the plate is able to be placed in an anterior portion of the disc space).


Regarding **Claim 26,** Lechmann discloses each bone anchor hole from the plurality of bone anchor holes extends from a portion of the top surface of the bone

plate that is disposed between the adjacent vertebral bones when the base plate is

implanted between the adjacent vertebral bones (Fig 1, 7 where the holes extend from

the top surface and angled towards the first and second ends, where the plate is able to

be placed in an anterior portion of the disc space).

Regarding **Claim 27,** Lechmann discloses the base plate and the chamber

structure are formed of different materials (paragraph 32-33).

Regarding **Claim 28,** Lechmann discloses a plurality of bone anchors (#20) each

configured to be implanted into one of the adjacent vertebral bones, each bone anchor

from the plurality of bone anchors configured to fit into a different bone anchor hole from

the plurality of bone anchor holes such that a head (#21, Fig 2) of that bone anchor is

disposed between the adjacent vertebral bones when that bone anchor is implanted into

the adjacent vertebral bone (Fig 1, 7 where the heads #21 of the anchors would be

located between adjacent vertebral bone).

Regarding **Claim 30,** Lechmann discloses a retainer (#18) configured to prevent

at least two of the plurality of bone anchors from backing out of their respective bone

anchor holes (paragraph 35).

### *Claim Rejections - 35 USC § 103*

The following is a quotation of pre-AIA 35 U.S.C. 103(a) which forms the basis

for all obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described
> as set forth in section 102, if the differences between the subject matter sought to be patented
> and the prior art are such that the subject matter as a whole would have been obvious at the
> time the invention was made to a person having ordinary skill in the art to which said subject
> matter pertains. Patentability shall not be negatived by the manner in which the invention was
> made.

The factual inquiries for establishing a background for determining obviousness

under pre-AIA 35 U.S.C. 103(a) are summarized as follows:

1. Determining the scope and contents of the prior art.

2. Ascertaining the differences between the prior art and the claims at issue.

3. Resolving the level of ordinary skill in the pertinent art.

4. Considering objective evidence present in the application indicating

obviousness or nonobviousness.

**Claims 1, 12, 19-24, 25, 29** are rejected under pre-AIA 35 U.S.C. 103(a) as

being unpatentable over Michelson US 2003/0078668 in view of Lechmannn US

2006/0085071.

Regarding **Claim 1, 19, 25,** Michelson discloses an apparatus (Figs 21-25),

comprising:

a base plate (where ref #404 is pointing to in Fig 21 and in Fig 23, which shows

a front view of the base plate) having a generally flat top surface (as seen in Fig 21, 23,

25), and first and second ends (see Fig below), the base plate defining a plurality of

bone anchor holes (holes for anchors #442) that each extend from the top surface

toward at least one of the first and second ends (see Fig below), the base plate

configured to be implanted primarily between anterior portions of adjacent vertebral

bones with the top surface of the base plate being generally flush with anterior surfaces

of the adjacent vertebral bones (Fig 21-24, the base plate can be implanted in the

anterior region such that the top surface is generally flush with anterior surfaces of

adjacent vertebral bones); and

a chamber structure (see Fig below), the chamber structure configured to

implanted between the adjacent vertebral bones so as to extend posteriorly from the

base plate (Fig 21-24), the base plate and the chamber structure, when implanted,

configured to share weight with the bone graft material placed between the adjacent

vertebral bones and in a space (#424, Fig 21) at least partially defined by the chamber

structure (see Fig below, Fig 21-24, paragraph 77,  where graft material can be placed

in the space and the apparatus placed in the disc space such that is shares weight with

the graft material). With regards to **Claim 1**, Michelson also discloses the base plate

fitting primarily between anterior portions of adjacent vertebral bones (as discussed

above, the apparatus is able to be implanted such that the base plate is in the anterior

region of the disc space). With regards to **Claim 25**, Michelson also discloses the

chamber structure configured to maintain disc space across a bone graft site between

adjacent vertebral bones (Fig 21-25, abstract, when implanted the chamber structure is

able to be implanted in the disc space, graft site, and maintain disc space height).



Regarding **Claim 12,** Michelson discloses the top surface of the base plate is generally (1) flat (Fig 21, 23-25) and (2) of rectangular shape when viewed in an anterior-to-posterior direction (as seen in Fig 23, 25).

Regarding **Claim 20,** Michelson discloses the base plate, when implanted, does not contact an anterior surface of at least one of the adjacent vertebral bones (Fig 21-24, see Fig below, which shows a general image of vertebral anatomy, where when implanted in the disc space, the base plate is able to not directly contact anterior surfaces of the vertebra).



Regarding **Claim 24,** Michelson discloses each bone anchor hole from the plurality of bone anchor holes extends from a portion of the top surface of the bone plate (as seen in Fig 23,  27) that is disposed between the adjacent vertebral bones when the base plate is implanted between the adjacent vertebral bones (Fig 21-24 where when implanted, the apparatus would be located in the disc space defined by adjacent vertebral bones).

Regarding **Claim 29,** Michelson discloses at least one of the plurality of bone anchor holes is configured to allow a bone anchor to be implanted into the adjacent vertebral bone at any angle within a predefined range (Fig 27, paragraph 103, "variability in its positioning", where the trajectory of bone anchor #442 can be varied within a predefined ranged, the range determined by the dimensions of the bone anchor hole and bone anchor).

Michelson discloses the apparatus can be made out of a variety of materials (paragraph 78, claims 78-79) but does not disclose the base plate having a bottom surface, the chamber structure configured to be coupled to the base plate.

Lechmann discloses a similar apparatus (Fig 1), comprising:

a base plate (#8) having a top surface (see Fig below), a bottom surface (opposite the top surface, surface that faces chamber structure #10), and first and second ends (see Fig below), the base plate defining a plurality of bone anchor holes (holes for anchors #20) that each extend from the top surface toward at least one of the first and second ends (Fig 1); and

a chamber structure (#10) configured to be coupled to the base plate (Fig 7), the chamber structure configured to maintain disc space across a bone graft site between adjacent vertebral bones (Fig 1, 7, paragraph 9, 32),

the base plate and the chamber structure configured to be implanted between the adjacent vertebral bones with (1) the base plate fitting primarily between anterior portions of the adjacent vertebral bones (Fig 1, 7, paragraph 9, 32 the plate is able to be implanted such that it is located between anterior and posterior portions of vertebral bones) and (2) the chamber structure extending posteriorly from the base plate (Fig 1, 7, the apparatus is able to be implanted such that the chamber structure #10 extends posteriorly from the base plate),  the base plate, when implanted, configured to bear weight along portions of the first and second ends of the base plate fitted between the anterior portions of the adjacent vertebral bones, while sharing weight with bone graft material placed between the adjacent vertebral bones and in a space (see Fig below) at least partially defined by the chamber structure (Fig 1, 7, paragraph 9, 32, where the space is able to house graft material and when implanted the base plate bears weight with the graft material),

the chamber structure configured to couple to the base plate via a rail and groove configuration (paragraph 20, Fig 5-6) which provides a bottom surface for the base plate (as discussed above) and allows the chamber structure and plate to be formed of different materials (paragraph 32-33) so that the chamber structure is x-ray transparent and the plate, which receives the anchors, can be made out of metal (paragraph 27, 32).

It would have been obvious to one having ordinary skill in the art at a time before the invention was made to modify Michelson to have the chamber structure configured to couple to the base plate, via a rail and grove configuration, such that the base plate has a bottom surface, in view of Lechmann above because this allows the chamber structure and plate to be formed of different materials so that the chamber structure is x-ray transparent and the plate, which receives the anchors, can be made out of metal.

Regarding **Claim 21,** Michelson as modified discloses the base plate has a maximum anterior-to-posterior dimension that is less than a maximum anterior-to-posterior dimension of the chamber structure (as seen in Figs 1-7 in Lechmannn, where the base plate is relatively thin as compared to the larger chamber structure that is larger in the anterior-posterior dimension and with the modification of Michelson to make the base plate and chamber structure separate components, the base plate of Mihelson would also have a has a maximum anterior-to-posterior dimension that is less than a maximum anterior-to-posterior dimension of the chamber structure).


Regarding **Claim 22,** Michelson as modified discloses the base plate has a maximum-anterior to posterior dimension that is less than a lateral dimension of the top

surface of the base plate (see Fig 1, 7 see Fig below, in Lechmann where the plate is

generally rectangular, where thickness or anterior posterior dimension of the plate is

less than the lateral width of the top surface, and with the modification of Michelson to

make the base plate and chamber structure separate components, the base plate of

Mihelson would also have a maximum-anterior to posterior dimension that is less than a

lateral dimension of the top surface of the base plate ).



Regarding **Claim 23,** Michelson as modified the base plate and the chamber

structure are formed of different materials (as discussed in the modification in view of

Lechmann above).

Application/Control Number: 16/990,863                                    Page 26
Art Unit: 3773

### Conclusion

The prior art made of record and relied upon is considered pertinent to the applicant's disclosure. See PTO-892 for art cited of interest.

Any inquiry concerning this communication or earlier communications from the examiner should be directed to JAN CHRISTOPHER L MERENE whose telephone number is (571)270-5032.  The examiner can normally be reached on Mon-Fri 8:30 am - 6pm EST.

Examiner interviews are available via telephone, in-person, and video conferencing using a USPTO supplied web-based collaboration tool. To schedule an interview, applicant is encouraged to use the USPTO Automated Interview Request (AIR) at http://www.uspto.gov/interviewpractice.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Eduardo Robert can be reached on 571-272-4719.  The fax phone number for the organization where this application or proceeding is assigned is 571-273-8300.

Information regarding the status of an application may be obtained from the Patent Application Information Retrieval (PAIR) system.  Status information for published applications may be obtained from either Private PAIR or Public PAIR. Status information for unpublished applications is available through Private PAIR only. For more information about the PAIR system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a USPTO Customer Service Representative or access to the automated information system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.

/JAN CHRISTOPHER L MERENE/
 Primary Examiner, Art Unit 3773

# EXHIBIT 11

| ***Applicant-Initiated Interview Summary*** | Application No.<br>16/990,863 | | Applicant(s)<br>BRAY, Robert S. | |
|---|---|---|---|---|
| | Examiner<br>JAN<br>CHRISTOPHER L | Art<br>Unit<br>3773 | AIA (First Inventor<br>to File) Status<br>No | Page<br>1 of 2 |

| All Participants (applicant, applicants representative, PTO personnel) | Title | Type |
|---|---|---|
| JAN CHRISTOPHER L MERENE | Primary Examiner | Telephonic |
| Brooke Matney | Attorney of Record | |

**Date of Interview:** 20 November 2020

**Issues Discussed:**

### 35 U.S.C. 102

The applicant argued that Lechmann US 20060085071 does not disclose that the plate "bear weight" and points to paragraph 8. The examiner stated that this paragraph discusses "compression" and that the plate has to bear at least some weight due to its placement within the disc space. Looking at Fig 1, 5, 7 where teeth at least partially surrounds the plate. If the height of the plate was less than the height of the chamber structure, then the examiner would agree with applicant. There was discussion about how the plate would bear a majority of the compressive forces, where such an amendment would overcome Lechmann and support for such an amendment should be provided.

### 35 U.S.C. 103

The applicant argued that Michelson US 2003/0078668 in view of Lechmann is improper because Michelson does not disclose the implant being made out of metal and points to paragraph 11, 78 in Michelson. Paragraph 11 did not explicitly teach this and talks about the need of preventing back out of implant, not necessarily the material of the implant. See also paragraph 12. Likewise paragraph 78 states that: "The present invention implant including the screws and locks may be formed of any material suitable for their intended purpose. To that end, they can be made of a surgical quality metal such as titanium or one of its alloys, cobalt chrome, or any other surgical quality metal suitable for the intended purpose. " The implant is never disclosed as not being made out metal. Paragraph 78 discloses that the implant can be made out of various materials including metals. The 103 was to make the one piece implant of Michelson into two pieces. Even if the implant of Michelson can not be made out of metal, other references showing two piece structures can be used in place of Lechmann, see previous PTO-892.

### Other

In an effort to expedite prosecution, the examiner suggested claiming the structure that allows the chamber structure to couple to the plate.

☑ Attachment

| ***Applicant-Initiated Interview Summary*** | **Application No.**<br>16/990,863 | | **Applicant(s)**<br>BRAY, Robert S. | |
|---|---|---|---|---|
| | **Examiner**<br>JAN<br>CHRISTOPHER L | **Art Unit**<br>3773 | **AIA (First Inventor to File) Status**<br>No | **Page**<br>**2 of 2** |

| /JAN CHRISTOPHER L MERENE/<br>Primary Examiner, Art Unit 3773 | |
|---|---|

| **Applicant is reminded that a complete written statement as to the substance of the interview must be made of record in the application file. It is the applicants responsibility to provide the written statement, unless the interview was initiated by the Examiner and the Examiner has indicated that a written summary will be provided. See MPEP 713.04**<br>Please further see:<br>MPEP 713.04<br>Title 37 Code of Federal Regulations (CFR) § 1.133 Interviews, paragraph (b)<br>37 CFR § 1.2 Business to be transacted in writing |
|---|

**Applicant recordation instructions:** The formal written reply to the last Office action must include the substance of the interview. (See MPEP section 713.04). If a reply to the last Office action has already been filed, applicant is given a non-extendable period of the longer of one month or thirty days from this interview date, or the mailing date of this interview summary form, whichever is later, to file a statement of the substance of the interview.

**Examiner recordation instructions:** Examiners must summarize the substance of any interview of record. A complete and proper recordation of the substance of an interview should include the items listed in MPEP 713.04 for complete and proper recordation including the identification of the general thrust of each argument or issue discussed, a general indication of any other pertinent matters discussed regarding patentability and the general results or outcome of the interview, to include an indication as to whether or not agreement was reached on the issues raised.

# EXHIBIT 12

Docket No.: RSBS-001/09US 334852-2003
(PATENT)

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | | |
|---|---|---|---|
| First Inventor: | Robert S. BRAY | Confirmation No.: | 7164 |
| Application No.: | 16/990,863 | Group Art Unit: | 3773 |
| Filed: | August 11, 2020 | Examiner: | Jan Christop L. Merene |

For:   BONE PLATE STABILIZATION SYSTEM AND METHOD FOR ITS USE

Commissioner for Patents
P.O. Box 1450
Alexandria, VA  22313-1450

### AMENDMENT/RESPONSE TO OFFICE ACTION

In response to the non-final Office Action dated September 9, 2020, to which the deadline for responding is March 9, 2020, with a three-month extension of time, Applicant submits the following Amendments and/or Remarks, and respectfully requests reconsideration of the application in view thereof.

Any extensions of time necessary to prevent abandonment of this application are hereby petitioned for under 37 C.F.R. §1.136(a), and any additional fees required (including fees for net addition of claims) are hereby authorized to be charged to our Deposit Account No. 50-1283.

**Amendments to the Claims** are reflected in the listing of the claims which begins on page 2 of this paper.

**Remarks/Arguments** begin on page 8 of this paper.

239166473 v1

**Application No.:** 16/990,863                    **Docket No.:** RSBS-001/09US 334852-2003

## IN THE CLAIMS:

*Set forth below in ascending order, with status identifiers, is a complete listing of all claims currently under examination. Changes to any amended claims are indicated by [[double brackets]], ~~strikethrough~~ and/or <u>underlining</u>. This listing also reflects any cancellation and/or addition of claims.*

1.      (Currently Amended)  An apparatus, comprising:

a base plate having a top surface, a bottom surface, and first and second ends, the base plate defining a plurality of bone anchor holes that each extend from the top surface toward ~~at least~~ one of the first and second ends<u>, the plurality of anchor holes including a first bone anchor hole extending from the top surface and terminating in a first opening at least partially defined by the first end and a second bone anchor hole extending from the top surface and terminating in a second opening at least partially defined by the first end, the first end including a substantially flat portion extending from the first opening to the second opening</u>; and

a chamber structure configured to be coupled to the base plate, the chamber structure configured to maintain disc space across a bone graft site between adjacent vertebral bones,

the base plate and the chamber structure configured to be implanted between the adjacent vertebral bones with (1) the base plate fitting primarily between anterior portions of the adjacent vertebral bones and (2) the chamber structure extending posteriorly from the base plate,

the base plate, when implanted, configured to bear weight along portions of the first and second ends of the base plate fitted between the anterior portions of the adjacent vertebral bones, while sharing weight with bone graft material placed between the adjacent vertebral bones and in a space at least partially defined by the chamber structure.

2.      (Original)      The apparatus of claim 1, wherein the base plate, when implanted, does not contact an anterior surface of at least one of the adjacent vertebral bones.

3.      (Original)      The apparatus of claim 1, wherein the base plate, when implanted, fits primarily between anterior portions of lip osteophytes of the adjacent vertebral bones.

2

**Application No.:** 16/990,863          **Docket No.:** RSBS-001/09US 334852-2003

4.    (Original)    The apparatus of claim 1, wherein all weight-bearing portions of the first and second ends of the base plate are shaped to fit between the anterior portions of the adjacent vertebral bones.

5.    (Original)    The apparatus of claim 1, wherein the base plate has a maximum anterior-to-posterior dimension that is less than a maximum anterior-to-posterior dimension of the chamber structure.

6.    (Original)    The apparatus of claim 1, wherein the base plate has a maximum-anterior to posterior dimension that is less than a lateral dimension of the top surface of the base plate.

7.    (Original)    The apparatus of claim 1, wherein the base plate and the chamber structure are formed of different materials.

8.    (Original)    The apparatus of claim 7, wherein the base plate is formed of a metal or metal alloy.

9.    (Original)    The apparatus of claim 1, wherein the chamber structure is detachable from the base plate.

10.    (Original)    The apparatus of claim 1, wherein the base plate and the chamber structure collectively surround the space for receiving the bone graft material.

11.    (Original)    The apparatus of claim 1, wherein each bone anchor hole from the plurality of bone anchor holes extends from a portion of the top surface of the bone plate that is disposed between the adjacent vertebral bones when the base plate is implanted between the adjacent vertebral bones.

12.    (Original)       The apparatus of claim 1, wherein the top surface of the base plate is generally (1) flat and (2) of rectangular shape when viewed in an anterior-to-posterior direction.

13.    (Original)       An apparatus, comprising:

a base plate having a top surface, a bottom surface, and first and second ends, the base plate defining a plurality of  bone anchor holes that each extend from the top surface toward at least one of the first and second ends, the base plate configured to be implanted primarily between anterior portions of adjacent vertebral bones with weight-bearing portions of the first and second ends of the base plate fitting between and engaging side surfaces of the adjacent vertebral bones; and

a chamber structure configured to be coupled to the base plate, the chamber structure configured to be implanted between the adjacent vertebral bones to maintain disc space across a bone graft site between the adjacent vertebral bones,

the base plate and the chamber structure, when implanted, configured to share weight with the bone graft material placed between the adjacent vertebral bones and in a space at least partially defined by the chamber structure.

14.    (Original)       The apparatus of claim 13, wherein the base plate, when implanted, does not contact an anterior surface of at least one of the adjacent vertebral bones.

15.    (Original)       The apparatus of claim 13, wherein the base plate has a maximum anterior-to-posterior dimension that is less than a maximum anterior-to-posterior dimension of the chamber structure.

16.    (Original)       The apparatus of claim 13, wherein the base plate has a maximum-anterior to posterior dimension that is less than a lateral dimension of the top surface of the base plate.

17.    (Original)       The apparatus of claim 13, wherein the base plate and the chamber structure are formed of different materials.

4

**Application No.:** 16/990,863                    **Docket No.:** RSBS-001/09US 334852-2003

18.    (Original)      The apparatus of claim 13, wherein each bone anchor hole from the plurality of bone anchor holes extends from a portion of the top surface of the bone plate that is disposed between the adjacent vertebral bones when the base plate is implanted between the adjacent vertebral bones.

19.    (Currently amended)   An apparatus, comprising:

a base plate having a generally flat top surface, a bottom surface, and first and second ends, the base plate defining a plurality of bone anchor holes that each extend from the top surface toward at least one of the first and second ends, the base plate configured to be implanted primarily between anterior portions of adjacent vertebral bones with the top surface of the base plate being generally flush with anterior surfaces of the adjacent vertebral bones; and

a chamber structure configured to be coupled to the base plate, the chamber structure configured to be implanted between the adjacent vertebral bones so as to extend posteriorly from the base plate,

the base plate and the chamber structure, when implanted, configured to share weight with the bone graft material placed between the adjacent vertebral bones and in a space at least partially defined by the chamber structure.

20.    (Original)      The apparatus of claim 19, wherein the base plate, when implanted, does not contact an anterior surface of at least one of the adjacent vertebral bones.

21.    (Original)      The apparatus of claim 19, wherein the base plate has a maximum anterior-to-posterior dimension that is less than a maximum anterior-to-posterior dimension of the chamber structure.

22.    (Original)      The apparatus of claim 19, wherein the base plate has a maximum-anterior to posterior dimension that is less than a lateral dimension of the top surface of the base plate.

239166473 v1

23.    (Original)        The apparatus of claim 19, wherein the base plate and the chamber structure are formed of different materials.

24.    (Original)        The apparatus of claim 19, wherein each bone anchor hole from the plurality of bone anchor holes extends from a portion of the top surface of the bone plate that is disposed between the adjacent vertebral bones when the base plate is implanted between the adjacent vertebral bones.

25.    (Currently Amended) An apparatus, comprising:

a base plate having a top surface, a bottom surface, and first and second ends, the base plate defining a plurality of bone anchor holes each configured to receive a bone anchor; and

a chamber structure configured to be coupled to the base plate, the chamber structure configured to maintain disc space across a bone graft site between adjacent vertebral bones,

the base plate and the chamber structure configured (1) to be implanted between the adjacent vertebral bones with the base plate fitted primarily between anterior portions of the adjacent vertebral bones and (2) to share weight with bone graft material placed between the adjacent vertebral bones and in a space at least partially defined by the chamber structure,

each bone anchor hole from the plurality of bone anchor holes extending from the top surface [[to]]through a different portions of the first or second ends of the base plate that is ~~are~~ configured to be fitted between the anterior portions of the adjacent vertebral bones, the plurality of bone anchor holes each having an opening that is fully defined by the top surface.

26.    (Cancel)

27.    (Original)        The apparatus of claim 25, wherein the base plate and the chamber structure are formed of different materials.

28.    (Original)        The apparatus of claim 25, further comprising a plurality of bone anchors each configured to be implanted into one of the adjacent vertebral bones,

6

each bone anchor from the plurality of bone anchors configured to fit into a different bone anchor hole from the plurality of bone anchor holes such that a head of that bone anchor is disposed between the adjacent vertebral bones when that bone anchor is implanted into the adjacent vertebral bone.

29.      (Original)        The apparatus of claim 28, wherein at least one of the plurality of bone anchor holes is configured to allow a bone anchor to be implanted into the adjacent vertebral bone at any angle within a predefined range.

30.      (Currently Amended) The apparatus of claim 28, further comprising a ~~retainer~~ retaining plate configured to prevent at least two of the plurality of bone anchors from backing out of their respective bone anchor holes.

# EXHIBIT 13

Appl. No. 10/419,652
Amdt. Dated August 18, 2005
Reply to Office action of May 24, 2005

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | |
|---|---|---|
| Appl. No. | : | 10/419,652 |
| Applicant | : | Robert S. Bray |
| Filed | : | April 21, 2003 |
| Title | : | BONE PLATE STABILIZATION SYSTEM AND METHOD FOR ITS USE |

| | | |
|---|---|---|
| Conf No. | : | 2298 |
| TC/A.U. | : | 3731 |
| Examiner | : | David O. Reip |

| | | |
|---|---|---|
| Customer No. | : | 000,116 |
| Docket No. | : | 36476 |

Mail Stop Amendment
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

## AMENDMENT "B"

Sir:

This amendment is filed in response to the Office action dated May 24, 2005. The three-month period for responding to the Office action expires on August 24, 2005.

Please amend the above-identified application in the following manner.

**Amendments to the Claims** are reflected in the listing of claims, which begins on page 2 of this paper.

**Remarks** begin on page 12 of this paper.

| | | |
|---|---|---|
| I hereby certify that this correspondence is being facsimile transmitted to the United States Patent and Trademark Office at 571-273-8300 on the date indicated below. | | |
| Una L. Lauricia | | 8·18·05 |
| Name of Attorney for Applicant(s) | Signature of Attorney | Date |

1

Appl. No. 10/419,652
Amdt. Dated August 18, 2005
Reply to Office action of May 24, 2005

AMENDMENTS

**Amendments to the Claims:**

This listing of claims will replace all prior versions, and listings, of claims in the application:

**Listing of Claims:**

1.    (original)     A method for joining first and second bones having top surfaces and side surfaces generally facing each other, the method comprising: inserting between the side surfaces of the bones a base plate having a first end nearer the first bone and a second end nearer the second bone, wherein the base plate has a first screw hole extending through the first end and a second screw hole extending through the second end;

introducing a first bone screw through the first screw hole and into the first bone, wherein the first bone screw is introduced at an angle relative to the top surface of the bone ranging from about 20° to about 60°,

introducing a second bone screw through the second screw hole and into the second bone, wherein the second bone screw is introduced at an angle relative to the top surface of the bone ranging from about 20° to about 70°, and

covering at least a part of the first bone screw and at least a part of the second bone screw to prevent the first and second bone screws from backing out of the first and second bones, respectively.

2.    (original)     The method according to claim 1, wherein the first bone screw is introduced into the first bone at a corner of the bone formed between the top surface and side surface of the first bone.

3.    (original)     The method according to claim 2, wherein the second bone screw is introduced into the second bone at a corner of the bone formed between the top surface and side surface of the second bone.

2

Appl. No. 10/419,652
Amdt. Dated August 18, 2005
Reply to Office action of May 24, 2005

4.   (original)   The method according to claim 1, wherein the second bone screw is introduced into the second bone at a corner of the bone formed between the top surface and side surface of the second bone.

5.   (original)   The method according to claim 4, wherein the base plate has a top surface that sits at or below the top surfaces of the first and second bones.

6.   (original)   The method according to claim 1, wherein the first and second bones are first and second vertebral bodies, respectively, and wherein the first bone screw is introduced into the lip osteophite of the first vertebral body and the second bone screw is introduced into the lip osteophite of the second vertebral body.

7.   (original)   The method according to claim 6, wherein the base plate has a top surface that sits at or below the top surfaces of the first and second vertebral bodies.

8.   (original)   The method according to claim 1, wherein the base plate has a top surface that sits at or below the top surfaces of the first and second bones.

9.   (original)   The method according to claim 1, wherein the first bone screw is introduced at an angle relative to the top surface of the bone ranging from about 40° to about 50°.

10.   (original)   The method according to claim 1, wherein the second bone screw is introduced at an angle relative to the top surface of the bone ranging from about 45° to about 65°.

11.   (original)   The method according to claim 1, wherein the second bone screw hole comprises an elongated slot in which the second bone screw can slide relative to the base plate.

3

Appl. No. 10/419,652
Amdt. Dated August 18, 2005
Reply to Office action of May 24, 2005

12.     (original)     The method according to claim 1, wherein, when the first and second bone screws are covered, they are permitted to toggle relative to the base plate.

13.     (original)     The method according to claim 1, wherein the first and second bone screws are covered by a single retaining plate.

14.     (original)     The method according to claim 1, wherein the base plate has a third screw hole extending through the first end, the method further comprising:

introducing a third bone screw through the third screw hole and into the first bone, wherein the third bone screw is introduced at an angle relative to the top surface of the bone ranging from about 20° to about 60°, and

covering at least a part of the third bone screw to prevent the third bone screw from backing out of the first bone.

15.     (original)     The method according to claim 14, wherein:

the first bone screw is introduced into the first bone at a corner of the bone formed between the top surface and side surface of the first bone;

the second bone screw is introduced into the second bone at a corner of the bone formed between the top surface and side surface of the second bone; and

the third bone screw is introduced into the first bone at a corner of the bone formed between the top surface and side surface of the second bone.

16.     (original)     The method according to claim 14, wherein the first and second bones are first and second vertebral bodies, respectively, and wherein the first and third bone screws are introduced into the lip osteophite of the first vertebral body, and the second bone screw is introduced into the lip osteophite of the second vertebral body.

17.     (original)     The method according to claim 14, wherein, when the first, second and third bone screws are covered, they are permitted to toggle relative to the base

4

Appl. No. 10/419,652
Amdt. Dated August 18, 2005
Reply to Office action of May 24, 2005

plate.

18.   (currently amended)   The method according to ~~claim 1~~ claim 14, wherein the first, second and third bone screws are covered by a single retaining plate.

19.   (original)   The method according to claim 1, wherein the first and second bones are first and second vertebral bodies, the method further comprising introducing a bone graft between the side surfaces of the first and second vertebral bodies prior to insertion of the base plate.

20.   (currently amended)   The method according to ~~claim 1~~ claim 19, wherein the base plate includes a first member that sits on a top surface of the bone graft and first and second tabs extending from the first member along first and second side surfaces of the bone graft in a direction generally transverse to the first and second vertebral bodies.

21.   (original)   The method according to claim 20, wherein the first and second tabs each include a generally-pointed nub that contacts the side surface of the first vertebral body.

22.   (original)   A bone stabilization plate system comprising:
a base plate having bottom surface and first and second ends, the first end comprising a first bone screw region having a first bone screw hole extending therethrough at an angle relative to the bottom surface of the base plate ranging from about 20° to about 60°, and the second end comprising a second bone screw region having a second bone screw hole extending therethrough at an angle relative to the bottom surface of the base plate ranging from about 20° to about 70°;
a first bone screw capable of securing the base plate to a first bone by insertion through the first bone screw hole;
a second bone screw capable of securing the base plate to a second bone by insertion

5

Appl. No. 10/419,652
Amdt. Dated August 18, 2005
Reply to Office action of May 24, 2005

through the second bone screw hole; and

      a bone screw retaining means for securely covering at least a part of the first and second bone screws to prevent the bone screws from backing out from the first and second bones.

      23.    (original)    The bone stabilization plate system according to claim 22, wherein the base plate comprises a primary member having a generally flat bottom surface and a secondary member adjacent the primary member, the secondary member having a bottom surface that is generally transverse to the bottom surface of the primary member, and where the first bone screw hole extends through the primary member and the second bone screw hole extends through the secondary member.

      24.    (original)    The bone stabilization plate system according to claim 22, wherein the first bone screw hole extends through the base plate at an angle relative to the bottom surface of the base plate ranging from about 40° to about 50°.

      25.    (original)    The bone stabilization plate system according to claim 22, wherein the second bone screw hole extends through the base plate at an angle relative to the bottom surface of the base plate ranging from about 45° to about 65°.

      26.    (original)    The bone stabilization plate system according to claim 22, wherein the second bone screw hole comprises an elongated slot in which the second bone screw can slide relative to the base plate.

      27.    (original)    The bone stabilization plate system according to claim 22, wherein, when the first and second bone screws are covered by the bone screw retaining means, they are permitted to toggle relative to the base plate.

      28.    (original)    The bone stabilization plate system according to claim 22,

Appl. No. 10/419,652
Amdt. Dated August 18, 2005
Reply to Office action of May 24, 2005

wherein the first and second bone screws are covered by a single retaining plate.

29.    (original)    The bone stabilization plate system according to claim 22, wherein the base plate has a third screw hole extending through the first end of the base plate at an angle relative to the bottom surface of the base plate ranging from about 20° to about 60°, and where the system further comprises a third bone screw capable of securing the base plate to the first bone by insertion through the third bone screw hole.

30.    (original)    The bone stabilization plate system according to claim 29, wherein, when the first, second and third bone screws are covered by the bone screw retaining means, they are permitted to toggle relative to the base plate.

31.    (original)    The bone stabilization plate system according to claim 29, wherein the first, second and third bone screws are covered by a single retaining plate.

32.    (currently amended)   The bone stabilization plate system according to claim 22, wherein the base plate includes a first member that sits on a top surface of the a bone graft and first and second tabs extending from the first member along first and second side surfaces of the bone graft in a direction generally transverse to the first and second vertebral bodies.

33.    (original)    The bone stabilization plate system according to claim 32, wherein the first and second tabs each include a generally-pointed nub.

34.    (original)    A method for joining vertebral bodies, comprising:

inserting between side surfaces of first and second adjacent vertebral body a first base plate having a first end nearer the first vertebral body and a second end nearer the second vertebral body, wherein the first base plate has a first screw hole extending through the first end and a second screw hole extending through the second end;

introducing a first bone screw through the first screw hole and into the first bone;

7

Appl. No. 10/419,652
Amdt. Dated August 18, 2005
Reply to Office action of May 24, 2005

introducing a second bone screw through the second screw hole and into the second bone;

covering at least a part of the first bone screw and at least a part of the second bone screw to prevent the first and second bone screws from backing out of the first and second bones, respectively;

inserting between a side surface of the second vertebral body and a side surface of a third vertebral body that is adjacent the second vertebral body a second base plate having a first end nearer the second vertebral body and a second end nearer the third vertebral body, wherein the second base plate has a first screw hole extending through its first end and a second screw hole extending through its second end;

introducing a third bone screw through the first screw hole of the second base plate and into the second bone;

introducing a fourth bone screw through the second screw hole of the second base plate and into the third bone; and

covering at least a part of the third bone screw and at least a part of the fourth bone screw to prevent the third and fourth bone screws from backing out of the second and third bones, respectively;

wherein the first base plate does not contact the second base plate.

35.    (previously presented) A bone stabilization plate system including a base plate for retaining bone graft material between first and second longitudinally-aligned, adjacent bone bodies and for permitting force transmission between the first and second bone bodies through the bone graft material, the base plate being sized to have an inter-fit between the first and second adjacent bone bodies and adjacent to lateral extents of the bone graft material such that the first and second bone bodies engage the bone graft material, and at least first and second bone screws for extending into the first and second bone bodies, respectively, to retain the base plate between the first and second bone bodies, the base plate having means for interacting with the first and second bone screws, the means for interacting including means for permitting movement of at least one of the first and second bone bodies relative to the

8

Appl. No. 10/419,652
Amdt. Dated August 18, 2005
Reply to Office action of May 24, 2005

base plate.

36.     (previously presented)  The bone stabilization plate system according to claim 35, wherein at least one of the bone screws includes an arcuate surface and the means for interacting includes a surface that engages the arcuate surface of the at least one bone screw and permits relative movement between the bone screw and the base plate.

37.     (previously presented)  The bone stabilization plate system according to claim 35, wherein the base plate includes two lateral tabs for location between the first and second adjacent bone bodies, the lateral tabs are spaced apart from each other such that ends of the lateral tabs provide for an open space of the base plate for location of the bone graft material therein.

38.     (currently amended)  The bone stabilization plate system according to ~~claim 35~~ claim 37, wherein the two lateral tabs include at least one portion shaped to penetrate into at least one of the first and second adjacent bone bodies.

39.     (previously presented)  The bone stabilization plate system according to claim 35, wherein each of the bone bodies has an outwardly-facing surface and each of the bone bodies has a side surface facing toward the side surface of the other bone body, the base plate having a first end portion adjacent to the first bone body, the first end portion having an outwardly-facing surface for location at a position recessed relative to the outwardly-facing surface of the first bone body, the first end portion having a first screw hole that opens toward the side surface of the first bone body, the base plate having a second end portion that has a second screw hole that opens toward the second bone body, the first and second bone screws extending through the first and second holes into the first and second bone bodies, respectively, each at an angle that is non-orthogonal to the longitudinal alignment of the first and second bone bodies.

9

Appl. No. 10/419,652
Amdt. Dated August 18, 2005
Reply to Office action of May 24, 2005

40.    (previously presented)  A bone stabilization plate system including a U-shaped base plate for positioning onto bone graft material placed at a location between first and second longitudinally-aligned, adjacent bone bodies and for retaining the bone graft material at the location between the first and second bone bodies, the base plate being sized to have an inter-fit between the first and second adjacent bone bodies and adjacent to lateral extents of the bone graft material, wherein each of the bone bodies has an outwardly-facing surface and each of the bone bodies has a side surface facing toward the side surface of the other bone body, the base plate having a first end portion adjacent to the first bone body, the first end portion having an outwardly-facing surface for location at a position recessed relative to the outwardly-facing surface of the first bone body, the first end portion having a first screw hole that opens toward the side surface of the first bone body, the base plate having a second end portion that has a second screw hole that opens toward the second bone body, and at least first and second bone screws for extending through the first and second holes into the first and second bone bodies, respectively, each at an angle that is non-orthogonal to the longitudinal alignment of the first and second bone bodies.

41.    (previously presented)  A method for stabilizing first and second longitudinally-aligned, adjacent bone bodies and for retaining a bone graft material at the location between the first and second bone bodies, wherein each of the bone bodies has an outwardly-facing surface and each of the bone bodies has a side surface facing toward the side surface of the other bone body, the method including positioning a U-shaped base plate onto the bone graft material, with the base plate being sized to have an inter-fit between the first and second adjacent bone bodies and adjacent to lateral extents of the bone graft material, with a first end portion of the base plate being adjacent to the first bone body and having an outwardly-facing surface of the first end portion located at a position recessed relative to the outwardly-facing surface of the first bone body, extending a first bone screw through a first screw hole at the first end portion and into the side surface of the first bone body at an angle that is non-orthogonal to the longitudinal alignment of the first and second bone bodies, and extending a second bone screw through a second screw hole at a second end

10 .

Appl. No. 10/419,652
Amdt. Dated August 18, 2005
Reply to Office action of May 24, 2005

portion of the base plate and into the second bone body at an angle that is non-orthogonal to

the longitudinal alignment of the first and second bone bodies.

11

Appl. No. 10/419,652
Amdt. Dated August 18, 2005
Reply to Office action of May 24, 2005

REMARKS/ARGUMENTS

Applicant would like to thank the Examiner for the careful consideration given the present application. The application has been carefully reviewed in light of the Office action, and amended as necessary to more clearly and particularly describe the subject matter, which applicant regards as the invention.

Applicant acknowledges with appreciation the allowance of claims 34, 40, and 41 and the indicated allowability of claims 11, 20, 21, 26, 30-33, and 37-39 if rewritten into independent form and/or rewritten to overcome the rejections under 35 U.S.C. 112, second paragraph, as set forth in the Office action. Claims 11, 20, and 21 depend from independent claim 1; claims 26 and 30-33 depend from independent claim 22; and claims 37-39 depend from independent claim 35. Independent claims 1, 22, and 35 are believed to be allowable for the reasons discussed herein. Accordingly, claims 11, 20, 21, 26, 30-33, and 37-39 have not been rewritten into independent form. However, Applicant reserves the right to cast such claims into independent form at a later date, if necessary.

Claims 18, 20, 21, 32, 33, and 38 were rejected under 35 U.S.C. 112, second paragraph, as being indefinite. Claims 18, 20, 32, and 38 have been amended herein as suggested by the Examiner. Accordingly, withdrawal of this rejection is respectfully requested.

Claims 1-10. 14-16, 22-25, and 29 were rejected under 35 U.S.C. 102(b) as being anticipated by Benzel et al. (U.S. Patent No. 5,800,433). Traversal of this rejection is made for at least the following reasons. Benzel et al. does not disclose a base plate having a *first end nearer the first bone* and a *second end nearer the second bone*, wherein the base plate has a *first screw hole extending through the first end* and a *second screw hole extending through the second end*, introducing a *first bone screw through the first screw hole at an angle* relative to the top surface of the bone ranging *from about 20° to about 60°*, and introducing a *second bone screw through the second bone screw hole at an angle* relative to the top surface of the bone ranging *from about 20° to about 70°*, as required by independent claims 1 and 22. The Examiner relies upon the combination of a first plate 30 and a second plate 32 of Benzel et al. as being equivalent to the claimed base plate and fasteners 40 and 46

12

Appl. No. 10/419,652
Amdt. Dated August 18, 2005
Reply to Office action of May 24, 2005

of Benzel et al. as being equivalent to the claimed first and second screws, respectively. However, the fasteners 40 and 46 of Benzel et al. are not provided through first and second holes that extend through first and second _ends_ of the base plate. Rather, as illustrated in Fig. 1 of Benzel et al., assuming that the claimed base plate is a combination of the first and second plates 30, 32, the fasteners 40 and 46 are provided through a middle portion of the plate, not at first and second ends wherein the first end is nearer a first bone and the second end is nearer a second bone, as required by claim 1.

Further, Benzel et al. fails to disclose covering at least a part of the first bone screw and at least a part of the second bone screw to prevent the first and second bone screws from backing out of the first and second bones, as required by independent claims 1 and 22. The Examiner relies on expander 310 of Benzel et al. to disclose this limitation. However, as illustrated in Fig. 3, the expander 310 of Benzel et al. does not cover a portion of the fasteners 40 and 46. Rather, the expander 310 is a component of the fasteners 40 and 46, along with sleeve 300. There is nothing in Benzel et al. that discloses _covering_ a portion of each of the fasteners 40 and 46, which are composed of sleeve 300 and expander 310 assembly, to keep the fasteners 40 and 46 from backing out of their corresponding screw holes.

Because Benzel et al. does not disclose each and every limitation as set forth in independent claims 1 and 22, Benzel et al. cannot anticipate such claims or claims 2-10, 14-16, 23-25, and 29, which depend therefrom. Accordingly, withdrawal of this rejection is respectfully requested.

Claims 1-10, 12-19, 22, 23, 27, 28, 35, and 36 were rejected under 35 U.S.C. 102(e) as being anticipated by LeHuec et al. (U.S. Patent Application No. 2002/0147450). Traversal of this rejection is made for at least the following reasons. With respect to claim 1, LeHuec et al. fails to disclose a method for joining first and second bones having top surfaces and _side surfaces generally facing each other_, the method comprising: _inserting between the side surfaces_ of the bones a base plate. Rather, LeHuec et al. merely discloses a providing a base plate on top surfaces of adjoining vertebrae. See Fig. 2 of LeHuec et al. Further, the device of LeHuec et al. is described as an _anterior_ spinal plate system.

Regarding claim 22, LeHuec et al. fails to disclose a base plate having a first end

13

Appl. No. 10/419,652
Amdt. Dated August 18, 2005
Reply to Office action of May 24, 2005

comprising a first bone screw hole extending therethrough at an angle relative to the bottom surface of the base plate ranging from about 20° to about 60°, and a second end having a second bone screw hole extending therethrough at an angle relative to the bottom surface of the base plate ranging from about 20° to about 70°. Fig. 2 of LeHuec et al. clearly illustrates that the bone screws are positioned at an angle relative to the bottom of the plate of more than 70°. Further, there is nothing within LeHuec et al. that discloses, teaches, or suggests positioning the bone screws at an angle between about 20° and about 60° or 70°. LeHuec et al. merely discloses that the bone screws are angled at a suitable angle determined by the surgeon. As suggested in LeHuec et al., the angle likely depends on the size of the plate and the bone configuration of the individual patient.

Regarding claim 35, LeHuec et al. fails to disclose a base plate being sized to have an *inter-fit between the first and second adjacent bone bodies*. Further, LeHuec et al. fails to disclose first and second bone screws for extending into the first and second bone bodies, respectively*, to retain the base plate between the first and second bone bodies*. Rather, LeHuec et al. discloses a plate provided on a top portion of two adjacent bone bodies. Specifically, the plate of LeHuec et al. is sized such that one end fits on a top surface of a first bone body and an opposing end fits on a top surface of a second, adjoining bone body. See Fig. 2 of LeHuec et al. Thus, the plate of LeHuec et al. cannot be inter-fit or retained between first and second adjacent bone bodies, as required by claim 35.

For at least the aforementioned reasons, LeHuec fails to disclose each and every limitation as set forth in independent claims 1, 22, and 35. Thus, LeHuec et al. cannot anticipate these claims or the claims that depend therefrom. Accordingly, withdrawal of this rejection is respectfully requested.

In light of the foregoing, it is respectfully submitted that the present application is in a condition for allowance and notice to that effect is hereby requested. If it is determined that the application is not in a condition for allowance, the Examiner is invited to initiate a telephone interview with the undersigned attorney to expedite prosecution of the present application.

14

Appl. No. 10/419,652
Amdt. Dated August 18, 2005
Reply to Office action of May 24, 2005

      If there are any additional fees resulting from this communication, please charge same to

our Deposit Account No. 16-0820, our Order No. 37318.

                                     Respectfully submitted,
                                     PEARNE & GORDON LLP

                                     Una L. Lauricia, Reg. No. 48,998

1801 East 9th Street
Suite 1200
Cleveland, Ohio 44114-3108
(216) 579-1700

Date:  August 18, 2005

15

# EXHIBIT 14

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| RSB SPINE, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 19-1515-RGA |
| | ) | |
| DEPUY SYNTHES SALES, INC., and | ) | |
| DEPUY SYNTHES PRODUCTS, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**OPENING EXPERT REPORT OF DR. RICHARD A. HYNES
ON INFRINGEMENT OF U.S. PATENT NOS. 6,984,234 AND 9,713,537**

Dated:  March 21, 2022

Respectfully submitted,

_____
Dr. Richard A. Hynes

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



**DEPRSB_00083691 at DEPRSB_00083704, DEPRSB_00083705**

115.   The inserted Zero-P VA titanium plate has a "**first end nearer the first bone and a second end nearer the second bone**."  A POSITA would recognize the first end and second end as opposing portions of the Zero-P VA's titanium plate, and

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

generally orthogonal to (but not mutually exclusive of) its top and bottom surfaces.

116.   I have annotated photographs of the Zero-P VA sample that DePuy provided to show the first and second ends.



| RSB_DEPUY0018046, RSB_DEPUY0018052 |
|---|

117.   After insertion, the Zero-P VA titanium plate's "**first end**" is "**nearer the first bone**" and its "**second end**" is "**nearer the second bone**," as shown below.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

| DEPRSB_00083691 at DEPRSB_00083694 |
|:---:|
|  |

118.   Claim 1[a] further recites that the "**base plate has a first screw hole extending through the first end and a second screw hole extending through the second end**."  The photographs of the Zero-P VA sample show how the titanium plate has a first screw hole that extends through the first end.

| RSB_DEPUY0018049, RSB_DEPUY0018046 |
|:---:|
|  |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

119.   The photographs of the Zero-P VA sample also show how the titanium

plate has a second screw hole that extends through the second end.



| RSB_DEPUY0018049, RSB_DEPUY0018052 |
|---|

**(3)    "introducing a first bone screw through the first screw hole and into the first bone, wherein the first bone screw is introduced at an angle relative to the top surface of the bone ranging from about 20° to about 60°," (Claim 1[b])**

120.   The Zero-P VA Surgical Technique Guide indicates that the Zero-P VA

is intended to be implanted with two bone screws and details three recommended

procedures for introducing these screws into adjacent vertebral bones using: (1) an

awl and self-drilling screws; (2) a drill guide; or (3) an angled awl.[107]  Independent

of the procedure selected, the guide describes step-by-step how a surgeon

"**introduc**[es] **a first bone screw through the first screw hole and into the first**

**bone**."  While I describe how the technique using the awl and self-drilling screws

practices this claim element below, the same analysis would apply equally to the

---

[107] DEPRSB_00083691 at DEPRSB_00083706-00083721.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

other two techniques.[108]

121.   As an initial step, the Zero-P VA Surgical Technique Guide recommends first creating a pilot hole before inserting the first self-drilling screw.[109] The surgeon determines the appropriate entry point and trajectory for the first screw and inserts the awl into the first screw hole of Zero-P VA's interbody plate.[110]   A pilot hole is created when the surgeon pushes down and twists the ball handle of the awl to advance the awl through the first bone screw hole of Zero-P VA's titanium plate and into a first vertebral bone.[111]

122.   The surgeon then removes the awl after the first pilot hole has been formed in the first bone.[112]   A first bone screw of an appropriate length (based on patient need) is then selected and loaded to a screw inserter.[113]   The surgeon then "**introduc**[es] **a first bone screw through the first screw hole**" of Zero-P VA's titanium plate, through the pilot hole "**and into the first bone**."[114] The surgical guide calls for the surgeon to advance the screwhead until it passes beyond a spring-loaded anti-backout mechanism within the first bone screw hole of Zero-P VA's titanium

---

[108] Should DePuy claim that the other two surgical techniques fail to practice this claim limitation, I reserve my right to supplement this report to address those claims.
[109] DEPRSB_00083691 at DEPRESB_00083707.
[110] *Id.*
[111] *Id.*
[112] *Id.*
[113] *Id.*
[114] *Id.*

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

plate.[115]

123.   This first bone screw is meant to be "**introduced at an angle relative to the top surface of the bone ranging from about 20° to about 60°**." The Zero-P VA Surgical Technique Guide indicates that its screws can be inserted through the screw hole of the titanium plate at angles of 27° to 44° in a cranial-caudal direction.[116]   The Surgical Technique Guide depicts this seventeen-degree bone screw range for variable angle insertion, and a 40° nominal angle insertion.

---

[115] *Id.*
[116] *Id.* at DEPRSB_00083695.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**DEPRSB_00083691 at DEPRSB_00083706**



124.  As I mentioned, the specified angle range in the Zero-P VA Surgical Technique Guide is in a cranial-caudal direction, whereas the claim recites angles relative to the top surface of the bone.  The angles relative to the top surface of the bone may be obtained for the variable angle range of the Zero-P VA by subtracting the cranial-caudal direction angles from approximately ninety degrees.  Thus, the Zero-P VA permits screws to be introduced at angles from 46° (90° − 44°(cranial-caudal)) to 63° (90° − 27° (cranial-caudal)) relative to the top surface of the bone.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Even Zero-P VA's "nominal angle insertion" of 40° in the cranial-caudal direction falls within the range recited in Claim 1[b].

125.   I personally inspected the Zero-P VA sample and implanted the construct in a sawbones model, and confirmed that its variable screw insertion angles are consistent with the depiction in the range recited in the Zero-P VA Surgical Technique Guide.   Based on my inspection and implantation of the construct, I confirmed that the "first bone screw" identified above would enter a first bone within the claimed range, at 46° - 63° from the top surface of the first bone.

> **(4)   "introducing a second bone screw through the second screw hole and into the second bone, wherein the second bone screw is introduced at an angle relative to the top surface of the bone ranging from about 20° to about 70°, and" (Claim 1[c])**

126.   The Zero-P VA Surgical Technique Guide instructs that the same procedure I described for Claim 1[b] with respect to the first bone screw should be applied for **"introducing a second bone screw through the second screw hole and into the second bone."** Step A3 depicts inserting this second bone screw through the second screw hole in Zero-P VA's titanium plate, and into a second bone.

# EXHIBIT 15

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

RSB SPINE, LLC,                        :

      Plaintiff,              :   C.A. No. 18-1973-RGA

    v.                            :

MEDACTA USA, INC.,                     :

      Defendant.              :

- - - - - - - - - - - - - -x

RSB SPINE, LLC,                        :

      Plaintiff,              :   C.A. No. 18-1974-RGA

    v.                            :

PRECISION SPINE, INC.,                 :

      Defendant.              :

- - - - - - - - - - - - - -x

RSB SPINE, LLC,                        :

      Plaintiff,              :C.A. No. 19-1515-RGA

    v.                            :

DEPUY SYNTHES SALES, INC.,             :

et al.                                 :

      Defendants.             :

- - - - - - - - - - - - - - x

** CONFIDENTIAL **

VIDEO DEPOSITION OF ROBERT HYNES

Tuesday, May 24, 2022

CONFIDENTIAL

Hynes, Robert                                      May 24, 2022

2

1                        9:06 a.m.

2

3            Video-Recorded Deposition of

4      ROBERT S. HYNES, JR., MD, held at the Melby

5      Hotel, 801 East Strawbridge Avenue,

6      Melbourne, Florida 32901 and by Zoom

7      videoconference, before RHONDA

8      HALL-BREUWET, Registered Diplomate

9      Reporter, Certified Realtime Reporter,

10     Certified Shorthand Reporter (CA and TX),

11     Licensed Court Reporter (TN), Certified

12     Court Reporter (GA, LA, NV, and WA),

13     Florida Professional Reporter, and Notary

14     Public of the State of Florida.

15

16

17

18

19

20

21

22

23

24

25              A P P E A R A N C E S

CONFIDENTIAL

Hynes, Robert                                          May 24, 2022

3

1

2      REPRESENTING THE PLAINTIFF RSB SPINE LLC:

3          COOLEY LLP

4               Reston Town Center

5               11951 Freedom Drive, 14th Floor

6               Reston, VA 20190-5640

7               (703) 456-8573

8          BY:  ERIK MILCH, ESQUIRE

9               emilch@cooley.com

10

11         COOLEY LLP

12              55 Hudson Yards

13              New York, New York 10001

14              (212) 479-6000

15         BY:  JOSEPH DRAYTON, ESQUIRE

16              JDRAYTON@COOLEY.COM

17              (Via Zoom)

18

19

20

21

22

23

24     (Continued)

25     REPRESENTING THE DEFENDANTS DEPUY SYNTHES SALES

CONFIDENTIAL

Hynes, Robert                                              May 24, 2022

4

1    INC. AND DEPUY SYNTHES PRODUCTS INC.:

2         JONES DAY

3              901 Lakeside Avenue

4              Cleveland, Ohio 44114

5              (216) 586-3939

6         BY:  CALVIN P. GRIFFITH, ESQUIRE

7              cpgriffith@jonesday.com

8

9         JONES DAY

10             901 Lakeside Avenue

11             Cleveland, Ohio 44114

12             (216) 586-3939

13        BY:  KENNETH S. LUCHESI, ESQUIRE

14             kluchesi@jonesday.com

15             (Via Zoom)

16

17

18

19    VIDEOGRAPHER:

20

21        RON FLEMING

22

23

24

25     --------------- I N D E X -----------------

CONFIDENTIAL

Hynes, Robert                                              May 24, 2022

9

1              THE VIDEOGRAPHER:  Thank you.

2              CERTIFIED STENOGRAPHER:  Raise your

3       right hand, please.

4              Do you solemnly swear the testimony

5       you are about to give will be the truth,

6       the whole truth, and nothing but the truth?

7              THE WITNESS:  Yes.

8              RICHARD HYNES, MD

9   acknowledged having been duly sworn to tell the

10  truth and testified upon his oath as follows:

11             DIRECT EXAMINATION

12  BY MR. GRIFFITH:

13      Q.    Please state your full name for the

14  record.

15      **A.    Richard Hynes.**

16      Q.    And what is your home address?

17      **A.    603 Atlantic Street, Melbourne**

18  **Beach, Florida.**

19      Q.    What is your business address?

20      **A.    2222 South City Harbor Boulevard,**

21  **Melbourne, Florida.**

22      Q.    Dr. Hynes, have you ever had your

23  deposition taken before?

24      **A.    Yes.**

25      Q.    About how many times?

CONFIDENTIAL

Hynes, Robert                                          May 24, 2022

49

1    stand-alone intervertebral body device in the

2    cervical area these days?

3         **A.    Occasionally.**

4         Q.    So PREVAIL was a stand-alone

5    intervertebral body device; right?

6              MR. MILCH:  Objection.  Form.

7              THE WITNESS:  My memory is on label

8         it was -- it could be used as a

9         stand-alone.

10   BY MR. GRIFFITH:

11        Q.    Did you think of it as a stand-alone

12   intervertebral body device?

13        **A.    I used it with a plate, personally.**

14        Q.    So you used supplemental fixation

15   with PREVAIL typically?

16        **A.    I believe so.  That would be off**

17   **label, but that's how I used it.**

18        Q.    Why was that?

19        **A.    I have a theory of strong fixation,**

20   **early mobility after fusions.**

21        Q.    So you -- so you like -- in the

22   cervical area, you like using these plate

23   products that go on the anterior surface of the

24   bone?

25              MR. MILCH:  Objection.  Form.

CONFIDENTIAL

Hynes, Robert                                      May 24, 2022

50

1    BY MR. GRIFFITH:

2         Q.    Strike that.

3               You have a preference for that.

4               Is that fair?

5         A.    **It's my method.  It's what I'm used**

6    **to using, where my success has been.**

7         Q.    And what are -- to you, what are the

8    pros associated with those plates that are

9    outside the intervertebral space and over the

10   anterior surface of the bones?  What are the

11   pros?  What are the cons?

12        A.    **The pros are that they're very**

13   **small.  They're only 15 -- about 15 millimeters**

14   **in -- if I recall the height.  I think they're**

15   **under 2 millimeters in thickness.  So they're**

16   **very, very thin, which is ideal for a plate, to**

17   **be thin, and they're easy to apply.**

18        Q.    Are there any cons?

19              MR. MILCH:  Objection.  Form.

20              THE WITNESS:  There's no cons I'm

21         aware of, but put them in the family of

22         anterior cervical plates, they have

23         whatever cons any anterior cervical plate

24         could have.  But nothing specific to them.

25   BY MR. GRIFFITH:

CONFIDENTIAL

Hynes, Robert                                          May 24, 2022

81

1    part, separate piece, that would make it more

2    of a plate.

3          Q.    The Zero-P VA -- strike that.

4                The plate in the Zero-P VA device is

5    not coded separately as a plate for FDA

6    purposes; correct?

7          A.    I'm not certain how it's coded.

8          Q.    Would that be indicative to you of

9    whether it's a plate or not?

10         A.    It depends.  That may affect it,

11   yes.

12         Q.    And the Zero-P VA plate is, to your

13   knowledge, always used as an integral part of

14   the whole device; correct?

15         A.    I don't know how the device is used

16   by the doctors.  I have no knowledge of that.

17         Q.    And do you know whether any doctor

18   has ever used the Zero-P VA product and removed

19   the PEEK spacer portion?

20         A.    I have no firsthand knowledge of

21   that.

22         Q.    Have you ever heard of that

23   happening?

24         A.    Surgeons will take on-label devices

25   and use them off label frequently.

CONFIDENTIAL

Hynes, Robert                                    May 24, 2022

82

1          Q.    So they may have done that?

2          **A.    Correct.**

3          Q.    And they may have, likewise, taken

4    the device, pulled the PEEK part out, and only

5    used the PEEK part, not the plate?

6          **A.    They may have.**

7          Q.    And you just don't know?

8          **A.    I don't know.**

9          Q.    And you don't know how often that

10   would have happened?

11         **A.    I don't.**

12         Q.    Do you get -- strike that.

13              So you said -- I think you said

14   PREVAIL has been withdrawn from the market?

15         **A.    I'm sorry?**

16         Q.    You said that PREVAIL is no longer

17   being sold?

18         **A.    That's correct.**

19         Q.    As far as you know.

20              Do you know why?

21         **A.    I don't.**

22         Q.    Were there -- did you ever hear of

23   it having problems -- product liability issues,

24   something like that?

25         **A.    Not that I was aware of, no.**

CONFIDENTIAL

Hynes, Robert                                              May 24, 2022

231

1                    C E R T I F I C A T E

2     STATE OF FLORIDA:

3

4              I, RHONDA HALL-BREUWET, RDR, CRR,

5     CSR, LCR, CCR, FPR, NCRA Realtime Systems

6     Administrator, shorthand reporter, do hereby

7     certify:

8              That the witness whose deposition is

9     hereinbefore set forth was duly sworn, and that

10    such deposition is a true record of the

11    testimony given by such witness.

12             I further certify that I am not

13    related to any of the parties to this action by

14    blood or marriage, and that I am in no way

15    interested in the outcome of this matter.

16             IN WITNESS WHEREOF, I have hereunto

17    set my hand this 28th of May, 2022.

18

19

20

21    _____

22    RHONDA HALL-BREUWET, RDR, CRR, CSR, LCR, CCR, FPR,

23    NCRA Realtime Systems Administrator

24    Shorthand Reporter

25

# EXHIBIT 16

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

Case No. 1:19-CV-1515-RGA

_____

RSB SPINE, LLC,

   Plaintiff,

vs.

DEPUY SYNTHES SALES, INC., and

DEPUY SYNTHES PRODUCTS, INC.,

  Defendants.

_____

VIDEO-RECORDED REMOTE DEPOSITION OF
DR. CHRISTOPHER M.J. CAIN

February 11, 2022

_____

   PURSUANT TO NOTICE and the Federal Rules of
Civil Procedure, the video-recorded remote deposition
of DR. CHRISTOPHER M.J. CAIN, called by the Defendants,
was taken on Friday, February 11, 2022, commencing at
9:00 a.m., before Marjorie R. Dauster, Registered Merit
Reporter, Certified Realtime Reporter, and Notary
Public.

Magna Legal Services
(866) 624-6221
www.MagnaLS.com



Page 2

```
 1                    APPEARANCES
 2   ON BEHALF OF THE PLAINTIFF:
 3            REUBEN CHEN, ESQ.
              DUSTIN KNIGHT, ESQ.
 4            Cooley LLP
              Reston Tower Center
 5            11951 Freedom Drive
              14th Floor
 6            Reston, Virginia 20190-5640
              703.456.8000
 7            rchen@cooley.com
 8   ON BEHALF OF THE DEFENDANTS:
 9            KENNETH LUCHESI, ESQ.
              T. KAITLIN CROWDER, ESQ.
10            Jones Day LLP
              77 West Wacker Drive
11            Suite 3500
              Chicago, Illinois 60601-1692
12            312.782.3939
              kluchesi@jonesday.com
13
     Also present:
14
              Mike Correia, CLVS
15
16
17
18
19
20
21
22
23
24
25
```



Page 107

1    have a plate and the screws are going through the plate

2    where the screws penetrate through the top of the

3    implant, it's posterior to the front of the device.

4    It's not as close to the front of the vertebrae as the

5    actual plate is.

6        Q.    Would you define the vertebral lip as the

7    juncture between the anterior surface and the end

8    plate?

9        A.    The normal anterior surface of the vertebrae

10   and the end plate, yes.

11       Q.    Can you go back to Exhibit 114.  And if you

12   can go to Slide 7, please.

13       A.    Okay.

14       Q.    Can you describe what's depicted in Slide 7.

15       A.    That is just a lateral view of what I've drawn

16   in the previous slides showing a diagramatic

17   representation of the SynCage-L sitting between two

18   vertebrae.  And the extension of the anterior surface

19   of that implant showing where we would ideally place

20   the implant so that it doesn't extend beyond the

21   anterior profile of the vertebrae and allows the screws

22   to be placed into the anterior portion of the end

23   plate.

24       Q.    And using the annotation feature once again,

25   could you annotate on Slide 7 where the anterior lips



Page 139

```
 1                REPORTER'S CERTIFICATE
 2   STATE OF COLORADO    )
                          ) ss.
 3   COUNTY OF LARIMER    )
 4           I, MARJORIE R. DAUSTER, Registered Merit
     Reporter, Certified Realtime Reporter, and Notary
 5   Public, do hereby certify that previous to the
     commencement of the examination, the said
 6   DR. CHRISTOPHER M.J. CAIN was duly sworn by me to
     testify to the truth in relation to the matters in
 7   controversy between the parties hereto; that the said
     deposition was taken in machine shorthand by me at the
 8   time and place aforesaid and was thereafter reduced to
     typewritten form; that the foregoing is a true
 9   transcript of the questions asked, testimony given, and
     proceedings had.
10
             I further certify that I am not employed by,
11   related to, nor counsel for any of the parties herein,
     nor otherwise interested in the outcome of this
12   litigation.
13           IN WITNESS WHEREOF, I have affixed my
     signature this 17th day of February, 2022.
14
15                        Marjorie R. Dauster
16                        _____
                          Marjorie R. Dauster, RMR, CRR
17
18
     My commission expires:
19   January 16, 2023
20
21
22
23
24
25
```

