## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

RSB SPINE, LLC,

        Plaintiff,

    v.

DEPUY SYNTHES SALES, INC., and
DEPUY SYNTHES PRODUCTS, INC.,

        Defendants.

C.A. No. 1:19-cv-1515-RGA

**REDACTED**

**PUBLIC VERSION**

### RSB SPINE, LLC'S ANSWERING BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

OF COUNSEL:
Erik B. Milch
Dustin M. Knight
COOLEY LLP
11951 Freedom Drive
One Freedom Square
Reston, VA 20190-5656
(703) 456-8000

Bonnie Fletcher-Price
COOLEY LLP
1299 Pennsylvania Avenue NW, Suite 700
Washington, DC 20004
(202) 842-7800

Joseph M. Drayton
COOLEY LLP
55 Hudson Yards
New York, NY 10001
(212) 479-6000

Reuben Chen
Elizabeth Stameshkin
David Murdter
Juan Pablo González
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304-1130
(650) 843-5000

John C. Phillips, Jr. (#110)
David A. Bilson (#4986)
PHILLIPS, MCLAUGHLIN & HALL, P.A.
1200 North Broom Street
Wilmington, DE 19806
(302) 655-4200
jcp@pmhdelaw.com
dab@pmhdelaw.com

*Attorneys for Plaintiff RSB Spine, LLC*

Dated: July 21, 2022

## TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ......................................................................................... 1

II.     FACTUAL BACKGROUND.......................................................................... 2

        A.    The Term "Lip Osteophyte" ............................................................... 2

        B.    The Claim Requirement That the "Base Plate Is Configured to Fit
              Primarily Between Anterior Portions of the Adjacent Vertebral Bones' Lip
              Osteophytes" ....................................................................................... 4

III.    LEGAL STANDARDS .................................................................................. 6

        A.    Summary Judgment of Non-Infringement .......................................... 6

        B.    Summary Judgment of Invalidity....................................................... 7

IV.     ARGUMENT ................................................................................................ 7

        A.    Factual Disputes Preclude DePuy's Summary Judgment Motion for
              Invalidity ............................................................................................ 7

              1.    Michelson '376 Does Not Disclose a "Base Plate" ................................. 7

              2.    RSB's Expert's Opinions Are Consistent with the Court's
                    Construction of "Base Plate" ................................................................. 11

              3.    The "Evidence" DePuy Cites Proves that Triable Issues Preclude
                    Summary Judgment ............................................................................. 13

        B.    DePuy's Summary Judgment Motion for Noninfringement Should be
              Denied ................................................................................................. 17

              1.    A Material Dispute of Fact Exists as to Whether the Accused
                    Products Fit Primarily Between Anterior Portions of Lip
                    Osteophytes......................................................................................... 17

              2.    A material fact dispute exists as to whether a "lip osteophyte" can
                    overlap with the vertebral side surface and be formed of hardened
                    bone..................................................................................................... 19

              3.    A material fact dispute exists as to the dimensions of a lip
                    osteophyte ........................................................................................... 23

              4.    A material fact dispute exists as to whether the Accused Products
                    are configured to fit primarily between anterior portions of lip
                    osteophytes......................................................................................... 25

              5.    DePuy's arguments exclusively relate to literal infringement and
                    fail to consider RSB's infringement claim under the doctrine of
                    equivalents ......................................................................................... 29

V.      CONCLUSION.............................................................................................. 31

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Altair Eng'g, Inc. v, LEDdynamics, Inc.*,
   413 F. App'x 251 (Fed. Cir. 2011) ......................................................................13

*Callaway Golf Co. v. Acushnet Co.*,
   576 F.3d 1331 (Fed. Cir. 2009)............................................................................7

*Cleveland v. Policy Mgmt. Sys. Corp.*,
   526 U.S. 795 (1999)............................................................................................16

*Cradle IP, LLC v. Texas Inst., Inc.*,
   5 F. Supp. 3d 626 (D. Del. 2013).........................................................................12

*EMI Group N. Am. v. Cypress Semiconductor Corp.*,
   268 F.3d 1342 (Fed. Cir. 2001)............................................................................10

*Frolow v. Wilson Sporting Goods Co.*,
   710 F.3d 1303 (Fed. Cir. 2013)............................................................................14

*Innogenetics, N.V. v. Abbott Lab'ys*,
   512 F.3d 1363 (Fed. Cir. 2008)............................................................................7

*Leader Techs., Inc. v. Facebook, Inc.*,
   770 F. Supp. 2d 686 (D. Del. 2011) ....................................................................19

*Leader Techs, Inc. v. Facebook, Inc.*,
   No. 08–862–LPS, 2011 WL 1514701 (D. Del. Mar. 14, 2011)............................19

*Leggett & Platt, Inc. v. Hickory Springs Mfg. Co.*,
   285 F.3d 1353 (Fed. Cir. 2002)............................................................................30

*Lockheed Martin Corp. v. Space Sys./Loral, Inc.*,
   324 F.3d 1308 (Fed. Cir. 2003)........................................................................6, 29

*Microsoft Corp. v. i4i Ltd. P'ship*,
   564 U.S. 91 (2011)..............................................................................................7

*Montrose Med. Group Participating Sav. Plan v. Bulger*,
   243 F.3d 773 (3d Cir. 2001).................................................................................16

*Motorola, Inc. v. Interdigital Tech. Corp.*,
   121 F.3d 1461 (Fed. Cir. 1997)............................................................................8

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Novartis Corp. v. Ben Venue Lab'ys, Inc.*,
    271 F.3d 1043 (Fed. Cir. 2001)................................................................................6

*Osram Sylvania v. Am. Induction Techs.*,
    701 F.3d 698 (Fed. Cir. 2012)..................................................................................7

*Perrigo Co. v. Intl. Vitamin Co.*,
    No. 1:17-cv-01778, 2019 WL 359991 (D. Del. Jan. 29, 2019) ..............................29

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005)..............................................................................13

*Pitney Bowes, Inc. v. Hewlett-Packard Co.*,
    182 F.3d 1298 (Fed. Cir. 1999)................................................................................6

*Robocast, Inc. v. Apple, Inc.*,
    39 F. Supp. 3d 552 (D. Del. 2014)............................................................................7

*Silicon Graphics, Inc. v. ATI Tech., Inc.*,
    607 F.3d 784 (Fed. Cir. 2010)..................................................................................7

*Uniloc USA, Inc. v. Microsoft Corp.*,
    632 F.3d 1292 (Fed. Cir. 2011)..............................................................................19

*Vehicular Techs. Corp. v. Titan Wheel Int'l, Inc.*,
    212 F.3d 1377 (Fed. Cir. 2000)..............................................................................30

**Other Authorities**

L.R. 7.1.3(c)(2) ...............................................................................................................29

MPEP § 2111 ...................................................................................................................13

## I.   INTRODUCTION

DePuy seeks summary judgment on two grounds: (1) that the '234 patent is invalid because it is anticipated by Michelson '376, and (2) that the Accused Products do not infringe the '537 patent because they do not include a base plate positioned primarily between anterior portions of lip osteophytes.  Both grounds should be denied because they suffer from the same fatal flaw: DePuy presents factual disputes to this Court under the guise of legal claim construction issues and misinterprets RSB's positions as well as the Court's claim construction order along the way.

DePuy's summary judgment motion for invalidity is marked by a material factual dispute as to whether Michelson '376 discloses a "base plate," which this Court construed to mean a "fixation **plate** for stabilizing adjacent vertebrae for fusion."  DePuy bears the burden of proving by clear and convincing evidence that the Michelson '376 implant comprises a structure that a person of ordinary skill in the art (POSITA) in 2003 would have understood to be a "**plate**."  But as RSB's expert Mr. Drewry testified and explained in his expert report, Michelson '376 discloses no such structure, and DePuy provides no principled reason—or indeed any reason at all—*why* a POSITA would interpret an arbitrary portion of Michelson's monolithic implant to be a "plate." DePuy and its expert attempt to write off Mr. Drewry's opinions as inconsistent with the Court's claim construction order, but their arguments rest on faulty logic and wither under scrutiny.  DePuy will have an opportunity to present evidence to a jury as to why a POSITA would understand a portion of Michelson '376 lying to one side of an imaginary line to be a "plate."  But DePuy cannot ignore the genuine, material, and significant *factual* dispute as to whether its characterization of a POSITA's understanding is correct.  Thus, this ground of DePuy's motion should be denied.

 DePuy's summary judgment motion for noninfringement should likewise be denied because there is a genuine, material factual dispute as to the location and extent of lip osteophytes. RSB's expert Dr. Hynes—the only expert in this case to provide actual images of lip osteophyte

formations on patients' vertebral lips—testified and further explained in his expert report that lip osteophytes mushroom outward from the vertebral lip, covering parts of both the top and side surfaces of the vertebral bodies. His infringement analysis of the Accused Products, informed by this understanding of patient morphology, is consistent with the Court's claim construction order, which recognized that "the three-dimensional 'lip osteophyte' may share or include a portion of the two-dimensional 'side surface.'" (D.I. 123 at 10 (quoting D.I. 102 at 58-59).) To the extent Dr. Hynes's testimony and analysis invoke issues of claim construction, it is only because *DePuy* seeks to impose an unduly narrow interpretation of "lip osteophyte" that confines such structures to lie along a two-dimensional "edge." This view not only contradicts the Court's construction of "lip osteophyte," but also conflicts with the only actual images of "lip osteophytes" in the record. Ultimately, the parties must give full meaning to this Court's construction of "lip osteophyte" and present to the jury any factual disputes about the metes and bounds of lip osteophytes, as well as the Accused Products' placement in relation to them. Because genuine, material factual disputes persist, DePuy's motion for summary judgment of noninfringement should be denied.

## II.     FACTUAL BACKGROUND

### A.     The Term "Lip Osteophyte"

The Court construed "lip osteophyte" as "bony outgrowth at the lip." (D.I. 123, at 9.) The Court noted that while "[i]t is undisputed that 'osteophyte' had a well-known meaning at the relevant time," the term "'[l]ip osteophyte[]' . . . was not used in the literature." (*Id.*) The Court agreed with RSB that "there can be overlap between the lip and the side surface," and that "the three-dimensional 'lip osteophyte' may share or include a portion of the two-dimensional 'side surface,' and nothing in the intrinsic record suggests that the terms *must* be mutually exclusive." (*Id.* at 10 (quoting D.I. 102, at 58-59).) The Court's construction of lip osteophyte allows for what is obvious to any clinician: bone outgrowth at the lip or junction of the vertebral side and

anterior/lateral surfaces may grow in myriad directions, including sharing a portion of the vertebral side surface.  Accordingly, the Court rejected DePuy's argument that the lip osteophyte be limited to an edge, *i.e.*, the "corner of the bone, distinct from the side surface." (*Id.*)

The Court also acknowledged that "the claim consistently refers to the lip osteophyte as the 'strongest part of the bone.'" (*Id.*)  And while the Court held that this did not amount to lexicography such that lip osteophyte was defined as the "strongest part of the bone," it accepted that the "claimed system and methods will not work on all patients," including those where the osteophytes fail to meet the strength requirements of the claimed invention. (*Id.*)  Thus, while the term lip osteophyte does not necessarily refer to the "strongest part of the bone" per the Court's construction, nothing in the Court's construction indicates that the lip osteophyte cannot comprise the "strongest part of the bone."  If anything, the Court indicated that the "strongest part of the bone" could certainly be the lip osteophyte, acknowledging that the claim indicates a reliance on this attribute for the purposes of the invention's claimed success. (*Id.*)

RSB and its experts' understanding and application of the term lip osteophyte adhere to the Court's construction.  Dr. Hynes explains that he understands lip osteophytes as bone formation along the vertebral lip that results from bone ossification. (Ex. 1[1], (Hynes Reply Rep.), ¶8.)  This bony outgrowth comprises ossified, or hardened, bone, and can extend into the vertebral side and anterior/lateral surfaces, presenting as an engorged vertebral lip. (*Id.*)

DePuy's expert, on the other hand, construes the term "lip osteophyte" as an osteophyte or bone spur on the vertebral lip that is perpendicular to the curvilinear surface of the vertebrae. (Ex. 2 (Cheng Depo. Tr.), 124:25-126:6.)  DePuy's expert further argues, inconsistent with the Court's claim construction order, that while a lip osteophyte grows along the vertebral lip, neither the

---

[1] Attached to the Declaration of Dustin Knight (filed concurrently).

vertebral lip nor the lip osteophyte can share any portion of the vertebral side surface.  (*Id.*, 163:2-10 ("Just as we stated the cortical shell makes up one portion.  The edge makes up a portion, the edge is defined [sic] the intersection between those two surfaces.  That intersection is a part of both the cortical shell and the endplate.  You need the two to define the edge.").)  Based on this interpretation, also the subject of RSB's *Daubert* challenge, DePuy argues that no genuine and material factual issues exist as to whether the Accused Products infringe the Asserted Patents.

**B.**     **The Claim Requirement That the "Base Plate Is Configured to Fit Primarily Between Anterior Portions of the Adjacent Vertebral Bones' Lip Osteophytes"**

The '537 patent recites "wherein the base plate is configured to fit primarily between anterior portions of adjacent vertebral bones' lip osteophytes." ('537, 38:1-3 (cl. 1); *see also id.*, 40:1-4 (cl. 21).)  During the '537 patent IPR proceedings, RSB explained in its Patent Owner Response that lip osteophyte formation occurs at the rim of the vertebral side surface, which in turn can be divided into anterior and posterior portions.  Because a lip osteophyte comprises a three-dimensional figure formed by bone growth, as defined by the Court (D.I. 123, at 9-10), it extends beyond a two-dimensional line, sharing portions of the vertebral side and curvilinear surfaces.  Dr. Hynes provides real-world examples of lip osteophyte formation in one of his patients as part of his analysis:



(Hynes Reply Rep., ¶ 11.)  He identifies lip osteophyte formation in red, distinguishing the bony outgrowth at the lip from healthy, non-degenerated and non-ossified bone.  (*Id.*)

Dr. Hynes, having implanted thousands of interbody devices in patients and the Accused Products in sawbones models, (Ex. 3 (Hynes Op. Rep.), ¶¶ 135, 236, 324, 410, 498), explains why a surgeon would position the Accused Products between lip osteophytes, including to minimize profile and avoid tissue irritation, and to take advantage of the superior bone quality found there. (*Id.*, ¶¶ 147, 155, 246, 252, 334, 340, 422, 428, 510, 516.)  DePuy's internal documentation acknowledges the superior bone quality found along the anterior vertebral lip and the advantage of positioning the base plate between the anterior vertebral lips of adjacent vertebrae:



(Ex. 4 (DEPRSB_00028328), Slide 12.)  A POSITA would thus understand the advantages offered by such placement of the Accused Products and would make use of it.  (Hynes Reply Rep., ¶¶ 59-60, 79, 107, 131, 154.)  Dr. Hynes determined the Accused Products infringe the '537 patent because they are configured to fit primarily between the anterior portions of lip osteophytes vis-à-vis the posterior portions.  (Hynes Op. Rep., ¶¶ 147, 155, 246, 252, 334, 340, 422, 428, 510, 516.) Alternatively, Dr. Hynes also opined that the Accused Products satisfy this claim element under the doctrine of equivalents under both the insubstantial differences test and the function-way-result test.  (*Id.*, ¶¶ 155, 252, 340, 428, 516.)

DePuy argues that "[t]here is no evidence that DePuy's Accused Products are positioned between 'lip osteophyte,' and certainly no evidence that they are placed primarily between them." (D.I. 181, at 25.)  DePuy rests this conclusion on (1) supposed inconsistencies between Dr. Hynes' application of the term lip osteophyte and RSB's positions during the IPR proceedings; and (2) evidence pertaining to osteophytes or bone spurs, as opposed to *lip* osteophytes, which DePuy asserts cannot share any portion with the vertebral side surfaces.  (*Id.*, at 22-25; Cheng Depo. Tr., 124:25-126:6.)  But a lip osteophyte, as construed by the Court, is not equivalent to an osteophyte or bone spur.  (*See* D.I. 123, at 9.)  And DePuy's motion altogether fails to parse out why each Accused Product does not infringe, or to address Dr. Hynes' opinions on the doctrine of equivalents.

## III.   LEGAL STANDARDS

### A.   Summary Judgment of Non-Infringement

Summary judgment of noninfringement requires a two-step analysis.  "First, the claims of the patent must be construed to determine their scope.  Second, a determination must be made as to whether the properly construed claims read on the accused device."  *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1304 (Fed. Cir. 1999) (citation omitted).  "[A] determination of infringement, both literal and under the doctrine of equivalents, is a question of fact."  *Lockheed Martin Corp. v. Space Sys./Loral, Inc.*, 324 F.3d 1308, 1318 (Fed. Cir. 2003).  "Summary judgment of noninfringement may only be granted if, after viewing the alleged facts in the light most favorable to the nonmovant and drawing all justifiable inferences in the nonmovant's favor, there is no genuine issue whether the accused device is encompassed by the patent claims."  *Novartis Corp. v. Ben Venue Lab'ys, Inc.*, 271 F.3d 1043, 1046 (Fed. Cir. 2001).

### B.    Summary Judgment of Invalidity

Patents are presumed valid.  *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91 (2011).  "To show that a patent claim is invalid as anticipated, the accused infringer must show by clear and convincing evidence that a single prior art reference discloses each and every element of a claimed invention." *Silicon Graphics, Inc. v. ATI Tech., Inc*., 607 F.3d 784, 796 (Fed. Cir. 2010).  "[E]very element of the claimed invention [must be described], either expressly or inherently, such that a [POSITA] could practice the invention without undue experimentation." *Callaway Golf Co. v. Acushnet Co*., 576 F.3d 1331, 1346 (Fed. Cir. 2009).  "What a prior art reference discloses is . . . a question of fact, and if there are disputes over material facts, whether the [prior art] anticipates the [patent] should be resolved at trial by the fact finder." *Innogenetics, N.V. v. Abbott Lab'ys*, 512 F.3d 1363, 1378 n.6 (Fed. Cir. 2008).  Thus, "[d]isputed material issues of fact concerning how [a POSITA] would understand disclosure of a particular technology mandates denial of summary judgment of anticipation." *Robocast, Inc. v. Apple, Inc*., 39 F. Supp. 3d 552, 564 (D. Del. 2014) (citing *Osram Sylvania v. Am. Induction Techs*., 701 F.3d 698, 706 (Fed. Cir. 2012)).

## IV.    ARGUMENT

### A.    Factual Disputes Preclude DePuy's Summary Judgment Motion for Invalidity

#### 1.    Michelson '376 Does Not Disclose a "Base Plate"

This Court construed "base plate" to mean "**a fixation plate to stabilize adjacent vertebrae for fusion**."  DePuy treats the Court's claim construction order as if it were a finding that Michelson '376 discloses a "base plate," but that is not the case.  DePuy still bears the burden of showing, by clear and convincing evidence, that a POSITA would understand Michelson '376 to disclose a "base plate" under the Court's construction.  DePuy fails to meet this burden, largely because it proffers no affirmative, principled reason as to why a POSITA would understand Michelson '376 to disclose a "**plate**" in the first instance.

7

The most probative evidence as to whether Michelson '376 anticipates the '234 patent is Michelson itself. *Cf. Motorola, Inc. v. Interdigital Tech. Corp*., 121 F.3d 1461, 1473 (Fed. Cir. 1997). Tellingly, DePuy pays scant attention in its opening brief to what Michelson '376 *actually* discloses, and opts instead to hand-wave in the direction of other extrinsic evidence, much of which post-dates the '234 patent by well over a decade. RSB addresses that purported evidence below. DePuy's diversionary tactics are understandable when one considers that Michelson '376 *never* describes its construct as comprising a plate at all. (Ex. 5 (Drewry Reb. Rep.), ¶¶ 83, 85.) The word "plate" appears only once in Michelson '376, and in that case to distinguish the Michelson '376 implant from actual plate-containing devices. (Drewry Reb. Rep., ¶85.)

That Michelson '376 does not describe trailing end 104 as a "plate" is particularly damning to DePuy's assertions given that fixation plates were well-known in the art before Michelson '376, as DePuy acknowledges in its opening brief. (*See* D.I. 181, at 2; Drewry Reb. Rep., ¶ 34.) Michelson himself was clearly aware of what the term "plate" meant in the context of spinal implants, as he is also the sole named inventor of patents pre- and post-dating the '234 patent that expressly disclose and claim spinal fixation ***plates***. (*See, e.g.,* Ex. 7, U.S. Pat. No. 6,936,051; Ex. 8, U.S. Pat. No. 7,118,573; Drewry Reb. Rep., ¶¶78-79, 85-86.) The plates described in those patents, notably, are structures that would have been identifiable as plates by a POSITA because they share physical characteristics a POSITA would have considered to be consistent with a "plate." (Drewry Reb. Rep. ¶¶ 78-79, 82, 85-86.) Yet Michelson does not identify any portion of the '376 implant as a "plate," nor does he identify any portions of his other monolithic designs as "plates." (*See* Ex. 9, U.S. Pat. No. 8,105,383; Ex. 10, U.S. App. No. 2003/0078668; Ex. 11, WO 00/66045; Drewry Reb. Rep., ¶¶ 80, 96-98, 119.) That Michelson described *other* constructs as

8

comprising a plate, but not the '376 implant, is compelling evidence a POSITA would not understand trailing end 104 to be a "plate."  (Drewry Reb. Rep., ¶ 86.)

DePuy's expert Dr. Cheng, unfazed by Michelson '376's lack of disclosure of a "plate," nevertheless identifies a *portion* of Michelson's monolithic structure as being a "base plate" within the meaning of the '234 patent.  Dr. Cheng offers no affirmative, principled reason as to why a POSITA would understand an arbitrarily subdivided portion of a monolithic structure to be a "base plate."  (Drewry Reb. Rep., ¶ 71.)  Indeed, the following is the entire affirmative case Dr. Cheng presents in his opening report as to why Michelson '376 comprises a "base plate":

> I understand that the Court construed the term "base plate" to mean "fixation plate to stabilize adjacent vertebrae for fusion." The portion of the Michelson 376 device identified as the base plate above meets this definition. In addition, I understand that during the prosecution of another patent that is related to the '234 patent, U.S. Patent No. 11,026,802, the Examiner identified a similar portion of a Michelson device as the claimed "base plate."

(Ex. 12 (Cheng Op. Rep.), ¶ 76.)  Besides his single conclusory assertion that some vague "portion of the Michelson '376 device" meets the Court's construction of a "base plate" (Dr. Cheng does not even clearly identify "trailing end 104" as the alleged "plate"), the only evidence Dr. Cheng cites is a single Examiner's characterization of a *different* Michelson reference (U.S. App. No. 2003/0078668, hereafter "Michelson '668") during prosecution of a continuation patent (U.S. Pat. No. 11,026,802)  *18 years* after the '234 priority date.  That Michelson reference, like the Michelson '376 reference, does not describe any portion of the implant as a "plate."  Far from acquiescing to the Examiner's characterization, RSB disputed the Examiner's rejections based on the Michelson '668, and the Examiner ultimately allowed RSB's claims because none of the cited prior art disclosed a "base plate" having the claimed characteristics.  (Drewry Reb. Rep. ¶ 96.) Revealingly, DePuy did not identify the anterior portion of the Michelson '376 implant as a "base plate" before this Office Action; it was only after that DePuy amended its invalidity contentions

to include this "portion equals plate" theory.  (*Compare* Ex. 13, Initial Invalidity Contentions (treating the *entirety* of "implant 100" as the alleged "base plate") *with* Ex. 14, Amended Invalidity Contentions (alleging that the *anterior portion* of implant 100 is a "base plate"); *see also* Drewry Reb. Rep. ¶¶ 92-98.).  DePuy's hindsight-driven interpretation belies its assertion that a POSITA would have understood Michelson '376 to disclose a "base plate."

The Examiner in the above-referenced Office Action provided no explanation as to why a POSITA would have understood the anterior portion of the Michelson '668 implant to be a "base plate," and neither does Dr. Cheng.  He simply accepts the Examiner's interpretation as gospel. (Cheng Op. Rep., ¶76.)  Nor does Dr. Cheng explain why the Michelson '668 construct—which differs from the Michelson '376 construct—is probative as to a POSITA's understanding of the Michelson '376 disclosure.  (*Id.*)  Such a conclusory analysis does not suffice to establish by clear and convincing evidence that Michelson '376 discloses a "base plate," and certainly does not carry DePuy's burden on summary judgment, as a reasonable jury could conclude that Michelson '376 does not disclose a base plate.

The remainder of Dr. Cheng's Michelson '376 opinions address his belief that a base plate *could* be part of a monolithic structure under the Court's construction—a position that DePuy echoes in its opening brief.  (*See* Cheng Op. Rep., ¶ 77; D.I. 181, at 16-17.)  But even if a monolithic structure *could* comprise a base plate, it does not follow that every monolithic structure in fact does so.  DePuy's burden, after all, is not to show that a monolithic structure could theoretically comprise a base plate—it is to show by clear and convincing evidence that the *specific monolithic structure of Michelson '376* discloses a "base plate" to one of skill in the art *at the time of the invention*, not with the benefit of decades of hindsight.  *See EMI Group N. Am. v. Cypress Semiconductor Corp.*, 268 F.3d 1342, 1350 (Fed. Cir. 2001) ("Such evidence must make clear that

10

the missing descriptive matter… would be so recognized by persons of ordinary skill.").  DePuy's opening brief is bereft of any principled reason as to *why* a skilled artisan would have understood a portion of Michelson '376 lying to one side of an imaginary line to be a "base plate."  (*See* Drewry Reb. Rep., ¶ 71.)  Its brief is equally devoid of any explanation as to where this line should be drawn, or why DePuy chose to draw the line where it did.  (Drewry Reb. Rep., ¶¶ 70-71.)  None of the evidence cited by DePuy remedies these shortcomings.  The factual question of *what* Michelson '376 discloses to a POSITA is in dispute, and a reasonable jury could conclude that DePuy has not carried its burden to show by clear and convincing evidence that Michelson '376 discloses a "base plate."  For these reasons alone, summary judgment is inappropriate.

### 2. RSB's Expert's Opinions Are Consistent with the Court's Construction of "Base Plate"

Yet those are not the only reasons to deny DePuy's motion.  Mr. Drewry's opinions as to a POSITA's understanding of a "plate" are consistent with the Court's claim construction order.  DePuy fixates on the Court's refusal to adopt an express requirement that a "base plate" be distinct from a spacer or bone graft material (D.I. 181, at 16-17), but forgets that the Court's construction nevertheless requires that there be *something* a skilled artisan would identify as a "**plate**."  Bearing this requirement in mind, Mr. Drewry's opinions detail how a skilled artisan would identify a "**plate**" based on its physical, structural, and dimensional characteristics.

Mr. Drewry explains that the term "plate," as understood by one of skill in the art, "does not broadly encompass all structures of any shape or form… or any generic structure… that could be used to stabilize adjacent vertebrae for fusion."  (Drewry Reb. Rep., ¶ 72.)  Rather, a "plate" is recognized by those of skill in the art to be "a distinct component or structure and not a *contiguous portion* of a monolithic structure."  (*Id.* (emphasis added); *see also id.*, ¶ 73.)  Contiguous portions of monolithic structures are referred to as just that—*portions*.  (*Id.*, ¶¶ 74-76.)  Thus, even if a

portion of Michelson '376 could be said to have plate-like dimensions (D.I. 181, at 15), a POSITA would nevertheless recognize the structure as a portion of a "cage, ring, [or] box," and crucially, not a "plate."  (Drewry Reb. Rep., ¶ 83.)

Beyond merely parroting the construction of the term "base plate," DePuy's expert Dr. Cheng presents no definition of the term "plate," or any criteria by which a POSITA would identify one.  (*See generally* Cheng Op. Rep., ¶¶ 71-77.)  Nor could Dr. Cheng articulate any clear definition of what a "plate" was at deposition, aside from again circularly referring to the Court's construction of "base plate."  (Cheng Depo. Tr. at 234:6-12, 240:23-244:3, 253:18-260:9, 261:2-262:7.)  The fact that Dr. Cheng nevertheless disputes Mr. Drewry's understanding of how a POSITA would identify a plate highlights why summary judgment is inappropriate.  *See Cradle IP, LLC v. Texas Inst., Inc.*, 5 F. Supp. 3d 626, 650 (D. Del. 2013) ("That the parties' experts do not agree on the plain and ordinary meaning of the term presents a genuine issue of material fact not properly resolved on summary judgment.").

Mr. Drewry's opinions are consistent with the Court's explanation that a plate need not be distinct from bone graft material or a spacer.  That is because Mr. Drewry's opinions concern the *dimensions* and *structure* of a "plate," and not its material (bone graft), purpose (spacer) or composition with other structures.  Pursuant to Mr. Drewry's opinions, a monolithic construct *could* be considered a plate, provided that the structure as a whole, and not merely an arbitrarily subdivided portion thereof, would be identifiable to a POSITA as a plate.  Thus, the requirement that a plate be an identifiable structure is not incompatible with a plate being comprised of bone graft material or indistinct from a spacer.  (Drewry Reb. Rep., ¶¶ 99-100.)

To the extent any party is guilty of flouting the Court's construction of "base plate," it is DePuy, not RSB.  In suggesting that an arbitrarily subdivided *portion* of a contiguous, monolithic

structure can be a "plate," DePuy completely vitiates the "plate" requirement in the Court's construction of "base plate." (*See, e.g.,* Cheng Depo. Tr. at 260:25-261:9 (remarking that a plate can be "any shape").) DePuy's position renders the term "plate" meaningless because it lacks any limiting principle: by DePuy's logic, a "portion" of *any* three-dimensional object could be a "plate," if sliced the right way by imaginary lines. (Drewry Reb. Rep., ¶ 89.)

At bottom, the parties' dispute as to *what* Michelson '376 discloses to a POSITA is not simply "one of claim construction," as DePuy represents. (D.I. 181, at 16.) It is a material dispute of fact that must be left to the trier of fact to resolve, rendering summary judgment inappropriate.

### 3. The "Evidence" DePuy Cites Proves that Triable Issues Preclude Summary Judgment

Perhaps recognizing the shortcomings of Michelson itself, DePuy goes beyond the reference to contend Michelson '376 discloses a "base plate." But this evidence, assessed in the light most favorable to RSB, only demonstrates why factual disputes preclude summary judgment.

**Prosecution History:** DePuy cites an office action from a related RSB patent application in which the same Examiner cited by Dr. Cheng had previously identified trailing end 104 of Michelson '376 as a "base plate." (D.I. 181, at 15-16.) But one Examiner's views on Michelson '376, to the extent they are relevant, are not dispositive as to whether Michelson '376 discloses a base plate. *See Altair Eng'g, Inc. v. LEDdynamics, Inc.*, 413 F. App'x 251, 255-56 (Fed. Cir. 2011) ("While the examiner's interpretation can be pertinent, the applicant's own interpretation has far more significance."). The relevance of this Examiner's interpretation is particularly attenuated given that the Examiner was not applying this Court's construction, but was instead operating under the more permissive "broadest reasonable interpretation" standard. *See Phillips v. AWH Corp.,* 415 F.3d 1303, 1316 (Fed. Cir. 2005); MPEP § 2111. RSB never conceded this Examiner's characterization of trailing end 104, and specifically disputed that Michelson '376

13

disclosed a base plate having the features recited in the pending claims.  (Ex. 15 (2021-03-11 Applicant Arguments), at 12-15.)   Indeed, before the RSB application was abandoned, the Examiner found at least one pending claim, which recited a base plate, was allowable.  (Ex. 16 (2021-05-07 Examiner Interview Summary Record), at 1.)   A reasonable jury could conclude that Michelson '376 does not disclose a "base plate," notwithstanding this particular Examiner's interpretation of the reference.

**InterPlate C-P:**   Although it is undisputed that RSB *marked* the InterPlate C-P with the '234 patent, there is a genuine factual dispute as to whether the InterPlate C-P actually embodies the '234 patent and whether RSB marked the product to convey so.[2]  (Ex. 18 (Pl.'s Resp. & Obj. to Def's First Set of RFAs), Resp. to RFA No. 2, at 7.)

For example, RSB's CEO Mr. Redmond explained that the InterPlate C-P was only marked with the '234 patent due to RSB's policy at the time of automatically marking all InterPlate branded products with the '234 patent.  (Ex. 19 (Redmond Depo. Tr.) at 67:5-68:18, 74:1-16, 85:22-86:4, 87:5-14.)  Mr. Redmond further explained that the InterPlate C-P was *not* a plate, but rather was intended to *replace* the plate-cage construct used in the prior versions of the product. (*Id*. at 82:17-83:20, 216:4-18.)  The documents cited by DePuy do not demonstrate otherwise.  The FDA filing for the InterPlate C-P references a "plate" only because RSB's filing used the same terminology as the predicate device, which comprised a discrete plate.  (*Id*. at 91:17-92:10.) Similarly, a promotional description of the InterPlate C-P as a "combined fixation plate and spacer" does not imply that the device comprises a "base **plate**" as required by the Court's

---

[2] To be clear, and should DePuy suggest otherwise in its reply, RSB's marking of the InterPlate C-P is not binding, and RSB is free to dispute whether the InterPlate C-P embodies the '234 patent. *See Frolow v. Wilson Sporting Goods Co*., 710 F.3d 1303, 1308-10, (Fed. Cir. 2013) (rejecting the doctrine of "marking estoppel" as a binding admission that a product would infringe the marked patent).

construction. Two things, when melded together, can result in something distinct from the things that were combined.

Finally, even if InterPlate C-P did comprise a "plate"—which RSB disputes—DePuy does not explain why it supports DePuy's only theory of anticipation, which is that Michelson '376's anterior *portion* is a "base plate."  DePuy cites no evidence that RSB—or indeed anyone else— considered the *anterior portion* of the InterPlate C-P, or any other equivalent portion of the device, to be a plate, let alone similar to Michelson '376.  DePuy's invocation of the InterPlate C-P does nothing to cure DePuy's failure to articulate any principle that would explain *why* a skilled artisan would consider trailing end 104 of Michelson '376 to be a plate.  Thus, the InterPlate C-P demonstrates nothing other than the existence of another factual dispute.

**The Hynes Patent:** DePuy claims that RSB's expert Dr. Hynes "recognized that a portion of a monolithic interbody device can be considered a plate" in U.S. RE48,058 ("'058 patent"), for which he is a named inventor, but this assertion is contradicted by the record.  Dr. Hynes was not identified as an inventor when the '058 patent originally issued as U.S. Pat. No. 8,885,280 and was not involved in prosecution or the drafting of its specification—he was only added as a named inventor when the patent re-issued over a decade after filing.  (Ex. 20, (Hynes Depo. Tr.) at 84:1-86:22.)  When DePuy attempted to ask Dr. Hynes about the '058 patent's use of the word "plate," Dr. Hynes testified that he had not previously read the patent's specification.  (Hynes Depo. Tr. at 88:16-90:10.)  Furthermore, upon reviewing the specification, Dr. Hynes decidedly did *not* recognize a portion of a monolithic construct as comprising a plate.  (*Id.*)  Notably, none of the '058 patent *claims* (*i.e.*, the basis for adding Dr. Hynes as an inventor) recite a plate.  For DePuy to claim that Dr. Hynes "recognized" anything about the '058 patent's *disclosure*, let alone details regarding its use of the word "plate," is belied by the factual record.  And even if DePuy's

characterization of what it believes Dr. Hynes understood were correct (which it is not), it would not establish that Michelson '376 discloses a base plate, because DePuy fails to explain why the '058 disclosure teaches anything about Michelson '376.  A reasonable jury could conclude that Michelson '376 does not disclose a base plate, notwithstanding the '058 reissue patent.

**RSB's Infringement Allegations Against Xtant:** Finally, DePuy cites RSB's infringement allegations against Xtant for the proposition that a "base plate can be part of a monolithic ring structure." (D.I. 181, at 19.)  This argument is irrelevant.  DePuy's burden is not to show that a base plate *can* be part of a monolithic ring structure, it is to show by clear and convincing evidence that a POSITA would have understood trailing end 104 of Michelson '376 to be a base plate in 2003.  DePuy cites no record evidence—and indeed there is none—showing the Irix device to be probative of a skilled artisan's understanding of Michelson '376.  DePuy's expert did not offer opinions as to the Irix device, and beside noting one superficial similarity, DePuy identifies no basis from which to analogize the Irix implant to Michelson '376.

The implication of DePuy's argument appears to be that RSB cannot assert a different theory of "base plate" in this litigation than the one it asserted against Xtant.  Even if it were true that RSB advances a different theory here—a point that RSB does not concede—DePuy is wrong as a matter of law.  RSB's lawsuit against Xtant settled before any claim construction and well before the conclusion of discovery; the Court "never accepted or adopted" RSB's infringement allegations against Xtant such that RSB is estopped from advancing a different theory, or even an entirely contradictory theory, in this litigation.  *See Montrose Med. Group Participating Sav. Plan v. Bulger*, 243 F.3d 773, 778 (3d Cir. 2001) (citing *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795 (1999)) (holding that judicial estoppel does not apply where a prior suit was settled, and the positions asserted in that suit were never accepted or adopted by the district court).  In short, RSB's

infringement allegations against Xtant have no legal or factual significance to this case, and certainly do not support DePuy's motion for summary judgment.

In sum, the extrinsic evidence cited by DePuy only further confirms that there is a genuine, material factual dispute regarding whether a POSITA would have understood trailing end 104 of Michaelson '376 to be a "plate" as required by this Court's construction of the term "base plate." Accordingly, DePuy's motion for summary judgment of invalidity should be denied.

**B.      DePuy's Summary Judgment Motion for Noninfringement Should be Denied**

**1.      A Material Dispute of Fact Exists as to Whether the Accused Products Fit Primarily Between Anterior Portions of Lip Osteophytes**

In its summary judgment motion for noninfringement of the '537 patent, DePuy sweeps the parties' factual disputes under the proverbial rug.  RSB and its experts have provided explanations as to the dimensions of lip osteophytes, their varied structures and formation patterns across patients, and a surgeon's motivation to fit the Accused Products between anterior portions of lip osteophytes.  This analysis considers real-world patient morphology, informed by Dr. Hynes' clinical perspective.  Dr. Hynes is the only expert in this matter with operating room experience, where he has placed thousands of intervertebral devices in human patients.

In an attempt to ignore the facts relied on by RSB, DePuy argues that no material dispute exists under a conflation of "osteophyte" with "lip osteophyte" (they are not equivalent) and where the Accused Products are placed based on that faulty interpretation.  Its non-surgeon expert drives DePuy's position with an unduly narrow interpretation of a lip osteophyte: an osteophyte or bone spur projecting perpendicularly from a two-dimensional "edge" of the vertebral lip, and where the vertebral lip and lip osteophyte cannot overlap with any of the vertebral side surfaces.  (Cheng Depo. Tr. at 124:25-126:6.)  This conclusion rests, at best, on evidence related to osteophytes and bone spurs, not *lip* osteophytes.  (D.I. 181, at 25 (relying on third party surgeons and surgical

technique guides and their treatment of "osteophytes" and "bone spurs").)  But, as the Court observed, osteophytes and bone spurs are not understood as synonymous with *lip* osteophytes. (D.I. 123, at 9 (While "[i]t is undisputed that 'osteophyte' had a well-known meaning at the relevant time," the term "'[l]ip osteophyte[]' . . . was not used in the literature.").)  The surgical evidence DePuy cites is limited to bone spurs and osteophytes, failing to address osteophytic growth along the vertebral lip or the insertion of bone screws into such bony outgrowth.  (*See* Hynes Reply Rep., ¶¶ 26-27.)

At base, the parties dispute the metes and bounds of a "lip osteophyte" under the Court's construction and whether the Accused Products fit primarily between anterior portions of lip osteophytes.  RSB and its expert recognize, consistent with the Court's construction, (1) that a lip osteophyte can overlap with the vertebral side surface and be formed of hardened bone; (2) that the dimensions of a lip osteophyte and the vertebral lip cannot be reduced to a two-dimensional line or edge; and (3) that the Accused Products are designed to fit primarily between the engorged anterior vertebral lips comprising lip osteophytes formed via bone ossification.  DePuy disputes RSB's factual assertions under its narrow view of what a lip osteophyte is.  (D.I. 181, at 22-25.)

Furthermore, DePuy's opening brief fails to parse out how placement of each Accused Products does not infringe, even though the parties never agreed to a representative product. Tellingly, DePuy omits that the Zero-P VA's placement between anterior portions of adjacent lip osteophytes would satisfy either party's understanding of the claim limitation. As shown below, lateral stops rest on anterior surfaces of adjacent vertebrae, forcing the base plate to situate flush with the anterior limit of the vertebral lips:

 

(Ex. 30 (DEPRSB_00083691 at DEPRSB_00083691-95).)

That DePuy and RSB's experts disagree on the application of the Court's construction to the facts of this case does not entitle DePuy to summary judgment.  Rather, these factual disputes are simply a classic "battle of the experts" for the jury to resolve.  *See, e.g.*, *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1301-02 (Fed. Cir. 2011) (holding that a factual issue for the jury exists where "the claim construction itself is not contested, but the application of that claim construction to the accused device is."); *Leader Techs., Inc. v. Facebook, Inc.*, 770 F. Supp. 2d 686, 701 (D. Del. 2011) ("To the extent [defendant] disagrees with [expert's] application of the Court's claim construction [the Accused Product], that disagreement amounts to a factual dispute which was within the province of the jury to resolve."); *Leader Techs, Inc. v. Facebook, Inc.*, No. 08–862–LPS, 2011 WL 1514701, at *2 (D. Del. Mar. 14, 2011) ("The expert witnesses in this case advanced detailed and plausible, but conflicting, opinions concerning the application of the Court's claim construction to the accused device for infringement purposes . . . .  Such conflicting expert testimony raises genuine issues of material fact that are appropriate for consideration by a jury in the first instance and, hence, preclude summary judgment.").

> **2.   A material fact dispute exists as to whether a "lip osteophyte" can overlap with the vertebral side surface and be formed of hardened bone**

The parties dispute the formation and structure of lip osteophytes.  Dr. Hynes interprets the Court's construction of lip osteophyte as including bone outgrowths that present about the vertebral lip.  (Hypes Op. Rep., ¶¶ 144-45.)  Consistent with the Court's claim construction order,

this bony outgrowth can occur along the entire vertebral lip, with varying thickness, and overlap with portions of the vertebral side surface. (Hynes Reply Rep., ¶¶ 7-12; *see also* D.I. 123, at 9-10.) DePuy disagrees, arguing that RSB and Dr. Hynes' application of the Court's construction is incongruent with DePuy's interpretation of lip osteophyte as a bone spur that must lie on the edge of the cortical shell and endplate, and cannot share any portion of the vertebral side surface.

Dr. Hynes' application of the term lip osteophyte aligns with the Court's claim construction order. He describes patients with lip osteophytes as typically presenting "with bone hardening and bone formation around the entire peripheral edge or lip of the vertebral bone." (Hynes Reply Rep., ¶ 8.) He explains that the "outgrowth of a lip osteophyte typically presents as part of the rim," and is due to "the fact that the cortical bone ossifies and grows from the inside out, starting at the apophyseal ring and working its way out to the outer surface of the vertebral bone." (*Id.*, ¶ 9.)

This understanding of lip osteophyte mirrors the Court's construction of lip osteophyte as a "bony outgrowth at the lip": Dr. Hynes describes bony outgrowth (*e.g.*, "bone formation," "outgrowth") at the lip (*e.g.*, "peripheral edge or lip of the vertebral bone," "presents as part of the rim"). That this outgrowth comprises ossified bone as Dr. Hynes indicates (*e.g.*, "bone hardening," "cortical bone ossifies and grows from the inside out") does not conflict with the Court's construction of lip osteophyte because the construction does not address the question of how a lip osteophyte can or cannot be formed. (*See* D.I. 123.) The Court acknowledges that the lip osteophyte could certainly comprise hard bone, if not "the strongest part of the bone," as repeatedly stated in the shared specification disclosures of the Asserted Patents. (*Id.*, at 10.)

As construed by the Court, and as applied by RSB and Dr. Hynes, "there can be overlap between the lip and the side surface," such that "the three-dimensional 'lip osteophyte' may share

or include a portion of the two-dimensional 'side surface.'" (*Id.*)  Dr. Hynes provides images of

lip osteophytes from one of his patients in his expert report:



(Hynes Reply Rep., ¶ 10.)  As demonstrated in the radiographs from the anterior and lateral sides,

bony outgrowth exists along the vertebral lip that extends along a portion of the lateral and anterior

vertebral surfaces.  Dr. Hynes also provided views of the side surfaces of the L2 and L3 vertebrae

from the perspective of the L2/L3 disc space to show how bony outgrowth along the vertebral

lips—the lip osteophyte—also extends along portions of the vertebral side surfaces in red shading:

 

(*Id.*, ¶¶ 11-12.)  He further explained that he can distinguish lip osteophyte from other bone because

the outgrowth comprises hardened, ossified bone that has degenerated.  (*Id.*, ¶ 10.)

DePuy and its expert Dr. Cheng proffer that "lip osteophyte" comprises: (1) a bone spur on

the vertebral lip that must always grow perpendicular to the "curvilinear" cortical surface of the

vertebrae, never projecting into the disc space or sharing a portion of the side surface (Cheng Depo.

Tr., at 124:25-126:6); and (2) that the vertebral lip comprises a line defined by the points along the

"intersection . . . of both the cortical shell and the endplate," such that it does not overlap with the

anterior or side surfaces (*id.*, at 163:2-10). Dr. Cheng's narrow interpretation of "lip osteophyte" contradicts the Court's construction because it does not allow for the lip osteophyte to share a portion of the side surface, and functionally limits the vertebral lip to a two-dimensional line (*i.e.*, one that can be defined on a cartesian plane) around the vertebrae. (*See* D.I. 179, at 10, 38.)

DePuy further indicates that lip osteophytes cannot be three-dimensional. DePuy dismisses the images provided by Dr. Hynes identifying a lip osteophyte on his patient because "much of [it] is inside the outer shell of the vertebra (anterior portion on top in this view)":



(D.I. 181, at 28.) This criticism cannot be reconciled with an understanding of lip osteophytes as three-dimensional bone structures which, when subject to cross-sectional radiographs, would reveal interior structures. Moreover, as noted by DePuy in its use of the descriptor "much," at least *some* of the lip osteophyte identified by Dr. Hynes is not inside the outer shell of the vertebra but rather extends along its outer surface.

Dr. Hynes also explains in his reply expert report that he provides a series of cross-sectional radiographs at varying distances from the vertebral side surfaces, including images of the cross-section at the surface to demonstrate both the interior and exterior portions of the lip osteophytes. (Hynes Reply Rep., ¶¶ 10-12; Hynes Depo. Tr., at 164:17-165:25.) Exemplars of these images are reproduced below.

| Caudal/Cranial Level of DePuy's Image Selection (D.I. 181, at 28) | Caudal/Cranial Level of Side Surface Cross-Sectional Image, Dr. Hynes' Report (Hynes Reply Rep. ¶11) |
|---|---|
|  |  |

As show in the right image, Dr. Hynes *also* provided cross-sectional imaging of the lip osteophyte along the side surface of the vertebra. The fact that *some* portion of the endplate towards the center of the vertebra extends beyond the line at which the image is taken is of no consequence because the relevant analysis focuses on bony outgrowth occurring at the vertebral lip (*i.e.*, lip osteophyte).

### 3. A material fact dispute exists as to the dimensions of a lip osteophyte

RSB has consistently interpreted lip osteophytes as three-dimensional bony outgrowths along the vertebral lip in both IPR proceedings and this litigation. (*See, e.g.*, D.I. 97 (RSB Amended Op. Cl. Const. Br.), at 9-10 (RSB using "corner area" and "region" to describe the vertebral lip and lip osteophytes).) It has never limited its understanding of lip osteophyte formation to a two-dimensional line along the vertebral lip as DePuy suggests. DePuy's confusion on RSB's position can again be traced back to its failure to appreciate real-world, patient morphology.

It is elementary that a bony outgrowth at the lip with three-dimensional shape is not limited to a two-dimensional line. RSB illustrated this concept in the '537 patent IPR proceedings with an *"example[s] of a simple plan view"* (Ex. 21 (IPR2020-00264, Patent Owner's Response), at 34-35 (emphasis added)), shown below:



These illustrations were intended as helpful tools to generally depict lip osteophyte positioning, understanding that patients present with varying lip osteophyte morphologies. Some patients may present with nascent degeneration and minor lip osteophyte formation. (Hynes Reply Rep., ¶¶ 8-18.) Others with more severe degeneration may present with major lip osteophyte formation that consumes a considerable portion of the side surface. (*Id.*) RSB has always maintained, as DePuy acknowledges, that lip osteophyte comprises a region whose dimensions across patients could not be reasonably and universally represented by a singular line along the vertebral lip.

RSB's IPR illustrations *do* convey that patient lip osteophyte formations *would* all commonly share outgrowth that extend *from* the vertebral lip. This can be readily shown by superimposing RSB's IPR illustrations over a cross-sectional radiograph provided by Dr. Hynes:



Dr. Hynes identifies lip osteophyte forming along the vertebral rim, consistent with RSB's POR.

In sum, the propriety of DePuy's assertion that the Accused Products are not placed between anterior lip osteophytes—because lip osteophytes cannot share a portion of the vertebral side surface—reduces to a material factual dispute between experts on applying the Court's construction to the Accused Products that must be resolved by a jury, not summary judgment.

4.      **A material fact dispute exists as to whether the Accused Products are configured to fit primarily between anterior portions of lip osteophytes**

Discovery revealed considerable evidence that the Accused Products are positioned primarily between anterior portions of lip osteophytes.  This evidence is consistent with RSB's long-standing position that (1) a vertebral lip encircles and can include part of the side surface; (2) lip osteophyte formation occurs along this lip; (3) the vertebral lip can be divided into an anterior and posterior portion; and (4) surgeons would be motivated to place the Accused Products between anterior portions of lip osteophytes.  DePuy's protestations rest on a misunderstanding of RSB's IPR position and evidence related to osteophytes and bone spurs, *not* lip osteophytes.  And its opening brief altogether fails to identify how *each* Accused Product does not infringe—an egregious omission when the parties never stipulated to a representative product.

In his opening report, Dr. Hynes laid out two interpretations of the claim language requiring the base plate to fit primarily between anterior portions of lip osteophytes: (1) a "plan view" perspective; and a (2) "lateral view" perspective.  (Hynes Op. Rep. ¶¶ 149-50.)  The plan view is similar to the simplified plan view representation RSB discussed in IPR proceedings for the '537 patent—*i.e.*, looking at the implant from a caudal/cranial perspective to determine if its base plate sits "mainly at the anterior periphery of the endplates within the disc space."  (*Id.*)  Dr. Hynes provided annotated images for each Accused Product to demonstrate how it satisfies the claim requirements under this view.  (*Id.*, ¶¶ 149, 246, 335, 422, 510.)  For example, he annotated frames from DePuy's training videos to show how the Zero-P implant's placement satisfies this limitation:



(*Id.*, ¶ 246.)

Alternatively, Dr. Hynes also explained how the base plate in each of the Accused Products satisfies this claim limitation when looking at the implant from a lateral perspective.  He again provided annotated images of each of the implanted Accused Products in support of his analysis. (*Id.*, ¶¶ 151, 248, 336, 424, 512.)  The image below is another example, from DePuy's publicly available Zero-P Surgical Technique Guide, showing how Dr. Hynes provided detailed annotations demonstrating how the implant's placement satisfies this limitation:



(*Id.*, ¶248.)  Thus, Dr. Hynes showed that each of the Accused Products are configured to fit primarily between anterior portions of lip osteophytes under either interpretation.

Dr. Hynes' analysis is consistent with RSB's IPR positions.  The simplified plan view from RSB's IPR2020-00264 POR, discussed earlier, depicts the relative locations of the anterior, posterior, lip osteophyte and endplate portions of the vertebrae:



RSB used these illustrations to delineate "anterior portions" and "posterior portions" of the vertebral side surface because "[i]f there were no such posterior portions, the claim language specifying that the base plate fit between the *anterior portions* improperly would be rendered meaningless or superfluous." (IPR2020-00264 POR, 32; *see also id.*, 35.) While the illustrations pointed to "non-lip osteophyte portions" toward the center of the side surface (*id.*, 35), nowhere did RSB represent the metes and bounds of "lip osteophyte" versus "non-lip osteophyte." RSB's experts have repeatedly testified throughout this litigation and the IPRs that lip osteophyte varies by patient morphology. (*E.g.*, Hynes Op. Rep., ¶¶ 144-45; Hynes Reply Rep., ¶¶ 7-12.)

DePuy contends that "[a]s RSB illustrated [in the annotated Fraser '106 figure], only the portions colored in orange sat between the anterior lip osteophytes." (D.I. 181, at 24.) But in the IPR proceedings, RSB highlighted in red those portions of the Fraser '106 implant that were "(i) on <u>posterior</u> portions of lip osteophytes and (ii) <u>not</u> on lip osteophytes":



(*Id.*, at 36.) Neither the annotated image of the Fraser '106 implant, nor RSB's accompanying description, claim that the portion of the implant between lip osteophytes is fixed and cannot vary depending on patient morphology. A lip osteophyte varies in dimension from patient to patient depending on the degree of bone degeneration and outgrowth. (Hynes Reply Rep., ¶¶ 7-12.) Thus, the border between the orange and red shading along the transverse elements below the horizontal

dotted blue line is not fixed but subject to change based on individual patient morphology. But even if the lip osteophytes grew across the entire vertebral side surface such that *all* of the transverse elements below the blue dotted line were shaded in orange, a majority of the implant still would not be *primarily* between anterior portions of adjacent bones' lip osteophytes because about half of Fraser '106 implant would be between the posterior portions of the vertebrae.

To demonstrate the proper application of Court's construction factoring in real-world patient morphologies, Dr. Hynes provided an example of how the Accused Products would be placed along the anterior portion of the lip osteophyte he identified in one of his patients:



(Hynes Reply Rep., ¶ 135.) He explained that the lateral tabs (in green) would also sit between anterior portions of adjacent bones' lip osteophytes. *Id.* Because the bottom surface of the base plate is anterior to the lateral tabs, it would necessarily also sit between lip osteophytes. *Id.* Below is an approximation of the Zero-P implant's placement relative to the lip osteophytes in the above image, aligning the lateral tabs (in green) with the base plate (in orange) anterior to them:



As the image illustrates, the base plate would sit along the anterior edge of the lip osteophyte. DePuy, nevertheless, points to allegedly contrary deposition testimony from Dr. Hynes. But Dr. Hynes' testimony is entirely consistent (or, at minimum, raises a question of fact). During deposition, DePuy provided the annotated image below and, via vague questioning, asked Dr. Hynes whether a base plate sitting where the rectangle is positioned, with only the areas outside of the blue lines comprising lip osteophyte, would still be primarily between lip osteophytes:



(D.I. 181, at 29.) Dr. Hynes answered that such a device would be primarily between lip osteophytes. (Hynes Depo at 135:21-136:16.) But DePuy never asked, and Dr. Hynes never testified, whether his conclusion was based on his understanding of where the bottom surface of the base place would be situated vis-à-vis the lateral tabs or if his conclusions were based on the plan or lateral view interpretation of the claim requirement discussed above.

### 5.   DePuy's arguments exclusively relate to literal infringement and fail to consider RSB's infringement claim under the doctrine of equivalents

DePuy's summary judgment motion fails to consider RSB's infringement claim under the doctrine of equivalents, which "is a question of fact" for the jury, *Lockheed Martin Corp.*, 324 F.3d at 1318, and the local rules prevent it from doing so on reply, L.R. 7.1.3(c)(2) ("The party filing the opening brief shall not reserve material for the reply brief which should have been included in a full and fair opening brief."); *accord Perrigo Co. v. Intl. Vitamin Co.*, No. 1:17-cv-01778, 2019 WL 359991, at *2 n.22 (D. Del. Jan. 29, 2019). Accordingly, DePuy has waived its right to move for summary judgment for noninfringement based on the doctrine of equivalents.

If this Court considers arguments from DePuy on this issue, material disputes of fact exist as to whether the Accused Products infringe the '537 patent under the doctrine of equivalents. DePuy ignores RSB's claim that if the Accused Products do not fit primarily between portions of adjacent vertebral bones' lip osteophytes (which they do), they nevertheless infringe the '537 patent under the doctrine of equivalents. The Federal Circuit has held that the doctrine of equivalents presents a fact-intensive inquiry that often may not be proper for summary judgment. *Leggett & Platt, Inc. v. Hickory Springs Mfg. Co.*, 285 F.3d 1353, 1360 (Fed. Cir. 2002) ("Because infringement under the doctrine of equivalents often presents difficult factual determinations, a summary conclusion that a reasonable jury could not find infringement is often illusive."); *accord Vehicular Techs. Corp. v. Titan Wheel Int'l, Inc.*, 212 F.3d 1377, 1381 (Fed. Cir. 2000).

RSB has provided considerable evidence demonstrating that if Accused Products do not infringe literally, they do so under the doctrine of equivalents. For example, RSB's infringement contentions for the Zero P implant cite the implant's surgical technique guide and internal DePuy documents that highlight, *inter alia*, that "[t]he ZERO-P Spacer does not extend beyond the confines of the intervertebral disc space," and that ████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████████████." (Ex. 22 (Zero-P 2nd Supp. Infring. Conts.), 5-13 (excerpting Ex. 27 and 28).) RSB provided comparable evidence in its infringement contentions for each of the other Accused Products. (Ex. 23 (Zero-P Natural 2nd Supp. Infring. Conts.), 5-13; Ex. 24 (Zero-P VA 2nd Supp. Infring. Conts.), 4-12; Ex. 25 (SynFix-LR 2nd Supp. Infring. Conts.), 6-9; Ex. 26 (SynFix Evolution 2nd Supp. Infring. Conts.), 8-12.)

Dr. Hynes similarly explained in his opening report that the Accused Products would infringe the claim limitation under the doctrine of equivalents because any difference in placement

is insubstantial, and the devices perform substantially the same function, in substantially the same way, to achieve substantially the same result.  (Hynes Op. Rep., ¶¶ 153-54, 250-51, 338-39, 426-27, 514-15.)  A POSITA would understand that the "function" of configuring a base plate to fit primarily between anterior portions of adjacent vertebral bones' lip osteophyte is to ensure (1) a flush profile along the anterior surface of the vertebra to avoid irritation, and (2) that the base plate engages adjacent vertebrae to facilitate fusion of the bone graft material.  *Id.*, ¶¶ 155, 252, 340, 428, 516.  These advantages are the same as those listed by the '537 patent for placing the base plate between anterior portions of adjacent bones' lip osteophytes.  ('537, 5:13-23, 12:40-45, 21:19-28.)  The Accused Products achieve this in substantially the same way, by sitting at the anterior periphery of adjacent vertebrae.  (Hynes Op. Rep., ¶¶ 156, 253, 341, 429, 517.)  And the Accused Products obtain substantially the same result as the claimed invention by achieving a minimal anterior profile while also facilitating fusion.  (*Id.*, ¶¶ 157, 254, 342, 430, 518.)

Dr. Cheng, DePuy's expert, failed to address Dr. Hynes' analysis regarding the insubstantial differences test, and inadequately rebuts Dr. Hynes' application of the function-way-result test.  (Ex. 29 (Cheng Rebuttal Rep.), ¶¶ 45-46, 89, 106, 130, 180, 214.)  Dr. Cheng does not dispute Dr. Hynes' analysis that the Accused Products are placed flush, or at most three millimeters recessed, with the anterior periphery of adjacent vertebrae to limit tissue irritation and engage optimal bone to facilitate fusion.  (*E.g.*, Hynes Reply Rep., ¶¶ 31-33.)  Rather, Dr. Cheng improperly rests his rebuttal on a ***legal*** conclusion that the doctrine of equivalents cannot apply, even if the Accused Products perform the same function, in the same way, to achieve the same result in the absence of a lip osteophyte.  (Cheng Rebuttal Rep., ¶¶ 45-46, 89, 106, 130, 180, 214.)

## V.   CONCLUSION

For these reasons, RSB requests that the Court deny DePuy's motion for partial summary judgment.

Respectfully submitted,

Dated: July 21, 2022

/s/ David A. Bilson
John C. Phillips, Jr. (#110)
David A. Bilson (#4986)
PHILLIPS, MCLAUGHLIN & HALL, P.A.
1200 North Broom Street
Wilmington, DE 19806
(302) 655-4200
jcp@pmhdelaw.com
dab@pmhdelaw.com

OF COUNSEL:

Erik B. Milch
Dustin M. Knight
COOLEY LLP
11951 Freedom Drive
One Freedom Square
Reston, VA 20190-5656
(703) 456-8000

Bonnie Fletcher Price
COOLEY LLP
1299 Pennsylvania Avenue NW, Suite 700
Washington, DC 20004
(202) 842-7800

Joseph M. Drayton
COOLEY LLP
55 Hudson Yards
New York, NY 10001
(212) 479-6000

Reuben Chen
Elizabeth Stameshkin
David Murdter
Juan Pablo González
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304-1130
(650) 843-5000

Attorneys for Plaintiff RSB Spine, LLC