IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| RSB SPINE, LLC,<br><br>    Plaintiff/Counter-Defendant,<br><br>v.<br><br>DEPUY SYNTHES SALES, INC., and<br>DEPUY SYNTHES PRODUCTS, INC.,<br><br>    Defendants/Counter-Plaintiffs. | Civil Action No. 19-01515-RGA |

MEMORANDUM OPINION

John C. Phillips, Jr., David A. Bilson, PHILLIPS, MCLAUGHLIN & HALL, P.A., Wilmington, DE; Bonnie Fletcher Price, Dustin M. Knight, Jennifer Volk-Fortier, COOLEY, LLP, Washington, D.C.; Reuben H. Chen, Juan Pablo Gonzalez, Elizabeth L. Stameshkin, COOLEY, LLP, Palo Alto, CA; Frank Pietrantonio, COOLEY, LLP, Reston, VA; Erik B. Milch, PROSKAUER ROSE, LLP, Washington, D.C.,

    Attorneys for Plaintiff/Counter-Defendant.

John G. Day, Andrew C. Mayo, ASHBY & GEDDES, Wilmington, DE; Calvin P. Griffith, Kenneth S. Luchesi, Patrick J. Norton, Robert Breetz, T. Kaitlin Crowder, Thomas S. Koglman, JONES DAY, Cleveland, OH,

    Attorneys for Defendant/Counter-Plaintiff.

January 7, 2025

ANDREWS, U.S. DISTRICT JUDGE:

Before me is the issue of claim construction of two terms in U.S. Patent No. 7,846,207 ("the '207 patent") (D.I. 309 at 4–17 of 141, Ex. 1). The parties submitted a Joint Claim Construction Chart (D.I. 303) and Joint Interference Claim Construction Brief. (D.I. 308). I heard oral argument on November 21, 2024. (D.I. 325). I have considered the briefing and oral argument.

I. BACKGROUND

RSB Spine asserted claims of infringement of U.S. Patent No. 9,713,537 ("the '537 patent") against DePuy.[1] (D.I. 10 at 1). DePuy asserted an interference counterclaim between the '537 patent and its own patent, U.S. Patent No. 7,846,207 ("the '207 patent"), in an amended answer (D.I. 16 at 39–42)[2] and again in a second amended answer. (D.I. 41 at 46–55). RSB Spine filed a motion for summary judgment of no interference. (D.I. 174). I deferred a decision on that summary judgment motion until after the jury trial. (D.I. 218).

At trial, a jury rendered a verdict for RSB Spine, finding the '537 patent not invalid and finding infringement by DePuy. (D.I. 276). Following the trial, I determined that the interference issue needed to be resolved before entry of a final judgment. (D.I. 292). RSB Spine filed a motion to dismiss the interference counterclaim as moot in view of arguments and evidence presented at trial. (D.I. 297). I denied RSB Spine's motion to dismiss the interference counterclaim as to the '537 patent. (D.I. 311).

---

[1] Plaintiff also asserted infringement of U.S. Patent No. 6,984,234 ("the '234 patent"). I found the asserted claims of the '234 patent invalid as anticipated at summary judgment. (D.I. 236).
[2] I dismissed Defendant's interference counterclaim as to the '234 patent as moot. (D.I. 311 at 2).

DePuy's '207 patent relates to intervertebral implants. ('207 patent at 1:13–14). The priority date of the '207 patent appears to be February 6, 2003. ('207 patent at 1:7; D.I. 16 at 36, ¶ 23).

I have scheduled a trial on the interference claim. I need to resolve two claim construction disputes for terms in the '207 patent.

## II.   LEGAL STANDARD

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (internal quotation marks omitted). "'[T]here is no magic formula or catechism for conducting claim construction.' Instead, the court is free to attach the appropriate weight to appropriate sources 'in light of the statutes and policies that inform patent law.'" *SoftView LLC v. Apple Inc.*, 2013 WL 4758195, at *1 (D. Del. Sept. 4, 2013) (alteration in original) (quoting *Phillips*, 415 F.3d at 1324). When construing patent claims, a court considers the literal language of the claim, the patent specification, and the prosecution history. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 977–80 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). Of these sources, "the specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1315 (internal quotation marks omitted). "While claim terms are understood in light of the specification, a claim construction must not import limitations from the specification into the claims." *Deere & Co. v. Bush Hog, LLC*, 703 F.3d 1349, 1354 (Fed. Cir. 2012) (citing *Phillips*, 415 F.3d at 1323).

"[T]he words of a claim are generally given their ordinary and customary meaning. . . . [Which is] the meaning that the term would have to a person of ordinary skill in the art in

3

question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1312–13 (citations and internal quotation marks omitted). "[T]he ordinary meaning of a claim term is its meaning to [an] ordinary artisan after reading the entire patent." *Id.* at 1321 (internal quotation marks omitted). "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314.

When a court relies solely upon the intrinsic evidence—the patent claims, the specification, and the prosecution history—the court's construction is a determination of law. *See Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 331 (2015). The court may also make factual findings based upon consideration of extrinsic evidence, which "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Phillips*, 415 F.3d at 1317–19 (quoting *Markman*, 52 F.3d at 980). Extrinsic evidence may assist the court in understanding the underlying technology, the meaning of terms to one skilled in the art, and how the invention works. *Id.* Extrinsic evidence, however, is less reliable and less useful in claim construction than the patent and its prosecution history. *Id.*

## III.   CONSTRUCTION OF DISPUTED TERMS

The parties agree that Claim 1 of the '207 patent is representative for the purpose of claim construction.[3] That claim states:

> 1. An intervertebral implant for insertion into an intervertebral disc space between endplates of adjacent vertebral bodies, the implant comprising:

---

[3] Claims 2 through 37 are dependent on Claim 1. ('207 patent at 6:59–8:46).

> a ***three-dimensional body*** having an upper side and an underside provided with teeth, the upper side and underside suitable for abutting the end plates of the adjacent vertebral bodies, the upper side defining an upper plane and the underside defining an underside plane, a left side surface and a right side surface, a front surface including first and second partial boreholes, a rear surface, a horizontal middle plane between the upper side and the underside, and a vertical middle plane extending from the front surface to the rear surface;
>
> a front plate mounted to the front surface of the three-dimensional body, the front plate including a first borehole and a second borehole having openings, the first borehole and the second borehole each being aligned with a respective first and second partial borehole;
>
> ***first and second fixation elements*** being anchorable within the first and second boreholes and the first and second partial boreholes, respectively, the first and second fixation elements ***having first and second heads and first and second shafts***, respectively, the first and second heads and the first and second boreholes and partial boreholes positioned substantially between the upper and underside planes in an assembled configuration, the first and second shafts being positioned substantially on an opposite side of the upper and underside planes, respectively, in the assembled configuration; and
>
> a securing plate fastened substantially parallel to the front plate in such a manner that the first and second boreholes of the front plate and the first and second heads are covered at least partly by the securing plate.

('207 Patent at 6:25–58 (disputed terms bolded and italicized)).

### 1. "three-dimensional body"

    a. *DePuy's proposed construction*: Plain and ordinary meaning, which is "an object that exists in three dimensions, *i.e.*, length, width, and height"
    b. *RSB Spine's proposed construction*: "a cage that absorbs all of the compressive load from adjacent vertebral bodies after implantation"
    c. *Court's construction*: Plain and ordinary meaning

The parties dispute whether the "three-dimensional body" must be in the form of a "cage." The parties also dispute whether the "three-dimensional body" must absorb 100% of the compressive load exerted on the implant after implantation.

5

### i. Cage

DePuy argues that "three-dimensional body" has a plain and ordinary meaning: "an object that exists in three dimensions, *i.e.*, length, width, and height." (D.I. 308 at 12). DePuy points out that the claim language further describes the three-dimensional body and its features, which limits the term's breadth. (D.I. 308 at 12–13; '207 patent at 6:29–38). RSB Spine argues that all real-world objects are three-dimensional and the "incredible breadth" of the term precludes it from having a customary meaning. (D.I. 308 at 17–18). RSB Spine argues the additional descriptive language in Claim 1 provides no more clarity, reciting only "what all planar three-dimensional objects would have." (D.I. 308 at 18). RSB Spine contends that the limitations of "teeth" and "partial boreholes" are "untethered to the ordinary meaning" of "three-dimensional body" proposed by DePuy. (D.I. 308 at 18).

RSB Spine argues that, because there is no ordinary meaning, "three-dimensional body" should not be "construed broader than its disclosure in the specification." (D.I. 308 at 17–18). Accordingly, RSB Spine argues that the term should be limited to a "cage," as described in the description of preferred embodiments in the specification. (D.I. 308 at 18–19; '207 patent at 3:13–14). DePuy argues that "cage" is narrower than "three-dimensional body" and RSB Spine's construction would "exclude other three-dimensional bodies like spacers." (D.I. 308 at 24–25). Both parties cite quotes from the inventors suggesting that a "cage" and a "spacer" are not necessarily the same thing, though they are in disagreement about what each term encompasses. (D.I. 308 at 27; D.I. 325 at 54–55).

"In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases

6

involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314. This is such a case.

"Cage" only appears one time in the specification, and that is in the description of the preferred embodiments. ('207 patent at 3:13–14 ("The intervertebral implant . . . includes a three-dimensional body in the form of a cage . . .")). The specification also states, "The body may be constructed as a hollow body," and Claim 22 discloses a version of the implant from Claim 1 "wherein the three-dimensional body is constructed as a hollow body." ('207 patent at 3:23, 7:57–58). This language indicates that the patent contemplates both hollow and non-hollow variants. *See Phillips*, 415 F.3d at 1315 (citing *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004) ("[T]he presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim.")). RSB Spine contends that a "cage" does not necessarily have to be hollow. (D.I. 308 at 34). If that were the case, I fail to see how "cage" provides any more clarity than "three-dimensional body," at least when "three-dimensional body" is considered in the context of the specification and surrounding claim language of Claim 1.

"While claim terms are understood in light of the specification, a claim construction must not import limitations from the specification into the claims." *Deere*, 703 F.3d at 1354 (citing *Phillips*, 415 F.3d at 1323). Construing "three-dimensional body" as "cage" would import a limitation from the preferred embodiment in the specification into the claims.

I agree with DePuy's construction. I find that "three-dimensional body" has a plain and ordinary meaning understandable to a POSITA and to lay-persons.

### ii. Compressive load

A sentence in the Summary of the Invention section of the '207 patent states, "The load is still absorbed under compression by the intervertebral implant and not by the front plate or the fixation screws (longitudinal fixation elements)." ('207 patent at 2:30–32). RSB Spine notes that, other than the front plate and fixation elements, "there is no other component to bear compressive load except the claimed three-dimensional body." (D.I. 308 at 21 n.2). RSB argues that this sentence indicates that the three-dimensional body bears 100% of the compressive load exerted on the implant. (D.I. 308 at 20–21). DePuy points out that Claim 1 "makes no mention of anything absorbing any compressive load" and neither does any other claim. (D.I. 308 at 15). DePuy argues that RSB Spine's construction would inappropriately "import the potential advantages of an invention into the claims when the advantages are not recited in the claims." (D.I. 308 at 16).

DePuy cites statements from the experts of both parties that components other than the three-dimensional body (the plate and longitudinal fixation elements) bear weight or compressive force in the SynFix-LR—the real-world embodiment of the '207 patent. (D.I. 308 at 16; *see* D.I. 309 at 85 of 141, Ex. 9; D.I. 289 at 70–72 of 252). RSB Spine's expert, Dr. Drewry, stated that his opinion that the plate bore weight was "supported by the laws of physics." (D.I. 309 at 85 of 141, Ex. 9). DePuy argues, "Drewry was unable to explain how, under the laws of physics, it would be possible to have no indirect transference of compressive load to the plate through rigidly connected screws, such as those described in the '207 patent." (D.I. 308 at 17 (citing D.I. 309 at 91–93 of 141, Ex. 10)). DePuy argues, "[T]he specification's disclosure of rigid and non-rigid embodiments suggests that in some embodiments the bone screws and/or front plate would absorb some compressive loads[.]" (D.I. 308 at 31–32).

8

RSB Spine argues that the features of a commercial embodiment are extrinsic evidence and entitled to little weight in the construction of a patent. (D.I. 308 at 22–23). RSB Spine argues, "The type of connection may affect the distribution of non-compressive loads within the plate (*e.g.* tensile loads), but that is irrelevant to whether the 'three-dimensional body' bears all of the compressive load from adjacent vertebrae." (D.I. 308 at 37). DePuy asserted at oral argument that the fixation elements, or screws, experience "multiple vectors" of force, one of which is "transferring a compressive force load." (D.I. 325 at 20). Accordingly, if the screws bear some compressive force, the three-dimensional body does not bear all of the compressive force.

The sentence in the patent RSB Spine points to occurs in a paragraph comparing the invention to two-part implants and reciting advantages of the "present invention." ('207 patent at 2:22). The paragraph states that, even though the implant is "fixed as frontally as possible at the body of the vertebra" where there is "good bone material" and the placement limits "anterior movement," the "load is still absorbed under compression by the intervertebral implant and not by the front plate or the [longitudinal fixation elements]." ('207 patent at 2:21–32).

"The written description part of the specification itself does not delimit the right to exclude. That is the function and purpose of the claims." *Markman*, 52 F.3d at 980. "[T]he specification may reveal an intentional disclaimer, or disavowal, of claim scope by the inventor . . . and the inventor's intention, as expressed in the specification, is regarded as dispositive." *Phillips*, 415 F.3d at 1316. However, "[t]o constitute disclaimer, there must be a clear and unmistakable disclaimer." *Thorner v. Sony Comput. Ent. Am. LLC*, 669 F.3d 1362, 1366–67 (Fed. Cir. 2012). RSB Spine cites *C.R. Bard* for its contention that the Summary of the Invention should be given particular weight (D.I. 308 at 22), but that case also states that the

9

"import to give language from the specification must . . . be determined on a case-by-case basis." *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 864 (Fed. Cir. 2004).

Claim 1 does not mention compressive load or compression or weight. ('207 patent at 6:25–58). Some embodiments of the invention include rigid connections between the fixation elements and the front plate of the implant. ('207 patent at 3:52–63). As DePuy explained at oral argument, the fixation elements anchor into vertebrae above and below the implant. The vertebrae then settle, "push[ing] into the teeth," and exert compressive force onto the implant. (D.I. 325 at 24). RSB Spine's expert, Drewry, appeared to opine on physics generally, not just about the real-world embodiment, stating a "screw that is rigidly attached to a plate has an axial compressive force acting on it . . . and at the same time the compressive load is being transferred across the length of the screw to the screw/plate interface." (D.I. 309 at 82 of 141, Ex. 9).

Given the placement of the sentence at issue within a discussion of advantages of the invention over prior art, the absence of any discussion of compressive load or compression anywhere else in the patent, and the parties' experts' opinions on the laws of physics and forces exerted on spinal implants, I find that this sentence in the Summary of the Invention is not a "clear and unmistakable disclaimer" of claim scope. *Thorner*, 669 F.3d at 1366–67. The three-dimensional body may receive a large portion of the compressive load exerted on the implant, but it is improper to import a limitation of "all of the compressive load" into the claim construction.

2. **"first and second fixation elements [. . . having first and second heads and first and second shafts]"**

   a. *DePuy's proposed construction*: Plain and ordinary meaning.[4] Alternatively, if the court finds that the term is subject to § 112 ¶ 6:

---

[4] DePuy proposes that the term to be construed includes the words enclosed in brackets.

10

>  **Function:** "being anchorable within the first and second boreholes of the front plate and the first and second partial boreholes of the three-dimensional body"
> **Structure identified in the specification:** "bone screws, threadless cylindrical pins, spiral springs, single-vaned spiral blades, and multi-vaned spiral blades"
>
> b. *RSB Spine's proposed construction*: Governed by § 112 ¶ 6
> **Function:** "to anchor within the first and second boreholes of the front plate and the first and second partial boreholes of the three-dimensional body"
> **Structure identified in the specification:** "smooth head bone screws, conical head bone screws, threadless cylindrical pins, spiral springs, single-vaned spiral blades, and multi-vaned spiral blades that do not absorb compressive load from vertebrae adjacent the intervertebral implant after insertion"
> Alternatively, if not governed by § 112 ¶ 6, "smooth head bone screws, conical head bone screws, threadless cylindrical pins, spiral springs, single-vaned spiral blades, and multi-vaned spiral blades that do not absorb compressive load from vertebrae adjacent the intervertebral implant after insertion"
>
> c. *Court's construction*: Not governed by § 112 ¶ 6. "Fixation element" is construed as "anchorable element having a head, a shaft, a tip and an axis" and includes bone screws, threadless cylindrical pins with a drilling tip, spiral springs, single-vaned spiral blades, and multi-vaned spiral blades.

The parties dispute whether Claim 1 contains a means-plus-function claim limitation, whether "fixation element" must be limited to the embodiments in the specification if section 112 ¶ 6 does not apply, and whether the "fixation elements" cannot absorb any of the compressive load after implantation.

### i.   Section 112 ¶ 6[5] means-plus-function claiming

Section 112 paragraph 6 provides:

An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

---

[5] Pre-AIA section 112 ¶ 6 contains the same language as post-AIA section 112(f).

11

35 U.S.C. § 112 ¶ 6 (2012) (current version at 35 U.S.C. § 112(f)).

DePuy states that section 112 ¶ 6 presumptively does not apply because Claim 1 does not contain the word "means." (D.I. 308 at 39). DePuy argues that the phrase "'First and second fixation elements . . . having first and second heads and first and second shafts' is plainly structural and does not merely recite function." (D.I. 308 at 39). DePuy argues the claim language is sufficiently definite to be understood by a POSITA as denoting structure. (D.I. 308 at 39). DePuy contends that RSB Spine's construction improperly construes "fixation elements" out of context of the claim. (D.I. 308 at 39).

RSB Spine argues that "element" is a "nonce term" and is described using functional language (i.e. "anchorable within"). (D.I. 308 at 42–43). RSB claims that the recited function required for section 112 ¶ 6 to apply is "to anchor." (D.I. 325 at 69–72). RSB Spine argues that "a broad range of head and shaft configurations are available that may or may not anchor" and that DePuy's proposed "structure" of having heads and shafts is insufficient to perform the anchoring function. (D.I. 308 at 43). DePuy denies that "being anchorable" requires a "specific level of fixation that shafts with heads cannot perform[.]" (D.I. 308 at 48). DePuy argues that a POSITA would have the "common sense to know which heads and shafts would and would not perform the anchoring function" and RSB Spine does not present evidence to suggest otherwise. (D.I. 308 at 48).

Should section 112 ¶ 6 apply, the parties do not "materially dispute" the anchoring function of the "fixation elements." (D.I. 308 at 40, 44).

Section 112 ¶ 6 is an exception to the general rule that courts should "avoid importing limitations from the specification into the claims." *Phillips*, 415 F.3d at 1323. A claim limitation does not trigger section 112 ¶ 6 if "the words of the claim are understood by persons of

12

ordinary skill in the art to have a sufficiently definite meaning as the name for structure." *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1349 (Fed. Cir. 2015) (citing *Greenberg v. Ethicon Endo-Surgery, Inc.*, 91 F.3d 1580, 1583 (Fed. Cir. 1996)).

The absence of the word "means" in a claim limitation creates a rebuttable presumption that section 112 ¶ 6 does not apply. *Zeroclick, LLC v. Apple Inc.*, 891 F.3d 1003, 1007 (Fed. Cir. 2018) (citing *Williamson*, 792 F.3d at 1348). This presumption can be overcome when "the claim term fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function." *Williamson*, 792 F.3d 1339, 1348 (citing *Watts v. XL Sys., Inc.*, 232 F.3d 877, 880 (Fed. Cir. 2000)) (cleaned up). Accordingly, section 112 ¶ 6 may apply to claims containing "nonce words" other than "means." *Williamson*, 792 F.3d at 1350. However, "[c]laim language that further defines a generic term . . . can sometimes add sufficient structure to avoid 112 ¶ 6." *Mass. Inst. of Tech. v. Abacus Software*, 462 F.3d 1344, 1354 (Fed. Cir. 2006).

Claim 1 does not contain the word "means." ('207 patent at 6:44). Therefore, presumptively, section 112 ¶ 6 does not apply. *Zeroclick*, 891 F.3d at 1007. "Element" can be a nonce word. *Williamson*, 792 F.3d at 1350. However, unlike the claim language in *Williamson*, in which the limitation recited a nonce word ("module") followed by "three functions performed by" the module ("for receiving . . . , for relaying . . ., and for coordinating"), Claim 1 is not written in "a format consistent with traditional means-plus-function claim limitations." *Williamson*, 792 F.3d at 1350. The language of Claim 1 ("being anchorable") instead reads as a characteristic of the "fixation elements" rather than their function.

Assuming that "being anchorable" or "to anchor" is the function of the "fixation elements," "the fact that a particular mechanism . . . is defined in functional terms is not

13

sufficient to convert a claim element containing that term into a 'means for performing a specified function' within the meaning of section 112(6)." *Greenberg*, 91 F.3d at 1583 (holding "detent mechanism" did not trigger section 112 ¶ 6 though the term has functional connotations). Even if a functional term "does not call to mind a single well-defined structure . . . [w]hat is important is not simply that" the term "is defined in terms of what it does, but that the term, as the name for a structure, has a reasonably well understood meaning in the art." *Id.*

I agree with RSB Spine that heads and shafts alone do not provide sufficient structure for "fixation elements" to perform the function of anchoring into bone. Experts on both sides appear to agree that the phrase "fixation elements" alone does not have an accepted plain and ordinary meaning in the field of spinal implants. (D.I. 309 at 134–35 of 141, Ex. 15; D.I. 309 at 61 of 141, Ex. 6). But Claim 1 contains more. *See Mass. Inst. of Tech*, 462 F.3d at 1354. As in *Phillips*, "the claims and the specification unmistakably establish" that the fixation elements "refer to a particular physical apparatus." *Phillips*, 415 F.3d at 1311 (holding that "baffles" was not subject to section 112 ¶ 6). Claim 1 requires that the "fixation elements" with "heads" and "shafts" be able to insert into the "boreholes" and "partial boreholes" and anchor into the vertebral bone. In the context of a patent for a spinal implant, as DePuy stated, "You understand that this is something that is fixing the implant in bone." (D.I. 325 at 63). I agree with DePuy that a POSITA would be able to ascertain which devices with heads and shafts available in the spinal implant space would have the requisite structure to anchor into bone.

RSB Spine cites *Cross Medical*, arguing that the Federal Circuit found language similar to the language in Claim 1 to be a means-plus-function claim. (D.I. 325 at 76); *Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293 (Fed. Cir. 2005). But the claim in *Cross Medical* included the word "means." *Cross Medical*, 424 F.3d at 1299 ("A fixation

device . . . comprising: at least two anchors and an elongated stabilizer comprising a rod having a diameter and a longitudinal axis, said anchors each comprising *anchoring means* which secure said anchors to said bone segment . . .") (emphasis in original). The opposite presumption—one in favor of section 112 ¶ 6—applied in *Cross Medical. Id.* at 1303. Here, in contrast, RSB Spine must overcome a presumption that section 112 ¶ 6 does not apply. RSB Spine does not provide sufficient evidence to do so.

Therefore, I find that section 112 ¶ 6 does not apply to Claim 1 for the proposed function of "being anchorable."

### ii. Terms with no ordinary meaning

A claim term "may be a 'coined term' that lacks an ordinary and customary meaning in the field." *Facebook, Inc. v. BlackBerry Ltd.*, 2019 WL 6828359, at *9 (N.D. Cal. Dec. 13, 2019). Coined terms "ordinarily cannot be construed broader than the disclosure in the specification." *Indacon, Inc. v. Facebook, Inc.*, 824 F.3d 1352, 1357 (Fed. Cir. 2016) (citing *Irdeto Access, Inc. v. Echostar Satellite Corp.*, 383 F.3d 1295, 1300 (Fed. Cir. 2004)). However, "simply because a phrase as a whole lacks a common meaning does not compel a court to abandon its quest for a common meaning and disregard established meanings of the individual words." *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1372 (Fed. Cir. 2003).

RSB Spine asserts that "fixation elements" has no accepted ordinary meaning and that inclusion of the terms "heads" and "shafts" in the claim language does not confer an ordinary meaning. (D.I. 308 at 42). RSB Spine cites DePuy's expert's deposition testimony that "fixation element" does not have a plain and ordinary meaning in the spinal fusion field. (D.I. 308 at 42 (citing D.I. 309 at 134–35 of 141, Ex. 15)). DePuy points out that its expert (Cheng) and RSB's expert (Drewry) only addressed the phrase "fixation element" in the abstract, not the actual claim

15

limitation, which includes "heads and shafts." (D.I. 308 at 46 (citing D.I. 309 at 61 of 141, Ex. 6; *id.* at 134–35 of 141, Ex. 15)). When asked about the term in view of the '207 patent's specification, DePuy notes that its expert said a POSITA would understand the meaning of "fixation elements." (D.I. 308 at 46 (citing D.I. 309 at 112–13 of 141, Ex. 12)). RSB Spine counters that DePuy's expert "only understood the scope of 'fixation elements' by examining examples of corresponding structure in the specification." (D.I. 308 at 52).

"Patents should be interpreted on the basis of their intrinsic record, not on the testimony of such after-the-fact 'experts' that played no part in the creation and prosecution of the patent." *Bell & Howell Doc. Mgmt. Prods. Co. v. Altek Sys.*, 132 F.3d 701, 706 (Fed. Cir. 1997). "[R]eliance on extrinsic evidence to interpret claims is proper only when the claim language remains genuinely ambiguous after consideration of the intrinsic evidence[.]" *Id.* (citing *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1584 (Fed. Cir. 1996)). Nevertheless, given the expert testimony, I agree with RSB Spine that the term "fixation elements" alone is ambiguous and does not have a plain and ordinary meaning to a POSITA. "Where a claim term has no ordinary and customary meaning, a court must resort to the remaining intrinsic evidence—the written description and the prosecution history—to obtain the meaning of that term." *Goldenberg v. Cytogen, Inc.*, 373 F.3d 1158, 1164 (Fed. Cir. 2004). The claims themselves are part of the written description. The term "fixation elements" does not stand in isolation. In the context of Claim 1, a fixation element is described has having a "head" and a "shaft" and as "being anchorable" within "boreholes" in a particular configuration. ('207 patent at 6:44–54). Additionally, the specification describes the "longitudinal fixation elements" as "introduced into the boreholes" and having "a head, a tip, a shaft and an axis." ('207 patent at 5:9–11). "Bone screws," "threadless cylindrical pins . . . with a drilling tip," "spiral springs,"

16

and "single-vaned or multi-vaned spiral blades" are potential embodiments of the broader category of "longitudinal fixation elements," with "bone screws" as the preferred embodiment. ('207 patent at 5:8–9, 28–34).

I find that "fixation element" is not limited to the list of embodiments in the specification, but construe "fixation element" to be an anchorable element, including a head, a tip, a shaft, and an axis. "Fixation elements" include bone screws, threadless cylindrical pins with a drilling tip, spiral springs, single-vaned spiral blades, and multi-vaned spiral blades.

### iii. No compressive load

The parties' arguments concerning the compressive load borne by the "fixation elements" parallel their arguments about the compressive load borne by the "three-dimensional body." In some embodiments, the fixation elements form a rigid connection with the implant, potentially transferring load comprised of a variety of force vectors. Some of these force vectors may be compressive. Accordingly, I agree with DePuy that the fixation elements are not prohibited from bearing any of the compressive load.

## IV. CONCLUSION

Within five days the parties shall submit a proposed order consistent with this Memorandum Opinion.